# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JACK P. KATZ, on behalf of himself and all others similarly situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) ) | FILED: JULY 16, 2008<br>08CV4035 |
| ERNEST A. GERARDI, JR., RUTH ANN M. GILLIS, NED S. HOLMES, ROBERT P. KOGOD, JAMES H. POLK III, JOHN C. SCHWEITZER, R. SCOT SELLERS, ROBERT H. SMITH, STEPHEN R. DEMERITT, CHARLES MUELLER, JR., CAROLINE BROWER, MARK SCHUMACHER, ALFRED G. NEELY, ARCHSTONE-SMITH OPERATING TRUST, ARCHSTONE-SMITH TRUST, LEHMAN BROTHERS HOLDINGS, INC., AND TISHMAN SPEYER DEVELOPMENT CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JUDGE DARRAH<br>MAGISTRATE JUDGE ASHMAN<br><br>PH |
| Defendants. | ) | |

## NOTICE OF REMOVAL

Defendants Archstone (formerly Archstone-Smith Operating Trust) (the "Archstone UPREIT"), Tishman Speyer Archstone-Smith Multifamily Series I Trust (successor by merger to Archstone-Smith Trust) (the "Archstone REIT"), Lehman Brothers Holdings Inc. ("Lehman"), and Tishman Speyer Development Corporation ("TSD") (collectively, "Defendants") hereby remove to this Court the state court action described below.

1.      On May 9, 2008, Plaintiff Jack Katz ("Plaintiff" or "Katz") filed the above-captioned putative class action in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. *Jack P. Katz v. Ernest A. Gerardi, Jr., Ruth Ann M. Gillis, Ned S. Holmes,*

*Robert P. Kogod, James H. Polk III, John C. Schweitzer, R. Scot Sellers, Robert H. Smith, Stephen R. Demeritt, Charles Mueller, Jr., Caroline Brower, Mark Schumacher, Alfred G. Neely, Archstone-Smith Operating Trust, Archstone-Smith Trust, Lehman Brothers Holdings, Inc., and Tishman Speyer Development Corporation,* Circuit Court of Cook County, Illinois No. 08 CH 17172 (the "*Katz* Action").

2.     Approximately six months prior, on November 30, 2007, another two members of the same putative plaintiff class alleged here, Steven Stender and Infinity Clark Street Operating (collectively, "Stender"), *represented by identical counsel as Katz here*, filed a parallel action to the *Katz* Action in the United States District Court for the District of Colorado. *See Stender et al. v. Cardwell et al.*, No. 07-cv-2503 (D. Colo. 2007) (the "*Stender* Action"). In that action, Stender invoked the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005) (the "CAFA"), as the basis for that case to be heard in federal court.

3.     Both the *Katz* Action here and the *Stender* Action pending in Colorado are based on the same factual allegations. Both Katz and Stender allege that the Prospectus and Registration Statement issued by Defendants ("Prospectus") in connection with their agreement to take the publicly held Archstone REIT private (the "Merger") "coerced" them and other putative class members to sell or exchange certain non-publicly traded securities related to the Archstone REIT for cash or other non-publicly traded securities, respectively. The most meaningful difference between the *Katz* and *Stender* Actions is their respective causes of action: Katz has alleged federal securities laws claims based on the Securities Act of 1933 (the "1933 Act") in Illinois state court, and Stender has alleged certain state law causes of action, but no federal causes of action, in the District of Colorado.

4.      The *Katz* Action is an attempt at forum shopping to avoid further proceedings in the Colorado District Court.  Stender's and Katz's counsel could have brought this 1933 Act claim on behalf of the purported class in the Colorado District Court.  Indeed, counsel indicated to the Colorado District Court in the *Stender* Action that counsel contemplated bringing "federal securities claim[s]" in the *Stender* Action.  (Transcript of Feb. 12, 2008 hearing in the *Stender* Action, attached hereto as Exhibit A).  Despite the factual similarity between the *Stender* and *Katz* Actions, and despite counsel's statements to the Colorado District Court, counsel for Stender and Katz filed Katz's 1933 Act claims in Illinois state court.

5.      Moreover, Katz's facially improper 1933 Act claims are an obvious effort to evade federal court jurisdiction.  While Katz alleges that he *sold* his interest in the Archstone UPREIT for *cash* (Compl. ¶ 12), he only brings securities claims under Sections 11 and 12 of the 1933 Act which unquestionably only relate to *purchases*, not *sales*, of securities.  *See* 15 U.S.C. §§ 77k(a) (Section 11 applies to a "person *acquiring* [a] security") and 77l(a) (Section 12 applies to a "person *purchasing* [a] security") (emphasis added).  As such, his alleged causes of action are facially at odds with the facts alleged in his Complaint.

6.      The reason for this unusual pleading is transparent.  If Katz has any securities law claim—which he does not—it is under the Securities Exchange Act of 1934 (the "1934 Act"), which governs *sales* of securities.  Katz alleges 1933 Act claims instead of 1934 Act claims for an obvious forum-shopping reason:  the 1934 Act provides for exclusive federal jurisdiction (15 U.S.C. § 78aa) while the 1933 Act provides for concurrent federal and state court jurisdiction (15 U.S.C. § 77v(a)).  Simply put, Katz alleges 1933 Act claims on his admitted *sale* of a security in an attempt at securing jurisdiction in an Illinois state court and avoiding the Colorado District Court.

7.      Katz and his counsel's blatant forum shopping efforts fail as a matter of law. Regardless of whether Katz has alleged a 1933 Act claim, Katz's Complaint qualifies for removal to this Court because this Court properly has jurisdiction under the CAFA, 28 U.S.C. §§ 1332(d) and 1453.  Once Katz's Complaint is removed, Defendants will seek in a soon to-be-filed Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) to transfer the *Katz* Action to the District of Colorado—where it should have properly been filed in the first place—to be consolidated with the *Stender* Action.

## FACTUAL BACKGROUND[1]

*Katz* Action

8.      Katz and other putative class members each contributed certain properties to either defendant Archstone UPREIT or to its predecessor, Charles E. Smith Residential Realty L.P. ("Smith UPREIT") (Archstone UPREIT and Smith UPREIT are collectively referred to as the "UPREITs").  (Compl. ¶ 2.)  In exchange for their property contributions to the UPREITs, Katz and other putative class members held Class A-1 Common Units of defendant Archstone UPREIT ("A-1 Units").  (*Id.* ¶ 1.)

9.      Archstone UPREIT was majority owned and controlled by defendant Archstone REIT, the sole trustee of Archstone UPREIT (Archstone UPREIT and Archstone REIT collectively are the "Archstone Entities").  Archstone REIT's common shares were publicly traded on the New York Stock Exchange.  (*Id.* ¶ 45.)  The A-1 Units, however, were not publicly traded; rather, Katz alleges the A-1 Units reflected limited partnership interests in the Archstone

---

[1]      For purposes of this Motion only, Defendants accept all of Plaintiff's underlying factual allegations as true.

UPREIT.  These A-1 Units issued by the Archstone UPREIT were either convertible into cash or into common stock of the Archstone REIT.  (*Id.* ¶ 47.)

10.    In May 2007, pursuant to a Merger Agreement, TSD and Lehman announced that, as part of an effort to take the Archstone Entities private, they would purchase the publicly traded common shares of the Archstone REIT for a premium cash consideration of $60.75 per share and, with respect to the A-1 Units, offered unitholders an option to elect to receive in exchange for each A-1 Unit (a) the same premium cash consideration being paid to the public shareholders, (b) Series O Preferred Units in the new private, merged entity, or (c) a combination of cash and Series O Units.  (*Id.* ¶¶ 66-67.)  Like the A-1 Units, the Series O Units are not publicly traded.  (*Id.* ¶ 79.)  The Prospectus detailing the terms of the Merger Agreement was filed in mid-July 2007 and amended in September 2007 (*Id.* ¶ 83.)

11.    While Katz alleges that he exchanged his A-1 Units for cash, he purports to bring this action on behalf of a putative class of A-1 unitholders who exchanged their A-1 Units for (a) cash, (b) Series O Units, or (c) a cash-unit combination.  (*Id.* ¶ 5.)  Katz claims that he and others were induced to sell or exchange their non-publicly traded A-1 Units by the Prospectus which, Katz alleges, contained certain false and misleading statements in violation of the 1933 Act.  (*Id.* ¶¶ 85, 103, 112-113.)  Katz does not allege—because he cannot—that he purchased any securities of any kind pursuant to the Prospectus.

### *Stender* Action

12.    This case is not the first action to be brought based on the sale or exchange of A-1 Units in the Archstone UPREIT.  On November 30, 2007, two former-holders of A-1 Units (and members of the putative class action here), Steven Stender and Infinity Clark Street Operating, brought a class action in the United States District Court for the District of Colorado alleging the

same underlying facts as this action:  that plaintiffs were "coerced" into exchanging or selling

their A-1 Units for cash or for Series O Units.  (*See Stender et al. v. Cardwell et. al.*, No. 07-cv-

2503 (D. Colo. 2007), PACER Doc. No. 1., attached hereto as Exhibit B (hereinafter "Stender

Complaint" or "Stender Compl.").)  While Katz alleges federal securities law violations here,

Stender alleges state law claims of breach of contract and breach of fiduciary duties.  (*Id.*)

13.     Although the causes of action are different, the underlying facts pled by plaintiffs

in both actions are nearly identical.  Indeed, with minor variation, paragraphs 44 through 89 of

the Stender Complaint are substantially identical to paragraphs 37 through 82 of the Complaint

here, including headings and subheadings.  (*Compare* Compl. ¶¶ 44-89 *with* Stender Compl. ¶¶

37-82.)  Likewise, the same defendants are named both here and in the *Stender* Action, and

named plaintiffs Katz and Stender purport to represent the same class.  (*Compare* Compl. ¶ 87

*with* Stender Compl. ¶ 95.)[2]

14.     The *Stender* Action invokes federal jurisdiction under the CAFA.  (*See, e.g.*,

Stender Compl. ¶ 35 (alleging that the matter in controversy "exceeds the sum of $5,000,000");

*Id.* ¶¶ 41-42 (alleging that exemptions to federal jurisdiction found in 28 U.S.C. §§ 1332(d)(3) &

(d)(4)(A) & (B) do not apply).)

---

[2]     In the *Stender* Action, the parties have made their Rule 26 disclosures and the *Stender* defendants have moved to stay or dismiss the *Stender* Action on the grounds that the contract claims are subject to mandatory arbitration and that the fiduciary claims are barred as a matter of law.  The motion is fully briefed and under advisement, and discovery in the *Stender* Action currently is stayed pending resolution of the arbitration and dismissal motion.

15.     Finally, and as previously noted, named plaintiffs Stender and Katz are represented by identical counsel:  Kenneth Wexler of Wexler Toriseva Wallace LLP, and Lee Squitieri of Squitieri & Fearon.  (*See* Compl. at pp. 38-39, Stender Compl. at pp. 29-30.)

Procedural History and Removal Requirements

16.     Katz filed this action on May 9, 2008, in the Circuit Court of Cook County, Illinois.

17.     Pursuant to 28 U.S.C. § 1446(a), Defendants have attached hereto as Exhibit C all pleadings filed in the record of the state court proceeding as of the date of this filing.  A true and correct copy of this Notice of Removal will be filed with the Clerk of the Circuit Court of Cook County, Illinois, in accordance with 28 U.S.C. § 1446(d), along with a Notice of that filing, a copy of which will be served upon all parties.

18.     The Archstone Entities accepted service of process of Plaintiff's Complaint on June 16, 2008.[3]  Thus, this Notice of Removal is filed timely, in accordance with 28 U.S.C. § 1446(b).

**BASIS FOR REMOVAL**

19.     Plaintiff's Complaint is removable to this Court pursuant to 28 U.S.C. § 1453. Pursuant to the CAFA, jurisdiction in this Court was proper at the time of filing of the Complaint and is proper at the time of filing of this Notice because this is a putative class action, involving more than 100 putative class members, who are seeking to recover in excess of $5,000,000, the parties are minimally diverse, and none of the statutory exceptions apply.  *See* 28 U.S.C. §§ 1332(d) and 1453(d).

---

[3]     The other Defendants accepted service after June 16, 2008.  In accepting service, all Defendants explicitly reserved their objections regarding venue and jurisdiction.

**This Court Has Jurisdiction Over This Action Under The CAFA.**

20.    Plaintiff Katz filed this putative class action Complaint on behalf of "all holders of Class A-1 or similar common units of Archstone-Smith Operating Trust at the time of the Merger" (Compl. ¶¶ 1, 87.)  The Complaint seeks to certify a class under 735 ILCS 5/2-801 (the Illinois equivalent to Rule 23 of the Federal Rules of Civil Procedure).  (*Id.* ¶ 87.)

21.    The CAFA reflects Congress's intent to have federal courts adjudicate substantial class action suits brought against out-of-state defendants.  To effectuate this purpose, the CAFA expressly provides that class action lawsuits filed in state court are removable to federal court, and expands federal jurisdiction over such class actions by amending 28 U.S.C. § 1332 to grant original jurisdiction where the CAFA's jurisdictional requirements are met.

22.    Katz's putative class action lawsuit satisfies all of the requirements under the CAFA for federal jurisdiction.  Based upon the allegations in the Complaint:  (1) the proposed class consists of 100 or more members; (2) the parties are minimally diverse; (3) the amount in controversy exceeds the $5,000,000 jurisdictional threshold; and (4) the exceptions to CAFA removal do not apply here.  *See* 28 U.S.C. § 1453(d).  (Compl. ¶¶ 12, 31-32, 47, 77, 79, 85h, 89, 102-103, 113, 118.)  Indeed, Katz's counsel filed the *Stender* Action in Colorado District Court based on nearly identical factual allegations as those contained in the instant Complaint, and there alleged compliance with the CAFA as the basis of federal jurisdiction.  As in the *Stender* Action, the CAFA provides the basis for federal jurisdiction here.

**A.    This case satisfies the minimal jurisdictional requirements for CAFA removal.**

23.    This case easily satisfies the above requirements for CAFA removal at both the time of filing of this Notice and the time of filing of the Complaint.

24.   *First*, Plaintiff Katz alleges that the putative class consists of "hundreds, if not thousands" of members.  (Compl. ¶ 89.)  In the *Stender* Action, plaintiffs made the identical allegation.  (Stender Compl. ¶ 97.)  As such, the putative class would consist of at least 100 persons.

25.   *Second*, there is minimal diversity at the time of filing of this Notice and there was minimal diversity at the time of filing of the Complaint—that is, at least one plaintiff class member and one defendant are from different states, 28 U.S.C. § 1332(d)(2)(A).  Plaintiff Katz was a citizen of the State of Illinois at the time of filing of the Complaint (Compl. ¶ 12) and remains a citizen of the State of Illinois at the time of filing of this Notice, while Defendant Archstone REIT is, and its predecessor Archstone-Smith Trust was, a Maryland real estate trust, with its principal place of business in Englewood, Colorado at the time of filing of the Complaint (*Id.* ¶ 31) and at the time of filing of this Notice.[4]

26.   *Finally*, the amount in controversy here exceeds $5,000,000, exclusive of interest and costs.  Under the CAFA, the claims of the individuals comprising a putative class are aggregated to determine if the amount in controversy exceeds the $5,000,000 jurisdictional threshold.  28 U.S.C. § 1332(d)(6).  Here, based upon Plaintiff's allegations and theories of recovery (which Defendants dispute, but which control for removal purposes), the amount in controversy clearly surpasses $5,000,000.  Indeed, the named plaintiffs in the *Stender* Action

---

[4]   While there are certain exceptions to CAFA jurisdiction for which, as discussed *supra*, Plaintiff bears the burden of proof, none are applicable here.  *See* 28 U.S.C. §§ 1332(d)(3), 1332(d)(4)(A-B), 1332(d)(5)(A-B).  For example, certain CAFA jurisdictional exceptions are based on there being a "significant" or "primary" in-state defendant, or that a state-actor be a defendant.  *Id.*  No such allegations exist here—no state-actors are named defendants and none of the primary named defendants are located in Illinois or are alleged to be located in Illinois.

have alleged "that the matter in controversy, upon information and belief, exceeds the sum of $5,000,000, exclusive of interest and costs." (Stender Compl. ¶ 35.)

**B.　The exceptions to CAFA removal do not apply here.**

27.　　The CAFA reflects Congress' broad intent that any national class action, regardless of its legal basis, be removed to federal court, subject to the limited exceptions listed in 28 U.S.C. § 1453(d); *see also* 28 U.S.C. § 1332(d)(9). Section 1453(d) exempts from removal an action that "*solely*" involves any of the following: (1) a "claim concerning a covered security as defined under section 16(f)(3) of the Securities Act . . . and section 28(f)(5)(E) of the Securities Exchange Act"; (2) "a claim that relates to the internal affairs or governance of a corporation or other form of business enterprise . . ."; or (3) "a claim that relates to the rights, duties . . ., and obligations relating to or created by or pursuant to any security . . . ." 28 U.S.C. § 1453(d); *see also* 28 U.S.C. § 1332(d)(9). As the *Katz* Action does not involve any of the above CAFA exceptions—and Katz has the burden of establishing them—Katz cannot establish that removal is improper on those grounds. *See Hart v. FedEx Ground Package System, Inc.*, 457 F.3d 675, 680-81 (7th Cir. 2006); *see also Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1019 (9th Cir. 2007) (joining all sister circuits in holding that party seeking remand bears the burden of establishing CAFA exceptions).

28.　　*First*, the "covered security" exception to CAFA removal is inapplicable here. The CAFA defines "covered securities" as: (a) securities traded on a national exchange; (b) securities of the same issuer equal in seniority or senior in seniority to those traded on a national exchange; or (c) issued by an investment company under the Investment Company Act of 1940. 28 U.S.C. § 1453(d)(1) (defining "covered security" by reference to Section 16(f)(3) of the 1933 Act, 15 U.S.C. § 77p(f)(3) and Section 28(f)(5)(E) of the 1934 Act, 15 U.S.C. § 78bb(f)(5)(E),

both of which reference Section 18(b) of the 1933 Act, 15 U.S.C. § 77r(b)(1)-(2)); *see also* 28 U.S.C. § 1332(d)(9)(A) (same).   Plaintiff does not allege that the A-1 Units were publicly traded (because they were not), and the A-1 Units were issued by the Archstone UPREIT, a different entity than the Archstone REIT, which did issue publicly traded shares.  (Compl. ¶¶ 2, 45, 47.)  The Series O Units—for which Plaintiff alleges some, but not all, A-1 Unit holders exchanged their A-1 Units—are alleged to be "completely illiquid for a minimum of five years" and "are not publicly traded in the market."  (*Id.*  ¶¶ 77, 79.)  As such, this action does not "solely" involve a claim concerning a covered security.

29.    ***Second***, section 1453(d)(2) exempts from removal a civil action that "solely" involves "a claim that relates to the internal affairs or governance of a corporation."  *See also* 28 U.S.C. § 1332(d)(9)(B).  This exception does not apply here either, as Katz's allegations do not relate "solely" to the internal affairs or governance of the Archstone Entities.

30.    ***Finally***, section 1453(d)(3) exempts from removal an action that "solely" involves a "claim that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security."  *See also* 28 U.S.C. § 1332(d)(9)(C).  A 1933 Act claim does not fall within this exception.  *See Estate of Pew v. Cardarelli*, No. 06-5703, 2008 WL 2042809 (2d Cir. May 13, 2008) (alleged misrepresentations in financial statements that fraudulently concealed issuer's insolvency not sufficient to prevent CAFA removal under "rights, duties and obligations" exception).

31.    Accordingly, there is no impediment to this Court taking jurisdiction of this action.

**WHEREFORE,** for the reasons described above, Defendants respectfully request that this Court assume full jurisdiction over this action.

Dated:  July 16, 2008                                    Respectfully submitted,


                                                         /s/ Steve Merouse
                                                         _____
                                                         *One of the attorneys for Defendants*

Christopher Q. King (ARDC # 6189835)
Steve Merouse (ARDC # 6243488)
Jeffery S. Davis (ARDC # 6277345)
Melissa A. Economy (ARDC # 6282802)
SONNENSCHEIN NATH& ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois  60606
Phone: (312) 876-8000
Fax:  (312) 876-7934
E-mail:   cking@sonnenschein.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I am an attorney and hereby certify that on July 16, 2008, I caused true copies of the

foregoing NOTICE OF REMOVAL to be served by messenger upon the following counsel for

Plaintiff:

     Kenneth A. Wexler
     Edward A. Wallace
     Christopher J. Stuart
     Melisa Twomey
     WEXLER, TORISEVA WALLACE, LLP
     55 W. Monroe Street, Suite 3300
     Chicago, IL 60603

                   /s/ Melissa A. Economy
                   *One of the attorneys for Defendants*

JUDGE DARRAH
MAGISTRATE JUDGE ASHMAN

PH

# Exhibit A

1

1       IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLORADO

3   Case No. 07-cv-02503-EWN-MJW

4   ══════════════════════════════════════════════════

5   STEVEN A. STENDER, et al.,

6        Plaintiffs,

7   vs.

8   JAMES A. CARDWELL, et al.,

9        Defendants.

10  ──────────────────────────────────────────────────

11          Proceedings before CRAIG B. SHAFFER, United States

12  Magistrate  Judge,  United  States  District  Court  for  the

13  District of Colorado, commencing at 8:34 a.m., February 12,

14  2008, in the United States Courthouse, Denver, Colorado.

15  ──────────────────────────────────────────────────

16          WHEREUPON,  THE ELECTRONICALLY RECORDED PROCEEDINGS

17  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18  ──────────────────────────────────────────────────

19                  APPEARANCES

20      GERALD L. BADER, JR., RENEE B. TAYLOR, MR. SQUITIERI:
21  SQUITIERI and KENNETH WEXLER, Attorneys at Law, appearing
22  for plaintiffs.
23      FREDERICK  J.  BAUMANN,  DAVID  GRUENSTEIN,  K.  ALLISON
24  WHITE,  BOBBEE  J.  MUSGRAVE,  JONATHAN  D.  POLKES  and  CINDY
25  OLIVER, Attorneys at Law, appearing for defendants.
26
27
28  ──────────────────────────────────────────────────
29                  STATUS CONFERENCE
30

2

```
 1              P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3    proceedings are herein transcribed, pursuant to order of
 4    counsel.)
 5              THE CLERK: All rise.  Court is in session.
 6              THE COURT: You may be seated.  The Court calls
 7    2007-cv-02503-EWN-MJW, Steven A. Stender, et al.,
 8    plaintiffs, versus James A. Cardwell, et al., defendants.
 9    I'll start first with counsel on behalf of the plaintiff.
10    If you'd enter your appearance, please.
11    *TRANSCRIBER'S NOTE: Speakers not speaking directly into a
12    microphone cannot be heard.
13              MR. BADER: Good morning, Your Honor.  Gerald L.
14    Bader, Jr., and Renee Taylor from Denver.  And I'd like to
15    introduce Mr. Squitieri from New York and Mr. Ken Wexler
16    from Illinois.
17              THE COURT: Thank you.
18              MR. SQUITIERI: Good morning, Your Honor.
19              MR. WEXLER: Good morning, Your Honor.
20              THE COURT: Good morning.  Counsel on behalf of the
21    defendants, please.  We'll start at this end.
22              MR. BAUMANN:  Good morning, Your Honor.  Fred
23    Baumann of Rothgerber Johnson & Lyons on behalf of the
24    defendants Archstone Smith Trust, which is now known as
25    Tishman Speyer Archstone Smith Multi Family One Trust and
```

3

1    the defendant Archstone Smith Operating Trust which is now
2    known as Archstone.  If the Court would indulge me, I would
3    simply refer to them both as Archstone.  With me today is
4    my partner, Cindy Oliver, who is sitting in the back.
5            THE COURT: All right.
6            MR. BAUMANN: The next men I'd like to introduce to
7    the Court, Andy Gruenstein of Wachtell Lipton Rosen & Katz
8    in New York. And in the front row, as well, Jonathan D.
9    Polkes from Weil Gotshal & Manges.
10            MR. POLKES: Good morning, Your Honor.
11            THE COURT: Good morning.
12            MR. BAUMANN: Messrs. Gruenstein and Polkes are
13    admitted to practice and we're all counsel for Archstone.
14            THE COURT: All right.  Thank you.
15            MS. WHITE: Good morning, Your Honor.  K. Allison
16    White of Ballard Spahr Andrews & Ingersoll, and I represent
17    defendants Tishman Speyer Development Corp and Lehman
18    Brothers Holding Corp.
19            THE COURT: Thank you.
20            MS. MUSGRAVE: Good morning, Your Honor, I'm Bobbee
21    Musgrave from Holme Roberts & Owen and I represent the
22    individual defendants.
23            THE COURT: All right.  Thank you.  This case is
24    before the Court this morning for a Rule 16 scheduling
25    conference.  The Court has reviewed the scheduling order as

4

1     tendered, and we'll go over that scheduling order at this
2     point.  First on the scheduling order, pages 1 through and
3     including page 14, inclusive, each of those pages are
4     approved within the scheduling order.
5             MR. BAUMANN: Your Honor, excuse me for a moment.
6             THE COURT: Yes, sir.
7             MR. BAUMANN:  Before you address this scheduling
8     order, on behalf of defendants, as you know, we have filed
9     a motion to stay discovery pending the -- Judge Nottingham's
10     determination  of  our  separate  motion to stay pending
11     arbitration or to dismiss.
12             THE COURT: Right.
13             MR. BAUMANN: And from our point of view, it would
14     make sense, Your Honor, since that motion to stay is in
15     front  of  you,  to  stay  discovery,  that  we  defer
16     considerations of the scheduling until Your Honor has a
17     chance to decide whether any discovery is appropriate, given
18     that we have a motion to dismiss in favor of arbitration
19     pending in front of Judge Nottingham.
20             THE COURT: Denied.
21             MR. BAUMANN: That motion will be fully briefed
22     within the next --
23             THE COURT: Well, it's not ripe so we're going to
24     go forward with the case until it gets ripe.  You just filed
25     it on January 29, unless I'm mistaken.

1           MR. BAUMANN: That's correct, Your Honor, but it
2     will be briefed within the next two weeks.
3           THE COURT: And I'll address it then.
4           MR. BAUMANN: Okay.
5           THE COURT: I don't believe in delaying any of
6     these cases, so we're just going to go forward with it.
7     I'll set the discovery out far enough that you don't have to
8     start if you don't want to, but we'll go forward with it.
9           MR. BAUMANN: Okay, Your Honor.
10          THE COURT: Did something prevent you from filing
11    this motion earlier?
12          MR. BAUMANN: Your Honor, we had just joined in the
13    case a couple weeks before that, and we filed it as soon as
14    possible.
15          THE COURT: Okay.
16          MR. BAUMANN: It  was filed along with the
17    dispositive motion.
18          THE COURT: I'll take it up as soon as it becomes
19    ripe, like I always do.  All right.
20          Paragraph 6 on the Rule 26(f) meeting and 26(a)(1)
21    disclosures, the parties have met pursuant to Rule 26(f) on
22    January 22nd, year 2008, at 3 o'clock p.m.  Moreover, it
23    does  appear  the  parties  have  agreed to make the Rule
24    26(a)(1) as of February 5, 2008.  That's why I double-check
25    with parties. Has the plaintiff done that, Mr. Bader?

6

1          MR. SQUITIERI: Yes.

2          THE COURT: All right.  Mr. Baumann, on behalf of

3    your clients?

4          MR. BAUMANN: Yes, Your Honor, we have.

5          THE COURT: All right.  Ms. White?

6          MS. WHITE: Yes, Your Honor.

7          THE COURT: And, Ms. Musgrave?

8          MS. MUSGRAVE: Yes, Your Honor.

9          THE COURT: The Court will find the parties have

10   then complied with both Rules 26(f) and 26(a)(1) of the

11   Federal Rules of Civil Procedures.  Accordingly, paragraph

12   number 6 is approved.

13          Page 17, paragraph 7 on consent, that's approved.

14   There is no consent in this case.

15          Paragraph 8, which deals with the case plan and

16   schedule and subparagraphs thereunder, we'll go over those

17   at this point in time.  Noting the motion itself, we're

18   going to simplify this a little bit to move the case along

19   here.

20          What other parties does the plaintiff anticipate

21   adding in this case?

22          MR. SQUITIERI: Your Honor, at this time we only

23   anticipate adding any parties that we know about but this is

24   a very complex series of transactions.  We want to provide

25   for the event that we do learn of new potential parties.

7

1          THE COURT: What other claims are you suggesting
2      you're going to have?
3          MR. SQUITIERI: At this time, Your Honor, I don't
4      know other than perhaps a federal securities claim based on
5      the federal securities statutes arising out of the
6      prospectus.
7          THE COURT: Okay.
8          MR. SQUITIERI: And other materials that we use in
9      connection with the issuance of a new unit of securities.
10         THE COURT: Against which defendant are you
11     referring to?
12         MR. SQUITIERI: Excuse me, Your Honor?
13         THE COURT: Against which defendant are you
14     referring to that you may be adding?
15         MR. SQUITIERI: Against the original corporate
16     defendant, Archstone --
17         THE COURT: Okay.
18         MR. SQUITIERI: -- and the individual defendants
19     who signed and/or were responsible for the directing and
20     issuance of the offering materials.
21         THE COURT: Okay.
22         MR. SQUITIERI: But they're already in the case.
23         THE COURT: I understand that.  I just want to see
24     what we really need to -- time we need to amend the
25     pleadings or join the parties.

8

1            Mr. Baumann, what other parties are you intending
2     to trying to join in this case?
3            MR. BAUMANN: I don't believe at this time our
4     clients intend to join any parties.
5            THE COURT: What are any other claims to be added?
6            MR. BAUMANN: We have no --
7            THE COURT: Counterclaims, cross-claims, third-
8     party complaints?
9            MR. BAUMANN: We still have not responded -- or
10    answered the complaint so we --
11           THE COURT: Okay.
12           MR. BAUMANN: -- are not in a position to assert
13    any other claims.  We have filed a motion to (inaudible-both
14    speaking).
15           THE COURT: All right.  Ms. White?
16           MS. WHITE: I take the same position as Mr.
17    Baumann.
18           THE COURT: All right.  Ms. Musgrave?
19           MS. MUSGRAVE: Same position, Your Honor.
20           THE COURT: All right.  Noting the pending motions
21    that have been outlined by the parties and the Court's aware
22    of those and when they'll become ripe.
23           (Pause) All right.  The deadline to join parties
24    or amend pleadings will be March 31, 2008.  I'll correct
25    paragraph 8-A to reflect the same.

9

1          Turning to discovery cutoff, I'll simplify this.

2   We'll have one date for all discovery including all experts.

3   That date will be -- noting the motions that are pending,

4   that will be July 31, 2008, for discovery to be complete.

5          Dispositive motion deadline will be moved back

6   slightly till August 29, 2008.

7          We'll address the experts at this point.  You're

8   looking at how many experts for the plaintiff?  It looks

9   like two or three.  Is that it?

10         MR. SQUITIERI: It could be as many as four, Your

11  Honor.

12         THE COURT: Okay.  How about -- well, we'll start

13  at this end for the defendants.  Mr. Baumann.

14         MR. BAUMANN: Your Honor, we've identified five

15  areas.  We would anticipate no more than five experts for

16  them.

17         THE COURT: Okay.  Ms. White?

18         MS. WHITE: I think (inaudible-no microphone)

19         MS. MUSGRAVE: (Inaudible-no microphone).

20         THE COURT: All right. Give me just a moment here.

21         (Pause) All right.  There'll be five experts per

22  each party group because a number of you represent multiple

23  parties, so each of your groups that you represent as

24  counsel get five experts without leave of court.

25         Turning now to the disclosure of the experts.

10

1    Plaintiff will disclose their experts in this case by May
2    1st, 2008.   The depositions of those experts need to be done
3    by the discovery cutoff date, so I'll delete that other
4    sentence there.
5          Defendants shall disclose their experts by June
6    2nd, 2008.   And then I'll give you a date for the rebuttal
7    experts -- let me write that in.   And the rebuttal experts
8    need to be disclosed by June 30th, 2008.   The experts need
9    to be disclosed by the discovery cutoff date, which I've set
10   on July 31, 2008.
11          We'll move on now to the deposition schedule.
12   Looks like you made your Rule 26(a)(1) disclosures already,
13   so I'll give you a date certain to file with the Court your
14   deposition schedule.
15          (Pause) Deposition schedule needs to be filed by
16   February 25, 2008.   That's two weeks from today. That's more
17   than enough time to get that done.
18          Regarding the interrogatory schedule and requests
19   for production of documents and requests for admissions
20   schedule, I'm going to simplify this, too.
21          (Pause)  All right.  Your interrogatories,
22   requests  for  production  of  documents,  requests  for
23   admissions, those need to be served no later than June 27th,
24   2008.  That's 33 days before the discovery cutoff, which is
25   consistent with the time of response plus Rule 6 on timing.

11

1          All   right.   Let's deal with the class
2     certification issue at this point.  We need to discuss that
3     briefly with the plaintiff.  What have you done on that
4     issue and how many other people are you talking about here?
5          MR. SQUITIERI:  Your  Honor,  we  think  there's
6     thousands of people in the class.
7          THE COURT: Based upon what?
8          MR.  SQUITIERI:  Based  upon  some  (inaudible)
9     information we have about the (inaudible) of the -- let's
10    say the various stuff, partnerships and (inaudible) rolled
11    up into what was -- has become the operat' -- we had some
12    information about certain partners in the partnership but --
13          THE COURT: Okay.
14          MR. SQUITIERI: -- it looks like it will certainly
15    be a class to try and meet any numerosity requirements.
16          THE COURT: All right.  As a potential putative
17    class,  Mr.  Baumann,  are  you  in  agreement  with  those
18    statements or not?
19          MR.  BAUMANN:  We  acknowledge  that  there  are
20    multiple people in the class.  We don't know exactly how
21    they intend to define their class.
22          THE COURT: Wait a minute.  He's talking in the
23    thousands, I think, by his statement.
24          MR. BAUMANN: There are over a thousand (inaudible)
25    holders --

12

1            THE COURT: Okay.

2            MR. BAUMANN: -- or were in the Archstone Trust.

3    But the issue for us is this that this issue -- class

4    certification should be done sooner rather than later.  The

5    issue is not whether they're going to (inaudible-someone

6    coughing) the requirements of Rule 23, but under Rule 23 and

7    the Tenth Circuit's law.

8            THE COURT: Right.

9            MR. BAUMANN: This should be done as soon as

10   practicable.  Their schedule, put it at the end.  Our

11   proposed schedule, put it at the front.

12           THE COURT: Right.

13           MR. BAUMANN: We think that is the first thing that

14   the parties should focus on.

15           THE COURT: Ms. White, are you in agreement with

16   the potential putative class in the case? As far as the

17   number.

18           MS. WHITE: I agree with Mr. Baumann's statements

19   regarding the class.

20           THE COURT: Okay.  And, Ms. Musgrave?

21           MS. MUSGRAVE: Yes, Your Honor, we agree.

22           THE COURT: All right.  Give me just a moment then.

23           (Pause) All right.  On the issue of class

24   certification, which is on page 19, carries over to page 20

25   and 21 and a small portion of page 22, there have been

13

1    various versions submitted here by both plaintiff and
2    defendant.  The Court rejects the plaintiff's version.
3    Class certification issues need to be addressed first.
4           Accordingly, under paragraph 8-H, the plaintiffs'
5    proposed class certification schedule is rejected and
6    deleted at this point.  The Court will adopt the defendants'
7    version, and accordingly the plaintiff's brief concerning
8    class certification will be due on February 15th, 2008.
9    Defendants will be due on March 13th, 2008, and the reply
10   papers by the plaintiff March 27, 2008.
11          Concerning the class certification and discovery
12   on the class, the Court approves that stated by defendants
13   in this case, which is defendants' deadline to serve
14   requests for production of documents and interrogatories
15   regarding class certification will be February 11th.
16          MR. BAUMANN: Your Honor, that is yesterday and we
17   did serve them yesterday.
18          THE COURT: That's fine.  And plaintiff shall
19   respond to those by February 25, 2008.  We're going to move
20   this along.
21          The depositions as outlined there are approved.
22   They need to be set. Have the parties discussed a location
23   for these two depositions that are listed here, Mr. Stender
24   and the 30(b)(6) designation from the Infinity Clark Street
25   Operating?

14

1           UNIDENTIFIED ON LOG: Have not.

2           THE COURT: Okay.  I want you to do that after this

3   morning.  You can use the conference room and get those set

4   so we can take care of those.

5           MR. WEXLER: Any objection to Chicago?

6           THE COURT: Well, let me find out.

7           MR. GRUENSTEIN:  We don't think we'll object, Your

8   Honor.

9           THE COURT: All right.  Well, I want counsel to

10  agree upon that today so we can move that along.  I don't

11  want that to be a delay in the case.

12          All right. Regarding Roman numeral small iii on

13  page 21, which is towards the bottom concerning the experts.

14  That's fine and approved as well, and Roman numeral iv is

15  also approved on page 22.

16          That leads us now to paragraph 8-I on page 22

17  towards the middle, which deals with the rest of the

18  discovery on the merits of the case.

19          MR. WEXLER: Your Honor?

20          THE COURT: Yeah.

21          MR. WEXLER: With regard to the February 15th date

22  for filing our class papers --

23          THE COURT: Yes, sir.

24          MR. WEXLER: -- could we possibly one extra week?

25          THE COURT: Well, that's going to throw off the

15

1   schedule, though, isn't it?

2              MR. WEXLER: It will.  By a week.

3              THE COURT: That's denied.

4              MR. WEXLER: Okay.

5              THE   COURT:   Turning   now   to   the   discovery

6   limitations, we'll address that at this point.  Regarding

7   the depositions, I guess I want to find out from counsel how

8   do you get to this number 60 at this stage?

9              MR. WEXLER: Well, Your Honor, we had -- we support

10  different parties here --

11             THE COURT: Sure.

12             MR. WEXLER: -- by four different counsel.  The

13  individual defendants alone number, I think, 12 to 15.  We

14  have investment bankers on various sides of the deal who

15  have  to  be  deposed.  We have sometimes more than one

16  plaintiff or adviser for each of these entities.  We have

17  two levels of corporate entities, the (inaudible) brief and

18  the parent brief.  The defendants themselves have identified

19  over --

20             UNIDENTIFIED:  Over 72.

21             MR. WEXLER: Excuse me?

22             UNIDENTIFIED:  Over 72.

23             MR. WEXLER: -- over 72 witnesses on their Rule 26

24  disclosures.

25             THE COURT: Okay.

16

1              MR.    WEXLER:    And    I    think    we've    identified
2       approximately 40.
3              THE COURT: Okay.
4              MR.    WEXLER:    Obviously,    there    is    some    overlap.
5       We'd like not to have to take 60 depositions, but we think
6       we may need right near that number.
7              THE COURT: All right.    Let me hear from the
8       defendants.
9              MR. BAUMANN: Your Honor, we identified 60 largely
10      because the plaintiffs asked for 60.    Our concern is that
11      there are a large number of individual agreements.    Each of
12      these folks in the putative class had --
13             THE COURT: Right.
14             MR.    BAUMANN:    --    a    separate    agreement,    and    we
15      believe    they're different.    We believe that's of course why
16      there will never be a class certified here.    But as part of
17      our discovery, we believe we may need to take a lot of
18      depositions of non-named class members in addition to the
19      folks that are on the 26(a)(1) list.    That's why we have a
20      large number of individuals.
21             THE COURT: Well, some of those people should be
22      pretty short, I would think.
23             MR. BAUMANN: That's true.
24             THE COURT: This is just limited to that one issue,
25      isn't it?

1　　　　　　　MR. BAUMANN: Each of these people would have

2　　entered under a separate --

3　　　　　　　THE COURT: Right.

4　　　　　　　MR. BAUMANN: -- agreement.  And so, Your Honor, I

5　　do not anticipate that those will be lengthy depositions,

6　　that's true.  But we have identified the number, not the

7　　duration.

8　　　　　　　THE COURT: All right.

9　　　　　　　MR. BAUMANN: We said we can complete them all in

10　　a (inaudible).

11　　　　　　　THE COURT: All right.  Mr. -- I'm sorry, Ms.

12　　White.

13　　　　　　　MS. WHITE: We agree with that position, Your

14　　Honor.

15　　　　　　　THE COURT: All right.  Ms. Musgrave?

16　　　　　　　MS. MUSGRAVE: As do we, Your Honor.

17　　　　　　　THE COURT: All right.  I'll permit the 60

18　　depositions per side, so 60 got the plaintiffs, 60 for

19　　defendants collectively, that means all defendants.  I'm

20　　going to indicate all defendants and all plaintiffs so we

21　　don't run into some dispute there.

22　　　　　　　This case-by-case basis on the deposition length,

23　　the rule calls for seven hours.  Which ones of these people

24　　are you going to need more than seven hours on?

25　　　　　　　MR. SQUITIERI: Well, Your Honor, we anticipate

18

1    that we will be identifying people who were very, very

2    involved with all aspects of the deal and, therefore, need

3    to be deposed on all of the issues in the case, and we

4    anticipate that some of those witnesses will take two,

5    possibly three days.  We don't know who they are yet.  We

6    can guess at some them, but we don't know how many there

7    will be until rather than set some hard and fast rules about

8    the categories of people, we raised the issue with

9    defendants and said let's see how it goes as we identify

10   people and get documents.

11           THE COURT: Well, the way you've phrased this, you

12   put: To be determined on a case-by-case basis. The length of

13   each deposition will be up to the maximum allowed under the

14   federal rules.  Well, the maximum allowed is seven hours.

15           MR. SQUITIERI: Yes.

16           THE COURT: So is that what you're saying, seven

17   hours?

18           MR. SQUITIERI: Well, I -- I think what we tried to

19   put in here is that unless we work out something

20   specifically for a witness, then it's going to be seven

21   hours.

22           THE COURT: Is that the intention is of the

23   defendants?

24           MR. BAUMANN: That is our understanding.  We did

25   agree with the plaintiffs and we would anticipate discussing

19

1   with them before we agree on a schedule, which is now due on

2   February 25th --

3            THE COURT: Right.

4            MR. BAUMANN: -- that if there are any witnesses

5   that the parties agree could be longer than seven hours --

6            THE COURT: Otherwise, you're falling back to the

7   default which is seven hours maximum, right?

8            MR. BAUMANN: Yes.  Correct.

9            THE COURT: All right.  Under that understanding

10  I'll approve paragraph 8-I, parens, 2, close parens.

11           Turning now to the number of interrogatories and

12  requests for production of documents and/or requests for

13  admissions, I'm a little -- I want to make sure I'm clear on

14  this wording here.  Is it  -- is the parties saying that

15  each plaintiff is going to have separate 50 interrogatories

16  and each defendant the same?

17           MR. SQUITIERI: For the plaintiffs, we envision 50

18  in the aggregate, Your Honor.

19           THE COURT: Okay.  How about from the def' -- I

20  know counsel represent more than one defendant so what are

21  we talking about there?

22           MR. BAUMANN: We agree, I believe, per side --

23           THE COURT: Okay.

24           MR. BAUMANN: -- that the defendants as a side --

25           THE COURT: All right.

20

1              MR. BAUMANN: -- would agree.  We think --

2              THE COURT: That's what I want to make sure.

3              MR. BAUMANN: -- it should be 35, not 50, but --

4      it's per side.

5              THE   COURT:   All   right.   There'll be 50

6      interrogatories per side.  I'm going to try to clarify this

7      so  it's clear.  Each side may serve no more than 50

8      interrogatories, so I'll correct that.  And the request for

9      production of parties in request -- excuse me, excuse me

10     requests for production of documents and the requests for

11     admissions, is that to be per party or per side?

12             MR. BAUMANN: Per party, Your Honor.

13             THE   COURT: Well,  I  got  a  problem  with  that,

14     because, for example, Ms. Musgrave represents a bunch of

15     individuals.  Are you going to ask 25 for each?

16             MS. MUSGRAVE: I don't know.

17             THE COURT: Then it's -- I'll allow it per party

18     group.  So each party group will get 25 requests for

19     production of documents and 25 requests for admissions.

20             Now, I want to caution everybody here.  I don't

21     believe in costing people's time and expense.  So I want the

22     defendants to meet, because I don't want you serving the

23     same stuff on the plaintiff that can be served once and

24     shared.  That's not going to happen.  And the same with

25     plaintiffs to the defendants because that's just a total

21

1    waste of people's expense and people's time.  So I want you

2    to meet and confer on that to see if you can come up with a

3    collective request and then you can just share the

4    information.  It's much easier.

5           I also want to remind counsel that under 26(a)(1),

6    you have mandatory disclosures.  There are a lot of

7    documents and it seems to me already in this case you've

8    identified a lot of documents that should be just turned

9    over.  So I want counsel to meet and confer on that as well.

10          All right.  Now, before we move on to paragraph 9,

11   what discussions have been made regarding any protective

12   orders in this case?

13          MR. BAUMANN: Your Honor, we identified as part of

14   the discussions in the 26(f) conference the need for a

15   protective order.  I believe that we have agreed that we

16   will meet by next Monday and confer with defendants --

17          THE COURT: Okay.

18          MR. BAUMANN: -- I'm sorry, the plaintiffs, to try

19   and come up with an agreement on the form.

20          THE COURT: Okay.  Is that right?

21          MR. SQUITIERI: That is, Your Honor.  The 18th is

22   the date we agreed to (inaudible) with them.

23          THE COURT: All right.  Well, I want it filed no

24   later than February 25, 2008.  Either it's going to be

25   unopposed or jointly filed or whoever's requesting it --

22

1    sounds like the defendants maybe filed, and so we can
2    address that.

3           I want to remind counsel that that will not
4    prevent discovery from going forward, because it's -- you
5    have time to respond in discovery.  So that's why I want it
6    filed as soon as possible so that we can address that.  So
7    the parties need to file any requests for protective orders
8    in this case either jointly or unopposed -- or if it is
9    opposed, let me know that -- by February 25, 2008.

10          All right.  Let's address paragraph 9 on
11   settlement.  That's fine as tendered at this point.  And the
12   Court did receive the parties' initial confidential
13   settlement statements and reviewed those.  We'll discuss
14   settlement a little bit further in a moment.

15          Regarding paragraph 11, I'm aware of the motions
16   that are outstanding.  I've already addressed those and how
17   we're going to handle those.  So that's fine.

18          Under paragraph 10-B, dealing with the length of
19   trial, that's a little difficult to determine at this point
20   only because we're not sure what's going to happen with the
21   class issue.  So I"m going to leave this as is as stated
22   where you put: Assuming a class, maximum time would be 25
23   days to 35 days.  We'll leave that as is, but I think we'll
24   relook at it the preliminary pretrial conference, because
25   we'll know better if this case is going forward in that

23

1    capacity or not.  So I'll leave that as is at this point.

2              Paragraph 11, we'll skip over for a moment, but

3    I'll return to it on further conferences.

4              Paragraph 12, other matters on page 25 is approved

5    as tendered.

6              Paragraph 13, amendments to the scheduling order,

7    that's also approved as tendered.  Give me just a moment

8    here.

9              (Pause) All right.  I need counsel to go back to

10   paragraph 11 at this point.  And if you would go to

11   paragraph 11-C, which is currently on page 25 of the

12   scheduling order.  Give me just one moment to make one

13   modification to that.

14             (Pause) All right.  Judge Nottingham will conduct

15   his own final pretrial conference.  I will conduct a

16   preliminary pretrial conference which will be set prior to

17   the close of discovery, so we're looking at the first part

18   of June.  I need counsel to take their calendars out at this

19   point.  We'll set that at this juncture.

20             Friday, June 6th at 8:30 a.m. for final pr' --

21   forgive me, preliminary pretrial conference.  Can the

22   plaintiff accept that date and time?

23             MR. SQUITIERI: Yes, Your Honor.

24             THE COURT: All right.  I'll start here.  Mr.

25   Baumann for the defendants, please?

24

1              MR. BAUMANN: One second, Your Honor.

2              THE COURT: All right.

3              MR. BAUMANN: Friday, the 6th?

4              THE COURT: Friday, the 6th at 8:30.  That's this

5      year.

6              MR. SQUITIERI: That'd be fine.

7              THE COURT: Okay.

8              MR. BAUMANN: That's fine, Your Honor.

9              THE COURT: Fine, Ms. Musgrave?  Ms. White?

10             MS. WHITE: If I could have one moment.  I'm sorry.

11             THE COURT: All right. That's all right.

12             MR. BAUMANN: Your Honor, we do have a large number

13     of counsel.  Not all of them will be able to make it on the

14     6th.

15             THE COURT: That's fine.

16             MR. BAUMANN: As long as we --

17             THE COURT: As long as I have one.

18             MR. BAUMANN: -- have representatives from

19     everyone.

20             THE COURT: Right.

21             MR. BAUMANN: True.

22             MS. WHITE: Yes, Your Honor, that works fine.

23     Thank you.

24             THE COURT: All right.  The matter is set for

25     preliminary pretrial conference June 6th, 2008, beginning at

25

1   8:30 a.m.  Each party has now accepted that date and time

2   through their counsel.

3          I will need your proposed preliminary pretrial

4   order submitted to the Court by Monday, June 2nd, 2008.  The

5   format to prepare the preliminary pretrial order may be

6   found on the Court's Web site.  Also each counsel are

7   ordered to the Court's Web site under Judge Nottingham's

8   name to make sure you're familiar with pretrial and trial

9   practices and procedures since you will be required to

10  follow those in this case.  Give me a moment to write that

11  in on our calendar.

12         (Pause)  All right.  Noting where the case is

13  postured, meaning the following: The current outstanding

14  motions that are pending including the motions to stay the

15  case pending resolution of the other motions that have been

16  filed in the case, I'm going to -- in reviewing the

17  settlement conference documents, I'm going to set a further

18  status conference, and I think we'll know where we stand

19  with this case in around 60 days.  So let me see if I can

20  clear a date in roughly the week of April 7th.  See what's

21  available during that time frame.

22         What's counsels' availability on April 8th, 2008,

23  at 8:30 a.m. for status conference?

24         MR. BAUMANN: Your Honor, I will be out of town

25  that day.

26

1           THE COURT: You will, all right.  Are you out of
2   town that week, rest of the week, or not?
3           MR. BAUMANN: I am not out on Monday.  I am out of
4   town the rest of the week of the 7th.
5           THE COURT: Okay.  April 14th at 8:30?  That's this
6   year.  Plaintiff's fine?
7           MR. SQUITIERI: Yes, Your Honor.
8           THE COURT: Defendants?
9           MR. BAUMANN: Yes, Your Honor.
10          THE  COURT:  Everybody's  shaking  their  heads  so
11  that's good.  That's the date set.  Give me a moment to
12  write that in.
13          (Pause)
14          MR. BAUMANN: Your Honor, what time on the 14th?
15          THE COURT: 8:30 a.m.
16          MR. BAUMANN: Thank you.  Give me a moment to put
17  that  in  our  scheduling  order  here.  That's  on  the  14th.
18  Everybody make sure they have that, April 14th at 8:30.
19  Okay.
20          MS. MUSGRAVE: Your Honor, I'm showing on that date
21  a preliminary pretrial conference.
22          THE COURT: Well, it shows it's been vacated on
23  this.
24          MS. MUSGRAVE: You know what.  It was.
25          THE COURT: All right.

27

1           MS. MUSGRAVE: I'm (inaudible).

2           THE COURT: All right.  Thank you.

3           (Pause) All right.  The status conference is set

4    for April 14th, year 2008, beginning at 8:30 a.m.  At that

5    time, I will need the parties to give me an update on

6    discovery, status on the outstanding motions at that point

7    will be addressed, and I'll look at the need to set a

8    settlement conference at that point.  We'll see where we are

9    with the case at that juncture.  At this point, I'm not

10   going to set any settlement conference.  I'll address that

11   at the status.

12          All right.  Ms. Moore, do you have all those

13   dates?

14          THE CLERK: Yes.

15          THE COURT: All right.  The Court will approve the

16   scheduling order as amended this morning on the record.

17          MR. BAUMANN: Excuse me, Your Honor.

18          THE COURT: Yes, sir.

19          MR. BAUMANN: I do have a question.  You went over

20   it too quickly for me to catch it before.  On item 5 in the

21   scheduling order on page 14 --

22          THE COURT: Let me go to it.

23          MR. BAUMANN: -- with respect to damages.  We had

24   raised an objection in our -- I guess in our section there

25   that that is a inadequate description of the plaintiff's

28

1    damages and contrary to the instructions for the scheduling

2    order.  The plaintiffs have made a similar nondisclosure in

3    their  26(a)(1)s  with  respect  to  damages.  These are

4    (inaudible-both speaking) --

5              THE COURT: I understand that.

6              MR. BAUMANN: -- Your Honor, so our request would

7    be that we not approve the scheduling order except that we

8    direct the plaintiffs to supplement, to describe as required

9    by the rules --

10             THE COURT: Right.

11             MR. BAUMANN: -- the damages that they believe

12   they've incurred.

13             THE COURT: Let me hear from the plaintiff.  Why

14   aren't you more specific on these damages?

15             MR. SQUITIERI: Your  Honor,  we  can't  really

16   quantify the damages as yet.  We can categorize them and

17   we'll supplement to categorize the damages.  But the

18   quantification of the damages are going to depend on things

19   like valuations of the new securities that were issued in

20   exchange for the old securities.  And certain estimates as

21   to when properties otherwise may or not have been sold,

22   estimating gains that would be subject (inaudible).  But we

23   can categorize at this time.  We think it's going to need an

24   expert to make the estimates that we need to make.

25             MR. BAUMANN: Your Honor, at least we --

29

1          THE COURT: Well --

2          MR. BAUMANN: -- we'd request that -- that

3   plaintiffs would split the cash.  This case is fundamentally

4   about their claiming tax liability and they should be able

5   to calculate and compute that --

6          THE COURT: Mr. Stender, I can understand you may

7   have some problem with potentially other putative class

8   members, but not with the named plaintiff.

9          MR. SQUITIERI: We'll supplement that, Your Honor.

10         THE COURT: All right.  Well, I'll have you -- I'm

11  just going to indicate on the scheduling order here the

12  plaintiff will supplement, and then I'll have you just

13  insert that when you resubmit it.  All right.

14         (Pause) All right.  I'll have plaintiff supplement

15  their damage calculation on paragraph 5 when this gets

16  resubmitted after the corrections get made that I made of

17  record.  So with that addition, the Court approves the --

18         MR. BAUMANN: Your Honor, if I -- just for the

19  record.  We ask that you enter the scheduling order without

20  prejudice to our position that this case should be

21  arbitrated and not litigated.  We're not waiving any of the

22  claims.

23         THE COURT: Oh, then -- there's no waiver.

24         MR. BAUMANN: I didn't think so, but I do want to

25  make sure the record is clear.

1          THE COURT: No, I just said the way the case is

2     postured.  There's outstanding motions but that's not

3     unusual for cases to have outstanding dispositive motions

4     and we still go forward with the case.

5          MR. BAUMANN: I understand.

6          THE COURT: Until they're ripe for ruling.  No,

7     you're -- there's no waiver by the defendants of their other

8     requests.

9          All right.  The Court approves the scheduling

10    order now as further amended on the record.  It is made an

11    order of the Court and a copy of the same will be provided

12    to you counsel who get that through e-notice.

13         May I ask whose, this scheduling order, word

14    processor it's on, plaintiffs or defendants or who?

15         MR. SQUITIERI:  I think it's on both of ours.

16         THE COURT: All right.

17         MR. BAUMANN: It's on either one of ours.

18         MR. TAYLOR: (Inaudible) our office.

19         MR. BAUMANN: Colorado counsel's saying they --

20         THE COURT: Plaintiff are to make the corrections

21    in blue that I"m handing you my copy.  Approved as to form

22    by all defendants, resubmit it to the Court.  I'll give you

23    two weeks, which will be until February 25, 2008.  It should

24    be nunc pro tunc back to today's date, as well, which is the

25    12th of February 2008.  And I put that on the signature

31

1    block, so you just need to follow that.  Okay.

2    Ms. Moore, do we have any problem with any of the

3    attorneys' e-notice addresses?

4    THE CLERK: (Inaudible-no microphone)

5    THE COURT: All right.  I'll order that take place

6    forthwith.  If you're going to participate in the case, you

7    need to enter your appearance electronically.  And remember

8    each attorney must have their entry of appearance

9    electronically separately to be placed on the e-notice list.

10    Also if any of the parties wish to have their

11    secretaries, paralegals, or both, added to the notice list,

12    let Ms. Moore know and we'll add those people for you.  I

13    suggest you do that, because I don't want people missing

14    hearings and so forth, so I suggest you do that.

15    Secondly, I want to advise counsel of a couple of

16    things that have arisen recently.  Make sure you speak with

17    your IT people in your offices to make sure that the Court's

18    domain name is placed on their white lists and your spam

19    blockers.  And that's so that the e-mails from the Court,

20    make sure they get they get delivered to you.

21    I did have an unfortunate case where the law firm

22    increased their spam levels, never checked to see what was

23    now being caught up in the spam file.  Turned out all of our

24    orders from the Court were being culled -- caught in it.

25    And then the argument by counsel was that: We didn't get it.

32

1    And the argument was denied because you got it and you
2    characterized it as spam.
3         If you look at the local rules, if it's received
4    by you folks and it's not a kickback -- in other words
5    nondeliverable by the Court -- it's being delivered to you.
6    So make sure you speak to your IT people, because I'm sure
7    all of you have spam filters on your computer systems, and
8    make sure that we're on the white list.
9         I would also recommend that any of the courts you
10   work in that have electronic filing they're also on the
11   white list as far as their domain names.  So you don't run
12   into that problem.  And that's an issue that has been
13   brought up in the court here because I don't like delay and
14   wasting people's time and people not showing up, and that's
15   what happened in that case.  And unfortunately, someone had
16   to get sanctioned with attorneys' fees and costs because one
17   side came in from out of state with all their parties and
18   the other side never showed up.  So let's not let that
19   happen.
20        Okay.  On the motions, I'm aware of those that
21   were outlined earlier by the parties.  Those aren't yet ripe
22   for ruling at this point noting they were recently filed
23   right at the end of January of this year.  We'll address
24   those as soon as they become ripe for ruling.
25        All right.  Anything further now on behalf of the

33

1    plaintiff at this point?

2                MR. SQUITIERI: Your Honor, just one thing for the

3    record if I may.

4                THE COURT: Yes, sir.

5                MR. SQUITIERI: Defendants' counsel spoke about

6    taking absent class members discovery.  I didn't jump up to

7    object, I didn't want to interrupt.  I do not agree to

8    waiving any of our rights to object to absent class members

9    that -- which is only very, very rarely ever raised.

10               THE COURT: Very well.  Anything else on behalf of

11   plaintiff?

12               MR. SQUITIERI: No, Your Honor.

13               THE COURT: On behalf -- Mr. Baumann, on behalf of

14   your clients -- defendants?

15               MR. BAUMANN: No, Your Honor.

16               THE COURT: All right.  Ms. White, on behalf of

17   your clients?

18               MS. WHITE: No, Your Honor.

19               THE COURT: Okay.  And finally, Ms. Musgrave, on

20   behalf of your clients?

21               MS. MUSGRAVE: None, Your Honor.

22               THE COURT: We're in recess.  Thank you.

23               MR. BAUMANN: Thank you.

24               THE CLERK: All rise.

25               (Whereupon, the within proceedings were then in

34

```
1    conclusion at 9:16 a.m. on February 12, 2008.)

2

3        I certify the foregoing is a correct transcript, to the

4    best of my knowledge and belief, from the record of

5    proceedings in the above-entitled matter.

6

7    _____        _____

8    Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Michael J. Watanabe**

Civil Action No.  07-cv-02503-EWN-MJW          FTR

Date:  February 12, 2008                       Shelley Moore, Deputy Clerk

STEVEN A. STENDER, et al.,                     Lee Squitieri
                                               Kenneth A. Wexler
                    Plaintiff(s),              Gerald L. Bader, Jr.
                                               Renee B. Taylor

v.

JAMES A. CARDWELL, et al.,                     Frederick J. Baumann
                                               David Gruenstein
                    Defendant(s).              K. Allison White
                                               Bobbee J. Musgrave
                                               Jonathan D. Polkes
                                               Cindy C. Oliver

---

## COURTROOM MINUTES / MINUTE ORDER

---

**SCHEDULING CONFERENCE**

**Court in Session 8:34 a.m.**
[X]       Scheduling Order entered as amended.

THE FOLLOWING WILL CONFIRM THE ACTIONS TAKEN AND DATES SET AT THE
SCHEDULING CONFERENCE HELD THIS DATE.
DEADLINES:
Joinder of Parties/Amendment to Pleadings: March 31, 2008
Fact Discovery: July 31, 2008
Dispositive Motions Deadline: August 29, 2008
Plaintiff's Disclosure of Experts: May 1, 2008
Defendants' Disclosure of Experts: June 2, 2008
Defendants' Rebuttal of Plaintiff's Experts: June 30, 2008
Plaintiff's Rebuttal of Defendant's Experts: June 30, 2008
Interrogatories: June 27, 2008
Requests for Production of documents:  June 27, 2008
Requests for Admissions:  June 27, 2008
Plaintiffs' class certification brief: February 15, 2008
Defendants' class certification response brief: March 13, 2008
Plaintiffs' class certification reply brief: March 27, 2008
Defendants' class certification written discovery: February 11, 2008
Plaintiffs' class certification written discovery responses due:  February 25, 2008

**SETTLEMENT CONFERENCE** set for: (none set)

**PRELIMINARY PRETRIAL CONFERENCE** set for: **June 6, 2008, at 8:30 a.m.**, in courtroom A-502. Valid photo identification is required to enter the courthouse. The proposed preliminary pretrial order shall be filed, and then sent as a Word or WordPerfect attachment to Watanabe_Chambers@cod.uscourts.gov, by **June 2, 2008**. In the subject line of the e-mail, counsel shall list the case number, short caption, and "proposed final pretrial order." (See www.cod.uscourts.gov for more information.)

TRIAL:
Trial Preparation Conference set for:
Trial to [X] Jury   for 25-30 days is set for

OTHER ORDERS:
Each party group shall be limited to 5 expert witnesses.
Each side shall be limited to 60 depositions.

**ORDERED:**     The parties shall submit a deposition schedule by February 25, 2008.

**ORDERED:**     The parties shall file any appropriate motion for protective order by February 25, 2008.

**ORDERED:**     A **Status Conference** is set on **April 14, 2008, at 8:30 a.m.** The Court will request an oral update on the progress of discovery and outstanding motions, and address the need to set a settlement conference.

**ORDERED:**     Parties are directed to www.cod.uscourts.gov and shall fully comply with the procedures of the judicial officer assigned to try this case on the merits.

**ORDERED:**     Plaintiff shall supplement the damages section with the resubmission of the scheduling order.

**ORDERED:**     Counsel shall make the changes of record and resubmit the scheduling order, dated *nunc pro tunc* February 12, 2008, on or before February 25, 2008.

Absent exceptional circumstances, no request for rescheduling any appearance in this court will be entertained unless a written request is made FIVE (5) business days in advance of the date of appearance.

**Court in Recess 9:16 a.m.**
Total In-Court Time 0:42, hearing concluded

*To obtain a transcript of this proceeding, please contact Avery Woods Reporting at (303)825-6119.

INFORMATION FOR SETTLEMENT CONFERENCES
BEFORE MAGISTRATE JUDGE WATANABE

Counsel and pro se litigants **shall have parties present** who shall have **full authority** to negotiate all terms and demands presented by the case, and **full authority** to enter into a settlement agreement, including an adjustor if an insurance company is involved. "Full authority" means that the person who attends the settlement conference has the complete and unfettered capacity and authority to meet or pay all terms or amounts which are demanded or sought by the other side of the case without consulting with some other person, committee or agency. If any person has limits upon the extent or amount within which he or she is authorized to settle on behalf of a party, that person does not have "full authority." **No party shall be permitted to attend the settlement conference by phone unless that party has obtained leave of Court following the filing of an appropriate motion, no later than five (5) business days prior to the settlement conference date.**

In order that productive settlement discussions can be held, the parties shall prepare and submit **two** settlement documents: one to be mailed to the other party or parties, and the other to be mailed only to the Magistrate Judge. The documents which are presented to opposing parties shall contain an overview of the case from the presenter's point of view, shall summarize the evidence which supports that side's claims, and shall present a demand or offer. These documents should be intended to persuade the clients and counsel or pro se litigant on the other side.

The document to be mailed to the Magistrate Judge shall contain copies of the above materials, but additionally shall contain any confidential comments which counsel or the pro se litigant wishes to make, any comments with regard to perceived weaknesses in the case and any comments which would be helpful to the magistrate in assisting the parties to negotiate a settlement.

ECF participants shall e-mail their Confidential Settlement Statements to chambers with a subject line "Confidential Settlement Statement" to: Watanabe_Chambers@cod.uscourts.gov, no later than five (5) business days prior to the settlement conference date. The Confidential Settlement Statement should be in PDF format and sent as an *attachment* to the e-mail. **Statements containing more than 15 pages *should also be submitted to chambers on paper* (hard copy)**, with the envelope addressed to "Magistrate Judge Watanabe Chambers, Personal and Confidential". Confidential Settlement Statements prepared by parties not represented by counsel, or without access to ECF, shall be submitted on paper to the Clerk's Office.

08CV4035
JUDGE DARRAH
MAGISTRATE JUDGE ASHMAN

PH

# Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| STEVEN A. STENDER and INFINITY CLARK STREET OPERATING, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| | ) Case No. |
| v. | ) ) |
| JAMES A. CARDWELL, ERNEST A. GERARDI, JR., RUTH ANN M. GILLIS, NED S. HOLMES, ROBERT P. KOGOD, JAMES H. POLK III, JOHN M. RICHMAN, JOHN C. SCHWEITZER, R. SCOT SELLERS, ROBERT H. SMITH, STEPHEN R. DEMERITT, CHARLES MUELLER, JR., CAROLINE BROWER, MARK SCHUMACHER, ALFRED G. NEELY, ARCHSTONE-SMITH OPERATING TRUST, ARCHSTONE-SMITH TRUST, LEHMAN BROTHERS HOLDINGS, INC., and TISHMAN SPEYER DEVELOPMENT CORPORATION, | ) ) <u>Jury Trial Demanded</u> ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Steven A. Stender ("Stender") and Infinity Clark Street Operating ("Infinity")

(hereinafter sometimes collectively referred to as "Plaintiffs"), by their attorneys, for their class

action complaint against Archstone-Smith Operating Trust, Archstone-Smith Trust, James A.

Cardwell, Ernest A. Gerardi, Jr., Ruth Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, James H.

Polk III, John M. Richman, John C. Schweitzer, R. Scot Sellers, Robert H. Smith, Stephen R.

Demeritt, Charles Mueller, Jr., Caroline Brower, Mark Schumacher, Alfred G. Neely Lehman

Brothers Holding, Inc. ("Lehman Brothers") and Tishman Speyer Development Corporation

("Tishman Speyer"), (hereinafter sometimes collectively referred to as "Defendants"), allege

upon knowledge as to their own acts, and upon information and belief as to all other matters,

based upon the investigation conducted by and through their attorneys, which investigation

included, *inter alia*, reviewing Securities Exchange Commission ("SEC") filings, press releases,

analyst reports, news articles, communications from the corporate Defendants and other

materials, as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiffs bring this action individually and as a class action on behalf of all

persons who owned Class A-1 Common Units of Archstone-Smith Operating Trust ("A-1 Unit

holders") as of the Merger (as defined hereinafter), for compensatory damages, contractual

damages and declaratory relief arising from the merger agreement among Archstone-Smith

Operating Trust (the "Archstone UPREIT"), Archstone-Smith Trust (the "Archstone REIT"),

Tishman Speyer and Lehman Brothers (Tishman Speyer and Lehman Brothers are referred to

collectively as the "Tishman-Lehman Partnership") to take the publically held Archstone REIT

private (the "Merger").

2.     The A-1 Unit holders of the Archstone UPREIT are former property owners, or

investors of former property owners, which contributed their properties (and/or equity in their

property holding companies) to the Archstone UPREIT, or its predecessor, Charles E. Smith

Residential Realty L.P. (the "Smith UPREIT), in exchange for limited partnership interests in the

Archstone UPREIT (or the Smith UPREIT) in the form of common units.  The objective of A-1

Unit holders in making such contributions was to obtain from the Archstone UPREIT (or the

Smith UPREIT) tax advantages, dividends and liquidity as specified in contribution agreements entered into at the time of their respective contributions. Upon information and belief, none of the contribution agreements pursuant to which the A-1 Unit holders received their A-1 Units allow the Archstone REIT, Archstone UPREIT or any subsequent buyers or merger partners to eliminate or avoid the contractual tax benefits, liquidity rights and dividends bargained for by the A-1 Unit holders at the time they contributed their properties to the Archstone UPREIT.

3. Given the magnitude of the tax liability A-1 Unit holders faced upon occurrence of a taxable event, the contractual tax liability protection afforded to the A-1 Unit holders by the Archstone UPREIT constituted an enormous potential liability to third parties interested in merging with or acquiring the Archstone UPREIT and the Archstone REIT. In this case, as explained in greater detail below, that liability was factored into the $60.75 buyout price offered per A-1 Unit by the Tishman-Lehman Partnership to A-1 Unit holders, which had been lowered from $64.00 to $62.50 to $60.75 to account for the Archstone UPREIT's obligations to A-1 Unit holders. However, even after lowering the offer price, the Defendants structured the Merger to disregard altogether the contractual tax, dividend and liquidity benefits owed to A-1 Unit holders. The Tishman-Lehman Partnership has not compensated the A-1 Unit holders for the loss of these benefits and A-1 Unit holders have sustained and will continue to accrue significant damages as a result.

4. More specifically, pursuant to the Merger Agreement, Plaintiffs and members of the Class (as defined hereinafter) have been coerced into: (1) cashing-out their A-1 Units, which will result in millions of dollars of unprotected tax liabilities; or (2) converting their A-1 Units into new Series O Preferred units ("Series O Units") which are economically inferior to the A-1 Units. While the Merger Agreement couches the cashing in of A-1 Units or conversion into

Series O Units as an "election," neither action as described in this Complaint was voluntary, but was coerced by Defendants. Insofar as the terms "elect" or "election" are used in this Complaint, it is for convenience only and in reference to the terminology in the Merger Agreement and is not intended to concede that it was a voluntary act of any kind.

5.     As a result of the Merger Agreement, A-1 Unit holders who took the Tishman-Lehman Partnership's cash offer will have to recognize capital gain in an amount based on the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT.

6.      Alternatively, A-1 Unit holders whose A-1 Units were converted to Series O Units have lost the liquidity and dividends they enjoyed before the Merger. Indeed, the Merger Agreement provides that Series O Unit holders will have to wait until the fifth anniversary of the Merger before they can redeem any or all of their Series O Units at a cash redemption price of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date. Moreover, the dividends previously regularly distributed to A-1 Unit holders have essentially been eliminated.

7.     Hence, many of the contractual tax protections, liquidity and long-term investment strategy benefits that hundreds, if not thousands of A-1 Unit holders enjoyed have been eliminated through the Merger by the unilateral breach of contract and breach of fiduciary duties by the Defendants.

8.     By entering into the Merger Agreement, the Individual Defendants, the Archstone REIT and Archstone UPREIT breached their fiduciary duties owed to A-1 Unit holders by failing to take all necessary steps to ensure that the unit holders will receive the maximum value realizable for their ownership interests and/or retain certain liquidity and dividend benefits and

tax protections they were guaranteed.  The Tishman-Lehman Partnership aided and abetted the other Defendants' breach of fiduciary duties and procured the breaches of contract detailed herein.

9.      Because Defendants failed to protect the best interests of the Class and breached with Class members, this lawsuit seeks compensatory damages, contractual damages and injunctive relief for all A-1 Unit holders who were or will be injured by Defendants' wrongful conduct.

## II.      PARTIES

10.     Plaintiff Stender is a resident of Cook County, Illinois and has been an owner of A-1 Units at all relevant times described herein.  Because of the coercive nature of the Merger Agreement, Stender was forced to "elect" to cash-out his A-1 Units and receive $60.75 per A-1 Unit.

11.     Plaintiff Infinity is an Illinois general partnership with its principal place of business in Chicago, Illinois.  Infinity is the successor in interest to Infinity Clark Street Operating, L.L.C., an Illinois limited liability company.  Infinity has been an owner of A-1 Units at all relevant times described herein.  Because of the coercive nature of the Merger Agreement, Infinity was forced to convert each Class A-1 Common Unit it owns to a newly issued Series O Preferred Unit on a one for one basis.

12.     Defendant James A. Cardwell was a director/trustee of both the Archstone REIT and the Archstone UPREIT at all relevant times.

13.     Defendant Ernest A. Gerardi, Jr. was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

14.     Defendant Ruth Ann M. Gillis was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

15.     Defendant Ned S. Holmes was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

16.     Defendant Robert P. Kogod was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

17.     Defendant James H. Polk III was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

18.     Defendant John M. Richman was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

19.     Defendant John C. Schweitzer was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

20.     Defendant R. Scot Sellers was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times, as well as the Chairman and Chief Executive Officer of the Archstone REIT and the Archstone UPREIT.  As an officer of the Archstone REIT and the Archstone UPREIT he will receive monetary benefits from the Merger in addition to the Merger consideration.

21.     Defendant Robert H. Smith was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

22.     Defendant Stephen R. Demeritt was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

23.     Defendant Charles Mueller, Jr. was the Chief Financial Officer of the Archstone REIT and the Archstone UPREIT at all relevant time.

24.     Defendant Caroline Brower was an Executive Vice President and General Counsel of the Archstone REIT and the Archstone UPREIT at all relevant times.

25.     Defendant Mark Schumacher was the Senior Vice President and Chief Accounting Officer of the Archstone REIT and the Archstone UPREIT at all relevant times.

26.     Defendant Alfred G. Neely was the Chief Development Officer and President of the Charles E. Smith Division of the Archstone REIT and the Archstone UPREIT at all relevant times

27.     The individual directors and officer Defendants are sometimes collectively referred to as the "Individual Defendants."

28.     The Individual Defendants, as officers, directors and trustees of the Archstone REIT and the Archstone UPREIT, owed fiduciary duties of care, candor, loyalty and good faith toward the A-1 Unit holders and were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of Archstone UPREIT, including, among other things, acting in good faith and with loyalty, due care, and candor towards A-1 Unit holders.

29.     Defendant Lehman Brothers is a corporation existing under the laws of the State of Delaware which, through affiliates: (1) owned and controlled River Holding LP, the party with which the Archstone REIT has merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT has merged.

30.     Defendant Tishman Speyer is a corporation existing under the laws of the state of Delaware which, through affiliates: (1) owned and controlled River Holding LP, an entity with which the Archstone REIT merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT merged.

31.     Defendant Archstone REIT was engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.  The Archstone REIT was organized under Maryland law and maintained its headquarters at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112.  The Archstone REIT owned approximately 89% of the Archstone UPREIT.  The Archstone REIT was the sole trustee of the Archstone UPREIT and its relation with the Archstone UPREIT was governed by the Declaration of Trust of the Archstone UPREIT.

32.     Defendant Archstone UPREIT was a limited partnership with its principal office at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112.  The Archstone UPREIT was organized under Maryland law.  Plaintiffs and members of the Class owned limited partnership interests known as A-1 Units in the Archstone UPREIT.

33.     By the acts, transactions, and courses of conduct alleged herein, Defendants, individually and as part of a common plan and scheme and/or aiding and abetting one another in total disregard of their fiduciary duties, are depriving Plaintiff and the Class of the true value of their investment in the Archstone UPREIT and/or the entity formed as a result of the Merger (the "Company").

34.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in his or her capacity as an officer and/or director of the Archstone REIT and the Archstone UPREIT, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

### III.     JURISDICTION AND VENUE

35.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy, upon information and belief, exceeds the sum of $5,000,000.00

exclusive of interest and costs, and is a class action in which members of the Class are citizens of states other than Colorado.

36.    Upon information and belief, at least one Class Member is a citizen of a state different than the Defendants.  Plaintiffs are seeking relief on behalf of a nationwide class and believe that Class Members reside in states throughout the country.

37.    Upon information and belief, more than two-thirds of the Class Members are not citizens of the state in which this action was filed.

38.    The principal injuries to the Class were incurred throughout the United States and were not principally incurred in the state where the action was originally filed.

39.    Upon information and belief, Colorado citizens do not comprise greater than one-third of the Plaintiff Class.

40.    Upon information and belief, Defendants are, for jurisdictional purposes, citizens of Colorado.  Defendants are not charitable organizations.

41.    This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. §§ 1332(d)(4)(A) and (B).

42.    This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(3).

43.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.  Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Real Estate Investment Trusts

44.    A Real Estate Investment Trust ("REIT") is an entity that owns and manages income-producing real estate such as apartments, offices and industrial space. Along with meeting additional criteria, to qualify as a REIT the entity must:

- pay at least 90% of its taxable income to its shareholders every year;

- have at least 100 shareholders;

- invest at least 75% of its total assets in real estate; and

- derive at least 75% of its income from rent or mortgage interest from properties in its portfolio.

45.    One of the most beneficial aspects of a REIT is the method in which taxes are handled. A REIT may deduct the dividends paid to the shareholders from its corporate tax bill. Therefore, a REIT generally does not pay federal corporate income tax and taxes are only paid by the individual investor for the dividends received and any capital gains.

46.    REIT investors also enjoy the advantages of limited liability and transferability of shares (*i.e.,* liquidity) that a corporate structure offers, without incurring the costs of double taxation. Thus, a REIT is essentially a combination of a corporation and a partnership in that it combines the benefits of a corporation with the tax pass-through nature of a partnership.

47.    An UPREIT is a partnership (Umbrella Partnership Real Estate Investment Trust). A typical UPREIT is created by a group of sponsors who form a limited partnership and contribute their property to the UPREIT in return for limited partnership interests in the UPREIT. Simultaneously, a corporation, typically the REIT, contributes cash that it raised in a

public offering in return for a general partnership interest in the UPREIT.  The resulting

partnership is called an UPREIT.

      48.     The managing general partner of an UPREIT is usually a REIT.  Because the

REIT is the managing general partner of the UPREIT, it is responsible for the strategic direction

of the UPREIT, as well as the management and administration of the properties held by the

UPREIT.

      49.     By contributing real estate to an UPREIT, sponsors can mitigate the level of risk

associated with the property they contributed by becoming equity holders in a much larger entity

that owns a diverse portfolio of real estate assets.  Sponsors also avail themselves of the

opportunity to eliminate the personal liabilities that encumber their contributed property by

having the UPREIT assume these liabilities.

      50.     In most UPREITs, the sponsors receive limited partnership interests that are easily

convertible into common stock of the managing partner REIT.  As a result, the limited

partnership interests are easily sellable on the open market.

**B.**     **Archstone-Smith Trust's and Archstone-Smith Operating Trust's Structure as an
UPREIT**

      51.     Archstone-Smith Operating Trust was structured as an UPREIT.

      52.     Archstone-Smith Trust was a REIT with its common shares publicly traded on the

New York Stock Exchange.  The Archstone REIT was the managing general partner of the

Archstone UPREIT.  Because the Archstone REIT was the managing general partner of the

Archstone UPREIT, it was responsible for the strategic direction of the UPREIT, as well as the

management and administration of the properties held by the UPREIT.  Moreover, the Archstone

REIT was the sole trustee and owned 88.2% of the Archstone UPREIT at December 31, 2006.

53.    As of December 31, 2006, the Archstone REIT and Archstone UPREIT (sometimes collectively referred to as the "Archstone Entities") owned or had an ownership position in 348 communities, representing 88,011 units, including units under construction.  The Archstone Entities were engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.

54.    In the Archstone UPREIT, like most UPREITs, the limited partners (here the A-1 Unit holders) received limited partnership interests that were convertible into common stock of the Archstone REIT.  The primary purpose of this feature was to give A-1 Unit holders liquidity in their investment.  Rather than being restricted to holding an illiquid limited partnership interest in the Archstone UPREIT, the A-1 Unit holders could redeem their interests for cash or convert their interests to common stock in the publicly traded Archstone REIT and then sell the stock in the open market.

55.    The Archstone UPREIT also offered valuable tax advantages to the A-1 Unit holders.  For example, generally transfers of appreciated property to a REIT are taxable events.  Thus, under the basic REIT form, a sponsor who contributes appreciated property to the REIT must recognize gain in an amount equal to the excess of the value of the stock received over the basis of the property contributed.  This tax ramification, however, applies only to corporations, not to partnerships.  By utilizing the Archstone UPREIT, A-1 Unit holders were able to contribute their property to the Archstone UPREIT, rather than to the Archstone REIT, with the result being tax deferred treatment of the transactions.

**C.**    **Plaintiffs and Members of the Class Were Afforded Significant Tax Protections and Liquidity Rights Upon Contributing Their Properties to the Archstone UPREIT**

56.    In the late 1990's, realizing the tax benefits and liquidity advantages of an UPREIT, many real estate investors, including partnerships Plaintiffs were investors in, agreed to

contribute their properties to various UPREITS in exchange for limited partnership interests ("Sponsors").

57.    Oftentimes, the Sponsors' real estate contribution agreements and partnership agreements with the UPREITS provided them with certain tax benefits, dividends and liquidity. For example, the Plaintiffs' contribution agreements with Charles E. Smith Residential Realty L.P. ("Smith UPREIT") provided that for a period of time following the closings of their real estate contributions, the Smith UPREIT could not dispose of any interest in the property contributed by Plaintiffs that resulted in them realizing a taxable gain.  If such a gain was triggered, the Plaintiffs were to be indemnified by the Smith UPREIT for any resulting tax liability.

58.    The Plaintiffs' contribution agreements also provided that they could redeem their UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc. REIT.

59.    On October 31, 2001, the Smith UPREIT merged with and into the Archstone UPREIT.  The foregoing tax protections and liquidity provisions were all contained in binding contribution agreements assumed by the Archstone UPREIT and Archstone REIT as well the declaration of trust governing the Archstone UPREIT and Archstone REIT.

60.    Upon information and belief, Plaintiffs' tax protections and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITS, including those with the Archstone UPREIT.

61.    Indeed, the Archstone UPREIT agreed in its Declaration of Trust, for the benefit of the hundreds, if not thousands of A-1 unit holders with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by

13

a wholly owned subsidiary of the Archstone UPREIT. According to the Declaration of Trust, these restrictions were to be effective until January 1, 2022.

62.    Moreover, each A-1 Unit issued pursuant to contribution agreements with tax protections and liquidity provisions virtually identical to those contained in Plaintiffs' contribution agreements was subject to a unit redemption right at the option of the A-1 Unit holder. This redemption right required the Archstone UPREIT to acquire the unit holder's A-1 Unit for the market price of Archstone REIT common shares. The Archstone REIT, in its discretion, could elect to assume and directly satisfy the Archstone UPREIT's redemption obligation, in which case the Archstone REIT would pay the redeeming unit holder in Archstone REIT common shares, or their cash equivalent.

63.    In addition, the Archstone UPREIT was contractually obligated to maintain specified levels of borrowings outstanding with respect to the properties contributed by Plaintiffs and members of the Class, and A-1 Unit holders were to receive quarterly dividend distributions from the Archstone UPREIT.

64.    These provisions were intended to ensure that Plaintiffs and members of the Class would be able to continue to defer the gain that would otherwise be recognized by them for tax purposes: (i) upon a sale by the Archstone UPREIT of any of the properties contributed by Plaintiffs or the members of the Class; (ii) upon the sale by the Archstone UPREIT of any of its interest in a subsidiary owning the properties contributed by Plaintiffs or the members of the Class; or (iii) upon the repayment of borrowings relating to the properties contributed by Plaintiffs or the members of the Class. If the Archstone UPREIT sold any of the properties contributed by Plaintiffs or members of Class, or any interest therein, without satisfaction of certain conditions, or repaid borrowings relating to the contributed properties, the Archstone

UPREIT was liable for the loss of tax benefits and could be liable for monetary damages for engaging in these undertakings.

1.    **The Archstone Entities' Merger Agreement With the Tishman-Lehman Partnership Circumvents the Benefits Provided to the Plaintiffs and Other A-1 Unit Holders**

       1.    *The Merger's Background*

65.    On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

66.    On May 2, 2007, the Tishman-Lehman Partnership submitted a written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

67.    On May 15 and 16, 2007, the Archstone REIT's board of trustees became aware of concerns on the part of both bidders with respect to the "significant magnitude of the built-in gain associated with certain of [Archstone's] properties that are subject to tax protection agreements with operating trust unitholders and the magnitude of the increase in property taxes as a result of the transaction."  Archstone Smith Operating Trust Form 424B3, filed Aug. 9, 2007, at 56.

68.    On May 19 and 20, 2007, the Tishman-Lehman Partnership indicated to Morgan Stanley, the Archstone Entities' financial advisor, that "due to increased expected transaction costs resulting from their better understanding of the magnitude of the company's tax protection obligations and due to adverse changes in the debt markets, they were uncertain whether any offer that they were to submit would be at a price equal to their initial indication of $64.00 per common share and unit."  *Id.* at 58.

69.　　On May 23, 2007, the Tishman-Lehman Partnership contacted Morgan Stanley and offered to acquire the Archstone Entities at a price of $60 per Archstone REIT common share and $60 per Archstone UPREIT common unit.  This offer represented a 6.25% decrease over a period of only three weeks, which Tishman-Lehman Partnership indicated "was primarily a result of information obtained in their confirmatory due diligence regarding, among other things, the magnitude and scope of our tax protection arrangements, the compression in returns that they could expect to realize from our development pipeline, and the deterioration of the debt capital markets."  *Id.* at 59.  In addition, the Tishman-Lehman Partnership "indicated that they had determined that there were significant transaction costs exclusive of the impact on value associated with the Company's tax protection obligations."  *Id.*  In response, the Archstone REIT's board of trustees instructed Morgan Stanley to present a counterproposal of $62 per common share and common unit.

70.　　On May 24, the Tishman-Lehman Partnership increased its offer to $61 per common share and common unit.  Later that day, the Tishman-Lehman Partnership indicated that it was unwilling to pay $61 per common share and common unit unless the second quarter dividend was not paid.  In response, Archstone REIT's board of trustees instructed Morgan Stanley to inform the Tishman-Lehman Partnership that the board would accept a price of $60.75 per common share and common unit and pay the second quarter dividend of $0.4525 per common share and common unit.

71.　　By the close of business on May 29, 2007, the Archstone REIT's shares traded at $61.45, a material premium to the Merger Agreement's consideration of $60.75 per share. Furthermore, the Archstone REIT's common stock price traded well above the Merger Agreement's consideration as recently as January 30, 2007.  In fact, the Archstone REIT's

common shares have lost a considerable amount of their value between late January 2007, and the day prior to the announcement concerning the Merger Agreement were and are poised to enjoy significant gains as slumping house prices cause individuals to rent, rather than buy, properties in large commercial markets.

### 2.    *The Merger Agreement*

72.    On May 29, 2007, the Archstone REIT publicly announced that it signed a definitive merger agreement to be acquired by the Tishman-Lehman Partnership in a transaction valued at approximately $22.2 billion, including the assumption and refinancing of the Archstone REIT's outstanding debt and excluding transaction costs.

73.    Pursuant to the Merger Agreement, the Tishman-Lehman Partnership agreed to acquire all outstanding common shares of the Archstone REIT in exchange for $60.75 per share in cash.  The Archstone REIT reported that the purchase price per share represented a 22.7% premium over the share price on May 24, 2007, immediately before published reports regarding a potential acquisition.

74.    The Merger Agreement also provided that holders of A-1 Units were entitled to one newly issued Series O Unit for each existing A-1 Unit.  Alternatively, A-1 Unit holders could "elect" to receive: (a) $60.75 per A-1 Unit in cash, without interest and less applicable withholding taxes; or (b) a combination of the cash consideration and Series O Units.

75.     Moreover, pursuant to the Merger Agreement no additional quarterly dividend distributions would be paid to A-1 Unit holders prior to the completion of Merger.

76.    A-1 Unit holders were allowed until 11:59 P.M., EST, on September 10, 2007, to make an "election" for their common units, which deadline was later extended until September 18, 2007.

77.     Had the A-1 Unit holders been told that the Archstone REIT and Archstone UPREIT were engaged in negotiating a transaction that would eliminate their dividend, liquidity and tax benefits, the A-1 holders could have redeemed their A-1 Units before they were informed of the Merger, and at prices substantially higher than the $60.75 per unit Merger price.

        **3.**      ***The A-1 Unit Holders' Tax Benefits Are Recognized***
                ***as an Integral Part of the Archstone Entities' Economic Structure***

78.     As indicated above, prior to the Merger Agreement being consummated, at least one additional unidentified company was involved in bidding on the acquisition of the Archstone UPREIT and the Archstone REIT.

79.     Interestingly, both the unidentified company and the Tishman-Lehman Partnership explained on numerous occasions that their offer prices to acquire the Archstone entities were based upon, among other things, the magnitude and scope of the Archstone UPREIT's tax protection arrangements with A-1 Unit holders.  All potential acquirers came to the same conclusion -- that the UPREIT's tax protection and other obligations were contractual obligations that would survive the Merger and therefore the potential acquirers felt that they needed to factor that liability into the acquisition price.  Accordingly the potential liability to the acquirers of the tax protection obligations caused the acquirers to lower the price to be offered which lowered the price at which A-1 unit holders could "elect" to cash out at the time of the Merger.  In fact, this factor ultimately led to the unidentified company's decision not to submit an offer to acquire the Archstone Entities.  Yet, despite the prospective buyers' lack of willingness to acquire the Archstone Entities at an adequate price, Defendants persisted on reaching a deal with the Tishman-Lehman Partnership, even if it meant that the A-1 Unit holders would suffer severe tax consequences or have the liquidity of their investments severely impaired.

18

80.    Moreover, even though Plaintiffs' and A-1 Unit holders' tax protection agreements were among one of the most significant factors in determining the lower final acquisition price of the Archstone UPREIT and the Archstone REIT, the Individual Defendants, the Archstone REIT, the Archstone UPREIT and the Tishman-Lehman Partnership refused to provide A-1 Unit holders with compensation for elimination of the tax protection agreements and refused to preserve a host of other contractual benefits contained in the contribution agreements for A-1 Unit holders.

### 4.    *The Negative Effects of the Merger on A-1 Unit Holders*

81.    The Merger has had negative financial consequences for both A-1 Unit holders that "elected" to receive the Tishman-Lehman Partnership's cash offer and A-1 Unit holders that "elected" to convert or otherwise had their A-1 Units converted to Series O Units.

82.    The A-1 Unit holders that were forced to accept the Tishman-Lehman Partnership's cash offer have had to recognize capital gain in an amount equal to the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT. Upon information and belief, such gains have resulted in millions of dollars of tax liability for many A-1 Unit holders.

83.    Alternatively, the A-1 Unit holders that were forced convert their units to Series O Units have been forced to forfeit the liquidity they enjoyed before the Merger and are now saddled with owning an investment in a private company that will likely be highly leveraged with debt.

84.    For example, the Merger Agreement provides that after five years Series O Unit holders can redeem any or all their units at a cash redemption of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date.  Hence, the Series O

Units will be completely illiquid for a minimum of five years and the Series O Unit holders will be deprived of any increase in the value of the underlying properties.

85.    Yet, even after the expiration of the five-year redemption waiting period described above, Series O Unit holders may only gradually liquidate their investment because the Company will not be required to redeem more than one-third of the Series O Units outstanding in any twelve month period.  If the Company receives redemption notices for a number of Series O Units in excess of the limit, it will redeem the units in the order that it received the redemption notices rather than pro rata.

86.    Thus, Series O Unit holders will be forced to hold an almost completely illiquid asset for a minimum of five years since these units are not publicly traded in the market, and even after this five year period, the liquidity of these units will be severely limited and possibly eliminated altogether.  The Company, however, has the right to redeem all of the Series O units for cash at $60.75 per unit any time after the fifth anniversary of the Merger.

87.    Plaintiffs and members of the Class are also damaged by the Archstone UPREIT's failure to pay third quarter dividends to A-1 Unit holders, as well as the Company's failure to plan for the regular payment of dividends to Series O Unit holders.  Previously, Plaintiffs and members of the Class had available the distributions that they regularly received from the Archstone UPREIT to defray taxes on gains.  As a result of A-1 Unit holders not receiving their third quarter dividends, however, they will not be able to defray a significant portion of their tax liability.  Moreover, following the Merger, A-1 Unit holders will likely no longer be able to defray their taxes because the payment of the six percent dividend on Series O Units is discretionary and, according to a source at the Archstone REIT, the Company has no current plan to pay dividends and does not know when it will begin, if ever, paying them.  Thus, Plaintiffs

and members of Class will likely now be forced to pay taxes on "phantom income" allocated to

them, but for which there are no cash distributions with which to pay the taxes.

88.    Yet, there are additional adverse consequences that the Merger has upon Plaintiffs

and members of the Class, which include, but are not limited to the following:

a.    Before the Merger, A-1 Units were protected by anti-dilution measures in the
Archstone UPREIT's governing documents.  After the Merger, these anti-dilution
measures were eliminated.

b.    Before the Merger, A-1 Unit holders were entitled to their pro rata share of the
proceeds of dissolution, liquidation, or winding up remaining after payment of the
Archstone UPREIT's debts and satisfaction of the preferences of any class or
series of units entitled to a preference in dissolution, liquidation, or winding up
over the Archstone UPREIT's common units.  After the Merger, Series O Unit
holders are only entitled to $60.75 per share plus any unpaid distributions.

c.    Before the Merger, the Archstone UPREIT was managed by the Archstone REIT,
and the Archstone REIT could not take any action that was contrary to an express
limitation or prohibition in the declaration of trust without an amendment to that
provision adopted under the Archstone UPREIT Declaration of Trust.  After the
Merger, the protection of allowing limited or prohibited action only after
amendment of the Archstone UPREIT Declaration of Trust was eliminated.

d.    Before the Merger, the Archstone REIT was generally prohibited from, directly or
indirectly, entering into or conducting any business other than in connection with
the ownership, acquisition and disposition of its and the management of its
business activities.  After the Merger the Company can engage in business
activities in addition to those relating to the newly formed UPREIT, including
business interests and activities that are in direct competition with newly formed
UPREIT.

e.    Before the Merger, A-1 Unit holders received quarterly and annual financial
reports.  After the Merger, Series O Unit holders will receive only annual
financial reports.

89.    Hence, Plaintiffs and members of the Class have sustained and will continue to

accrue significant damages as a result of the Merger.

## IV.     CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class A-1 Common Unit holders of Archstone-Smith Operating Trust at the time of the Merger (the "Class").

96.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed by amendment or amended complaint.  Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

97.     **Numerosity**.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds, if not thousands of similarly situated A-1 Unit holders of record scattered throughout the United States.  Upon information and belief, hundreds, if not thousands of other A-1 Unit holders enjoyed similar, if not identical liquidity and tax benefits through their agreements with the Archstone UPREIT.  The precise number of Class Members is unknown to Plaintiffs.  The true number of Class Members is known by Defendants, however, and thus, may be notified of the pendency of this action by first class mail, electronic mail, and by published notice.

98.     **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all members of the Class and predominate over

any questions affecting only individual Class Members.  These common legal and factual

questions include, but are not limited to, the following:

     i.      Whether the Defendants have breached their fiduciary
             duties owed by them to Plaintiffs and the Class, and/or
             have aided and abetted in such breach, by virtue of their
             participation and/or acquiescence and by their other
             conduct complained of herein;

     ii.     Whether Defendants breached their contracts with Plaintiffs
             and members of the Class;

     iii     Whether Tishman Speyer and Lehman Brothers have
             tortiously interfered with the A-1 Unit holders contracts;
             and

     iv.     Whether Plaintiffs and members of the Class have
             sustained damages as a result of Defendants' conduct, and,
             if so, what is the appropriate measure of damages.

99.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Class Members in

that Plaintiffs and each member of the Class are all A-1 Unit holders of the Archstone UPREIT

who have and will continue to suffer financial hardship and other damages as a result of

Defendants' conduct.

100.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately protect the

interests of the members of the Class.  Plaintiffs have retained counsel experienced in complex

class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no

adverse or antagonistic interests to those of the Class.

101.    **Superiority**.  A class action is superior to all other available means for the fair

and efficient adjudication of this controversy.  The damages or other financial detriment suffered

by individual members of the Class is relatively small compared to the burden and expense that

would be entailed by individual litigation of their claims against the Defendants.  It would thus

be virtually impossible for the members of the Class, on an individual basis, to obtain effective

redress for the wrongs done to them.  Furthermore, even if members of the Class could afford

such individualized litigation, the court system could not.  Individualized claims brought by

members of the Class would create the danger of inconsistent or contradictory judgments arising

from the same set of facts.  Individualized litigation would also increase the delay and expense to

all parties and the court system from the issues raised by this action.  By contrast, the class action

device provides the benefits of adjudication of these issues in a single proceeding, economies of

scale, and comprehensive supervision by a single court, and presents no unusual management

difficulties under the circumstances here.

102.    The requirements for maintaining this action as a class action under Rules

23(b)(1) and (b)(2) are also satisfied:

a.    Prosecution of separate actions by members of the Class would create a risk of

inconsistent adjudications with respect to individual members of the Class which

would establish incompatible standards of conduct for Defendants.  Alternatively,

adjudications with respect to individual members of the Class would, as a

practical matter, be dispositive of the interests of the other members not parties to

the adjudications, or substantially impair or impede their ability to protect their

interests, particularly in light of the fact that Plaintiffs seek to obtain relief on

behalf of all A-1 Unit holders; and

b.    Defendants have acted and/or failed to act, on grounds generally applicable to the

Class, thereby making appropriate monetary relief, final injunctive and other

equitable relief with respect to the Classes as a whole.

## COUNT I

### BREACH OF CONTRACT
**(Against the Archstone UPREIT and the Archstone REIT)**

103.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

104.    Plaintiffs and members of the Class executed enforceable property contribution agreements and partnership agreements with the Archstone UPREIT.

105.    Under the contribution agreements and partnership agreements, the Archstone UPREIT and the Archstone REIT agreed not to enter into any transactions or dispose of any interest in the property contributed by the A-1 Unit holders that resulted in them realizing a taxable gain and to provide A-1 Unit holders with the ability to liquidate their units by receiving cash or converting them to common shares in the publicly traded Archstone REIT.

106.    The Archstone UPREIT and the Archstone REIT, as the general managing partner of the Archstone UPREIT, failed to perform their duties under the contribution and partnership agreements and statutory and common law partnership principles, and thereby breached their contractual obligations by failing to honor certain liquidity provisions in the contribution and partnership agreements and by failing to act independently so that the interests of A-1 Unit holders would be protected.

107.    Instead, the Archstone REIT and the Individual Defendants have accepted the Merger Agreement, which subjects Plaintiffs and members of the Class either to adverse tax consequences or completely strips them of their liquidity rights, in violation of the contribution and partnership agreements.

108.    The Archstone Entities' failure to perform their duties under the contribution and partnership agreements have and will continue to cause financial and other damage to Class A-1 Common Unit holders.

109.    The Archstone Entities' failure to perform their duties under the contribution and partnership agreements is material in nature thereby discharging any and all obligations Plaintiffs and the members of the Class owe to the Archstone Entities under the contribution and partnership agreements.

110.    Plaintiffs and the members of the Class have performed all conditions precedent to enable them to recover the relief sought herein, or such conditions have been excused or waived.

## COUNT II

### BREACH OF FIDUCIARY DUTIES - MAJORITY OPPRESSION OF THE MINORITY A-1 UNIT HOLDERS
**(Against the Archstone REIT and against the Individual Defendants and Tishman-Lehman Partnership for the aiding and abetting thereof)**

111.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

112.    At all relevant times, the Archstone REIT was the majority owner of the Archstone UPREIT, owning of over 89% of the equity of the Archstone UPREIT.

113.    As majority owner, the Archstone REIT owed a fiduciary duty to the minority A-1 Unit holders to avoid using its majority ownership in bad faith or in reckless disregard of its duties as trustee to oppress the minority owners.

114.    The actions of the Archstone REIT in negotiating, formulating and voting in favor of the Merger of Archstone Entities with the Tishman-Lehman Partnership, however, were committed in bad faith and with reckless disregard of its duties as trustee and constitute oppression of the minority by the majority and have resulted in damage and loss to Plaintiffs and members of the Class.

115.     More specifically, the Merger proceeded without a vote of Plaintiffs and members of the Class, thereby disenfranchising the A-1 Unit holders.  The Archstone REIT approved the Merger pursuant to a written consent dated and effective as of August 31, 2007.

116.     As a result of the Merger, Plaintiffs and the members of the Class were entitled to receive one newly issued Series O Unit per each existing A-1 Unit.  Alternatively Plaintiffs and the members of  the Class were offered an "election" to receive in exchange for their A-1 Units either $60.75 per unit in cash, without interest and less applicable withholding taxes or a combination of the cash consideration and Series O Units.

117.     Plaintiffs and the members of the Class were also forced to forgo any dividends owed to them by the Archstone UPREIT for the third quarter of fiscal year 2007.

118.     The Archstone REIT used its majority power in bad faith and with reckless disregard to its duties as trustee to: (1) disenfranchise the minority; (2) coerce the minority into converting their A-1 Units for cash with less than the fair value of the allocable share of the equity, assets and earnings of the Archstone UPREIT; (3) deprive the minority A-1 Unit holders of the financial benefits of the dividends and tax agreements; and (4) destroy the liquidity of the A-1 Units.

119.     The Individual Defendants and the Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transaction on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Archstone UPREIT owed fiduciary duties to the A-1 Unit holders and with knowledge that the Archstone REIT was breaching its fiduciary duties to Archstone UPREIT and the A-1 Unit holders.

## COUNT III

### BREACH OF FIDUCIARY DUTIES – SELF DEALING
**(Against the Archstone REIT and the Individual Defendants
and against the Tishman-Lehman Partnership for the aiding and abetting thereof)**

120.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

121.    At all relevant times, the Individual Defendants and the Archstone REIT, as the sole trustee and majority owner of Archstone UPREIT, had:  (1) a fiduciary duty to the minority A-1 Unit holders to, in good faith, act in the best interests of all A-1 Unit holders; (2) a fiduciary duty not to act in reckless disregard of its duties as trustee; (3) a duty not to self-deal with the Archstone UPREIT on terms that were more beneficial to the Archstone REIT, its directors and officers, or any of its affiliates than to the minority holders; (4) a fiduciary duty to deal at arms length with the Archstone UPREIT and in such dealings to eliminate all conflicts of interests; and (5) a fiduciary duty to ensure that in all dealings with the Archstone UPREIT were maintained an "entire fairness" standard, meaning that any transactions between the Archstone REIT and Archstone UPREIT must be achieved, if at all, through a fair process at a fair price.

122.    The Archstone REIT breached its fiduciary duties by, *inter alia*:  (1) refusing to allow A-1 Unit holders to vote on the Merger; (2) refusing to appoint an independent committee to act on behalf of the Archstone UPREIT; (3) refusing to require that any transaction between Archstone REIT (and any affiliates thereof) and Archstone UPREIT be approved by a majority vote of the A-1 and A-2 Unit holders voting separately as a class; and (4) refusing to allow the Archstone UPREIT to engage investment and legal advisers to advise on the fairness of any transactions, from a procedural and financial view to the minority holders.

123.    As a result of the Archstone REIT's and the Individual Defendants' self-dealing and reckless disregard of their duties as trustees and officers of the trust, and the aiding and

abetting thereof by the Tishman-Lehman Partnership, Plaintiffs and the Class have sustained loss and damage to the value of their A-1 Units.

124.    The Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transactions on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Individual Defendants owed fiduciary duties to Archstone UPREIT and the Class A-1 Unit holders and with knowledge that the Archstone REIT and Archstone UPREIT were breaching their fiduciary duties to A-1 Unit holders.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  November 30, 2007

**STEVEN A. STENDER and INFINITY CLARK STREET OPERATING, on behalf themselves and all others similarly situated,**

s/Gerald L. Bader, Jr.
Gerald L. Bader, Jr.
Renée B. Taylor
**BADER & ASSOCIATES, LLC**
14426 East Evans Avenue
Suite 200
Denver, Colorado  80014
Telephone:  303-534-1700

Kenneth A. Wexler
Edward A. Wallace
Christopher J. Stuart
Andrae P. Reneau
**WEXLER TORISEVA WALLACE LLP**
55 West Monroe Street
Suite 3300
Chicago, Illinois  60603
Telephone:  312-346-2222

Lee Squitieri
**SQUITIERI & FEARON, LLP**
32 East 57th Street
2nd Floor
New York, New York  10022
Telephone:  212-421-6492

Plaintiffs' addresses:

Steven A. Stender
900 Elm Place
Glencoe, Illinois 60022

Infinity Clark Street Operating
20 North Wacker Drive
Suite 1725
Chicago, Illinois 60606

08CV4035
JUDGE DARRAH
MAGISTRATE JUDGE ASHMAN

PH

# Exhibit C

Firm No. 37591

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

JACK P. KATZ, on behalf of himself and all
others similarly situated,

              Plaintiff,

              v.

ERNEST A. GERARDI, JR., RUTH ANN M.
GILLIS, NED S. HOLMES, ROBERT P.
KOGOD, JAMES H. POLK III, JOHN C.
SCHWEITZER, R. SCOT SELLERS,
ROBERT H. SMITH, STEPHEN R.
DEMERITT, CHARLES MUELLER, JR.,
CAROLINE BROWER, MARK
SCHUMACHER, ALFRED G. NEELY,
ARCHSTONE-SMITH OPERATING
TRUST, ARCHSTONE-SMITH TRUST,
LEHMAN BROTHERS HOLDINGS, INC.,
and TISHMAN SPEYER DEVELOPMENT
CORPORATION,

              Defendants.

Case No.

# 08CH17172

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Jack P. Katz ("Katz" or "Plaintiff"), by his attorneys, for his class action

complaint against Archstone-Smith Operating Trust, Archstone-Smith Trust, Ernest A. Gerardi,

Jr., Ruth Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, James H. Polk III, John C.

Schweitzer, R. Scot Sellers, Robert H. Smith, Stephen R. Demeritt, Charles Mueller, Jr.,

Caroline Brower, Mark Schumacher, Alfred G. Neely, Lehman Brothers Holding, Inc. ("Lehman

Brothers") and Tishman Speyer Development Corporation ("Tishman Speyer"), (hereinafter

sometimes collectively referred to as "Defendants"), alleges upon knowledge as to his own acts,

and upon information and belief as to all other matters, based upon the investigation conducted

by and through his attorneys, which investigation included, *inter alia*, reviewing Securities Exchange Commission ("SEC") filings, press releases, analyst reports, news articles, communications from defendants and other materials, as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiff brings this action pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k, 77l(a)(2), and 77o, respectively, individually and as a class action on behalf of all holders of Class A-1 or similar common units of Archstone-Smith Operating Trust ("A-1 Unit holders") at the time of the Merger (as defined hereinafter), for statutory damages and rescissory damages arising from the merger and exchange of A-1 units for cash and/or Series O units pursuant to an agreement among Archstone-Smith Operating Trust (the "Archstone UPREIT"), Archstone-Smith Trust (the "Archstone REIT"), Tishman Speyer and Lehman Brothers (Tishman Speyer and Lehman Brothers are referred to collectively as the "Tishman-Lehman Partnership") to take the publically held Archstone REIT private (the "Merger").

2.     The A-1 Unit holders of the Archstone UPREIT are former property owners, or investors in property owning companies, which contributed their properties (and/or equity in their property holding companies) to the Archstone UPREIT, or its predecessor, Charles E. Smith Residential Realty L.P. (the "Smith UPREIT), in exchange for equity interests in the Archstone UPREIT (or its predecessor the Smith UPREIT) in the form of common units.

3.     The objective of A-1 Unit holders in making such contributions was to obtain from the Archstone UPREIT (or the Smith UPREIT) tax advantages, dividends and liquidity as specified in contribution agreements entered into at the time of their respective contributions. Upon information and belief, none of the contribution agreements pursuant to which the A-1 Unit holders received their A-1 Units allow the Archstone REIT, Archstone UPREIT or any

subsequent buyers or merger partners to eliminate or avoid the contractual tax benefits, liquidity rights and dividends bargained for by the A-1 Unit holders at the time they contributed their properties to the Archstone UPREIT.

4.      Given the magnitude of the tax liability A-1 Unit holders faced upon occurrence of a taxable event, the contractual tax liability protection afforded to the A-1 Unit holders by the Archstone UPREIT constituted an enormous potential liability to third parties interested in merging with or acquiring the Archstone UPREIT and the Archstone REIT.  In this case, as explained in greater detail below, that liability was factored into the $60.75 buyout price offered per A-1 Unit by the Tishman-Lehman Partnership to A-1 Unit holders, which had been lowered from $64.00 to $62.50 to $60.75 to account for the Archstone UPREIT's obligations to A-1 Unit holders.  However, even after lowering the offer price, Defendants structured the Merger to disregard altogether the contractual tax, dividend and liquidity benefits owed to A-1 Unit holders.  The Tishman-Lehman Partnership has not compensated the A-1 Unit holders for the loss of these benefits and A-1 Unit holders have sustained and will continue to accrue significant damages as a result.

5.      More specifically, pursuant to the Merger Agreement and the materially false and misleading Prospectus and Registration Statement issued pursuant to the agreement, Plaintiff and members of the Class (as defined hereinafter) have been coerced into:  (1) cashing-out their A-1 Units, which will result in millions of dollars of unprotected tax liabilities; or (2) converting their A-1 Units into new Series O Preferred units ("Series O Units") which are economically inferior to the A-1 Units.  While the Merger Agreement couches the cashing in of A-1 Units or conversion into Series O Units as an "election," neither action as described in this Complaint was voluntary, but was coerced by Defendants.  Insofar as the terms "elect" or "election" are used in

this Complaint, it is for convenience only and in reference to the terminology in the Merger Agreement and is not intended to concede that it was a voluntary act of any kind.

6.    Moreover, when Defendants, through the Registration Statement and Prospectus, eliminated the liquidity, dividend and the tax-protections rights to which the A-1 Unit holders were entitled, the A-1 unit holders effectively acquired new A-1 units under the Registration Statement because the new A-1 units had materially different and inferior economic rights than the original A-1 units.  The holders of these fundamentally changed A-1 units had two choices: sell the units for $60.75 or accept the Series O units in exchange.

7.    As a result of the Merger Agreement, A-1 Unit holders, all of whom were solicited by defendants, sold their A-1 units for the cash consideration offered will have to recognize capital gain in an amount based on the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT.

8.    Alternatively, A-1 Unit holders whose A-1 Units were converted to Series O Units have still lost the liquidity and dividends they enjoyed before the Merger.  Indeed, the Merger Agreement provides that Series O Unit holders will have to wait until the fifth anniversary of the Merger before they can redeem any or all of their Series O Units at a cash redemption price of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date.  Moreover, the dividends previously regularly distributed to A-1 Unit holders have essentially been eliminated.

9.    Hence, Defendants, through the Merger, have eliminated many of the contractual tax protections, liquidity, dividend and long-term investment strategy benefits that hundreds, if not thousands of A-1 Unit holders enjoyed.  As explained more fully below, Defendants failed to include information in the Prospectus and Registration Statement, information without which

Plaintiff and members of the Class were unable to make a reasonable and informed decision as to their "election," thereby rendering both the Prospectus and Registration Statement false and misleading. The omitted information was necessary to make the other statements contained in the Prospectus and Registration Statement not misleading.

10.    The transactions referred to herein resulting in A-1 unitholders exchanging their A-1 units for cash and/or new securities were solicited through materially false and misleading prospectuses and the securities were issued by way of a materially false and misleading registration statement. Plaintiff and the class suffered damages caused by the violations of the statutes alleged herein and loss compensable under the statutes which give rise to the claims asserted herein.

11.    Because Defendants violated Sections 11, 12(a)(2) and/or 15 of the Securities Act, as alleged in Counts I, II and III, by issuing a false and misleading Prospectus and Registration Statement, Plaintiff seeks compensatory damages and rescissory damages for all persons that held A-1 or similar common units who were or will be injured by Defendants' wrongful conduct.

## II.    PARTIES

12.    Plaintiff Katz is a resident of Cook County, Illinois and was an owner of A-1 Units at all relevant times described herein.  Because of the coercive nature of the Merger Agreement, Katz was forced to "elect" to cash-out his A-1 Units and receive $60.75 per unit.

13.    Defendant Ernest A. Gerardi, Jr. was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

14.    Defendant Ruth Ann M. Gillis was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

15.     Defendant Ned S. Holmes was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

16.     Defendant Robert P. Kogod was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

17.     Defendant James H. Polk III was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

18.     Defendant John C. Schweitzer was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

19.     Defendant R. Scot Sellers was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times, as well as the Chairman and Chief Executive Officer of the Archstone REIT and the Archstone UPREIT.  As an officer of the Archstone REIT and the Archstone UPREIT he will receive monetary benefits from the Merger in addition to the Merger consideration.

20.     Defendant Robert H. Smith was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

21.     Defendant Stephen R. Demeritt was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

22.     Defendant Charles Mueller, Jr. was the Chief Financial Officer of the Archstone REIT and the Archstone UPREIT at all relevant time.

23.     Defendant Caroline Brower was an Executive Vice President and General Counsel of the Archstone REIT and the Archstone UPREIT at all relevant times.

24.     Defendant Mark Schumacher was the Senior Vice President and Chief Accounting Officer of the Archstone REIT and the Archstone UPREIT at all relevant times.

25.    Defendant Alfred G. Neely was the Chief Development Officer and President of the Charles E. Smith Division of the Archstone REIT and the Archstone UPREIT at all relevant times

26.    The individual directors and officer Defendants are sometimes collectively referred to as the "Individual Defendants."

27.    The Individual Defendants, as officers, directors and trustees of the Archstone REIT and the Archstone UPREIT, were controlling persons within the meaning of Section 15 of the Securities Act at the time of the wrongs alleged herein.  As such, the Individual Defendants had the power and influence and exercised the same to cause Archstone REIT to engage in the acts described herein, and were also offerors and/or solicitors of the exchange of shares offered pursuant to the Prospectus and Registration Statement.  The Individual Defendants owed to the A-1 Unit holders, including Plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials related to the Merger, including the Prospectus and Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated to make the statements contained therein not misleading.

28.    The Individual Defendants violated these duties and Sections 11, 12(a)(2) and 15 of the Securities Act when they signed, issued and disseminated, caused to be signed, issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Prospectus and Registration Statement, which misrepresented or failed to disclose, *inter alia,* the information set forth below.

29.    Defendant Lehman Brothers is a corporation existing under the laws of the State of Delaware which, through affiliates: (1) owned and controlled River Holding LP, the party

with which the Archstone REIT has merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT has merged. Defendant Lehman Brothers was an offeror and/or solicitor of the exchange of shares offered pursuant to the Prospectus and Registration Statement.

30.    Defendant Tishman Speyer is a corporation existing under the laws of the state of Delaware which, through affiliates: (1) owned and controlled River Holding LP, an entity with which the Archstone REIT merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT merged. Defendant Tishman Speyer was an offeror and/or solicitor of the exchange of shares offered pursuant to the Prospectus and Registration Statement.

31.    Defendant Archstone REIT was engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in metropolitan areas throughout the United States including, *inter alia,* Chicago, Illinois, Boston, Massachusetts, New York, New York and Washington, D.C. The Archstone REIT was organized under Maryland law and maintained its headquarters at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112. The Archstone REIT owned approximately 89% of the Archstone UPREIT. The Archstone REIT was the sole trustee of the Archstone UPREIT and its relation with the Archstone UPREIT was governed by the Declaration of Trust of the Archstone UPREIT. Defendant Archstone REIT is an issuer and was an offeror and/or solicitor of the exchange of shares offered pursuant to the Prospectus and Registration Statement.

32.    Defendant Archstone UPREIT was a limited partnership with its principal office at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112. The Archstone UPREIT was organized under Maryland law. Plaintiff and members of the Class owned limited

partnership interests known as A-1 Units in the Archstone UPREIT. Defendant Archstone UPREIT was an issuer and an offeror and/or solicitor of the exchange of shares offered pursuant to the Prospectus and Registration Statement, and also issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Prospectus and Registration Statement, which misrepresented or failed to disclose, *inter alia,* the information set forth below.

33.     By the acts, transactions, and courses of conduct alleged herein, Defendants, individually and as part of a common plan in issuing a false and misleading Prospectus and Registration Statement in violation of the Securities Act are depriving Plaintiff and the Class of the true value of their investment in the Archstone UPREIT and/or the entity formed as a result of the Merger (the "Company").

### III.     JURISDICTION AND VENUE

34.     This Court has jurisdiction pursuant to Illinois Code of Civil Procedure, 735 ILCS 5/2 209(a)(1), (2), (3), (7), (10) and (11) by the defendant's: (a) transaction of business in this State; (b) the commission of torts in this State; (c) ownership, use, or possession of real estate located in this State; (d) making or performance of any contract or promise substantially connected with this State; and (e) acquisition of ownership, possession or control of any asset or thing of value present within this State when ownership, possession or control was acquired.

35.     This Court has subject matter jurisdiction over this action. The claims asserted here arise under and pursuant to Sections 12(a)(1), 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§ 77, 77l(a)(1)(2) and 77(o)]. This Court therefore has jurisdiction over the claims asserted in this Complaint pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and 28 U.S.C. §§ 1331.

36.     Venue is proper in this Court pursuant to 735 ILCS 5/2-101(2) because one or more of the Defendants do substantial business in Cook County, and certain acts and transactions of the Defendants giving rise to Plaintiff's cause of action occurred within this County.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Real Estate Investment Trusts

37.     A Real Estate Investment Trust ("REIT") is an entity that owns and manages income-producing real estate such as apartments, offices and industrial space.    Along with meeting additional criteria, to qualify as a REIT the entity must:

- pay at least 90% of its taxable income to its shareholders every year;

- have at least 100 shareholders;

- invest at least 75% of its total assets in real estate; and

- derive at least 75% of its income from rent or mortgage interest from properties in its portfolio.

38.     One of the most beneficial aspects of a REIT is the method in which taxes are handled.  A REIT may deduct the dividends paid to the shareholders from its corporate tax bill.  Therefore, a REIT generally does not pay federal corporate income tax and taxes are only paid by the individual investor for the dividends received and any capital gains.

39.     REIT investors also enjoy the advantages of limited liability and transferability of shares (*i.e.,* liquidity) that a corporate structure offers, without incurring the costs of double taxation.  Thus, a REIT is essentially a combination of a corporation and a partnership in that it combines the benefits of a corporation with the tax pass-through nature of a partnership.

40.     An UPREIT is a partnership (Umbrella Partnership Real Estate Investment Trust). A typical UPREIT is created by a group of sponsors who form a limited partnership and contribute their property to the UPREIT in return for limited partnership interests in the

UPREIT. Simultaneously, a corporation, typically the REIT, contributes cash that it raised in a public offering in return for a general partnership interest in the UPREIT. The resulting partnership is called an UPREIT.

41.    The managing general partner of an UPREIT is usually a REIT. Because the REIT is the managing general partner of the UPREIT, it is responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT.

42.    By contributing real estate to an UPREIT, sponsors can mitigate the level of risk associated with the property they contributed by becoming equity holders in a much larger entity that owns a diverse portfolio of real estate assets. Sponsors also avail themselves of the opportunity to eliminate the personal liabilities that encumber their contributed property by having the UPREIT assume these liabilities.

43.    In most UPREITs, the sponsors receive limited partnership interests that are easily convertible into common stock of the managing partner REIT. As a result, the limited partnership interests are easily sellable on the open market.

**B.    Archstone-Smith Trust's and Archstone-Smith Operating Trust's Structure as an UPREIT**

44.    The Archstone-Smith Operating Trust (the "Archstone UPREIT") was structured as an UPREIT, with all property ownership and business operations of the Archstone REIT conducted through the Archstone UPREIT.

45.    The Archstone-Smith Trust (the "Archstone REIT") was a REIT with its common shares publicly traded on the New York Stock Exchange. The Archstone REIT was the managing general partner of the Archstone UPREIT. Because the Archstone REIT was the managing general partner of the Archstone UPREIT, it was responsible for the strategic direction

of the UPREIT, as well as the management and administration of the properties held by the UPREIT. Moreover, the Archstone REIT was the sole trustee and owned 88.2% of the Archstone UPREIT at December 31, 2006.

46.     As of December 31, 2006, the Archstone REIT and Archstone UPREIT (sometimes collectively referred to as the "Archstone Entities") owned or had an ownership position in 348 communities, representing 88,011 units, including units under construction. The Archstone Entities were engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.

47.     In the Archstone UPREIT, like most UPREITs, the limited partners (here the A-1 Unit holders) received limited partnership interests that were convertible into common stock of the Archstone REIT. The primary purpose of this feature was to give A-1 Unit holders liquidity in their investment. Rather than being restricted to holding an illiquid limited partnership interest in the Archstone UPREIT, the A-1 Unit holders could redeem their interests for cash or convert their interests to common stock in the publicly traded Archstone REIT and then sell the stock in the open market.

48.     Structuring the Archstone-Smith Operating Trust as an UPREIT also offered valuable tax advantages to the A-1 Unit holders. For example, transfers of appreciated property to a REIT are generally taxable events. Thus, under the basic REIT form, a sponsor who contributes appreciated property to the REIT must recognize gain in an amount equal to the excess of the value of the stock received over the basis of the property contributed. This tax ramification, however, applies only to corporations, not to partnerships. Defendants structured the Operating Trust as an UPREIT so that A-1 Unit holders were able to contribute their property to the Archstone UPREIT, rather than to the Archstone REIT, with the result being tax deferred

- 12 -

treatment of the transactions. Thus, structuring the Operating trust as an UPREIT was essential to the tax protections guaranteed by Defendants.

**C.    Plaintiff and Members of the Class Were Afforded Significant Tax Protections and Liquidity Rights Upon Contributing Their Properties to the Archstone UPREIT**

49.    In the late 1990's, realizing the tax benefits and liquidity advantages of an UPREIT, many real estate investors, including partnerships that Plaintiff and members of the Class were investors in, agreed to contribute their properties to various UPREITS in exchange for limited partnership interests ("Sponsors").

50.    Oftentimes, the Sponsors' real estate contribution agreements and partnership agreements with the UPREITS provided them with certain tax-protection, dividend and liquidity benefits. For example, the A-1 units held by Plaintiff derive from units he held in a real estate limited partnership that owned and operated apartment buildings in the Chicago metropolitan area. The real estate held by the limited partnership was transferred pursuant to contribution agreements with Charles E. Smith Residential Realty L.P. ("Smith UPREIT"). The contribution agreements provided that for a period of time following the closings of the real estate contributions, the Smith UPREIT could not dispose of any interest in the property contributed by Plaintiff that realized a taxable gain. If such a gain was triggered, the Smith UPREIT was obligated to indemnify Plaintiff for any resulting tax liability.

51.    The Plaintiff's contribution agreements also provided that he could redeem his UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc. REIT.

52.    On October 31, 2001, the Smith UPREIT merged with and into the Archstone UPREIT. The foregoing tax protections and liquidity provisions were all contained in binding contribution agreements assumed by the Archstone UPREIT and Archstone REIT as well the

Declaration of Trust governing the Archstone UPREIT and Archstone REIT.  As explained below, A-1 Unit holders were provided with the foregoing tax and liquidity protections.

53.     Upon information and belief, Plaintiff's tax protections and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITS, including those with the Archstone UPREIT.

54.     Specifically, the Archstone UPREIT agreed in its Declaration of Trust, for the benefit of the hundreds, if not thousands of A-1 Unit holders with tax and liquidity provisions virtually identical to those of the Plaintiff, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by a wholly owned subsidiary of the Archstone UPREIT.  According to the Declaration of Trust, these tax benefit restrictions were to be effective until January 1, 2022.

55.     In addition to the tax and liquidity protections explained above, each A-1 Unit issued pursuant to contribution agreements (with tax protections and liquidity provisions virtually identical to those contained in Plaintiff's contribution agreements) was subject to a unit redemption right at the option of the A-1 Unit holder.  This redemption right required the Archstone UPREIT to acquire the unit holder's A-1 Unit for the market price of Archstone REIT common shares.  Once the redemption right was exercised, the Archstone REIT, in its discretion, could elect to assume and directly satisfy the Archstone UPREIT's redemption obligation, in which case the Archstone REIT would pay the redeeming unit holder in Archstone REIT common shares, or their cash equivalent.

56.     The Archstone UPREIT was also contractually obligated to maintain specified levels of borrowings outstanding with respect to the properties contributed by Plaintiff and

members of the Class, and A-1 Unit holders were to receive quarterly dividend distributions from the Archstone UPREIT.

57.    The provisions were especially intended to ensure that Plaintiff and members of the Class would be able to continue to defer the gain that would otherwise be recognized by them for tax purposes: (i) upon a sale by the Archstone UPREIT of any of the properties contributed by Plaintiff or the members of the Class; (ii) upon the sale by the Archstone UPREIT of any of its interest in a subsidiary owning the properties contributed by Plaintiff or the members of the Class; or (iii) upon the repayment of borrowings relating to the properties contributed by Plaintiff or the members of the Class.  Specifically, if the Archstone UPREIT sold any of the properties contributed by Plaintiff or members of Class, or any interest therein, without satisfaction of certain conditions, or repaid borrowings relating to the contributed properties, the Archstone UPREIT was liable for the loss of tax benefits and could be liable for monetary damages for engaging in these undertakings.

**D.    The Archstone Entities' Merger Agreement With the Tishman-Lehman Partnership Circumvents the Benefits Provided to the Plaintiff and Other A-1 Unit Holders**

**1.    *The Merger's Background***

58.    On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities for a cash purchase price of $64.00 per Archstone REIT common share and $64.00 per Archstone UPREIT common unit.

59.    On May 2, 2007, the Tishman-Lehman Partnership submitted a written indication of interest to acquire the Archstone Entities for a cash purchase price of $64.00 per Archstone REIT common share and $64.00 per Archstone UPREIT common unit.

60.    On May 15 and 16, 2007, the Archstone REIT's board of trustees became aware of concerns on the part of both bidders with respect to the "significant magnitude of the built-in

gain associated with certain of [Archstone's] properties that are subject to tax protection agreements with operating trust unitholders and the magnitude of the increase in property taxes as a result of the transaction." Archstone Smith Operating Trust Form 424B3, filed Aug. 9, 2007, at 56.

61.    On May 19 and 20, 2007, the Tishman-Lehman Partnership indicated to Morgan Stanley, the Archstone Entities' financial advisor, that "due to increased expected transaction costs resulting from their better understanding of the magnitude of the company's tax protection obligations and due to adverse changes in the debt markets, they were uncertain whether any offer that they were to submit would be at a price equal to their initial indication of $64.00 per common share and unit." *Id.* at 58.

62.    On May 23, 2007, the Tishman-Lehman Partnership contacted Morgan Stanley and offered to acquire the Archstone Entities at a price of $60.00 per Archstone REIT common share and $60.00 per Archstone UPREIT common unit. This offer represented a 6.25% decrease over a period of only three weeks, which Tishman-Lehman Partnership indicated "was primarily a result of information obtained in their confirmatory due diligence regarding, among other things, the magnitude and scope of our tax protection arrangements, the compression in returns that they could expect to realize from our development pipeline, and the deterioration of the debt capital markets." *Id.* at 59. In addition, the Tishman-Lehman Partnership "indicated that they had determined that there were significant transaction costs exclusive of the impact on value associated with the Company's tax protection obligations." *Id.* In response, the Archstone REIT's board of trustees instructed Morgan Stanley to present a counterproposal of $62.00 per common share and common unit.

63.     On May 24, the Tishman-Lehman Partnership increased its offer to $61.00 per common share and common unit.  Later that day, the Tishman-Lehman Partnership indicated that it was unwilling to pay $61.00 per common share and common unit unless the second quarter dividend was not paid.  In response, Archstone REIT's board of trustees instructed Morgan Stanley to inform the Tishman-Lehman Partnership that the board would accept a price of $60.75 per common share and common unit and pay the second quarter dividend of $0.4525 per common share and common unit.

64.     By the close of business on May 29, 2007, the Archstone REIT's shares traded at $61.45, a material premium to the Merger Agreement's consideration of $60.75 per share. Furthermore, the Archstone REIT's common stock price traded well above the Merger Agreement's consideration as recently as January 30, 2007.  In fact, the Archstone REIT's common shares have lost a considerable amount of their value between late January 2007, and the day prior to the announcement concerning the Merger Agreement were and are poised to enjoy significant gains as slumping house prices cause individuals to rent, rather than buy, properties in large commercial markets.

**2.     *The Merger Agreement***

65.     On May 29, 2007, the Archstone REIT publicly announced that it signed a definitive merger agreement to be acquired by the Tishman-Lehman Partnership in a transaction valued at approximately $22.2 billion, including the assumption and refinancing of the Archstone REIT's outstanding debt and excluding transaction costs.

66.     Pursuant to the Merger Agreement, the Tishman-Lehman Partnership agreed to acquire all outstanding common shares of the Archstone REIT in exchange for $60.75 per share in cash.  The Archstone REIT reported that the purchase price per share represented a 22.7%

premium over the share price on May 24, 2007, immediately before published reports regarding a potential acquisition.

67.     The Merger Agreement also provided that holders of A-1 Units were entitled to one newly issued Series O Unit for each existing A-1 Unit.  Alternatively, A-1 Unit holders could "elect" to receive: (a) $60.75 per A-1 Unit in cash, without interest and less applicable withholding taxes; or (b) a combination of the cash consideration and Series O Units.

68.     Moreover, pursuant to the Merger Agreement no additional quarterly dividend distributions would be paid to A-1 Unit holders prior to the completion of Merger.

69.     A-1 Unit holders were allowed until 11:59 P.M., EST, on September 10, 2007, to make an "election" for their common units, which deadline was later extended until September 18, 2007.

70.     Had the A-1 Unit holders been told that the Archstone REIT and Archstone UPREIT were engaged in negotiating a transaction that would eliminate their dividend, liquidity and tax benefits, the A-1 holders could have redeemed their A-1 Units before they were informed of the Merger, and at prices substantially higher than the $60.75 per unit Merger price.

**3.     *The A-1 Unit Holders' Tax Benefits Are Recognized as an Integral Part of the Archstone Entities' Economic Structure***

71.     As indicated above, prior to the Merger Agreement being consummated, at least one additional unidentified company was involved in bidding on the acquisition of the Archstone UPREIT and the Archstone REIT.

72.     Interestingly, both the unidentified company and the Tishman-Lehman Partnership explained on numerous occasions that their offer prices to acquire the Archstone entities were based upon, among other things, the magnitude and scope of the Archstone UPREIT's tax protection arrangements with A-1 Unit holders.  All potential acquirers came to

the same conclusion: that the UPREIT's tax protection, liquidity, dividend and other obligations were contractual obligations that would survive the Merger and therefore the potential acquirers felt that they needed to factor that liability into the acquisition price. Accordingly the potential liability to the acquirers of the tax protection obligations caused the acquirers to lower the price to be offered, which in turn lowered the price at which A-1 Unit holders could "elect" to cash out at the time of the Merger. In fact, the tax protections afforded to the A-1 Unit holders ultimately led to the unidentified company's decision not to submit an offer to acquire the Archstone Entities. Yet, despite the prospective buyers' lack of willingness to acquire the Archstone Entities at an adequate price, Defendants persisted on reaching a deal with the Tishman-Lehman Partnership, even if it meant that the A-1 Unit holders would suffer severe tax consequences or have the liquidity of their investments severely impaired.

73.     Even though Plaintiff's and A-1 Unit holders' tax protection agreements were among one of the most significant factors in determining the lower final acquisition price of the Archstone UPREIT and the Archstone REIT, the Individual Defendants, the Archstone REIT, the Archstone UPREIT and the Tishman-Lehman Partnership refused to provide A-1 Unit holders with compensation for elimination of the tax protection agreements and refused to preserve a host of other contractual benefits, as discussed below, Defendants owed to all A-1 Unit holders.

**4.     *The Negative Effects of the Merger on A-1 Unit Holders***

74.     The Merger has had negative financial consequences for both A-1 Unit holders that "elected" to receive the Tishman-Lehman Partnership's cash offer and A-1 Unit holders that "elected" to convert or otherwise had their A-1 Units converted to Series O Units.

75.     The removal of the liquidity and dividend guarantees from the original A-1 Units, as well as the cancellation of their tax-protections, represented a fundamental change in the

- 19 -

nature of the A-1 Units. This fundamental change effectively eliminated the original A-1 Units and, as a result, each A-1 Unit holder acquired a separate and distinct A-1 Unit that is traceable directly back to the Registration Statement. The holders of these newly-issued A-1 Units were then forced to accept the Tishman-Lehman Partnership's cash offer have had to recognize capital gain in an amount equal to the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT. Upon information and belief, such gains have resulted in millions of dollars of tax liability for many A-1 Unit holders.

76.    Alternatively, the A-1 Unit holders that were forced to convert their units to Series O Units have been forced to forfeit the liquidity they enjoyed before the Merger and are now saddled with owning an investment in a private company that will likely be highly leveraged with debt.

77.    For example, the Merger Agreement provides that after five years Series O Unit holders can redeem any or all their units at a cash redemption of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date. Hence, the Series O Units will be completely illiquid for a minimum of five years. In addition, the Series O Unit holders will be deprived of any increase in the value of the underlying properties because the cash redemption after five years is capped at $60.75 and does not take into account any increase in value of the underlying properties.

78.    Moreover, even after the expiration of the five-year redemption waiting period described above, Series O Unit holders may only gradually liquidate their investment because the Company will not be required to redeem more than one-third of the Series O Units outstanding in any twelve month period. If the Company receives redemption notices for a number of Series O

Units in excess of the limit, it will redeem the units in the order that it received the redemption notices rather than pro rata.

79.    Thus, Series O Unit holders will be forced to hold an almost completely illiquid asset for a minimum of five years since these units are not publicly traded in the market, and even after this five year period, the liquidity of these units will be severely limited and possibly eliminated altogether.  The Company, however, has the right to redeem all of the Series O units for cash at $60.75 per unit any time after the fifth anniversary of the Merger.

80.    Plaintiff and members of the Class are also damaged by the Archstone UPREIT's failure to pay third quarter dividends to A-1 Unit holders, as well as the Company's failure to plan for the regular payment of dividends to Series O Unit holders.  Previously, Plaintiff and members of the Class had available the distributions that they regularly received from the Archstone UPREIT, which they could have used to defray taxes on gains.  As a result of A-1 Unit holders not receiving their third quarter dividends, however, they will not be able to defray a significant portion of their tax liability.  Moreover, following the Merger, A-1 Unit holders will likely no longer be able to defray their taxes because the payment of the six percent dividend on Series O Units is discretionary and, according to a source at the Archstone REIT, the Company has no current plan to pay dividends and does not know when it will begin, if ever, paying them. Thus, Plaintiff and members of Class will likely now be forced to pay taxes on "phantom income" allocated to them, but for which there are no cash distributions with which to pay the taxes.

81.    There are even more adverse consequences that the Merger has upon Plaintiff and members of the Class, which include, but are not limited to the following:

a.   Before the Merger, A-1 Units were protected by anti-dilution measures in the Archstone UPREIT's governing documents. After the Merger, these anti-dilution measures were eliminated.

b.   Before the Merger, A-1 Unit holders were entitled to their pro rata share of the proceeds of dissolution, liquidation, or winding up remaining after payment of the Archstone UPREIT's debts and satisfaction of the preferences of any class or series of units entitled to a preference in dissolution, liquidation, or winding up over the Archstone UPREIT's common units. After the Merger, Series O Unit holders are only entitled to $60.75 per share plus any unpaid distributions.

c.   Before the Merger, the Archstone UPREIT was managed by the Archstone REIT, and the Archstone REIT could not take any action that was contrary to an express limitation or prohibition in the declaration of trust without an amendment to that provision adopted under the Archstone UPREIT Declaration of Trust. After the Merger, the protection of allowing limited or prohibited action only after amendment of the Archstone UPREIT Declaration of Trust was eliminated.

d.   Before the Merger, the Archstone REIT was generally prohibited from, directly or indirectly, entering into or conducting any business other than in connection with the ownership, acquisition and disposition of its and the management of its business activities. After the Merger the Company can engage in business activities in addition to those relating to the newly

formed UPREIT, including business interests and activities that are in direct competition with newly formed UPREIT.

e.    Before the Merger, A-1 Unit holders received quarterly and annual financial reports. After the Merger, Series O Unit holders will receive only annual financial reports.

82.    Hence, Plaintiff and members of the Class have sustained and will continue to accrue significant damages as a result of the Merger.

**E.    Defendants Procured the "Election" of A-1 Unit Holders and Issued the Series O Units Pursuant to a Materially False and Misleading Prospectus and Registration Statement**

83.    The Archstone REIT filed its Prospectus and Registration Statement containing the terms of the Merger in mid-July and subsequently amended it in September 2007. In addition, the Series O Units were issued pursuant to a Registration Statement signed by the Individual Defendants.

84.    The Individual Defendants, together with the Tishman-Lehman Partnership, controlled the Archstone Entities and exercised such control as to cause a materially false and misleading Prospectus and Registration Statement to be issued to A-1 Unit holders in violation of applicable federal securities laws.

85.    Such false and misleading statements contained in the Prospectus and Registration Statement include, but are not limited to, the following:

a.    The Prospectus and Registration Statement failed to make full and adequate disclosure of factors and assumptions underlying the selection and exclusion of comparable companies associated with Morgan Stanley's comparable company and comparable transaction analysis. Although the proxy supplement reveals that Morgan Stanley made "numerous

- 23 -

assumptions with respect to industry performance, general business and economic conditions and other matters," none of those assumptions were disclosed, nor was there any description of the "other matters" considered by Morgan Stanley.  As a result, Plaintiff and the Class were denied facts necessary to understanding how Morgan Stanley valued the Archstone Entities relative to those companies Morgan Stanley itself deemed "comparable," as well as how Morgan Stanley determined what was "precedent" to the subject transaction.  These factors were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

b.    In addition, Morgan Stanley failed to disclose what the results of its analysis would have been had the tax protection benefits to A-1 Unit holders been factored into the analysis.  This analysis was necessary in order to provide Plaintiff and members of the Class with information to make a full and informed decision regarding their "election."  The Prospectus and Registration Statement also failed to disclose differences in the quality and performance of the properties owned by the Archstone Entities versus those owned by the comparable public companies, the disclosure of which was necessary to provide A-1 Unit holders with a clear understanding of Morgan Stanley's opinion regarding the relative value of the Archstone Entities' properties, and to make the other statements contained in the Prospectus and Registration Statement not misleading.

c.      The Prospectus and Registration Statement and supplements thereto disclosed failed to consider any projections any more recent than those extant in "late 2006" and failed to disclose the reliability of those old projections by disclosing whether and to what extent there had been any deviation in the actual operating results from those projections.   These projections were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

d.      The Prospectus and Registration Statement failed to disclose Archstone's management's conclusions regarding the prospects for exceeding the financial projections provided to Morgan Stanley and Company A.   Given the character of the Archstone Entities' properties (generally regarded as very high), as well as the value of its development pipeline (estimated by Wall Street analysts at over $4 billion), the Archstone Entities are positioned for strong growth in revenue and profits over the next several years.   A-1 unit holders were also deprived of financial information material to their "election" because the defendants concealed and refused to disclose the projections for dividend increases to A-1 unit holders in the future.   As a result of this growth, understanding the Company's future financial prospects was material to Plaintiff's and Class members' ability to quantify the Company's value in order to make a full and informed decision of their "election."   As such, these conclusions and financial information were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

e.  In regards to Morgan Stanley's dividend discount model analysis, the Prospectus and Registration Statement and supplements thereto failed to disclose all the methodologies used by Morgan Stanley to select the range of discount rates disclosed in the Prospectus and Registration Statements and the supplements thereto. Defendants also concealed from the A-1 Unit holders information within their possession and Morgan Stanley's possession which was used in the analysis to arrive at the fairness opinion information concerning "observed private market discount rates." These methodologies and information were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

f.  With respect to Morgan Stanley's adjusted net asset value analysis, the Prospectus and Registration Statement provided no disclosure of the asset by asset valuations conducted by Archstone in March to May 2006 and March to May 2007 or the changes, if any, in the assets valuations individually or in the aggregate used in the analysis. The Prospectus and Registration Statement provided no information regarding the indicated aggregate or property-specific values resulting from this analysis. These valuations and information were necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

g.  The Prospectus and Registration Statement revealed that Morgan Stanley seemingly deducted numerous transaction costs from its net asset value

analysis, which in turn, lowered the overall value of the Archstone Entities. The rationale for this decision was not disclosed, however. The disclosure of this rationale was necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

h.    The Prospectus and Registration Statement failed to properly disclose Morgan Stanley's analysis of the Archstone Entities' development portfolio. The Prospectus and Registration Statement simply stated that this portfolio was valued by discounting a "spread" between the projects' future values and estimated costs. However, given the size of the potential portfolio (one analyst estimates it at $4.4 billion), more thorough disclosure of this analysis was necessary to understanding the Archstone Entities' value, and to make the other statements contained in the Prospectus and Registration Statement not misleading.

i.    The Prospectus and Registration Statement stated that Morgan Stanley had provided financial advisory and financing services for both members of the Tishman-Lehman Partnership. The extent and nature of these relationships was not disclosed, however, along with any fees Morgan Stanley had earned from these relationships in the past 5 years. Moreover, neither the Trustees nor Morgan Stanley explained how Morgan Stanley was able to neutralize Morgan Stanley's financial motive to find the offered transaction "fair" given that Morgan Stanley's contract with Archstone would pay Morgan Stanley only $1 million dollars for the

fairness opinion work if the transaction was not consummated but Morgan Stanley would earn $24 million for the same fairness opinion work if the transaction were consummated.  Absent disclosure, Plaintiff and the Class could not properly evaluate Morgan Stanley's independence and its ability to objectively discharge its duties to the Archstone Entities.    This disclosure was necessary in order to make the other statements contained in the Prospectus and Registration Statement not misleading.

j.    The Prospectus and Registration Statement failed to disclose Morgan Stanley's basis for its quantification of the "tax protection agreements with operating trust unitholders" which resulted in a "range of present value tax protection costs of $93 million to $278 million" that purportedly negatively impacted both the unidentified company's and the Tishman-Lehman Partnership's valuation of the Archstone Entities' shares.  Given the exceedingly broad range of the estimate and the failure to provide all the underlying assumptions, Plaintiff and the Class were unable to value or analyze the magnitude of such tax protection agreements.  The Prospectus and Registration Statement and supplements thereto also disclosed that taking into account tax protection costs and other transactions cost yielded an implied valuation for the common shares of $53.06 to $59.34 per share but failed to disclose the implied value of A-1 units with and without the burden and benefit of the tax protections.  This information was necessary to make the other statements contained in the Prospectus and Registration Statement not misleading.

k.    The Prospectus and registration Statements and supplements thereto also failed to disclose material information concerning the values and valuations of future development properties, including the assumptions underlying its selection of discount rates as high as 16% to 20%.  Such information is particularly material given that the addition of estimated platform values drove the implied per share valuation as high as $64.45 per share, and was necessary to make the other statements contained in the Prospectus and Registration Statement not misleading.

l.    The Prospectus and Registration Statement stated that the Archstone Entities' board of trustees, after careful consideration, unanimously approved the Merger Agreement and the other transactions contemplated by the Merger Agreement, and had declared the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement advisable, fair to and in the Archstone Entities' best interests and the best interests of A-1 Unit holders and Archstone REIT's common shareholders. However, the Prospectus and Registration Statement failed to disclose any information concerning the UPREIT Trustees' view of the Transaction from the point of view of fairness to the A-1 Unit holders.  It also failed to disclose the reasons why no fairness opinion, appraisal, or other determination of a financial adviser or any other third party with respect to the fairness of the consideration offered to the Class A-1 common unit holders in connection with the operating trust merger for the A-1 Unit holders was obtained or considered.  This information was necessary to

make the other statements contained in the Prospectus and Registration Statement not misleading.

86.     The Defendants' dissemination of a materially false and misleading Prospectus and Registration Statement precluded A-1 Unit holders from determining the true value of their A-1 Units, as well as the true value of the Archstone Entities as a whole, and prevented the A-1 Unit holders from making fully informed decisions as to the "election" and disposition of their A-1 Units.

## V.     CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action on behalf of himself and a nationwide class of all others similarly situated pursuant to 735 ILCS 5/2-801 on behalf of all holders of Class A-1, OP or similar Common Unit of Archstone-Smith Operating Trust at the time of the Merger (the "Class").

88.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

89.     **Numerosity**. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains hundreds, if not thousands of similarly situated A-1 Unit holders of record scattered throughout the United States. Upon information and belief, hundreds, if not thousands of other A-1 Unit holders enjoyed similar, if not identical liquidity and tax benefits

through their agreements with the Archstone UPREIT. The precise number of Class Members is unknown to Plaintiff. The true number of Class Members is known by Defendants, however, and thus, may be notified of the pendency of this action by first class mail, electronic mail, and by published notice.

90.    **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a.    Whether the Defendants violated the federal securities laws as alleged herein;

b.    Whether the Registration Statement and Prospectus contained material misstatements or omissions; and

c.    Whether Plaintiff and members of the Class have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages.

91.    **Typicality**. Plaintiff's claims are typical of the claims of the Class Members in that Plaintiff and each member of the Class are all A-1 Unit holders of the Archstone UPREIT who have and will continue to suffer financial hardship and other damages as a result of Defendants' conduct.

92.    **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

93.   **Superiority**.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual members of the Class is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendants.  It would thus be virtually impossible for the members of the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if members of the Class could afford such individualized litigation, the court system could not.  Individualized claims brought by members of the Class would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## COUNT I

### VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### (Against the Archstone UPREIT and the Individual Defendants)

94.   Plaintiff repeats and realleges each and every allegation contained above, as if more fully set forth herein.

95.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons or entities who acquired Series O Units or cashed out on their A-1 Units pursuant and traceable to the Registration Statement.  Members of the Class received Series O Units pursuant and traceable to the Registration Statement, or cashed out of their A-1 Units pursuant and traceable to the Registration Statement.  At the time they acquired the Series O Units or cashed out of their A-1 Units, Plaintiff and members of the Class were without

knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

96.    The Prospectus and Registration Statement, as set forth above, were false and misleading, contained untrue statements of material facts, and omitted to state other facts necessary to make the statements contained therein not misleading.  In particular, as set forth above, the Prospectus and Registration Statement were false and misleading in that they failed to make a full and adequate disclosure of factors, assumptions, findings and determinations materially related to the Merger, thereby preventing the A-1 Unit holders from making fully informed decisions as to the "election" and disposition of their A-1 Units.

97.    All Defendants are responsible for the contents and dissemination of the Registration Statement and Prospectus, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Prospectus and Registration Statement were true and without omissions of any material facts and were not misleading.

98.    The Individual Defendants, as signatories of the Registration Statement and the Prospectus and as directors and/or officers of Archstone UPREIT, are strictly liable for the misstatements and omissions in the Prospectus and Registration Statement pursuant to which the Series O Units were issued, and for the damages that Plaintiff and other members of the Class have sustained thereby.

99.    The Archstone UPREIT and its successor in interest is the issuer of the stock issued and sold via the Registration Statement.  As the issuer of the stock, the Archstone UPREIT is strictly liable to Plaintiff and members of the Class for the misstatements and omissions in the Prospectus and Registration Statement pursuant to which the Series O Units

were issued, and for the damages that Plaintiff and other members of the Class have sustained thereby.

100.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Prospectus that should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

101.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Prospectus and Registration Statement, which misrepresented or failed to disclose, *inter alia,* the facts set forth above.  By reason of the conduct alleged herein, each Defendant named in this Count violated Section 11 of the Securities Act.  As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, Plaintiff and members of the Class suffered substantial damage in connection with receipt of Series O Units pursuant to the Registration Statement and the Prospectus.

102.    By virtue of the foregoing, Plaintiff and members of the Class are entitled to recission and/or damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

103.    Plaintiff and members of the Class who exchanged their A-1 Units for Series O Units seek rescission of their exchange and the return of the full protections afforded to them by the A-1 Units, and/or damages in the amount of the full value of the A-1 Units at the time of the merger plus the value of the tax protections and other provisions that were provided to them as A-1 Unit holders but that they did not receive as Series O Unit holders.

## COUNT II

## VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT
### (Against All Defendants)

104.   Plaintiff and members of the Class who cashed out their A-1 Units for $60.75 seek rescissory damages for their exchange and/or damages in the amount of their tax liability that they were required to pay when they cashed out of their A-1 Units.

105.   Plaintiff repeats and realleges the previous paragraphs as if fully set forth herein.

106.   This Count is brought pursuant to Section 12(a)(2) of the Securities Act against all Defendants on behalf of all persons or entities who acquired Series O Units or cashed out on their A-1 Units pursuant and traceable to the Registration Statement.  At the time they acquired Series O Units or cashed out of their A-1 Units, Plaintiff and the other members of the Class were without knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

107.   Each of the Defendants named in this Count were offerors and/or solicitors of the exchange of the shares offered pursuant to the Prospectus, as defined in the Securities Act. Specifically, all Defendants offered and/or solicited the Series O Units in the Merger to Plaintiff and other members of the Class by virtue of the Defendants' signing, preparation, solicitation and/or dissemination of the Registration Statement.

108.   The Prospectus and Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Defendants' actions of solicitation included participating in the preparation and issuance of the false and misleading Prospectus.

109.   The Defendants owed to the A-1 Unit holders, including Plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials

related to the Merger, including the Prospectus contained therein, to ensure that such statements were true and that there was no omission to state a material fact required to be stated to make the statements contained therein not misleading. The Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the offering materials as set forth above.

110. Plaintiff and members of the Class acquired Series O Units pursuant to and/or traceable to the defective Prospectus. Neither Plaintiff nor members of the Class knew nor in the exercise of reasonable diligence could have known, the untruths and omissions contained in the Prospectus.

111. By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of the materially false and misleading statements in the Registration Statement and Prospectus, Plaintiff and the other members of the Class have sustained substantial damage. Accordingly, Plaintiff and members of the Class are entitled to rescissory damages or recission if they tender the Series O Units back to Defendants.

112. Plaintiff and members of the Class who exchanged their A-1 Units for Series O Units seek rescission of their exchange and the return of the full protections afforded to them by the A-1 Units, and/or damages in the amount of the full value of the A-1 Units at the time of the merger plus the value of the tax protections and other provisions that were provided to them as A-1 Unit holders but that they did not receive as Series O Unit holders.

113. Plaintiff and members of the Class who cashed out their A-1 Units for $60.75 seek rescissory damages for their exchange and/or damages in the amount of their tax liability that they were required to pay when they cashed out of their A-1 Units.

## COUNT III

## VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against the Individual Defendants)

114.    Plaintiff repeats and realleges the previous paragraphs as if fully set forth herein.

115.    This Count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act on behalf of all persons or entities who acquired Series O Units or cashed out on their A-1 Units pursuant and traceable to the Registration Statement.  At the time they acquired the Series O Units or cashed out of their A-1 Units, Plaintiff and members of the Class were without knowledge of the facts concerning the materially false and misleading statements in the Registration Statement and Prospectus.

116.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of the Archstone REIT and the Archstone UPREIT within the meaning of Section 15 of the Securities Act.  Individual Defendants had the power and influence, and exercised the same, to cause the Archstone REIT and the Archstone UPREIT to engage in the acts described herein that caused violations of law complained of herein and were able to and did control the contents of the Prospectus and Registration Statement.

117.    Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

118.    By virtue of the conduct alleged herein, Individual Defendants are strictly liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this lawsuit is properly maintainable as a class action, and certifying Plaintiff as representative of the Class under Rule 23 of the Colorado Rules of Civil Procedure;

B.    Declaring that Defendants violated applicable federal securities laws;

C.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon at the maximum rate allowable by law;

D.    Awarding rescissory damages against Defendants, jointly and severally, and/or ordering recission;

E.    Awarding Plaintiff and the Class their costs and disbursements and reasonable allowances for Plaintiff's counsel and experts' fees and expenses; and

F.    Granting such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED: May 9, 2008                JACK P. KATZ, on behalf himself and all
                                  others similarly situated,


                                  By: _____
                                      Kenneth A. Wexler
                                      Edward A. Wallace
                                      Christopher J. Stuart
                                      Melisa Twomey
                                      Wexler Toriseva Wallace LLP
                                      55 W. Monroe Street, Suite 3300
                                      Chicago, IL  60603
                                      Telephone:  (312) 346-2222
                                      Firm No. 37591

Lee Squitieri
Squitieri & Fearon, LLP
32 E. 57th Street, 2nd Floor
New York, NY  10022
Telephone:  (212) 421-6492

*Attorneys for Plaintiff Jack P. Katz
 and the Proposed Class*