**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACK P. KATZ, on behalf of himself and all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08-CV-4035 |
| v. | ) | Judge Darrah |
| | ) | |
| ERNEST A. GERARDI, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF CERTAIN DEFENDANTS'
28 U.S.C. § 1404(a) MOTION TO TRANSFER**

Plaintiff's lawsuit is before this Court as a result of his improper forum-shopping. Pursuant to 28 U.S.C. § 1404(a), this case should be transferred to the United States District Court, District of Colorado, to be consolidated with the prior pending action on behalf of the *same putative class*, against the *same defendants*, based on the *same facts*, and brought by the *same counsel*, as this case. (*See Stender, et al. v. Gerardi, et al.,* No. 07-cv-2503 (D. Colo. 2007), Stender PACER Doc. No. 1, attached hereto as Exhibit A (hereinafter "Stender Complaint" or "Stender Compl.") (the "*Stender* Action").) *Lawrence v. Xerox Corp.*, 56 F. Supp. 2d 442, 453-54 (D.N.J. 1999) ("Where related lawsuits exist, it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court and not simultaneously before two tribunals.") (internal quotations and citation omitted).

Plaintiff here, Jack P. Katz ("Katz"), the *Stender* plaintiffs, and their counsel, have improperly split their causes of action—brought on behalf of the same plaintiff class regarding the same set of factual allegations—in the hope of finding a forum they prefer to the District of Colorado. There can be no doubt that the Colorado district court is the forum in which this lawsuit could have and should have been brought, and indeed counsel for Katz and the *Stender*

plaintiffs ("Plaintiffs' Counsel") expressly told the Colorado district court that he was

contemplating doing so.  Further, Colorado is indisputably a convenient and appropriate forum

for all parties, particularly in light of the fact that Plaintiffs' Counsel sued there in the first

instance, and now the pendency of the *Stender* Action there makes transfer all the more

compelling.  Upon transfer, this litigation may be reunited and proceed in a single forum, on

behalf of the same claimed class, and before a single judge.  The benefits in terms of efficiencies

and convenience to the witnesses, the courts, and the parties are obvious.

## FACTS[1]

### A.    The *Stender* Action

#### 1.    Background

Plaintiffs Steven Stender and Infinity Clark Street Operating (collectively, "Stender")

filed the *Stender* Action on November 30, 2007, in the United States District Court, District of

Colorado, as a putative class action brought on behalf of class members who contributed certain

properties to either Archstone (formerly Archstone-Smith Operating Trust) (the "Archstone

UPREIT") or to its predecessor, Charles E. Smith Residential Realty L.P.  (Stender Compl. ¶¶ 1-

2.)  In exchange for their property contributions, Stender and other putative class members held

Class A-1 Common Units of the Archstone UPREIT ("A-1 Units").  (*Id.*)  The Archstone

UPREIT was majority owned and controlled by the Archstone-Smith Trust (succeeded by the

Tishman Speyer Archstone-Smith Multifamily Series I Trust) (the "Archstone REIT").  (*Id.* ¶

52.)  Both the Archstone UPREIT and the Archstone REIT are headquartered in Colorado.  (*Id.*

¶¶ 31-32.)

The *Stender* plaintiffs allege that, as part of an effort by Tishman Speyer Development

Corporation ("TSD") and Lehman Brothers Holdings Inc. ("Lehman") to take the Archstone

---

[1] For purposes of this Motion only, Defendants accept all of Plaintiff's underlying factual allegations as true.

REIT private, the *Stender* Action class members were "coerced" into exchanging their A-1 Units

for one of three options:  (1) the same $60.75 premium cash consideration paid to the public

shareholders of the Archstone REIT; (2) newly issued Series O Preferred Units in the newly-

formed private, merged entity ("Series O Units"); or (3) a combination of cash and Series O

Units.  (*Id.* ¶¶ 72-74.)  The *Stender* plaintiffs allege that this purported "coerced" exchange

amounted to breach of certain agreements related to the Archstone UPREIT and Archstone REIT

and a breach of certain fiduciary duties owed to the *Stender* Action class.  (*Id.* Counts I-III.)

### 2.    Federal securities claims are contemplated in the *Stender* Action

In addition to the breach of contract and breach of fiduciary duty causes of action,

Plaintiffs' Counsel also considered bringing securities claims in the *Stender* Action.  On

February 12, 2008, a Fed. R. Civ. P. Rule 16 scheduling conference was held with the Colorado

district court.  All parties were represented at the hearing, and a comprehensive scheduling order

was negotiated.

During that scheduling conference, Plaintiffs' Counsel told the Colorado district court

that the class had federal securities claims which he might bring in *Stender*:

> THE COURT:  What other [additional] claims are you suggesting
> you're going to have?
>
> MR. SQUITIERI [PLAINTIFFS' COUNSEL]:  At this time, Your
> Honor, I don't know other than perhaps a federal securities claim
> based on the federal securities statutes arising out of the
> prospectus.

(Transcript of Feb. 12, 2008 hearing in the *Stender* Action, attached hereto as Exhibit B, at 7.)

To date, no federal securities claims have been filed in the *Stender* Action.

### 3.    Motions to stay

On January 29, 2008, defendants in the *Stender* Action moved to stay or dismiss the

*Stender* Action in favor of arbitration, and to dismiss the fiduciary claims for failure to state a

claim. (Defendants' Motion to Stay or Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim, Stender PACER Doc. No. 29, attached hereto as Exhibit C (without exhibits) (the "Motion to Dismiss and/or Stay").) At the same time, defendants moved to stay proceedings pending resolution of the Motion to Dismiss and/or Stay. (Defendants' Motion to Stay Discovery and Further Pretrial Proceedings Pending Resolution of Threshold Issues, Stender PACER Doc. No. 28, attached hereto as Exhibit D (without exhibits) (the "Discovery Stay Motion").) On February 27, 2008, the *Stender* court granted the Discovery Stay Motion (Feb. 27, 2008 Order, Stender PACER Doc. No. 50); the Motion to Dismiss and/or Stay is currently pending before the Colorado court.

### B.     The *Katz* Action

While Plaintiffs' Counsel has not, to date, added federal securities claims in the *Stender* Action, on May 9, 2008—approximately two months after the discovery stay was entered in *Stender*—Katz filed this action in state court in Illinois (the "*Katz* Action"), alleging violations of the Securities Act of 1933 (the "1933 Act"). (Katz Compl. ¶ 1.) The *Katz* and *Stender* Actions parallel each other in many material respects. The putative class in both actions is the same—Katz is a member of the Stender class and the *Stender* plaintiffs are members of the Katz class.[2] The defendants in both the *Katz* and *Stender* Actions are identical.[3] (*Compare* Stender Compl. ¶¶ 13-17, 19-25, 29-32 *with* Katz Compl. ¶¶ 13-24, 29-32.) Plaintiffs' Counsel represents both Katz and the *Stender* plaintiffs. (*See* Stender Compl. at pp. 29-30, Katz Compl. at pp. 38-39.)

---

[2] *Compare* Stender Compl. ¶ 1: "Plaintiff brings this action individually and as a class action on behalf of all persons who owned Class A-1 Common Units of Archstone-Smith Operating Trust ("A-1 Unit holders") as of the Merger…." *with* Katz Compl. ¶ 1: "Plaintiff brings this action … individually and as a class action on behalf of all holders of Class A-1 or similar common units of Archstone-Smith Operating Trust ("A-1 Unit holders") at the time of the Merger…."

[3] The Stender Complaint also named James A. Cardwell and John M. Richman as defendants, but plaintiffs subsequently stipulated to dismissal of these individual defendants.

Likewise, both complaints allege the same wrong, *i.e.*, that "[b]ecause of the coercive nature of the merger agreement, [Stender/Katz] was forced to 'elect' to cash out his A-1 units and receive $60.75 per A-1 unit." (*Compare* Stender Compl. ¶ 10 *with* Katz Compl. ¶ 12.) Indeed, with minor variation, paragraphs 1 through 34, and 44 through 89, of the *Stender* Complaint are substantially identical to paragraphs 1 through 33, and 37 through 82, of the *Katz* Complaint, including headings and subheadings.[4] (*Compare* Stender Compl. ¶¶ 1-34 and 44-89 *with* Katz Compl. ¶¶ 1-33 and 37-82.) The main difference between the *Stender* and *Katz* Complaints is the claims brought: the *Stender* Action asserts claims for breach of contract and breach of fiduciary duty, while the *Katz* Action asserts violations of the 1933 Act.[5] (*Compare* Stender Compl. Counts I-III *with* Katz Compl. Counts I-III.)

On July 16, 2008, certain defendants in the *Katz* Action filed their Notice of Removal to this Court. (Katz PACER Doc. No. 2.)

## **ARGUMENT**

### **DEFENDANTS' MOTION TO TRANSFER SHOULD BE GRANTED, AS THE DISTRICT OF COLORADO IS A MORE CONVENIENT FORUM AND A TRANSFER THERE SERVES THE INTERESTS OF JUSTICE**

28 U.S.C. § 1404(a) provides that "for the convenience of parties and witnesses, and the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The general purpose of Section 1404(a) is to avoid "waste of time, energy and money, as well as to protect litigants,

---

[4] The main difference between the factual allegations of the *Stender* and *Katz* Complaints is that the *Katz* Complaint contains additional paragraphs of allegations regarding the prospectus and registration statement issued in connection with taking the Archstone REIT private. (*See* Katz Compl. ¶¶ 9-11, 83-86.)

[5] As discussed in defendants' Notice of Removal, filed July 16, 2008, while Katz purports to assert 1933 Act claims, his factual allegations are at odds with such a cause of action. Katz claims that he *sold* his A-1 Units for cash, not that he acquired Series O Units. (Katz Compl. ¶ 12.) However, the 1933 Act only relates to the *purchase*, not the *sale*, of securities. 15 U.S.C. § 77k(a); 15 U.S.C. § 77l(a). The reason for this unusual pleading is obvious: Katz does not want to bring a claim under the Securities Exchange Act of 1934—which governs the *sale* of securities— because the 1934 Act provides for exclusive federal jurisdiction. 15 U.S.C. § 78aa.

witnesses and the public against inconvenience and expense." *Dean Foods Co. v. Eastman Chem. Co.*, No. 00 C 3675, 2000 WL 1557915, at *2 (N.D. Ill. Oct. 19, 2000) (Aspen, C.J.) (quoting *Van Gelder v. Taylor*, 621 F. Supp. 613, 618 (N.D. Ill. 1985) (Bua, J.)). Here there is little question that transfer of the *Katz* Action to Colorado will serve justice, be convenient for the parties and prevent "waste of time, energy, and money." Indeed, Plaintiffs' Counsel cannot credibly argue that Colorado is an inconvenient forum, as they have already chosen Colorado as the forum for the same putative class as alleged here to adjudicate their claims. The Archstone entities—which are based in Colorado—and the other defendants are already litigating in Colorado. It is axiomatic that allowing a class action to proceed in a single forum, before a single judge, is more efficient and more convenient for all involved—the parties, witnesses, and the courts—than splitting a class action and allowing different causes of action based on the same set of facts to proceed in two different courts, in two different states, and before two different judges. Simply put, there is no legally cognizable basis to keep this case in Illinois.

Under 28 U.S.C. 1404(a), transfer is appropriate when the moving party demonstrates that venue is proper in both the transferor and transferee court, transfer is for the convenience of parties and witnesses, and transfer is in the interest of justice. *Navarrette v. JQS Prop. Maint.*, No. 07 C 6164, 2008 WL 299084, at *1 (N.D. Ill. Jan. 29, 2008) (Darrah, J.); *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986). Each of these requirements is satisfied here.

## A.     The District Of Colorado Is The Proper And Preferred Venue For This Action.

As an initial matter, venue is proper and undisputed in the District of Colorado. Plaintiffs' Counsel brought the initial class action against the Archstone entities in the District of Colorado, and pled that Colorado was a proper venue in the *Stender* Action. (*See Stender* Compl. ¶ 43.) Under these circumstances, not only is venue proper in Colorado, but under the federal "first filed" rule, Colorado is the preferred venue: "Where two actions involving

- 6 -

overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first filed suit under the first-filed rule." *Manual v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005).  Plaintiffs' Counsel, having first sought a Colorado venue, cannot now argue that Colorado is not a proper venue for an action composed of an identical putative class against an identical group of defendants based on nearly identical factual allegations.[6]

> **B.    The Requested Transfer Will Serve The Convenience of Parties And Witnesses, As Well As The Interests of Justice.**

In exercising its discretion in determining whether a forum is more convenient and whether transfer would be in the interests of justice, the court must consider the private interests of the parties and the public interests of the court.  *N. Shore Gas Co. v. Salomon, Inc.*, 896 F. Supp. 786, 791 (N.D. Ill. 1995) (Gettleman, J.).  The factors relevant to the parties' private interests include:  (1) the plaintiff's choice of forum; (2) the situs of the material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience of the parties.  *Juarez v. Nat'l R.R. Passenger Corp.*, No. 06 C 3681, 2007 WL 2713357, at *4 (N.D. Ill. Sept. 12, 2007) (Darrah, J.); *Schwarz v. Nat'l Van Lines, Inc.*, 317 F. Supp. 2d 829, 835 (N.D. Ill. 2004) (St. Eve, J.).  Factors relevant to the public interest of the court include the court's familiarity with the applicable law and concerns relating to the efficient administration of justice.  *Coll. Craft Cos., Ltd. v. Perry*, 889 F. Supp. 1052, 1056 (N.D. Ill. 1995) (Bucklo, J.).  All of these factors favor transfer of the *Katz* Action to Colorado.

---

[6] While, for purposes of the transfer analysis only, venue is proper in this district because, under analogous 28 U.S.C. § 1441 circumstances, venue of an action removed from state court properly lies in the federal district embracing the place where the state action was pending, *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665 (1953), Defendants do not concede that this action was properly brought in Illinois state court.  Defendants do not waive, and expressly reserve, all objections and defenses to Illinois state court as a proper forum for this action, including objections and defenses related to prior pending action, improper venue, *forum non conveniens*, and *in personam* jurisdiction.

1.    The *Katz* Complaint is an Attempt at Improper Forum Shopping

Plaintiff Katz's choice of an Illinois forum is improper procedural maneuvering that is not entitled to deference.  *See Wiley v. Trendwest Resorts, Inc.*, No. C 04-4321 SBA, 2005 WL 1910934, at *5 (N. D. Cal. Aug. 10, 2005 ) ("[I]f there is any indication that plaintiff's choice of forum is the result of forum shopping, plaintiff's choice will be accorded little deference.") (citation omitted).  The undisputed facts demonstrate that this case was filed in Illinois, instead of simply adding the 1933 Act claims to the *Stender* Action, in an obvious attempt at forum shopping.  Plaintiffs' Counsel expressly stated to the Colorado court that "federal securities claims" were possibly going to be added to the *Stender* Action.  Less than three months after making that statement, and approximately two months after discovery was stayed in the *Stender* Action and defendants had filed their Motion to Dismiss and/or Stay—and without any explicable reason—Plaintiffs' Counsel filed the *Katz* Action in Illinois, alleging the same factual narrative as the *Stender* action, against the same defendants, and on behalf of the same class. The only logical conclusion to draw from this conduct and timing is that Plaintiffs' Counsel is now dissatisfied with Colorado and is shopping for a different forum.

It is exactly this sort of forum shopping that Section 1404(a) was intended to prevent. *Packer v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 728 F. Supp. 8, 12 (D.C. 1989) (citing *Wright, Miller & Cooper*, Fed. Practice & Proc.: Jurisdiction § 3845 (1986)) (Section 1404(a) was "intended in part to avoid forum shopping by plaintiffs.").  Indeed, the Northern District of California recently granted a motion to transfer in a comparable situation.  In *Forrand v. Fed. Express Corp.,* No. C07-4674 TEH, 2008 WL 276389 (N.D. Cal. Jan. 30, 2008), the Northern District of California court granted defendant's motion to transfer the litigation pending before it to the Central District of California, where three of the four named plaintiffs, represented by the same counsel, had previously brought a "nearly identical" suit.  2008 WL

- 8 -

276389 at *3. The court found that, given the factual circumstances, the plaintiffs had "filed th[e] case in th[e] [Northern District] in an improper attempt to forum shop, and the Court therefore need not give substantial deference to [p]laintiffs' choice of forum." *Id.* So too here— Katz's and Plaintiffs' Counsel's "improper attempt to forum shop" should be rejected and this case should be transferred to Colorado.[7]

2.      It is Convenient for the Witnesses and Parties to Litigate in Colorado

The other four private interest factors in the Section 1404 analysis—location of material events, access to proof, convenience of the witnesses, and convenience of the parties—all support transfer to the District of Colorado as well. As Plaintiffs' Counsel recognized in filing the *Stender* Action there, Colorado has a strong relationship to this dispute and is a logical place for this litigation. The Archstone entities—on which both the *Stender* and *Katz* Actions are focused—are based in Colorado. (Declaration In Support of Defendants' 28 U.S.C. § 1404(a) Motion to Transfer ("Reif Declaration" or "Reif Dec.") ¶ 3, attached hereto as Exhibit E.) As explained in detail in the Reif Declaration, each of the location of material events, access to proof, and convenience to witnesses and parties favor Colorado:

- Location of Material Events: Because both Archstone entities are based in Colorado, the events surrounding Katz's participation in the Archstone UPREIT and the subsequent 2007 mergers at issue in the Katz Complaint were all based in Colorado. (Reif Dec. ¶¶ 3, 6-8.)

- Access to Proof: All of the documents related to both contributions of property to the Archstone UPREIT and the 2007 mergers are housed in Colorado. (*Id.* ¶¶ 6-7.)

---

[7] Likewise, because Katz, like the *Stender* plaintiffs, is alleging a class action, his home forum is irrelevant. *Georgouses v. Natec Resources, Inc.*, 963 F. Supp. 728, 730 (N.D. Ill. 1997) (Gettleman, J.) (citing *Genden v. Merrill Lynch Pierce Fenner & Smith*, 621 F. Supp. 780, 782 (N.D. Ill. 1985) (Rovner, J.)). And, even if this Court were to consider Katz's choice of forum, a plaintiff's choice is afforded even less deference where, as here, another forum has a stronger relationship to the dispute or where, as here, the plaintiff's chosen forum has no significant connection to the situs of material events. *Chicago, Rock Is. & Pac. R.R. Co. v. Igoe*, 220 F.2d 299, 304 (7th Cir. 1955) (citation omitted).

- Convenience to Witnesses and Parties:  The Archstone entities' employees are based in Colorado, including substantially all of Archstone's current and former senior management.  Five of the named defendants either reside or have their principal executive offices in Colorado, and at least two other potential non-party witnesses also reside in Colorado.  (*Id.* ¶¶ 3-5.)

Plaintiffs' Counsel will be hard-pressed to dispute these points, as Plaintiffs' Counsel conceded in the *Stender* Complaint that "a substantial part of the events or omissions" occurred in Colorado, and the defendants "received substantial compensation there."  (Stender Compl. ¶ 43.)

Indeed, while Colorado is plainly an obvious and logical forum for any Archstone-related litigation, it is equally obvious that Illinois is not.  There are no allegations in either the *Stender* or *Katz* Actions that suggest any meaningful or relevant witnesses or documents are located in Illinois, or that any events germane to this litigation occurred in Illinois.  The only connection to Illinois alleged in either complaint is that both Katz and *Stender* plaintiffs are located in Illinois.[8] As such, there is no adverse impact on Katz in transferring this action to the District of Colorado.

Finally, transfer of this action to Colorado will allow for consolidation of the *Katz* and *Stender* Actions.  Related litigation should be transferred to a forum where consolidation is feasible and logical so as to minimize duplication of effort.  *Dean Foods Co.,* 2000 WL 1557915 at *5 (ordering transfer where "[b]oth cases involve similar issues and stem from the same factual basis and it would be wasteful of time, energy and resources to permit both to go on simultaneously.")  The efficiencies to be obtained from consolidating the *Katz* and *Stender* Actions in the District of Colorado, once *Katz* is transferred there are obvious and further argue for transfer of the *Katz* Action.  *See* Fed. R. Civ. P. 42(a).  Such efficiencies will inure to the benefit of all parties and the courts.

---

[8] Among the seventeen defendants named in the *Katz* Action, only one, Ruth Ann M. Gillis, a former director and trustee of the Archstone entities, resides in Illinois.  (Reif. Dec. ¶ 4.)

3.    The Interests of Justice Favor Transfer

The public interest factors focus on the transfer's effect on the efficient administration of justice, including the likelihood of a speedy trial, and the transferor and transferee court's familiarity with the applicable law.[9] *Coll. Craft Cos., Ltd. v. Perry*, 889 F. Supp. 1052, 1056 (N.D. Ill. 1995) (Bucklo, J.).  This inquiry focuses primarily on administrative concerns rather than the merits of the underlying dispute.  *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 221 (7th Cir. 1986).  Here, too, these factors argue for transfer of this action to the District of Colorado.

As an initial matter, "one of the most important factors considered by courts in evaluating a motion to transfer is the existence of similar litigation in the transferee district."  *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 660 (S.D.N.Y. 1998).  Absent special circumstances not present here, cases will be transferred in the interests of justice to the district where the prior related litigation is pending.  *Id.*  Here, transferring this action to Colorado for consolidation with the *Stender* Action "is far more efficient than allowing separate actions to proceed in [Colorado] and [Illinois]."  *Id.*

In addition to the obvious benefits of combining these actions in Colorado where Plaintiffs' Counsel filed the first Archstone-related putative class action, there is also less docket backlog in the District of Colorado than in the Northern District of Illinois.  According to the Federal Court Management Statistics, which are cited by courts evaluating the efficient administration of justice factors, *see Morton Grove Pharms., Inc. v. Nat'l Pediculosis Ass'n*, 525 F. Supp. 2d 1039, 1046 (N.D. Ill. 2007) (Bucklo, J.), the number of cases per judge pending in both the Northern District of Illinois and the District of Colorado, and the time to trial in both

---

[9]  The Securities Act claims involve a federal question, and both Districts are competent to hear and decide issues of federal law.  *Dean Foods Co.*, 2000 WL 1557915 at *5.

venues, are relatively equal:  368 cases per judge in the Northern District of Illinois to 376 cases per judge in Colorado; 29.7 months from filing to trial in the Northern District of Illinois to 29.0 months from filing to trial in the District of Colorado.  (Fed. Ct. Mgt. Stats., http://www.uscourts.gov/cgi-bin/cmsd2007.pl; attached hereto as Exhibit F.)  However, the number of cases on the dockets that are over three years old are somewhat higher in the Northern District of Illinois as compared to the District of Colorado:  as of September 30, 2007, 6.5% of cases in the Northern District of Illinois were over three years old while, for the same period, 4.3% of District of Colorado cases were that old.  (*Id*.)  Given that Colorado has fewer older cases than the Northern District of Illinois, this factor also supports a transfer to the District of Colorado.

* * *

Should Katz seek to remand this case to the Circuit Court of Cook County, this Court should exercise its discretion to transfer this litigation to Colorado in the first instance, and allow the Colorado district court to evaluate the remand motion.  *See Gould v. Nat'l Life Ins. Co.*, 990 F. Supp. 1354, 1362-63 (M.D. Ala. 1998) (transferring action prior to consideration of remand motion and collecting cases from multiple jurisdictions finding that a court is not required to consider remand before transfer).  This is especially true where, as here, there is a prior pending related case.  *Huntsman Corp. v. Int'l Risk Ins. Co.*, No. 1:08-CV-029, 2008 WL 1836384, at *3 (E.D. Tex. April 22, 2008) (deciding transfer request before remand request is "particularly appropriate" where "a related suit is already pending in the transferee district . . .") (citation omitted).  The Colorado district court is already familiar with the parties and the underlying legal and factual issues involved in this action.  As such, for the sake of efficiency, if this Court deems transfer is warranted, the Section 1404 transfer to the District of Colorado should precede any ruling on remand.  *See, e.g., In Re Prudential Ins. Co. Sales Practices Litig.*, 170 F. Supp. 2d

1346, 1347 (J.P.M.L. 2001) ("remand motions can be presented to and decided by the transferee judge"); *In Re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) (finding pendency of motion to remand removed action to state court was not sufficient to avoid inclusion in consolidated proceedings, since remand motion could be decided by transferee court).

## <u>CONCLUSION</u>

For the reasons stated in this Memorandum and in Certain Defendants' 28 U.S.C. § 1404(a) Motion To Transfer, this Court should transfer this action to the District of Colorado.

Dated:  July 23, 2008                          Respectfully submitted,


By:      /s/Jeffery S. Davis_____
         *One of the attorneys for Defendants Archstone-*
         *Smith Operating Trust, Archstone-Smith Trust,*
         *Lehman Brothers Holdings Inc., and Tishman*
         *Speyer Development Corporation*

         Christopher Q. King (6189835)
         Steve Merouse (6243488)
         Jeffery S. Davis (6277345)
         SONNENSCHEIN NATH & ROSENTHAL LLP
         7800 Sears Tower
         Chicago, IL  60606
         Phone:  (312) 876-8000
         Fax:  (312) 876-7934

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2008, I electronically filed the preceding with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the

following and, in addition, served the following by U.S. Mail and email on July 23, 2008:

> Kenneth A. Wexler
> Edward A. Wallace
> Christopher J. Stuart
> Melisa Twomey
> Wexler Toriseva Wallace LLP
> 55 W. Monroe Street
> Suite 3300
> Chicago, IL  60603
>
> Lee Squitieri
> Squitieri & Fearon, LLP
> 32 E. 57th Street
> 2nd Floor
> New York, NY  10022

> /s/Jeffery S. Davis_____

# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

STEVEN A. STENDER and INFINITY     )
CLARK STREET OPERATING, on behalf of  )
themselves and all others similarly situated,  )
                                        )
           Plaintiffs,         )
                                          )   Case No.
      v.                    )
                                          )
JAMES A. CARDWELL,           )
ERNEST A. GERARDI, JR.,       )   <u>Jury Trial Demanded</u>
RUTH ANN M. GILLIS,          )
NED S. HOLMES,               )
ROBERT P. KOGOD,           )
JAMES H. POLK III,            )
JOHN M. RICHMAN,           )
JOHN C. SCHWEITZER,        )
R. SCOT SELLERS,            )
ROBERT H. SMITH,           )
STEPHEN R. DEMERITT,        )
CHARLES MUELLER, JR.,       )
CAROLINE BROWER,         )
MARK SCHUMACHER,        )
ALFRED G. NEELY,          )
ARCHSTONE-SMITH OPERATING TRUST, )
ARCHSTONE-SMITH TRUST,      )
LEHMAN BROTHERS HOLDINGS, INC., )
and                                 )
 TISHMAN SPEYER DEVELOPMENT   )
CORPORATION,              )
                                          )
            Defendants.     )

## CLASS ACTION COMPLAINT

Plaintiffs Steven A. Stender ("Stender") and Infinity Clark Street Operating ("Infinity")

(hereinafter sometimes collectively referred to as "Plaintiffs"), by their attorneys, for their class

action complaint against Archstone-Smith Operating Trust, Archstone-Smith Trust, James A.

Cardwell, Ernest A. Gerardi, Jr., Ruth Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, James H.

Polk III, John M. Richman, John C. Schweitzer, R. Scot Sellers, Robert H. Smith, Stephen R.

Demeritt, Charles Mueller, Jr., Caroline Brower, Mark Schumacher, Alfred G. Neely Lehman

Brothers Holding, Inc. ("Lehman Brothers") and Tishman Speyer Development Corporation

("Tishman Speyer"), (hereinafter sometimes collectively referred to as "Defendants"), allege

upon knowledge as to their own acts, and upon information and belief as to all other matters,

based upon the investigation conducted by and through their attorneys, which investigation

included, *inter alia*, reviewing Securities Exchange Commission ("SEC") filings, press releases,

analyst reports, news articles, communications from the corporate Defendants and other

materials, as follows:

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action individually and as a class action on behalf of all

persons who owned Class A-1 Common Units of Archstone-Smith Operating Trust ("A-1 Unit

holders") as of the Merger (as defined hereinafter), for compensatory damages, contractual

damages and declaratory relief arising from the merger agreement among Archstone-Smith

Operating Trust (the "Archstone UPREIT"), Archstone-Smith Trust (the "Archstone REIT"),

Tishman Speyer and Lehman Brothers (Tishman Speyer and Lehman Brothers are referred to

collectively as the "Tishman-Lehman Partnership") to take the publically held Archstone REIT

private (the "Merger").

2.    The A-1 Unit holders of the Archstone UPREIT are former property owners, or

investors of former property owners, which contributed their properties (and/or equity in their

property holding companies) to the Archstone UPREIT, or its predecessor, Charles E. Smith

Residential Realty L.P. (the "Smith UPREIT), in exchange for limited partnership interests in the

Archstone UPREIT (or the Smith UPREIT) in the form of common units.  The objective of A-1

Unit holders in making such contributions was to obtain from the Archstone UPREIT (or the

2

Smith UPREIT) tax advantages, dividends and liquidity as specified in contribution agreements entered into at the time of their respective contributions. Upon information and belief, none of the contribution agreements pursuant to which the A-1 Unit holders received their A-1 Units allow the Archstone REIT, Archstone UPREIT or any subsequent buyers or merger partners to eliminate or avoid the contractual tax benefits, liquidity rights and dividends bargained for by the A-1 Unit holders at the time they contributed their properties to the Archstone UPREIT.

3.    Given the magnitude of the tax liability A-1 Unit holders faced upon occurrence of a taxable event, the contractual tax liability protection afforded to the A-1 Unit holders by the Archstone UPREIT constituted an enormous potential liability to third parties interested in merging with or acquiring the Archstone UPREIT and the Archstone REIT. In this case, as explained in greater detail below, that liability was factored into the $60.75 buyout price offered per A-1 Unit by the Tishman-Lehman Partnership to A-1 Unit holders, which had been lowered from $64.00 to $62.50 to $60.75 to account for the Archstone UPREIT's obligations to A-1 Unit holders. However, even after lowering the offer price, the Defendants structured the Merger to disregard altogether the contractual tax, dividend and liquidity benefits owed to A-1 Unit holders. The Tishman-Lehman Partnership has not compensated the A-1 Unit holders for the loss of these benefits and A-1 Unit holders have sustained and will continue to accrue significant damages as a result.

4.    More specifically, pursuant to the Merger Agreement, Plaintiffs and members of the Class (as defined hereinafter) have been coerced into: (1) cashing-out their A-1 Units, which will result in millions of dollars of unprotected tax liabilities; or (2) converting their A-1 Units into new Series O Preferred units ("Series O Units") which are economically inferior to the A-1 Units. While the Merger Agreement couches the cashing in of A-1 Units or conversion into

Series O Units as an "election," neither action as described in this Complaint was voluntary, but was coerced by Defendants. Insofar as the terms "elect" or "election" are used in this Complaint, it is for convenience only and in reference to the terminology in the Merger Agreement and is not intended to concede that it was a voluntary act of any kind.

5.     As a result of the Merger Agreement, A-1 Unit holders who took the Tishman-Lehman Partnership's cash offer will have to recognize capital gain in an amount based on the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT.

6.     Alternatively, A-1 Unit holders whose A-1 Units were converted to Series O Units have lost the liquidity and dividends they enjoyed before the Merger. Indeed, the Merger Agreement provides that Series O Unit holders will have to wait until the fifth anniversary of the Merger before they can redeem any or all of their Series O Units at a cash redemption price of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date. Moreover, the dividends previously regularly distributed to A-1 Unit holders have essentially been eliminated.

7.     Hence, many of the contractual tax protections, liquidity and long-term investment strategy benefits that hundreds, if not thousands of A-1 Unit holders enjoyed have been eliminated through the Merger by the unilateral breach of contract and breach of fiduciary duties by the Defendants.

8.     By entering into the Merger Agreement, the Individual Defendants, the Archstone REIT and Archstone UPREIT breached their fiduciary duties owed to A-1 Unit holders by failing to take all necessary steps to ensure that the unit holders will receive the maximum value realizable for their ownership interests and/or retain certain liquidity and dividend benefits and

4

tax protections they were guaranteed. The Tishman-Lehman Partnership aided and abetted the other Defendants' breach of fiduciary duties and procured the breaches of contract detailed herein.

9.      Because Defendants failed to protect the best interests of the Class and breached with Class members, this lawsuit seeks compensatory damages, contractual damages and injunctive relief for all A-1 Unit holders who were or will be injured by Defendants' wrongful conduct.

## II.    PARTIES

10.     Plaintiff Stender is a resident of Cook County, Illinois and has been an owner of A-1 Units at all relevant times described herein. Because of the coercive nature of the Merger Agreement, Stender was forced to "elect" to cash-out his A-1 Units and receive $60.75 per A-1 Unit.

11.     Plaintiff Infinity is an Illinois general partnership with its principal place of business in Chicago, Illinois. Infinity is the successor in interest to Infinity Clark Street Operating, L.L.C., an Illinois limited liability company. Infinity has been an owner of A-1 Units at all relevant times described herein. Because of the coercive nature of the Merger Agreement, Infinity was forced to convert each Class A-1 Common Unit it owns to a newly issued Series O Preferred Unit on a one for one basis.

12.     Defendant James A. Cardwell was a director/trustee of both the Archstone REIT and the Archstone UPREIT at all relevant times.

13.     Defendant Ernest A. Gerardi, Jr. was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

5

14.     Defendant Ruth Ann M. Gillis was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

15.     Defendant Ned S. Holmes was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

16.     Defendant Robert P. Kogod was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

17.     Defendant James H. Polk III was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

18.     Defendant John M. Richman was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

19.     Defendant John C. Schweitzer was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

20.     Defendant R. Scot Sellers was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times, as well as the Chairman and Chief Executive Officer of the Archstone REIT and the Archstone UPREIT.  As an officer of the Archstone REIT and the Archstone UPREIT he will receive monetary benefits from the Merger in addition to the Merger consideration.

21.     Defendant Robert H. Smith was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

22.     Defendant Stephen R. Demeritt was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

23.     Defendant Charles Mueller, Jr. was the Chief Financial Officer of the Archstone REIT and the Archstone UPREIT at all relevant time.

6

24.     Defendant Caroline Brower was an Executive Vice President and General Counsel of the Archstone REIT and the Archstone UPREIT at all relevant times.

25.     Defendant Mark Schumacher was the Senior Vice President and Chief Accounting Officer of the Archstone REIT and the Archstone UPREIT at all relevant times.

26.     Defendant Alfred G. Neely was the Chief Development Officer and President of the Charles E. Smith Division of the Archstone REIT and the Archstone UPREIT at all relevant times

27.     The individual directors and officer Defendants are sometimes collectively referred to as the "Individual Defendants."

28.     The Individual Defendants, as officers, directors and trustees of the Archstone REIT and the Archstone UPREIT, owed fiduciary duties of care, candor, loyalty and good faith toward the A-1 Unit holders and were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of Archstone UPREIT, including, among other things, acting in good faith and with loyalty, due care, and candor towards A-1 Unit holders.

29.     Defendant Lehman Brothers is a corporation existing under the laws of the State of Delaware which, through affiliates: (1) owned and controlled River Holding LP, the party with which the Archstone REIT has merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT has merged.

30.     Defendant Tishman Speyer is a corporation existing under the laws of the state of Delaware which, through affiliates: (1) owned and controlled River Holding LP, an entity with which the Archstone REIT merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT merged.

7

31.    Defendant Archstone REIT was engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States. The Archstone REIT was organized under Maryland law and maintained its headquarters at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112. The Archstone REIT owned approximately 89% of the Archstone UPREIT. The Archstone REIT was the sole trustee of the Archstone UPREIT and its relation with the Archstone UPREIT was governed by the Declaration of Trust of the Archstone UPREIT.

32.    Defendant Archstone UPREIT was a limited partnership with its principal office at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112. The Archstone UPREIT was organized under Maryland law. Plaintiffs and members of the Class owned limited partnership interests known as A-1 Units in the Archstone UPREIT.

33.    By the acts, transactions, and courses of conduct alleged herein, Defendants, individually and as part of a common plan and scheme and/or aiding and abetting one another in total disregard of their fiduciary duties, are depriving Plaintiff and the Class of the true value of their investment in the Archstone UPREIT and/or the entity formed as a result of the Merger (the "Company").

34.    Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in his or her capacity as an officer and/or director of the Archstone REIT and the Archstone UPREIT, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

### III.    JURISDICTION AND VENUE

35.    The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy, upon information and belief, exceeds the sum of $5,000,000.00

exclusive of interest and costs, and is a class action in which members of the Class are citizens of states other than Colorado.

36.     Upon information and belief, at least one Class Member is a citizen of a state different than the Defendants. Plaintiffs are seeking relief on behalf of a nationwide class and believe that Class Members reside in states throughout the country.

37.     Upon information and belief, more than two-thirds of the Class Members are not citizens of the state in which this action was filed.

38.     The principal injuries to the Class were incurred throughout the United States and were not principally incurred in the state where the action was originally filed.

39.     Upon information and belief, Colorado citizens do not comprise greater than one-third of the Plaintiff Class.

40.     Upon information and belief, Defendants are, for jurisdictional purposes, citizens of Colorado. Defendants are not charitable organizations.

41.     This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. §§ 1332(d)(4)(A) and (B).

42.     This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(3).

43.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District. Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Real Estate Investment Trusts

44.     A Real Estate Investment Trust ("REIT") is an entity that owns and manages income-producing real estate such as apartments, offices and industrial space.  Along with meeting additional criteria, to qualify as a REIT the entity must:

- pay at least 90% of its taxable income to its shareholders every year;

- have at least 100 shareholders;

- invest at least 75% of its total assets in real estate; and

- derive at least 75% of its income from rent or mortgage interest from properties in its portfolio.

45.     One of the most beneficial aspects of a REIT is the method in which taxes are handled.  A REIT may deduct the dividends paid to the shareholders from its corporate tax bill.  Therefore, a REIT generally does not pay federal corporate income tax and taxes are only paid by the individual investor for the dividends received and any capital gains.

46.     REIT investors also enjoy the advantages of limited liability and transferability of shares (*i.e.,* liquidity) that a corporate structure offers, without incurring the costs of double taxation.  Thus, a REIT is essentially a combination of a corporation and a partnership in that it combines the benefits of a corporation with the tax pass-through nature of a partnership.

47.     An UPREIT is a partnership (Umbrella Partnership Real Estate Investment Trust).  A typical UPREIT is created by a group of sponsors who form a limited partnership and contribute their property to the UPREIT in return for limited partnership interests in the UPREIT.  Simultaneously, a corporation, typically the REIT, contributes cash that it raised in a

public offering in return for a general partnership interest in the UPREIT. The resulting partnership is called an UPREIT.

48. The managing general partner of an UPREIT is usually a REIT. Because the REIT is the managing general partner of the UPREIT, it is responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT.

49. By contributing real estate to an UPREIT, sponsors can mitigate the level of risk associated with the property they contributed by becoming equity holders in a much larger entity that owns a diverse portfolio of real estate assets. Sponsors also avail themselves of the opportunity to eliminate the personal liabilities that encumber their contributed property by having the UPREIT assume these liabilities.

50. In most UPREITs, the sponsors receive limited partnership interests that are easily convertible into common stock of the managing partner REIT. As a result, the limited partnership interests are easily sellable on the open market.

**B.** **Archstone-Smith Trust's and Archstone-Smith Operating Trust's Structure as an UPREIT**

51. Archstone-Smith Operating Trust was structured as an UPREIT.

52. Archstone-Smith Trust was a REIT with its common shares publicly traded on the New York Stock Exchange. The Archstone REIT was the managing general partner of the Archstone UPREIT. Because the Archstone REIT was the managing general partner of the Archstone UPREIT, it was responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT. Moreover, the Archstone REIT was the sole trustee and owned 88.2% of the Archstone UPREIT at December 31, 2006.

11

53.    As of December 31, 2006, the Archstone REIT and Archstone UPREIT (sometimes collectively referred to as the "Archstone Entities") owned or had an ownership position in 348 communities, representing 88,011 units, including units under construction. The Archstone Entities were engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.

54.    In the Archstone UPREIT, like most UPREITs, the limited partners (here the A-1 Unit holders) received limited partnership interests that were convertible into common stock of the Archstone REIT. The primary purpose of this feature was to give A-1 Unit holders liquidity in their investment. Rather than being restricted to holding an illiquid limited partnership interest in the Archstone UPREIT, the A-1 Unit holders could redeem their interests for cash or convert their interests to common stock in the publicly traded Archstone REIT and then sell the stock in the open market.

55.    The Archstone UPREIT also offered valuable tax advantages to the A-1 Unit holders. For example, generally transfers of appreciated property to a REIT are taxable events. Thus, under the basic REIT form, a sponsor who contributes appreciated property to the REIT must recognize gain in an amount equal to the excess of the value of the stock received over the basis of the property contributed. This tax ramification, however, applies only to corporations, not to partnerships. By utilizing the Archstone UPREIT, A-1 Unit holders were able to contribute their property to the Archstone UPREIT, rather than to the Archstone REIT, with the result being tax deferred treatment of the transactions.

**C.    Plaintiffs and Members of the Class Were Afforded Significant Tax Protections and Liquidity Rights Upon Contributing Their Properties to the Archstone UPREIT**

56.    In the late 1990's, realizing the tax benefits and liquidity advantages of an UPREIT, many real estate investors, including partnerships Plaintiffs were investors in, agreed to

12

contribute their properties to various UPREITS in exchange for limited partnership interests ("Sponsors").

57.    Oftentimes, the Sponsors' real estate contribution agreements and partnership agreements with the UPREITS provided them with certain tax benefits, dividends and liquidity. For example, the Plaintiffs' contribution agreements with Charles E. Smith Residential Realty L.P. ("Smith UPREIT") provided that for a period of time following the closings of their real estate contributions, the Smith UPREIT could not dispose of any interest in the property contributed by Plaintiffs that resulted in them realizing a taxable gain. If such a gain was triggered, the Plaintiffs were to be indemnified by the Smith UPREIT for any resulting tax liability.

58.    The Plaintiffs' contribution agreements also provided that they could redeem their UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc. REIT.

59.    On October 31, 2001, the Smith UPREIT merged with and into the Archstone UPREIT. The foregoing tax protections and liquidity provisions were all contained in binding contribution agreements assumed by the Archstone UPREIT and Archstone REIT as well the declaration of trust governing the Archstone UPREIT and Archstone REIT.

60.    Upon information and belief, Plaintiffs' tax protections and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITS, including those with the Archstone UPREIT.

61.    Indeed, the Archstone UPREIT agreed in its Declaration of Trust, for the benefit of the hundreds, if not thousands of A-1 unit holders with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by

13

a wholly owned subsidiary of the Archstone UPREIT. According to the Declaration of Trust, these restrictions were to be effective until January 1, 2022.

62.    Moreover, each A-1 Unit issued pursuant to contribution agreements with tax protections and liquidity provisions virtually identical to those contained in Plaintiffs' contribution agreements was subject to a unit redemption right at the option of the A-1 Unit holder. This redemption right required the Archstone UPREIT to acquire the unit holder's A-1 Unit for the market price of Archstone REIT common shares. The Archstone REIT, in its discretion, could elect to assume and directly satisfy the Archstone UPREIT's redemption obligation, in which case the Archstone REIT would pay the redeeming unit holder in Archstone REIT common shares, or their cash equivalent.

63.    In addition, the Archstone UPREIT was contractually obligated to maintain specified levels of borrowings outstanding with respect to the properties contributed by Plaintiffs and members of the Class, and A-1 Unit holders were to receive quarterly dividend distributions from the Archstone UPREIT.

64.    These provisions were intended to ensure that Plaintiffs and members of the Class would be able to continue to defer the gain that would otherwise be recognized by them for tax purposes: (i) upon a sale by the Archstone UPREIT of any of the properties contributed by Plaintiffs or the members of the Class; (ii) upon the sale by the Archstone UPREIT of any of its interest in a subsidiary owning the properties contributed by Plaintiffs or the members of the Class; or (iii) upon the repayment of borrowings relating to the properties contributed by Plaintiffs or the members of the Class. If the Archstone UPREIT sold any of the properties contributed by Plaintiffs or members of Class, or any interest therein, without satisfaction of certain conditions, or repaid borrowings relating to the contributed properties, the Archstone

14

UPREIT was liable for the loss of tax benefits and could be liable for monetary damages for engaging in these undertakings.

**1.    The Archstone Entities' Merger Agreement With the Tishman-Lehman Partnership Circumvents the Benefits Provided to the Plaintiffs and Other A-1 Unit Holders**

### 1.    *The Merger's Background*

65.    On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

66.    On May 2, 2007, the Tishman-Lehman Partnership submitted a written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

67.    On May 15 and 16, 2007, the Archstone REIT's board of trustees became aware of concerns on the part of both bidders with respect to the "significant magnitude of the built-in gain associated with certain of [Archstone's] properties that are subject to tax protection agreements with operating trust unitholders and the magnitude of the increase in property taxes as a result of the transaction." Archstone Smith Operating Trust Form 424B3, filed Aug. 9, 2007, at 56.

68.    On May 19 and 20, 2007, the Tishman-Lehman Partnership indicated to Morgan Stanley, the Archstone Entities' financial advisor, that "due to increased expected transaction costs resulting from their better understanding of the magnitude of the company's tax protection obligations and due to adverse changes in the debt markets, they were uncertain whether any offer that they were to submit would be at a price equal to their initial indication of $64.00 per common share and unit." *Id.* at 58.

69.     On May 23, 2007, the Tishman-Lehman Partnership contacted Morgan Stanley and offered to acquire the Archstone Entities at a price of $60 per Archstone REIT common share and $60 per Archstone UPREIT common unit.  This offer represented a 6.25% decrease over a period of only three weeks, which Tishman-Lehman Partnership indicated "was primarily a result of information obtained in their confirmatory due diligence regarding, among other things, the magnitude and scope of our tax protection arrangements, the compression in returns that they could expect to realize from our development pipeline, and the deterioration of the debt capital markets." *Id.* at 59.  In addition, the Tishman-Lehman Partnership "indicated that they had determined that there were significant transaction costs exclusive of the impact on value associated with the Company's tax protection obligations." *Id.*  In response, the Archstone REIT's board of trustees instructed Morgan Stanley to present a counterproposal of $62 per common share and common unit.

70.     On May 24, the Tishman-Lehman Partnership increased its offer to $61 per common share and common unit.  Later that day, the Tishman-Lehman Partnership indicated that it was unwilling to pay $61 per common share and common unit unless the second quarter dividend was not paid.  In response, Archstone REIT's board of trustees instructed Morgan Stanley to inform the Tishman-Lehman Partnership that the board would accept a price of $60.75 per common share and common unit and pay the second quarter dividend of $0.4525 per common share and common unit.

71.     By the close of business on May 29, 2007, the Archstone REIT's shares traded at $61.45, a material premium to the Merger Agreement's consideration of $60.75 per share.  Furthermore, the Archstone REIT's common stock price traded well above the Merger Agreement's consideration as recently as January 30, 2007.  In fact, the Archstone REIT's

16

common shares have lost a considerable amount of their value between late January 2007,

and the day prior to the announcement concerning the Merger Agreement were and are

poised to enjoy significant gains as slumping house prices cause individuals to rent, rather

than buy, properties in large commercial markets.

### 2. *The Merger Agreement*

72.     On May 29, 2007, the Archstone REIT publicly announced that it signed a

definitive merger agreement to be acquired by the Tishman-Lehman Partnership in a transaction

valued at approximately $22.2 billion, including the assumption and refinancing of the Archstone

REIT's outstanding debt and excluding transaction costs.

73.     Pursuant to the Merger Agreement, the Tishman-Lehman Partnership agreed to

acquire all outstanding common shares of the Archstone REIT in exchange for $60.75 per share

in cash.  The Archstone REIT reported that the purchase price per share represented a 22.7%

premium over the share price on May 24, 2007, immediately before published reports regarding

a potential acquisition.

74.     The Merger Agreement also provided that holders of A-1 Units were entitled to

one newly issued Series O Unit for each existing A-1 Unit.  Alternatively, A-1 Unit holders

could "elect" to receive: (a) $60.75 per A-1 Unit in cash, without interest and less applicable

withholding taxes; or (b) a combination of the cash consideration and Series O Units.

75.     Moreover, pursuant to the Merger Agreement no additional quarterly dividend

distributions would be paid to A-1 Unit holders prior to the completion of Merger.

76.     A-1 Unit holders were allowed until 11:59 P.M., EST, on September 10, 2007, to

make an "election" for their common units, which deadline was later extended until September

18, 2007.

77.    Had the A-1 Unit holders been told that the Archstone REIT and Archstone UPREIT were engaged in negotiating a transaction that would eliminate their dividend, liquidity and tax benefits, the A-1 holders could have redeemed their A-1 Units before they were informed of the Merger, and at prices substantially higher than the $60.75 per unit Merger price.

### 3.    The A-1 Unit Holders' Tax Benefits Are Recognized as an Integral Part of the Archstone Entities' Economic Structure

78.    As indicated above, prior to the Merger Agreement being consummated, at least one additional unidentified company was involved in bidding on the acquisition of the Archstone UPREIT and the Archstone REIT.

79.    Interestingly, both the unidentified company and the Tishman-Lehman Partnership explained on numerous occasions that their offer prices to acquire the Archstone entities were based upon, among other things, the magnitude and scope of the Archstone UPREIT's tax protection arrangements with A-1 Unit holders. All potential acquirers came to the same conclusion -- that the UPREIT's tax protection and other obligations were contractual obligations that would survive the Merger and therefore the potential acquirers felt that they needed to factor that liability into the acquisition price. Accordingly the potential liability to the acquirers of the tax protection obligations caused the acquirers to lower the price to be offered which lowered the price at which A-1 unit holders could "elect" to cash out at the time of the Merger. In fact, this factor ultimately led to the unidentified company's decision not to submit an offer to acquire the Archstone Entities. Yet, despite the prospective buyers' lack of willingness to acquire the Archstone Entities at an adequate price, Defendants persisted on reaching a deal with the Tishman-Lehman Partnership, even if it meant that the A-1 Unit holders would suffer severe tax consequences or have the liquidity of their investments severely impaired.

18

80.     Moreover, even though Plaintiffs' and A-1 Unit holders' tax protection agreements were among one of the most significant factors in determining the lower final acquisition price of the Archstone UPREIT and the Archstone REIT, the Individual Defendants, the Archstone REIT, the Archstone UPREIT and the Tishman-Lehman Partnership refused to provide A-1 Unit holders with compensation for elimination of the tax protection agreements and refused to preserve a host of other contractual benefits contained in the contribution agreements for A-1 Unit holders.

### 4.     *The Negative Effects of the Merger on A-1 Unit Holders*

81.     The Merger has had negative financial consequences for both A-1 Unit holders that "elected" to receive the Tishman-Lehman Partnership's cash offer and A-1 Unit holders that "elected" to convert or otherwise had their A-1 Units converted to Series O Units.

82.     The A-1 Unit holders that were forced to accept the Tishman-Lehman Partnership's cash offer have had to recognize capital gain in an amount equal to the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT. Upon information and belief, such gains have resulted in millions of dollars of tax liability for many A-1 Unit holders.

83.     Alternatively, the A-1 Unit holders that were forced convert their units to Series O Units have been forced to forfeit the liquidity they enjoyed before the Merger and are now saddled with owning an investment in a private company that will likely be highly leveraged with debt.

84.     For example, the Merger Agreement provides that after five years Series O Unit holders can redeem any or all their units at a cash redemption of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date.  Hence, the Series O

19

Units will be completely illiquid for a minimum of five years and the Series O Unit holders will

be deprived of any increase in the value of the underlying properties.

85.     Yet, even after the expiration of the five-year redemption waiting period

described above, Series O Unit holders may only gradually liquidate their investment because the

Company will not be required to redeem more than one-third of the Series O Units outstanding in

any twelve month period.  If the Company receives redemption notices for a number of Series O

Units in excess of the limit, it will redeem the units in the order that it received the redemption

notices rather than pro rata.

86.     Thus, Series O Unit holders will be forced to hold an almost completely illiquid

asset for a minimum of five years since these units are not publicly traded in the market, and

even after this five year period, the liquidity of these units will be severely limited and possibly

eliminated altogether.  The Company, however, has the right to redeem all of the Series O units

for cash at $60.75 per unit any time after the fifth anniversary of the Merger.

87.     Plaintiffs and members of the Class are also damaged by the Archstone UPREIT's

failure to pay third quarter dividends to A-1 Unit holders, as well as the Company's failure to

plan for the regular payment of dividends to Series O Unit holders.  Previously, Plaintiffs and

members of the Class had available the distributions that they regularly received from the

Archstone UPREIT to defray taxes on gains.  As a result of A-1 Unit holders not receiving their

third quarter dividends, however, they will not be able to defray a significant portion of their tax

liability.  Moreover, following the Merger, A-1 Unit holders will likely no longer be able to

defray their taxes because the payment of the six percent dividend on Series O Units is

discretionary and, according to a source at the Archstone REIT, the Company has no current plan

to pay dividends and does not know when it will begin, if ever, paying them.  Thus, Plaintiffs

and members of Class will likely now be forced to pay taxes on "phantom income" allocated to them, but for which there are no cash distributions with which to pay the taxes.

88.    Yet, there are additional adverse consequences that the Merger has upon Plaintiffs and members of the Class, which include, but are not limited to the following:

a.    Before the Merger, A-1 Units were protected by anti-dilution measures in the Archstone UPREIT's governing documents. After the Merger, these anti-dilution measures were eliminated.

b.    Before the Merger, A-1 Unit holders were entitled to their pro rata share of the proceeds of dissolution, liquidation, or winding up remaining after payment of the Archstone UPREIT's debts and satisfaction of the preferences of any class or series of units entitled to a preference in dissolution, liquidation, or winding up over the Archstone UPREIT's common units. After the Merger, Series O Unit holders are only entitled to $60.75 per share plus any unpaid distributions.

c.    Before the Merger, the Archstone UPREIT was managed by the Archstone REIT, and the Archstone REIT could not take any action that was contrary to an express limitation or prohibition in the declaration of trust without an amendment to that provision adopted under the Archstone UPREIT Declaration of Trust. After the Merger, the protection of allowing limited or prohibited action only after amendment of the Archstone UPREIT Declaration of Trust was eliminated.

d.    Before the Merger, the Archstone REIT was generally prohibited from, directly or indirectly, entering into or conducting any business other than in connection with the ownership, acquisition and disposition of its and the management of its business activities. After the Merger the Company can engage in business activities in addition to those relating to the newly formed UPREIT, including business interests and activities that are in direct competition with newly formed UPREIT.

e.    Before the Merger, A-1 Unit holders received quarterly and annual financial reports. After the Merger, Series O Unit holders will receive only annual financial reports.

89.    Hence, Plaintiffs and members of the Class have sustained and will continue to accrue significant damages as a result of the Merger.

21

## IV.　　CLASS ACTION ALLEGATIONS

95.　　Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class A-1 Common Unit holders of Archstone-Smith Operating Trust at the time of the Merger (the "Class").

96.　　Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed by amendment or amended complaint.  Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

97.　　**Numerosity**.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds, if not thousands of similarly situated A-1 Unit holders of record scattered throughout the United States.  Upon information and belief, hundreds, if not thousands of other A-1 Unit holders enjoyed similar, if not identical liquidity and tax benefits through their agreements with the Archstone UPREIT.  The precise number of Class Members is unknown to Plaintiffs.  The true number of Class Members is known by Defendants, however, and thus, may be notified of the pendency of this action by first class mail, electronic mail, and by published notice.

98.　　**Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all members of the Class and predominate over

22

any questions affecting only individual Class Members. These common legal and factual

questions include, but are not limited to, the following:

    i.    Whether the Defendants have breached their fiduciary duties owed by them to Plaintiffs and the Class, and/or have aided and abetted in such breach, by virtue of their participation and/or acquiescence and by their other conduct complained of herein;

    ii.    Whether Defendants breached their contracts with Plaintiffs and members of the Class;

    iii    Whether Tishman Speyer and Lehman Brothers have tortiously interfered with the A-1 Unit holders contracts; and

    iv.    Whether Plaintiffs and members of the Class have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages.

99.    **Typicality**. Plaintiffs' claims are typical of the claims of the Class Members in

that Plaintiffs and each member of the Class are all A-1 Unit holders of the Archstone UPREIT

who have and will continue to suffer financial hardship and other damages as a result of

Defendants' conduct.

100.    **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the

interests of the members of the Class. Plaintiffs have retained counsel experienced in complex

class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no

adverse or antagonistic interests to those of the Class.

101.    **Superiority**. A class action is superior to all other available means for the fair

and efficient adjudication of this controversy. The damages or other financial detriment suffered

by individual members of the Class is relatively small compared to the burden and expense that

would be entailed by individual litigation of their claims against the Defendants. It would thus

be virtually impossible for the members of the Class, on an individual basis, to obtain effective

redress for the wrongs done to them.  Furthermore, even if members of the Class could afford such individualized litigation, the court system could not.  Individualized claims brought by members of the Class would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

102.    The requirements for maintaining this action as a class action under Rules 23(b)(1) and (b)(2) are also satisfied:

a.    Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.  Alternatively, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests, particularly in light of the fact that Plaintiffs seek to obtain relief on behalf of all A-1 Unit holders; and

b.    Defendants have acted and/or failed to act, on grounds generally applicable to the Class, thereby making appropriate monetary relief, final injunctive and other equitable relief with respect to the Classes as a whole.

## COUNT I

### BREACH OF CONTRACT
**(Against the Archstone UPREIT and the Archstone REIT)**

103.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

104.    Plaintiffs and members of the Class executed enforceable property contribution agreements and partnership agreements with the Archstone UPREIT.

105.    Under the contribution agreements and partnership agreements, the Archstone UPREIT and the Archstone REIT agreed not to enter into any transactions or dispose of any interest in the property contributed by the A-1 Unit holders that resulted in them realizing a taxable gain and to provide A-1 Unit holders with the ability to liquidate their units by receiving cash or converting them to common shares in the publicly traded Archstone REIT.

106.    The Archstone UPREIT and the Archstone REIT, as the general managing partner of the Archstone UPREIT, failed to perform their duties under the contribution and partnership agreements and statutory and common law partnership principles, and thereby breached their contractual obligations by failing to honor certain liquidity provisions in the contribution and partnership agreements and by failing to act independently so that the interests of A-1 Unit holders would be protected.

107.    Instead, the Archstone REIT and the Individual Defendants have accepted the Merger Agreement, which subjects Plaintiffs and members of the Class either to adverse tax consequences or completely strips them of their liquidity rights, in violation of the contribution and partnership agreements.

108.    The Archstone Entities' failure to perform their duties under the contribution and partnership agreements have and will continue to cause financial and other damage to Class A-1 Common Unit holders.

109.    The Archstone Entities' failure to perform their duties under the contribution and partnership agreements is material in nature thereby discharging any and all obligations Plaintiffs and the members of the Class owe to the Archstone Entities under the contribution and partnership agreements.

110.    Plaintiffs and the members of the Class have performed all conditions precedent to enable them to recover the relief sought herein, or such conditions have been excused or waived.

## COUNT II

### BREACH OF FIDUCIARY DUTIES - MAJORITY OPPRESSION OF THE MINORITY A-1 UNIT HOLDERS
### (Against the Archstone REIT and against the Individual Defendants and Tishman-Lehman Partnership for the aiding and abetting thereof)

111.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

112.    At all relevant times, the Archstone REIT was the majority owner of the Archstone UPREIT, owning of over 89% of the equity of the Archstone UPREIT.

113.    As majority owner, the Archstone REIT owed a fiduciary duty to the minority A-1 Unit holders to avoid using its majority ownership in bad faith or in reckless disregard of its duties as trustee to oppress the minority owners.

114.    The actions of the Archstone REIT in negotiating, formulating and voting in favor of the Merger of Archstone Entities with the Tishman-Lehman Partnership, however, were committed in bad faith and with reckless disregard of its duties as trustee and constitute oppression of the minority by the majority and have resulted in damage and loss to Plaintiffs and members of the Class.

115.    More specifically, the Merger proceeded without a vote of Plaintiffs and members of the Class, thereby disenfranchising the A-1 Unit holders.  The Archstone REIT approved the Merger pursuant to a written consent dated and effective as of August 31, 2007.

116.    As a result of the Merger, Plaintiffs and the members of the Class were entitled to receive one newly issued Series O Unit per each existing A-1 Unit.  Alternatively Plaintiffs and the members of the Class were offered an "election" to receive in exchange for their A-1 Units either $60.75 per unit in cash, without interest and less applicable withholding taxes or a combination of the cash consideration and Series O Units.

117.    Plaintiffs and the members of the Class were also forced to forgo any dividends owed to them by the Archstone UPREIT for the third quarter of fiscal year 2007.

118.    The Archstone REIT used its majority power in bad faith and with reckless disregard to its duties as trustee to: (1) disenfranchise the minority; (2) coerce the minority into converting their A-1 Units for cash with less than the fair value of the allocable share of the equity, assets and earnings of the Archstone UPREIT; (3) deprive the minority A-1 Unit holders of the financial benefits of the dividends and tax agreements; and (4) destroy the liquidity of the A-1 Units.

119.    The Individual Defendants and the Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transaction on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Archstone UPREIT owed fiduciary duties to the A-1 Unit holders and with knowledge that the Archstone REIT was breaching its fiduciary duties to Archstone UPREIT and the A-1 Unit holders.

## COUNT III

### BREACH OF FIDUCIARY DUTIES – SELF DEALING
**(Against the Archstone REIT and the Individual Defendants
and against the Tishman-Lehman Partnership for the aiding and abetting thereof)**

120.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

121.    At all relevant times, the Individual Defendants and the Archstone REIT, as the

sole trustee and majority owner of Archstone UPREIT, had:  (1) a fiduciary duty to the minority

A-1 Unit holders to, in good faith, act in the best interests of all A-1 Unit holders; (2) a fiduciary

duty not to act in reckless disregard of its duties as trustee; (3) a duty not to self-deal with the

Archstone UPREIT on terms that were more beneficial to the Archstone REIT, its directors and

officers, or any of its affiliates than to the minority holders; (4) a fiduciary duty to deal at arms

length with the Archstone UPREIT and in such dealings to eliminate all conflicts of interests;

and (5) a fiduciary duty to ensure that in all dealings with the Archstone UPREIT were

maintained an "entire fairness" standard, meaning that any transactions between the Archstone

REIT and Archstone UPREIT must be achieved, if at all, through a fair process at a fair price.

122.    The Archstone REIT breached its fiduciary duties by, *inter alia*:  (1) refusing to

allow A-1 Unit holders to vote on the Merger; (2) refusing to appoint an independent committee

to act on behalf of the Archstone UPREIT; (3) refusing to require that any transaction between

Archstone REIT (and any affiliates thereof) and Archstone UPREIT be approved by a majority

vote of the A-1 and A-2 Unit holders voting separately as a class; and (4) refusing to allow the

Archstone UPREIT to engage investment and legal advisers to advise on the fairness of any

transactions, from a procedural and financial view to the minority holders.

123.    As a result of the Archstone REIT's and the Individual Defendants' self-dealing

and reckless disregard of their duties as trustees and officers of the trust, and the aiding and

abetting thereof by the Tishman-Lehman Partnership, Plaintiffs and the Class have sustained loss and damage to the value of their A-1 Units.

124. The Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transactions on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Individual Defendants owed fiduciary duties to Archstone UPREIT and the Class A-1 Unit holders and with knowledge that the Archstone REIT and Archstone UPREIT were breaching their fiduciary duties to A-1 Unit holders.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: November 30, 2007

> STEVEN A. STENDER and INFINITY CLARK STREET OPERATING, on behalf themselves and all others similarly situated,
>
> s/Gerald L. Bader, Jr.
> Gerald L. Bader, Jr.
> Renée B. Taylor
> **BADER & ASSOCIATES, LLC**
> 14426 East Evans Avenue
> Suite 200
> Denver, Colorado 80014
> Telephone: 303-534-1700
>
> Kenneth A. Wexler
> Edward A. Wallace
> Christopher J. Stuart
> Andrae P. Reneau
> **WEXLER TORISEVA WALLACE LLP**
> 55 West Monroe Street
> Suite 3300
> Chicago, Illinois 60603
> Telephone: 312-346-2222

Lee Squitieri
**SQUITIERI & FEARON, LLP**
32 East 57th Street
2nd Floor
New York, New York  10022
Telephone:  212-421-6492

Plaintiffs' addresses:

Steven A. Stender
900 Elm Place
Glencoe, Illinois 60022

Infinity Clark Street Operating
20 North Wacker Drive
Suite 1725
Chicago, Illinois 60606

# Exhibit B

1

1       IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLORADO

3    Case No. 07-cv-02503-EWN-MJW

4    ══════════════════════════════════════════════════

5    STEVEN A. STENDER, et al.,

6         Plaintiffs,

7    vs.

8    JAMES A. CARDWELL, et al.,

9         Defendants.

10   ══════════════════════════════════════════════════

11         Proceedings before CRAIG B. SHAFFER, United States

12   Magistrate Judge, United States District Court for the

13   District of Colorado, commencing at 8:34 a.m., February 12,

14   2008, in the United States Courthouse, Denver, Colorado.

15   ══════════════════════════════════════════════════

16         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   ══════════════════════════════════════════════════

19                   APPEARANCES

20       GERALD L. BADER, JR., RENEE B. TAYLOR, MR. SQUITIERI:
21   SQUITIERI and KENNETH WEXLER, Attorneys at Law, appearing
22   for plaintiffs.
23       FREDERICK J. BAUMANN, DAVID GRUENSTEIN, K. ALLISON
24   WHITE, BOBBEE J. MUSGRAVE, JONATHAN D. POLKES and CINDY
25   OLIVER, Attorneys at Law, appearing for defendants.
26
27   ══════════════════════════════════════════════════
28
29                STATUS CONFERENCE
30

1              P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE CLERK: All rise.  Court is in session.

6              THE COURT: You may be seated.  The Court calls

7    2007-cv-02503-EWN-MJW, Steven A. Stender, et al.,

8    plaintiffs, versus James A. Cardwell, et al., defendants.

9    I'll start first with counsel on behalf of the plaintiff.

10   If you'd enter your appearance, please.

11   *TRANSCRIBER'S NOTE: Speakers not speaking directly into a

12   microphone cannot be heard.

13             MR. BADER: Good morning, Your Honor.  Gerald L.

14   Bader, Jr., and Renee Taylor from Denver.  And I'd like to

15   introduce Mr. Squitieri from New York and Mr. Ken Wexler

16   from Illinois.

17             THE COURT: Thank you.

18             MR. SQUITIERI: Good morning, Your Honor.

19             MR. WEXLER: Good morning, Your Honor.

20             THE COURT: Good morning.  Counsel on behalf of the

21   defendants, please.  We'll start at this end.

22             MR. BAUMANN: Good morning, Your Honor.  Fred

23   Baumann of Rothgerber Johnson & Lyons on behalf of the

24   defendants Archstone Smith Trust, which is now known as

25   Tishman Speyer Archstone Smith Multi Family One Trust and

3

1    the defendant Archstone Smith Operating Trust which is now

2    known as Archstone.  If the Court would indulge me, I would

3    simply refer to them both as Archstone.  With me today is

4    my partner, Cindy Oliver, who is sitting in the back.

5              THE COURT: All right.

6              MR. BAUMANN: The next men I'd like to introduce to

7    the Court, Andy Gruenstein of Wachtell Lipton Rosen & Katz

8    in New York. And in the front row, as well, Jonathan D.

9    Polkes from Weil Gotshal & Manges.

10             MR. POLKES: Good morning, Your Honor.

11             THE COURT: Good morning.

12             MR. BAUMANN: Messrs. Gruenstein and Polkes are

13   admitted to practice and we're all counsel for Archstone.

14             THE COURT: All right.  Thank you.

15             MS. WHITE: Good morning, Your Honor.  K. Allison

16   White of Ballard Spahr Andrews & Ingersoll, and I represent

17   defendants Tishman Speyer Development Corp and Lehman

18   Brothers Holding Corp.

19             THE COURT: Thank you.

20             MS. MUSGRAVE: Good morning, Your Honor, I'm Bobbee

21   Musgrave from Holme Roberts & Owen and I represent the

22   individual defendants.

23             THE COURT: All right.  Thank you.  This case is

24   before the Court this morning for a Rule 16 scheduling

25   conference.  The Court has reviewed the scheduling order as

4

1    tendered, and we'll go over that scheduling order at this
2    point.  First on the scheduling order, pages 1 through and
3    including page 14, inclusive, each of those pages are
4    approved within the scheduling order.
5                    MR. BAUMANN: Your Honor, excuse me for a moment.
6                    THE COURT: Yes, sir.
7                    MR. BAUMANN:  Before you address this scheduling
8    order, on behalf of defendants, as you know, we have filed
9    a motion to stay discovery pending the -- Judge Nottingham's
10   determination of our separate  motion to stay pending
11   arbitration or to dismiss.
12                   THE COURT: Right.
13                   MR. BAUMANN: And from our point of view, it would
14   make sense, Your Honor, since that motion to stay is in
15   front  of  you,  to  stay  discovery,  that  we  defer
16   considerations of the scheduling until Your Honor has a
17   chance to decide whether any discovery is appropriate, given
18   that we have a motion to dismiss in favor of arbitration
19   pending in front of Judge Nottingham.
20                   THE COURT: Denied.
21                   MR. BAUMANN: That motion will be fully briefed
22   within the next --
23                   THE COURT: Well, it's not ripe so we're going to
24   go forward with the case until it gets ripe.  You just filed
25   it on January 29, unless I'm mistaken.

5

1          MR. BAUMANN: That's correct, Your Honor, but it

2     will be briefed within the next two weeks.

3          THE COURT: And I'll address it then.

4          MR. BAUMANN: Okay.

5          THE COURT: I don't believe in delaying any of

6     these cases, so we're just going to go forward with it.

7     I'll set the discovery out far enough that you don't have to

8     start if you don't want to, but we'll go forward with it.

9          MR. BAUMANN: Okay, Your Honor.

10          THE COURT: Did something prevent you from filing

11     this motion earlier?

12          MR. BAUMANN: Your Honor, we had just joined in the

13     case a couple weeks before that, and we filed it as soon as

14     possible.

15          THE COURT: Okay.

16          MR.  BAUMANN:  It  was filed along with the

17     dispositive motion.

18          THE COURT: I'll take it up as soon as it becomes

19     ripe, like I always do.  All right.

20          Paragraph 6 on the Rule 26(f) meeting and 26(a)(1)

21     disclosures, the parties have met pursuant to Rule 26(f) on

22     January 22nd, year 2008, at 3 o'clock p.m.  Moreover, it

23     does  appear  the  parties  have  agreed to make the Rule

24     26(a)(1) as of February 5, 2008.  That's why I double-check

25     with parties. Has the plaintiff done that, Mr. Bader?

6

1          MR. SQUITIERI: Yes.

2          THE COURT: All right.  Mr. Baumann, on behalf of

3     your clients?

4          MR. BAUMANN: Yes, Your Honor, we have.

5          THE COURT: All right.  Ms. White?

6          MS. WHITE: Yes, Your Honor.

7          THE COURT: And, Ms. Musgrave?

8          MS. MUSGRAVE: Yes, Your Honor.

9          THE COURT: The Court will find the parties have

10    then complied with both Rules 26(f) and 26(a)(1) of the

11    Federal Rules of Civil Procedures.  Accordingly, paragraph

12    number 6 is approved.

13         Page 17, paragraph 7 on consent, that's approved.

14    There is no consent in this case.

15         Paragraph 8, which deals with the case plan and

16    schedule and subparagraphs thereunder, we'll go over those

17    at this point in time.  Noting the motion itself, we're

18    going to simplify this a little bit to move the case along

19    here.

20         What other parties does the plaintiff anticipate

21    adding in this case?

22         MR. SQUITIERI: Your Honor, at this time we only

23    anticipate adding any parties that we know about but this is

24    a very complex series of transactions.  We want to provide

25    for the event that we do learn of new potential parties.

7

1           THE COURT: What other claims are you suggesting

2    you're going to have?

3           MR. SQUITIERI: At this time, Your Honor, I don't

4    know other than perhaps a federal securities claim based on

5    the federal securities statutes arising out of the

6    prospectus.

7           THE COURT: Okay.

8           MR. SQUITIERI: And other materials that we use in

9    connection with the issuance of a new unit of securities.

10          THE COURT: Against which defendant are you

11    referring to?

12          MR. SQUITIERI: Excuse me, Your Honor?

13          THE COURT: Against which defendant are you

14    referring to that you may be adding?

15          MR. SQUITIERI: Against the original corporate

16    defendant, Archstone --

17          THE COURT: Okay.

18          MR. SQUITIERI: -- and the individual defendants

19    who signed and/or were responsible for the directing and

20    issuance of the offering materials.

21          THE COURT: Okay.

22          MR. SQUITIERI: But they're already in the case.

23          THE COURT: I understand that.  I just want to see

24    what we really need to -- time we need to amend the

25    pleadings or join the parties.

8

1          Mr. Baumann, what other parties are you intending

2     to trying to join in this case?

3          MR. BAUMANN: I don't believe at this time our

4     clients intend to join any parties.

5          THE COURT: What are any other claims to be added?

6          MR. BAUMANN: We have no --

7          THE COURT: Counterclaims, cross-claims, third-

8     party complaints?

9          MR. BAUMANN: We still have not responded -- or

10    answered the complaint so we --

11         THE COURT: Okay.

12         MR. BAUMANN: -- are not in a position to assert

13    any other claims.  We have filed a motion to (inaudible-both

14    speaking).

15         THE COURT: All right.  Ms. White?

16         MS. WHITE: I take the same position as Mr.

17    Baumann.

18         THE COURT: All right.  Ms. Musgrave?

19         MS. MUSGRAVE: Same position, Your Honor.

20         THE COURT: All right.  Noting the pending motions

21    that have been outlined by the parties and the Court's aware

22    of those and when they'll become ripe.

23         (Pause) All right.  The deadline to join parties

24    or amend pleadings will be March 31, 2008.  I'll correct

25    paragraph 8-A to reflect the same.

1          Turning to discovery cutoff, I'll simplify this.

2     We'll have one date for all discovery including all experts.

3     That date will be -- noting the motions that are pending,

4     that will be July 31, 2008, for discovery to be complete.

5          Dispositive motion deadline will be moved back

6     slightly till August 29, 2008.

7          We'll address the experts at this point.  You're

8     looking at how many experts for the plaintiff?  It looks

9     like two or three.  Is that it?

10          MR. SQUITIERI: It could be as many as four, Your

11     Honor.

12          THE COURT: Okay.  How about -- well, we'll start

13     at this end for the defendants.  Mr. Baumann.

14          MR. BAUMANN: Your Honor, we've identified five

15     areas.  We would anticipate no more than five experts for

16     them.

17          THE COURT: Okay.  Ms. White?

18          MS. WHITE: I think (inaudible-no microphone)

19          MS. MUSGRAVE: (Inaudible-no microphone).

20          THE COURT: All right.  Give me just a moment here.

21          (Pause) All right.  There'll be five experts per

22     each party group because a number of you represent multiple

23     parties, so each of your groups that you represent as

24     counsel get five experts without leave of court.

25          Turning now to the disclosure of the experts.

1    Plaintiff will disclose their experts in this case by May

2    1st, 2008.  The depositions of those experts need to be done

3    by the discovery cutoff date, so I'll delete that other

4    sentence there.

5         Defendants shall disclose their experts by June

6    2nd, 2008.  And then I'll give you a date for the rebuttal

7    experts -- let me write that in.  And the rebuttal experts

8    need to be disclosed by June 30th, 2008.  The experts need

9    to be disclosed by the discovery cutoff date, which I've set

10   on July 31, 2008.

11        We'll move on now to the deposition schedule.

12   Looks like you made your Rule 26(a)(1) disclosures already,

13   so I'll give you a date certain to file with the Court your

14   deposition schedule.

15        (Pause) Deposition schedule needs to be filed by

16   February 25, 2008.  That's two weeks from today. That's more

17   than enough time to get that done.

18        Regarding the interrogatory schedule and requests

19   for production of documents and requests for admissions

20   schedule, I'm going to simplify this, too.

21        (Pause)  All right.  Your interrogatories,

22   requests  for  production  of  documents,  requests  for

23   admissions, those need to be served no later than June 27th,

24   2008.  That's 33 days before the discovery cutoff, which is

25   consistent with the time of response plus Rule 6 on timing.

1          All   right.   Let's deal with the class

2     certification issue at this point.   We need to discuss that

3     briefly with the plaintiff.   What have you done on that

4     issue and how many other people are you talking about here?

5          MR.   SQUITIERI: Your   Honor,   we   think   there's

6     thousands of people in the class.

7          THE COURT: Based upon what?

8          MR.   SQUITIERI:   Based   upon   some   (inaudible)

9     information we have about the (inaudible) of the -- let's

10    say the various stuff, partnerships and (inaudible) rolled

11    up into what was -- has become the operat' -- we had some

12    information about certain partners in the partnership but --

13         THE COURT: Okay.

14         MR. SQUITIERI: -- it looks like it will certainly

15    be a class to try and meet any numerosity requirements.

16         THE COURT: All right.   As a potential putative

17    class,  Mr.  Baumann,  are  you  in  agreement  with  those

18    statements or not?

19         MR.  BAUMANN:  We   acknowledge   that   there   are

20    multiple people in the class.   We don't know exactly how

21    they intend to define their class.

22         THE COURT: Wait a minute.   He's talking in the

23    thousands, I think, by his statement.

24         MR. BAUMANN: There are over a thousand (inaudible)

25    holders --

1              THE COURT: Okay.

2              MR. BAUMANN: -- or were in the Archstone Trust.

3    But the issue for us is this that this issue -- class

4    certification should be done sooner rather than later.  The

5    issue is not whether they're going to (inaudible-someone

6    coughing) the requirements of Rule 23, but under Rule 23 and

7    the Tenth Circuit's law.

8              THE COURT: Right.

9              MR. BAUMANN: This should be done as soon as

10   practicable.  Their schedule, put it at the end.  Our

11   proposed schedule, put it at the front.

12             THE COURT: Right.

13             MR. BAUMANN: We think that is the first thing that

14   the parties should focus on.

15             THE COURT: Ms. White, are you in agreement with

16   the potential putative class in the case?  As far as the

17   number.

18             MS. WHITE: I agree with Mr. Baumann's statements

19   regarding the class.

20             THE COURT: Okay.  And, Ms. Musgrave?

21             MS. MUSGRAVE: Yes, Your Honor, we agree.

22             THE COURT: All right.  Give me just a moment then.

23             (Pause) All right.  On the issue of class

24   certification, which is on page 19, carries over to page 20

25   and 21 and a small portion of page 22, there have been

13

1    various versions submitted here by both plaintiff and
2    defendant.  The Court rejects the plaintiff's version.
3    Class certification issues need to be addressed first.
4         Accordingly, under paragraph 8-H, the plaintiffs'
5    proposed class certification schedule is rejected and
6    deleted at this point.  The Court will adopt the defendants'
7    version, and accordingly the plaintiff's brief concerning
8    class certification will be due on February 15th, 2008.
9    Defendants will be due on March 13th, 2008, and the reply
10   papers by the plaintiff March 27, 2008.
11        Concerning the class certification and discovery
12   on the class, the Court approves that stated by defendants
13   in this case, which is defendants' deadline to serve
14   requests for production of documents and interrogatories
15   regarding class certification will be February 11th.
16        MR. BAUMANN: Your Honor, that is yesterday and we
17   did serve them yesterday.
18        THE COURT: That's fine.  And plaintiff shall
19   respond to those by February 25, 2008.  We're going to move
20   this along.
21        The depositions as outlined there are approved.
22   They need to be set. Have the parties discussed a location
23   for these two depositions that are listed here, Mr. Stender
24   and the 30(b)(6) designation from the Infinity Clark Street
25   Operating?

14

1          UNIDENTIFIED ON LOG: Have not.

2          THE COURT: Okay.  I want you to do that after this

3     morning.  You can use the conference room and get those set

4     so we can take care of those.

5          MR. WEXLER: Any objection to Chicago?

6          THE COURT: Well, let me find out.

7          MR. GRUENSTEIN:  We don't think we'll object, Your

8     Honor.

9          THE COURT: All right.  Well, I want counsel to

10    agree upon that today so we can move that along.  I don't

11    want that to be a delay in the case.

12          All right. Regarding Roman numeral small iii on

13    page 21, which is towards the bottom concerning the experts.

14    That's fine and approved as well, and Roman numeral iv is

15    also approved on page 22.

16          That leads us now to paragraph 8-I on page 22

17    towards the middle, which deals with the rest of the

18    discovery on the merits of the case.

19          MR. WEXLER: Your Honor?

20          THE COURT: Yeah.

21          MR. WEXLER: With regard to the February 15th date

22    for filing our class papers --

23          THE COURT: Yes, sir.

24          MR. WEXLER: -- could we possibly one extra week?

25          THE COURT: Well, that's going to throw off the

15

1    schedule, though, isn't it?

2              MR. WEXLER: It will.  By a week.

3              THE COURT: That's denied.

4              MR. WEXLER: Okay.

5              THE  COURT:  Turning  now  to  the  discovery

6    limitations, we'll address that at this point.  Regarding

7    the depositions, I guess I want to find out from counsel how

8    do you get to this number 60 at this stage?

9              MR. WEXLER: Well, Your Honor, we had -- we support

10   different parties here --

11             THE COURT: Sure.

12             MR. WEXLER: -- by four different counsel.  The

13   individual defendants alone number, I think, 12 to 15.  We

14   have investment bankers on various sides of the deal who

15   have to be deposed.  We have sometimes more than one

16   plaintiff or adviser for each of these entities.  We have

17   two levels of corporate entities, the (inaudible) brief and

18   the parent brief.  The defendants themselves have identified

19   over --

20             UNIDENTIFIED:  Over 72.

21             MR. WEXLER: Excuse me?

22             UNIDENTIFIED:  Over 72.

23             MR. WEXLER: -- over 72 witnesses on their Rule 26

24   disclosures.

25             THE COURT: Okay.

1        MR. WEXLER: And I think we've identified
2    approximately 40.

3        THE COURT: Okay.

4        MR. WEXLER: Obviously, there is some overlap.
5    We'd like not to have to take 60 depositions, but we think
6    we may need right near that number.

7        THE COURT: All right. Let me hear from the
8    defendants.

9        MR. BAUMANN: Your Honor, we identified 60 largely
10   because the plaintiffs asked for 60. Our concern is that
11   there are a large number of individual agreements. Each of
12   these folks in the putative class had --

13       THE COURT: Right.

14       MR. BAUMANN: -- a separate agreement, and we
15   believe they're different. We believe that's of course why
16   there will never be a class certified here. But as part of
17   our discovery, we believe we may need to take a lot of
18   depositions of non-named class members in addition to the
19   folks that are on the 26(a)(1) list. That's why we have a
20   large number of individuals.

21       THE COURT: Well, some of those people should be
22   pretty short, I would think.

23       MR. BAUMANN: That's true.

24       THE COURT: This is just limited to that one issue,
25   isn't it?

1          MR. BAUMANN: Each of these people would have

2     entered under a separate --

3          THE COURT: Right.

4          MR. BAUMANN: -- agreement.  And so, Your Honor, I

5     do not anticipate that those will be lengthy depositions,

6     that's true.  But we have identified the number, not the

7     duration.

8          THE COURT: All right.

9          MR. BAUMANN: We said we can complete them all in

10     a (inaudible).

11          THE COURT: All right.  Mr. -- I'm sorry, Ms.

12     White.

13          MS. WHITE: We agree with that position, Your

14     Honor.

15          THE COURT: All right.  Ms. Musgrave?

16          MS. MUSGRAVE: As do we, Your Honor.

17          THE COURT: All right.  I'll permit the 60

18     depositions per side, so 60 got the plaintiffs, 60 for

19     defendants collectively, that means all defendants.  I'm

20     going to indicate all defendants and all plaintiffs so we

21     don't run into some dispute there.

22          This case-by-case basis on the deposition length,

23     the rule calls for seven hours.  Which ones of these people

24     are you going to need more than seven hours on?

25          MR. SQUITIERI: Well, Your Honor, we anticipate

18

1    that we will be identifying people who were very, very

2    involved with all aspects of the deal and, therefore, need

3    to be deposed on all of the issues in the case, and we

4    anticipate that some of those witnesses will take two,

5    possibly three days.  We don't know who they are yet.  We

6    can guess at some them, but we don't know how many there

7    will be until rather than set some hard and fast rules about

8    the categories of people, we raised the issue with

9    defendants and said let's see how it goes as we identify

10   people and get documents.

11            THE COURT: Well, the way you've phrased this, you

12   put: To be determined on a case-by-case basis. The length of

13   each deposition will be up to the maximum allowed under the

14   federal rules.  Well, the maximum allowed is seven hours.

15            MR. SQUITIERI: Yes.

16            THE COURT: So is that what you're saying, seven

17   hours?

18            MR. SQUITIERI: Well, I -- I think what we tried to

19   put in here is that unless we work out something

20   specifically for a witness, then it's going to be seven

21   hours.

22            THE COURT: Is that the intention is of the

23   defendants?

24            MR. BAUMANN: That is our understanding.  We did

25   agree with the plaintiffs and we would anticipate discussing

1    with them before we agree on a schedule, which is now due on

2    February 25th --

3            THE COURT: Right.

4            MR. BAUMANN: -- that if there are any witnesses

5    that the parties agree could be longer than seven hours --

6            THE COURT: Otherwise, you're falling back to the

7    default which is seven hours maximum, right?

8            MR. BAUMANN: Yes.  Correct.

9            THE COURT: All right.  Under that understanding

10    I'll approve paragraph 8-I, parens, 2, close parens.

11            Turning now to the number of interrogatories and

12    requests for production of documents and/or requests for

13    admissions, I'm a little -- I want to make sure I'm clear on

14    this wording here.  Is it  -- is the parties saying that

15    each plaintiff is going to have separate 50 interrogatories

16    and each defendant the same?

17            MR. SQUITIERI: For the plaintiffs, we envision 50

18    in the aggregate, Your Honor.

19            THE COURT: Okay.  How about from the def' -- I

20    know counsel represent more than one defendant so what are

21    we talking about there?

22            MR. BAUMANN: We agree, I believe, per side --

23            THE COURT: Okay.

24            MR. BAUMANN: -- that the defendants as a side --

25            THE COURT: All right.

20

1          MR. BAUMANN: -- would agree.  We think --

2          THE COURT: That's what I want to make sure.

3          MR. BAUMANN: -- it should be 35, not 50, but --

4     it's per side.

5          THE   COURT:   All   right.   There'll be 50

6     interrogatories per side.  I'm going to try to clarify this

7     so it's clear.  Each side may serve no more than 50

8     interrogatories, so I'll correct that.  And the request for

9     production of parties in request -- excuse me, excuse me

10    requests for production of documents and the requests for

11    admissions, is that to be per party or per side?

12         MR. BAUMANN: Per party, Your Honor.

13         THE  COURT:  Well,  I  got  a  problem  with  that,

14    because, for example, Ms. Musgrave represents a bunch of

15    individuals.  Are you going to ask 25 for each?

16         MS. MUSGRAVE: I don't know.

17         THE  COURT:  Then it's -- I'll allow it per party

18    group.  So each party group will get 25 requests for

19    production of documents and 25 requests for admissions.

20         Now, I want to caution everybody here.  I don't

21    believe in costing people's time and expense.  So I want the

22    defendants to meet, because I don't want you serving the

23    same stuff on the plaintiff that can be served once and

24    shared.  That's not going to happen.  And the same with

25    plaintiffs to the defendants because that's just a total

1    waste of people's expense and people's time.  So I want you

2    to meet and confer on that to see if you can come up with a

3    collective  request  and  then  you  can  just  share  the

4    information.  It's much easier.

5            I also want to remind counsel that under 26(a)(1),

6    you  have  mandatory  disclosures.  There are a lot of

7    documents and it seems to me already in this case you've

8    identified a lot of documents that should be just turned

9    over.  So I want counsel to meet and confer on that as well.

10           All right.  Now, before we move on to paragraph 9,

11   what discussions have been made regarding any protective

12   orders in this case?

13           MR. BAUMANN: Your Honor, we identified as part of

14   the  discussions  in  the  26(f)  conference  the  need  for  a

15   protective order.  I believe that we have agreed that we

16   will meet by next Monday and confer with defendants --

17           THE COURT: Okay.

18           MR. BAUMANN: -- I'm sorry, the plaintiffs, to try

19   and come up with an agreement on the form.

20           THE COURT: Okay.  Is that right?

21           MR. SQUITIERI: That is, Your Honor.  The 18th is

22   the date we agreed to (inaudible) with them.

23           THE COURT: All right.  Well, I want it filed no

24   later than February 25, 2008.  Either it's going to be

25   unopposed or jointly filed or whoever's requesting it --

22

1    sounds like the defendants maybe filed, and so we can

2    address that.

3         I want to remind counsel that that will not

4    prevent discovery from going forward, because it's -- you

5    have time to respond in discovery.  So that's why I want it

6    filed as soon as possible so that we can address that.  So

7    the parties need to file any requests for protective orders

8    in this case either jointly or unopposed -- or if it is

9    opposed, let me know that -- by February 25, 2008.

10        All right.  Let's address paragraph 9 on

11   settlement.  That's fine as tendered at this point.  And the

12   Court did receive the parties' initial confidential

13   settlement statements and reviewed those.  We'll discuss

14   settlement a little bit further in a moment.

15        Regarding paragraph 11, I'm aware of the motions

16   that are outstanding.  I've already addressed those and how

17   we're going to handle those.  So that's fine.

18        Under paragraph 10-B, dealing with the length of

19   trial, that's a little difficult to determine at this point

20   only because we're not sure what's going to happen with the

21   class issue.  So I"m going to leave this as is as stated

22   where you put: Assuming a class, maximum time would be 25

23   days to 35 days.  We'll leave that as is, but I think we'll

24   relook at it the preliminary pretrial conference, because

25   we'll know better if this case is going forward in that

23

1     capacity or not.  So I'll leave that as is at this point.

2              Paragraph 11, we'll skip over for a moment, but

3     I'll return to it on further conferences.

4              Paragraph 12, other matters on page 25 is approved

5     as tendered.

6              Paragraph 13, amendments to the scheduling order,

7     that's also approved as tendered.  Give me just a moment

8     here.

9              (Pause) All right.  I need counsel to go back to

10    paragraph 11 at this point.  And if you would go to

11    paragraph 11-C, which is currently on page 25 of the

12    scheduling order.  Give me just one moment to make one

13    modification to that.

14            (Pause) All right.  Judge Nottingham will conduct

15    his own final pretrial conference.  I will conduct a

16    preliminary pretrial conference which will be set prior to

17    the close of discovery, so we're looking at the first part

18    of June.  I need counsel to take their calendars out at this

19    point.  We'll set that at this juncture.

20            Friday, June 6th at 8:30 a.m. for final pr' --

21    forgive me, preliminary pretrial conference.  Can the

22    plaintiff accept that date and time?

23            MR. SQUITIERI: Yes, Your Honor.

24            THE COURT: All right.  I'll start here.  Mr.

25    Baumann for the defendants, please?

24

```
 1              MR. BAUMANN: One second, Your Honor.

 2              THE COURT: All right.

 3              MR. BAUMANN: Friday, the 6th?

 4              THE COURT: Friday, the 6th at 8:30.  That's this

 5    year.

 6              MR. SQUITIERI: That'd be fine.

 7              THE COURT: Okay.

 8              MR. BAUMANN: That's fine, Your Honor.

 9              THE COURT: Fine, Ms. Musgrave?  Ms. White?

10              MS. WHITE: If I could have one moment.  I'm sorry.

11              THE COURT: All right. That's all right.

12              MR. BAUMANN: Your Honor, we do have a large number

13    of counsel.  Not all of them will be able to make it on the

14    6th.

15              THE COURT: That's fine.

16              MR. BAUMANN: As long as we --

17              THE COURT: As long as I have one.

18              MR. BAUMANN: -- have representatives from

19    everyone.

20              THE COURT: Right.

21              MR. BAUMANN: True.

22              MS. WHITE: Yes, Your Honor, that works fine.

23    Thank you.

24              THE COURT: All right.  The matter is set for

25    preliminary pretrial conference June 6th, 2008, beginning at
```

25

1     8:30 a.m.   Each party has now accepted that date and time

2     through their counsel.

3           I will need your proposed preliminary pretrial

4     order submitted to the Court by Monday, June 2nd, 2008.   The

5     format to prepare the preliminary pretrial order may be

6     found on the Court's Web site.   Also each counsel are

7     ordered to the Court's Web site under Judge Nottingham's

8     name to make sure you're familiar with pretrial and trial

9     practices and procedures since you will be required to

10    follow those in this case.   Give me a moment to write that

11    in on our calendar.

12          (Pause)  All right.   Noting where the case is

13    postured, meaning the following: The current outstanding

14    motions that are pending including the motions to stay the

15    case pending resolution of the other motions that have been

16    filed in the case, I'm going to -- in reviewing the

17    settlement conference documents, I'm going to set a further

18    status conference, and I think we'll know where we stand

19    with this case in around 60 days.   So let me see if I can

20    clear a date in roughly the week of April 7th.   See what's

21    available during that time frame.

22          What's counsels' availability on April 8th, 2008,

23    at 8:30 a.m. for status conference?

24          MR. BAUMANN: Your Honor, I will be out of town

25    that day.

26

```
 1                THE COURT: You will, all right.  Are you out of
 2      town that week, rest of the week, or not?
 3                MR. BAUMANN: I am not out on Monday.  I am out of
 4      town the rest of the week of the 7th.
 5                THE COURT: Okay.  April 14th at 8:30?  That's this
 6      year.  Plaintiff's fine?
 7                MR. SQUITIERI: Yes, Your Honor.
 8                THE COURT: Defendants?
 9                MR. BAUMANN: Yes, Your Honor.
10                THE COURT: Everybody's shaking their heads so
11      that's good.  That's the date set.  Give me a moment to
12      write that in.
13                (Pause)
14                MR. BAUMANN: Your Honor, what time on the 14th?
15                THE COURT: 8:30 a.m.
16                MR. BAUMANN: Thank you.  Give me a moment to put
17      that in our scheduling order here.  That's on the 14th.
18      Everybody make sure they have that, April 14th at 8:30.
19      Okay.
20                MS. MUSGRAVE: Your Honor, I'm showing on that date
21      a preliminary pretrial conference.
22                THE COURT: Well, it shows it's been vacated on
23      this.
24                MS. MUSGRAVE: You know what.  It was.
25                THE COURT: All right.
```

27

1              MS. MUSGRAVE: I'm (inaudible).

2              THE COURT: All right.  Thank you.

3              (Pause) All right.  The status conference is set

4       for April 14th, year 2008, beginning at 8:30 a.m.  At that

5       time, I will need the parties to give me an update on

6       discovery, status on the outstanding motions at that point

7       will be addressed, and I'll look at the need to set a

8       settlement conference at that point.  We'll see where we are

9       with the case at that juncture.  At this point, I'm not

10      going to set any settlement conference.  I'll address that

11      at the status.

12             All right.  Ms. Moore, do you have all those

13      dates?

14             THE CLERK: Yes.

15             THE COURT: All right.  The Court will approve the

16      scheduling order as amended this morning on the record.

17             MR. BAUMANN: Excuse me, Your Honor.

18             THE COURT: Yes, sir.

19             MR. BAUMANN: I do have a question.  You went over

20      it too quickly for me to catch it before.  On item 5 in the

21      scheduling order on page 14 --

22             THE COURT: Let me go to it.

23             MR. BAUMANN: -- with respect to damages.  We had

24      raised an objection in our -- I guess in our section there

25      that that is a inadequate description of the plaintiff's

28

1    damages and contrary to the instructions for the scheduling

2    order.  The plaintiffs have made a similar nondisclosure in

3    their 26(a)(1)s with respect to damages.  These are

4    (inaudible-both speaking) --

5            THE COURT: I understand that.

6            MR. BAUMANN: -- Your Honor, so our request would

7    be that we not approve the scheduling order except that we

8    direct the plaintiffs to supplement, to describe as required

9    by the rules --

10           THE COURT: Right.

11           MR. BAUMANN: -- the damages that they believe

12    they've incurred.

13           THE COURT: Let me hear from the plaintiff.  Why

14    aren't you more specific on these damages?

15           MR. SQUITIERI: Your Honor, we can't really

16    quantify the damages as yet.  We can categorize them and

17    we'll supplement to categorize the damages.  But the

18    quantification of the damages are going to depend on things

19    like valuations of the new securities that were issued in

20    exchange for the old securities.  And certain estimates as

21    to when properties otherwise may or not have been sold,

22    estimating gains that would be subject (inaudible).  But we

23    can categorize at this time.  We think it's going to need an

24    expert to make the estimates that we need to make.

25           MR. BAUMANN: Your Honor, at least we --

1          THE COURT: Well --

2          MR. BAUMANN: -- we'd request that -- that

3    plaintiffs would split the cash.  This case is fundamentally

4    about their claiming tax liability and they should be able

5    to calculate and compute that --

6          THE COURT: Mr. Stender, I can understand you may

7    have some problem with potentially other putative class

8    members, but not with the named plaintiff.

9          MR. SQUITIERI: We'll supplement that, Your Honor.

10          THE COURT: All right.  Well, I'll have you -- I'm

11    just going to indicate on the scheduling order here the

12    plaintiff will supplement, and then I'll have you just

13    insert that when you resubmit it.  All right.

14          (Pause) All right.  I'll have plaintiff supplement

15    their damage calculation on paragraph 5 when this gets

16    resubmitted after the corrections get made that I made of

17    record.  So with that addition, the Court approves the --

18          MR. BAUMANN: Your Honor, if I -- just for the

19    record.  We ask that you enter the scheduling order without

20    prejudice to our position that this case should be

21    arbitrated and not litigated.  We're not waiving any of the

22    claims.

23          THE COURT: Oh, then -- there's no waiver.

24          MR. BAUMANN: I didn't think so, but I do want to

25    make sure the record is clear.

1          THE COURT: No, I just said the way the case is

2    postured.   There's outstanding motions but that's not

3    unusual for cases to have outstanding dispositive motions

4    and we still go forward with the case.

5          MR. BAUMANN: I understand.

6          THE COURT: Until they're ripe for ruling.  No,

7    you're -- there's no waiver by the defendants of their other

8    requests.

9          All right.  The Court approves the scheduling

10   order now as further amended on the record.  It is made an

11   order of the Court and a copy of the same will be provided

12   to you counsel who get that through e-notice.

13          May I ask whose, this scheduling order, word

14   processor it's on, plaintiffs or defendants or who?

15          MR. SQUITIERI:  I think it's on both of ours.

16          THE COURT: All right.

17          MR. BAUMANN: It's on either one of ours.

18          MR. TAYLOR: (Inaudible) our office.

19          MR. BAUMANN: Colorado counsel's saying they --

20          THE COURT: Plaintiff are to make the corrections

21   in blue that I"m handing you my copy.  Approved as to form

22   by all defendants, resubmit it to the Court.  I'll give you

23   two weeks, which will be until February 25, 2008.  It should

24   be nunc pro tunc back to today's date, as well, which is the

25   12th of February 2008.  And I put that on the signature

1    block, so you just need to follow that.  Okay.

2            Ms. Moore, do we have any problem with any of the

3    attorneys' e-notice addresses?

4            THE CLERK: (Inaudible-no microphone)

5            THE COURT: All right.  I'll order that take place

6    forthwith.  If you're going to participate in the case, you

7    need to enter your appearance electronically.  And remember

8    each    attorney    must    have    their    entry , of    appearance

9    electronically separately to be placed on the e-notice list.

10           Also if any of the parties wish to have their

11   secretaries, paralegals, or both, added to the notice list,

12   let Ms. Moore know and we'll add those people for you.  I

13   suggest you do that, because I don't want people missing

14   hearings and so forth, so I suggest you do that.

15           Secondly, I want to advise counsel of a couple of

16   things that have arisen recently.  Make sure you speak with

17   your IT people in your offices to make sure that the Court's

18   domain name is placed on their white lists and your spam

19   blockers.  And that's so that the e-mails from the Court,

20   make sure they get they get delivered to you.

21           I did have an unfortunate case where the law firm

22   increased their spam levels, never checked to see what was

23   now being caught up in the spam file.  Turned out all of our

24   orders from the Court were being culled -- caught in it.

25   And then the argument by counsel was that: We didn't get it.

32

1    And the argument was denied because you got it and you
2    characterized it as spam.
3          If you look at the local rules, if it's received
4    by you folks and it's not a kickback -- in other words
5    nondeliverable by the Court -- it's being delivered to you.
6    So make sure you speak to your IT people, because I'm sure
7    all of you have spam filters on your computer systems, and
8    make sure that we're on the white list.
9          I would also recommend that any of the courts you
10   work in that have electronic filing they're also on the
11   white list as far as their domain names.  So you don't run
12   into that problem.  And that's an issue that has been
13   brought up in the court here because I don't like delay and
14   wasting people's time and people not showing up, and that's
15   what happened in that case.  And unfortunately, someone had
16   to get sanctioned with attorneys' fees and costs because one
17   side came in from out of state with all their parties and
18   the other side never showed up.  So let's not let that
19   happen.
20         Okay.  On the motions, I'm aware of those that
21   were outlined earlier by the parties.  Those aren't yet ripe
22   for ruling at this point noting they were recently filed
23   right at the end of January of this year.  We'll address
24   those as soon as they become ripe for ruling.
25         All right.  Anything further now on behalf of the

33

1    plaintiff at this point?

2    MR. SQUITIERI: Your Honor, just one thing for the

3    record if I may.

4    THE COURT: Yes, sir.

5    MR. SQUITIERI: Defendants' counsel spoke about

6    taking absent class members discovery.  I didn't jump up to

7    object, I didn't want to interrupt.  I do not agree to

8    waiving any of our rights to object to absent class members

9    that -- which is only very, very rarely ever raised.

10    THE COURT: Very well.  Anything else on behalf of

11    plaintiff?

12    MR. SQUITIERI: No, Your Honor.

13    THE COURT: On behalf -- Mr. Baumann, on behalf of

14    your clients -- defendants?

15    MR. BAUMANN: No, Your Honor.

16    THE COURT: All right.  Ms. White, on behalf of

17    your clients?

18    MS. WHITE: No, Your Honor.

19    THE COURT: Okay.  And finally, Ms. Musgrave, on

20    behalf of your clients?

21    MS. MUSGRAVE: None, Your Honor.

22    THE COURT: We're in recess.  Thank you.

23    MR. BAUMANN: Thank you.

24    THE CLERK: All rise.

25    (Whereupon, the within proceedings were then in

34

1    conclusion at 9:16 a.m. on February 12, 2008.)

2

3        I certify the foregoing is a correct transcript, to the

4    best of my knowledge and belief, from the record of

5    proceedings in the above-entitled matter.

6

7    _____        _____

8    Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  07-CV-02503 EWN-MJW

STEVEN A. STENDER and INFINITY CLARK
STREET OPERATING, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

v.

JAMES A. CARDWELL, ERNEST A. GERARDI, JR.,
RUTH ANN M. GILLIS, NED S. HOLMES, ROBERT P.
KOGOD, JAMES H. POLK III, JOHN M. RICHMAN,
JOHN C. SCHWEITZER, R. SCOT SELLERS, ROBERT
H. SMITH, STEPHEN R. DEMERITT, CHARLES MUELLER,
JR., CAROLINE BROWER, MARK SCHUMACHER, ALFRED
G. NEELY, ARCHSTONE-SMITH OPERATING TRUST,
ARCHSTONE-SMITH TRUST, LEHMAN BROTHERS
HOLDINGS INC., and TISHMAN SPEYER DEVELOPMENT
CORPORATION,

      Defendants.

---

## DEFENDANTS' MOTION TO STAY OR TO DISMISS IN FAVOR OF ARBITRATION AND TO DISMISS FOR FAILURE TO STATE A CLAIM

---

Defendants hereby move to stay or to dismiss this action pursuant to the Federal

Arbitration Act, 9 U.S.C. § 3, and Federal Rules of Civil Procedure 12(b)(1) and (6).  As shown

below, because plaintiffs must arbitrate the contract claims, and have no cognizable tort claims,

this action should not be permitted to proceed.

## Summary of Argument

This putative class action arises from a 2007 merger in which all of the outstanding shares of Archstone-Smith Trust, a real estate investment trust organized under Maryland law (the "Archstone REIT"), were acquired at a premium price of $60.75 in cash per share. The Archstone REIT was the sole trustee and 89% owner of Archstone-Smith Operating Trust (the "Archstone UPREIT").

Prior to the merger, the named plaintiffs, Steven A. Stender and Infinity Clark Street Operating, held Class A-1 Units in the Archstone UPREIT. On behalf of a putative class, they allege breach of contract claims (Count I), as well as two types of breach of fiduciary duty: oppression of the minority by the majority (Count II) and trustee self-dealing (Count III). All of these claims arise from the fact that they and other holders of Class A-1 Units were given a supposedly wrongful choice between two alternatives: (1) the same $60.75 premium cash consideration paid to the public shareholders of the trustee/majority unitholder, the Archstone REIT; or (2) newly issued "Series O" preferred units in exchange for their old Class A-1 Units.

Dismissal or stay of all counts is required. As set forth in Point I, the contract claim (Count I) should be stayed or dismissed because of mandatory arbitration clauses. As set forth in Point II, the breach of fiduciary duty claims are barred for lack of derivative standing under Maryland law, and in any event are precluded by contractual and statutory exculpation provisions, by Maryland's business judgment rule, and by the Archstone UPREIT's governing Declaration of Trust. As set forth in Point III, to the extent that any count or portion thereof is not otherwise stayed or dismissed, it should be stayed in light of the predominance of the

arbitrable issues presented. Finally, for the reasons set forth in defendants' concurrently filed separate motion ("*Defendants' Motion to Stay Discovery and Further Pretrial Proceedings Pending Resolution of Threshold Issues*"), discovery and other pretrial proceedings should be stayed pending resolution of the threshold matters presented by this motion.

## Argument

### I. THE CONTRACT CLAIM (COUNT I) SHOULD BE STAYED OR DISMISSED IN FAVOR OF ARBITRATION.

Although Count I of the Complaint alleges breach of contract, plaintiffs neither quote nor attach any of the contracts upon which they purport to rely. Instead, they refer generally to unspecified "contribution and partnership agreements" and "statutory and common law partnership principles." Compl. ¶¶ 105-06. They do not even quote their own agreements. On this motion to dismiss in favor of arbitration, however, defendants may submit, and the Court may properly rely upon, "evidence extraneous to the complaint," including "affidavits" and "documents" relevant to the issue of arbitrability—most importantly, the pertinent contract terms. *Crawford* v. *United Servs. Auto. Ass'n Ins.*, No. 06-cv-00380, 2006 U.S. Dist. LEXIS 46433, at *15-*16 (D. Colo. July 7, 2006) (Nottingham, J.) (attached hereto as Exhibit B) (quoting *Wheeler* v. *Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)); *see also GFF Corp.* v. *Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

3

The only agreement mentioned by name anywhere in the Complaint is the Archstone UPREIT's Declaration of Trust (the "Declaration of Trust").[1] Compl. ¶¶ 31, 59, 61. With regard to the Declaration of Trust, the Complaint alleges the following:

> [T]he Archstone UPREIT agreed in its Declaration of Trust, for the benefit of the hundreds, if not thousands of A-1 unit holders with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by a wholly owned subsidiary of the Archstone UPREIT. According to the Declaration of Trust, these restrictions were to be effective until January 1, 2022.

Compl. ¶ 61. While the Complaint includes no citation, this allegation indisputably refers to Section 2 (entitled "*Restrictions on Dispositions of Protected Properties*") of Exhibit D to Annex A of the Declaration of Trust (the "Smith Agreement"). *See* Reif Aff., Tab 1, Annex A, Exh. D at § 2. The Smith Agreement, by its terms, provides certain protections for the former limited partners of the Charles E. Smith Residential Realty L.P. (the "Smith UPREIT"). The named plaintiffs were former limited partners of the Smith UPREIT. Compl. ¶ 57.

Section 4 of the Smith Agreement (entitled "*Remedies for Breach*") provides that "the sole and exclusive rights and remedies of any [former Smith] Partner for a breach of or violation of the covenants set forth in Section 2 . . . shall be a claim for damages against the Trust." Reif Aff., Tab 1, Annex A, Exh. D at § 4(b). Section 4 further provides the exclusive mechanism for

---

[1]    The Amended and Restated Declaration of Trust dated May 19, 2006—a true and correct copy of which is annexed at Tab 1 to the accompanying Affidavit of Thomas S. Reif (the "Reif Aff.," attached hereto as Exhibit A)—was the Archstone UPREIT's charter document that was in effect at the time of the 2007 merger. *See* MD. CODE, CORPS. & ASS'NS § 8-202 (providing for REIT declarations of trust) and § 2-104 (providing for corporate articles of incorporation).

disposing of any such claim of breach. If the parties cannot resolve their disagreement by good

faith negotiation, they *must* arbitrate:

> [T]he Trust and the [former Smith] Partner shall jointly retain a nationally recognized independent public accounting firm ("an Accounting Firm") to act as an arbitrator to resolve as expeditiously as possible all points of any such disagreement (including, without limitation, whether a breach of any of the covenants set forth [in] Section 2, Section 3, Section 6, Section 7 or Section 9 has occurred and, if so, the amount of damages to which the [former Smith] Partner is entitled as a result thereof, determined as set forth in Section 4(a)). All determinations made by the Accounting Firm with respect to the resolution of any breach or violation of any of the covenants set forth in Section 2, Section 3, Section 6, Section 7 or Section 9 and the amount of damages payable to the [former Smith] Partner under Section 4(a) shall be final, conclusive and binding on the Trust and the [former Smith] Partner.

*Id.* [2]

As it did in the Smith Agreement, the Archstone UPREIT had a regular practice of

requiring mandatory arbitration of disputes for breach of tax-related covenants in the other tax-

related agreements that it entered into with other putative class members. Reif Aff. ¶¶ 2-4.

---

[2]      The named plaintiffs are bound by this agreement. *See* Declaration of Trust (Reif Aff., Tab 1), Annex A at Preamble ("Annex A constitutes not only an integral part of the Declaration of Trust but also a separate agreement among all of the holders of the Units . . . . Each holder of Units on the Effective Date . . . shall become a party to this agreement") (emphasis omitted); *id.*, Exh. D at § 2(a) and Sch. 1 at pp. D-18 and D-20 (providing certain tax protections "for the benefit of each SRW Partner," a term that includes Steven A. Stender and Infinity Clark Street Operating LLC). "Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract." RESTATEMENT (SECOND) OF CONTRACTS, § 309 cmt. b (2007). By invoking tax protections under the Smith Agreement (*e.g.*, Compl. ¶ 61), the named plaintiffs are bound by all of its terms, including its arbitration clause. *See Blinco* v. *Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005) (enforcing arbitration clause against non-signatory to contract claiming benefits under that agreement); *Washington Mut. Fin. Group, LLC* v. *Bailey*, 364 F.3d 260, 267-68 (5th Cir. 2004) (same); *Int'l Paper Co.* v. *Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (same).

The Complaint is replete with allegations of breach of the tax-related covenants, which are subject to mandatory arbitration. *See, e.g.*, Compl. ¶ 2 ("The objective of A-1 Unit holders in making [property] contributions was to obtain from the Archstone UPREIT . . . tax advantages"); ¶ 4 (plaintiffs will suffer "millions of dollars of unprotected tax liabilities"); ¶ 7 ("many of the contractual tax protections . . . have been eliminated through the Merger"); ¶ 8 (defendants failed to ensure that "tax protections" were secured); ¶ 61 ("Archstone UPREIT agreed . . . not to sell, exchange or otherwise dispose of . . . any of the specifically enumerated properties"); ¶ 80 (merger did not "provide A-1 Unit holders with compensation for elimination of the tax protection agreements"); ¶ 107 (complaining of "adverse tax consequences" to plaintiffs from breach); ¶ 118 (merger "deprive[d] the minority A-1 Unit holders of the financial benefits of the dividends and tax agreements").

Section 3 of the Federal Arbitration Act, 9 U.S.C § 3, requires district courts to issue stays to enforce arbitration agreements such as those in place here:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

*Id.* The Federal Arbitration Act thus establishes a "'liberal federal policy favoring arbitration.'" *Comanche Indian Tribe of Oklahoma* v. *49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004) (quoting *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991)).  Under this policy, arbitration provisions must "'be broadly construed so as to be coextensive with congressional

6

power to regulate under the Commerce Clause.'" *Id.* at 1132 (quoting *Foster* v. *Turley*, 808 F.2d

38, 40 (10th Cir. 1986)).  "[A]ny doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460

U.S. 1, 24-25 (1983).

Moreover, as this Court has recognized, "'a valid and unwaived arbitration clause

deprives the court of subject matter jurisdiction until the dispute has been submitted to

arbitration.'" *Crawford*, 2006 U.S. Dist. LEXIS 46433, at *47 (quoting *Encore Prods., Inc.* v.

*Promise Keepers*, 53 F. Supp. 2d 1101, 1111 (D. Colo. 1999) (dismissing arbitrable claims for

lack of jurisdiction)).  "The requirement that jurisdiction be established as a threshold matter . . .

is inflexible and without exception." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 94-95

(1998) (internal quotation marks and citation omitted).

Arbitration of the central contractual tax protection dispute in this case cannot be evaded

by conclusory additional allegations that Archstone failed "to honor certain liquidity provisions

in the contribution and partnership agreements and by failing to act independently so that the

interests of A-1 Unit holders would be protected." Compl. ¶ 106.  Plaintiffs complain about

supposed "other" contract rights—mentioning "liquidity," "dividends," "levels of borrowings,"

and "financial reports," *see id.* ¶¶ 2, 7, 54, 63, 88—but they nowhere cite, quote nor attach any

provision of any agreement demonstrating any continuing right on the part of any plaintiff to any

of the foregoing benefits following the merger.  These conclusory assertions fail to state any

cognizable basis for relief, and must be disregarded. *See Bell Atlantic Corp.* v. *Twombly*, 127 S.

Ct. 1955, 1964-65 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to

relief requires more than labels and conclusions.") (internal quotation marks and alternations

7

omitted); *Connolly* v. *Mitsui O.S.K. Lines (America), Inc.*, No. 04-5127, 2007 WL 4207836, at *10 (D.N.J. Nov. 21, 2007) (attached hereto as Exhibit C) (dismissing claim where plaintiff failed "to allege or submit any contractual terms"); *Parrish* v. *NFL Players Ass'n*, No. C 07-00943, 2007 WL 2601385, at *11 (N.D. Cal. Sept. 6, 2007) (attached hereto as Exhibit D) (dismissing claim asserting plaintiffs were "entitled to payments" under contract without "alleg[ing] what provision of the relevant [agreement] was breached by defendants").

## II.    THE FIDUCIARY DUTY COUNTS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Maryland law governs plaintiffs' fiduciary duty claims against the Archstone UPREIT,[3] which is a "Maryland real estate investment trust" formed under Maryland law.[4]    The conduct complained of in Counts II and III is primarily, if not exclusively, conduct undertaken by the Archstone REIT in its capacity "as trustee" for the Archstone UPREIT.    Compl. ¶¶ 118, 121. The fiduciary duty claim based on trustee self-dealing fails for at least three reasons under Maryland law (standing, exculpation, and the business judgment rule), and under multiple provisions of the Archstone UPREIT's Declaration of Trust and Annex A thereto, including

---

[3]     Colorado courts follow the internal affairs doctrine—the choice-of-law rule under which fiduciary duties of directors and officers are defined by the state of incorporation, here Maryland. *See Great W. Producers Co-op* v. *Great W. United Corp.*, 613 P.2d 873, 878 n.4 (Colo. 1980); *Ajay Sports, Inc.* v. *Casazza*, 1 P.3d 267, 275 (Colo. Ct. App. 2000); *see also Edgar* v. *MITE Corp.*, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine . . . recognizes that only one State should have the authority to regulate a corporation's internal affairs.").

[4]     Archstone UPREIT Declaration of Trust (Reif Aff., Tab 1), p. 1 at ¶ First.    This document, which as shown in Point I is properly considered on this motion, plainly identifies the Archstone UPREIT as a real estate investment trust or REIT; plaintiffs' contrary allegation that the Archstone UPREIT is a limited partnership (Compl. ¶ 32) may be disregarded.

Sections 5.8B ("*No Obligation to Consider Separate Interests of other Unitholders*"), 5.1E ("*No Obligation to Consider Tax Consequences of other Unitholders*"), 5.8A ("*Liability of the Trustee*"—"*General*") and 9.2B ("*Transfer of Trustee's Trust Interest*"—"*Specific Transaction Prohibition*") of Annex A, as well as Sections 4.9 ("*Limitation of Liability*") and 8.1 ("*Limitation of Liability of Officers and Employees*") of the Declaration of Trust itself.

## A.    Trustee duties

### 1.    The standing obstacle

Plaintiffs' fiduciary duty counts are asserted as direct claims alleging breaches of "fiduciary duty to the minority A-1 Unit holders," Compl. ¶¶ 113, 121, rather than as derivative claims by, or in the right of, the Archstone UPREIT..

Section 2-405.1(g) of the Maryland General Corporation Law provides: "Nothing in this section creates a duty of any director of a corporation *enforceable otherwise than by the corporation or in the right of the corporation.*"  (Emphasis added.)  Section 8-601.1 of the Maryland REIT Law applies the limitations on director liability in Section 2-405.1(g) of the Maryland General Corporation Law to the trustees of Maryland REITs.  MD. CODE, CORPS. & ASS'NS §§ 2-405.1(g), 8-601.1 (attached hereto as Exhibit E and Exhibit F).  Accordingly, fiduciary duty claims against a trustee of a Maryland REIT may only be brought by, or in the right of, the REIT.

A recent Maryland Circuit Court decision, *In re Laureate*, No. 24-C-07-000664 (Md. Cir. Ct. June 26, 2007) (attached hereto as Exhibit G), is squarely on point.  Shareholders there

9

alleged breaches of fiduciary duty in a corporate transaction in which a Maryland corporation

was to be merged out of existence. The court dismissed the action under Section 2-405.1(g):

> [T]he Court sees no reason to prolong this litigation. In its judgment, plaintiffs'
> claims suffer from a *threshold flaw* that is fatal to their efforts to challenge the
> actions of the [board and its advisors]. *That flaw is that the vehicle they have
> chosen to utilize for those purposes, i.e., a direct action against corporate
> directors for alleged violations of fiduciary duties, is unavailable to them in
> Maryland.*

*Id.*, slip op. at 2 (emphasis added).[5] Finding Section 2-405.1(g) to be "plain and unambiguous,"

the *Laureate* court held that the "clear intent" of the statute was "to foreclose exactly the kinds of

claims which plaintiffs seek to bring in this action." *Id.* at 2-3. The claim had to be brought

derivatively, after demand on the board or a showing that demand was excused:

> The Court believes that plaintiffs must pursue their claims against Laureate's
> directors by making a demand on the corporation or, if demand is futile or
> excused, by suing derivatively in the right of the corporation. In this case,
> plaintiffs have elected neither course of action.

*Id.* at 2. For this reason alone—failure to bring these claims derivatively—plaintiffs' breach of

fiduciary claims must be dismissed.

Moreover, plaintiffs' lack of derivative standing bars not only their claims for breach of

fiduciary duty, but for aiding and abetting as well. *See, e.g., Danielewicz* v. *Arnold*, 769 A.2d

---

[5]    *See also Carley* v. *Kopko*, No. 03-C-06-008836, slip op. at 4 (Md. Cir. Ct. Apr. 2, 2007)
(attached hereto as Exhibit H) ("Pursuant to Maryland law, a claim for breach of fiduciary duty
against a corporate officer or director may only be pursued as a derivative, and not a direct,
action"); *Patterson* v. *Patterson*, No. 03-C-05-005429, 2006 WL 990998, at *5 (Md. Cir. Ct. Jan.
31, 2006) (attached hereto as Exhibit I) ("Because it is Plaintiff . . . who has brought this suit on
his own behalf, and he is not suing in the right of the Corporation for any injury done to the
corporation, the Defendant directors have no duty to Plaintiff under this section.").

274, 279, 296 (Md. Ct. Spec. App. 2001) (affirming dismissal of aiding and abetting claims);

*Laureate*, slip op. at 2, 4 (dismissing all claims, including against directors' outside advisors);

*see also Feldman* v. *Cutaia*, C.A. No. 1656-VCL, 2007 WL 2215956, at *12 (Del. Ch. Aug. 1,

2007) (attached hereto as Exhibit J) ("[A]n aiding and abetting claim premised on a derivative

cause of action is necessarily derivative itself.").

### 2.    The exculpation obstacle

As authorized by Maryland law,[6] the Declaration of Trust contains three different express

exculpation provisions eliminating the liability of the Archstone UPREIT's trustees, officers,

employees and agents to the Archstone UPREIT or its unitholders for money damages:

> Section 4.9    *Limitation of Liability.*
>
> To the maximum extent that Maryland law in effect from time to time permits limitation of the liability of trustees of a real estate investment trust, no Trustee of the Trust shall be liable to the Trust or to any Unitholder for money damages, except to the extent set forth in Section 5.8 or other Sections of Annex A hereto.
>
> \*        \*        \*
>
> Section 8.1    *Limitation of Liability of Officers and Employees.*
>
> To the maximum extent that Maryland law in effect from time to time permits limitation of the liability of officers, employees or agents of a real estate investment trust, no officer, employee or agent of the Trust shall be liable to the Trust or to any Unitholder for money damages.

---

[6]    *See* MD. CODE, CORPS. & ASS'NS § 8-601(b) ("A shareholder or trustee of a real estate investment trust shall have the immunity from liability described under § 5-419 of the Courts and Judicial Proceedings Article."); MD. CODE, CTS. & JUD. PROC. § 5-419(c)(1) ("[T]he declaration of trust of a real estate investment trust may include any provision expanding or limiting the liability of its trustees and officers to the trust or its shareholders for money damages.").

\*        \*        \*

Section 5.8 (of Annex A)        *Liability of the Trustee.*

A.    *General.*        To the maximum extent that Maryland law in effect from time to time permits limitation of the liability of trustees of a real estate investment trust, the Trustee shall not be liable to the Trust or to any Unitholder for money damages. . . .

Declaration of Trust (Reif Aff., Tab 1) at §§ 4.9 and 8.1 and Annex A at § 5.8.

Maryland law permits such broad exculpation absent receipt of an "improper benefit or profit in money, property or services," or "active and deliberate dishonesty," by the trustees. MD. CODE, CTS. & JUD. PROC. § 5-419(c)(2); *see also Hayes* v. *Crown Central Petroleum Corp.*, 78 Fed. Appx. 857, 865 (4th Cir. 2003) ("A corporation's charter may limit the liability of directors for money damages except to the extent that (1) the directors received an improper benefit or (2) engaged in active and deliberate dishonesty.") (affirming dismissal of Maryland law fiduciary duty claim).

With respect to former Smith UPREIT limited partners, the Smith Agreement modifies the application of Section 5.8A (of Annex A) to provide that: "The Trustee shall not be liable for monetary damages to the Trust or to any Unitholder for losses sustained or incurred as a result of errors in judgment or of any act or omission if the Trustee acted in good faith." Reif Aff., Tab 1, Annex A, Exh. D at § 11.

Plaintiffs have not pled facts sufficient to come within any exception to exculpation. Nor can they. As the Complaint concedes, the Class A-1 Unitholders were offered the *same* $60.75 per unit that the Archstone REIT's public shareholders received. Compl. ¶ 73. There is thus no plausible inference that the Archstone REIT (or the Individual Defendants) "actually received an

improper benefit or profit in money, property, or services." MD. CODE, CTS. & JUD. PROC. § 5-419(c)(2)(i); *see In re Ply Gem Indus., Inc. S'holders Litig.*, C.A. No. 15779-NC, 2001 WL 755133, at *7 (Del. Ch. June 26, 2001) (attached hereto as Exhibit K) (no "improper benefit" where directors received merger consideration "on the same terms as any other shareholder"). There is also no allegation of dishonesty at all, let alone any allegation "that the person's action or failure to act was the result of active and deliberate dishonesty." MD. CODE, CTS. & JUD. PROC. § 5-419(c)(2)(ii). The Complaint may take issue with the Archstone REIT's business judgment to offer unitholders a choice between the same cash consideration offered to the public shareholders and a new preferred security, but applying a "bad faith" label to that business judgment does not satisfy plaintiffs' pleading obligation. To survive a motion to dismiss, "plaintiffs must plead facts supporting a claim that is not barred by the exculpatory . . . provision." *Malpiede* v. *Townson*, 780 A.2d 1075, 1094 n.65 (Del. 2001). As plaintiffs have not done so (and indeed cannot do so), the fiduciary duty claims can and should be dismissed.

### 3. The Maryland business judgment rule obstacle

Under Maryland's business judgment rule, a corporate director or officer—and here a REIT trustee or officer—is "presumed" to have acted in accordance with his or her fiduciary duties. *See* MD. CODE, CORPS. & ASS'NS § 2-405.1(a), (e); *NAACP* v. *Golding*, 679 A.2d 554, 559 (Md. 1996). Maryland law "precludes judicial review of a legitimate business decision of an organization, absent fraud or bad faith." *Black* v. *Fox Hills N. Cmty. Ass'n*, 599 A.2d 1228, 1231 (Md. Ct. Spec. App. 1992). The protections of the business judgment rule fully apply in the

takeover context.[7]  Put simply, the business judgment rule operates to "prevent a court from second guessing corporate decisions and to give directors proper latitude in managing the business," and presumes that the board "act[ed] in the corporation's best interests and in good faith."  *Froelich* v. *Erickson*, 96 F. Supp. 2d 507, 520 (D. Md. 2000) (applying Maryland law), *aff'd*, 5 Fed. Appx. 287 (4th Cir. 2001).

The business judgment rule requires dismissal of the Complaint absent well-pleaded allegations of fraud or bad faith that are wholly lacking here.  *See Black*, 599 A.2d at 1231-32. Plaintiffs have not even alleged fraud, let alone complied with the requirement in Federal Rule of Civil Procedure 9(b) that fraud be pleaded with particularity.  And although Plaintiffs include conclusory averments of "bad faith," such buzzwords cannot salvage an otherwise deficient complaint.  *See Full Value Partners, L.P.* v. *Neuberger Berman Real Estate Income Fund, Inc.*, No. Civ. AMD 04-3399, 2005 WL 885421, at *3 (D. Md. Apr. 18, 2005) (attached hereto as Exhibit O) (Maryland business judgment rule "insulate[s] . . . corporate directors . . . from nettlesome 'second-guessing,' in the form of mere conclusory allegations"); *Desimone* v.

---

[7]    *See* MD. CODE, CORPS. & ASS'NS § 2-405.1(f) ("An act of a director relating to or affecting an acquisition or a potential acquisition of control of a corporation may not be subject to a higher duty or greater scrutiny than is applied to any other act of a director."); MD. CODE, CORPS. & ASS'NS § 8-601.1 (Section 2-405.1(f) "shall apply to real estate investment trusts"). Maryland law imposes no "heightened level of scrutiny" in the context of a merger.  *See Hudson* v. *Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at *11 n.13 (Md. Cir. Ct. Apr. 1, 2004) (attached hereto as Exhibit L); *Jasinover* v. *Rouse Co.*, No. 13-C-04-59594, 2004 WL 3135516, at *9 (Md. Cir. Ct. Nov. 4, 2004) (attached hereto as Exhibit M); *Foster* v. *Town & Country Trust*, No. 24-C-06-001442, 2006 WL 991000, at *2 (Md. Cir. Ct. Feb. 24, 2006) (attached hereto as Exhibit N).  Thus, contrary to plaintiffs' erroneous legal conclusion (Compl. ¶ 124)—which need not be credited on this motion, *see Papasan* v. *Allain*, 478 U.S. 265, 286 (1986)—the Archstone merger is not subject to entire fairness review.

14

*Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007) ("[A] complaint alleging breach of fiduciary duty must plead facts supporting an inference of breach, not simply a conclusion to that effect.").

### 4.  The Declaration of Trust obstacles

Finally, plaintiffs' fiduciary duty complaints are premised on conduct that is fully permitted under the governing Declaration of Trust of the Archstone UPREIT.  Plaintiffs describe that conduct as follows:

> (1) refusing to allow A-1 Unit holders to vote on the Merger; (2) refusing to appoint an independent committee to act on behalf of the Archstone UPREIT; (3) refusing to require that any transaction between Archstone REIT (and any affiliates thereof) and Archstone UPREIT be approved by a majority vote of the A-1 and A-2 Unit holders voting separately as a class; and (4) refusing to allow the Archstone UPREIT to engage investment and legal advisers to advise on the fairness of any transactions, from a procedural and financial view to the minority holders.

Compl. ¶ 122.

First, Article 9.2B of the Declaration of Trust specifically permits merger transactions where, as here, "all Unitholders either will receive, or will have the right to elect to receive, for each Unit an amount of cash, securities, or other property equal to . . . the greatest amount of cash, securities or other property paid to a holder of Shares corresponding to such Unit"—here, the $60.75 premium cash price concededly (Compl. ¶ 74) offered to them.

Second, Annex A to the Declaration of Trust—which by its terms "constitutes not only an integral part of the Declaration of Trust but also a separate agreement among all of the holders of Units" (*see* Reif Aff., Tab 1, Annex A at Preamble and § 13.11)—expressly provides that the Archstone REIT could act in the best interests of *its shareholders*, and was *not* required to act

15

with regard to any separate or different interests of the A-1 Unitholders—in particular their tax concerns.[8]

Third, the A-1 Unitholders were not entitled to a separate class vote on the merger. Under Maryland law, a REIT "may provide by its declaration of trust" that "any specified securities issued or to be issued by the real estate investment trust have any voting or other rights which, by law, are or may be conferred on shareholders." MD. CODE, CORPS. & ASS'NS § 8-

---

[8]     Article 5.8B ("*No Obligation to Consider Separate Interests of other Unitholders*") of Annex A of the Declaration of Trust (Reif Aff., Tab 1) provides:

> The Unitholders (including the Trustee to the extent that its Trust Interest is not in its capacity as Trustee) expressly acknowledge that the Trustee is acting on behalf of the Trust and the Trustee's shareholders collectively, that the *Trustee is under no obligation to consider the separate interests of the other Unitholders (including, without limitation, the tax consequences to the other Unitholders) in* deciding whether to cause the Trust to take (or decline to take) any actions, and that the Trustee shall not be liable for monetary damages for losses sustained, liabilities incurred or benefits not derived by Unitholders in connection with such decisions except as set forth in Exhibit D, unless the Trustee acted in bad faith and the act or omission was material to the matter giving rise to the loss, liability or benefit not derived. [Emphasis added.]

*See also* Smith Agreement (Reif Aff., Tab 1, Annex A, Exh. D) at § 11 (as respects former Smith UPREIT limited partners).

Article 5.1E ("*No Obligation to Consider Tax Consequences of other Unitholders*") of Annex A of the Declaration of Trust (*id.*) drives the point home specifically with respect to taxes:

> In exercising its authority under this Agreement, the Trustee may, but *shall be under no obligation to, take into account the tax consequences to any Unitholder* (including the Trustee) of any action taken (or not taken) by any of them. Except as set forth in Exhibit D to this Agreement, the Trustee and the Trust shall not have liability to a Unitholder for monetary damages or otherwise for losses sustained, liabilities incurred or benefits not derived by such Unitholder in connection with such decisions, provided that the Trustee has acted in good faith and pursuant to its authority under this Agreement. [Emphasis added.]

16

203(a)(4).   However, any class voting right must be expressly set forth in a REIT's declaration

of trust, as the statute relating to approval of mergers contains no independent requirement of a

class vote.   MD. CODE, CORPS. & ASS'NS §§ 8-202(c), 8-501.1(g).   The Complaint cites no

provision of the Declaration of Trust providing for such a class vote, and there is no such

provision.   To the contrary, under Section 9.2B of the Declaration of Trust, a merger offering

equal consideration to shareholders and unitholders was explicitly permitted if it "has been

approved by the Unitholders holding at least a *majority* of the then outstanding Units (*including*

*any Units held by the Trustee*)" (emphasis added).   *See Warner Commc'ns, Inc.* v. *Chris-Craft*

*Indus., Inc.*, 583 A.2d 962, 971 (Del. Ch. 1989) (whether class vote is required is purely legal

question answerable by reference to the corporate charter, and may be addressed on the

pleadings), *aff'd*, 567 A.2d 419 (Del. 1989).   Such approval was provided by written consent

(Compl. ¶ 115) of the "Trustee" (the Archstone REIT), which held a clear majority of 89% of the

voting shares (Compl. ¶ 31).

   Plaintiffs' fiduciary claims are thus additionally barred because the conduct complained

of by plaintiffs was permitted by the express provisions of the Declaration of Trust.

### B.    Majority unitholder duties

   Plaintiffs have attempted to dress up their fiduciary duty claim against the Archstone

REIT in the language of  "Majority Oppression of the Minority A-1 Unit Holders," but the only

action even arguably taken by the Archstone REIT in its capacity as a unitholder (as opposed to

as trustee) was its written consent to the merger. Compl. ¶ 115.   It is not "majority oppression"

to vote in favor of a corporate transaction simply because it may be adverse to another individual

shareholder or group of shareholders.   Under Maryland law, absent "some ulterior purpose adverse to the interests of the corporation," "[s]tockholders are not trustees or *quasi* trustees for each other." *Coop. Milk Serv., Inc.* v. *Hepner*, 81 A.2d 219, 224 (Md. 1951).   Moreover, it has long been the law in Maryland that stockholders owning two-thirds of a corporation are free to approve of a sale of all of the corporation's assets; "[t]his is a property right of which the shareholders, while acting in good faith, may not be deprived, no matter the motives nor the folly and consequences of their action." *Homer* v. *Crown Cork & Seal Co. of Baltimore City*, 141 A. 425, 434 (Md. 1928).

A majority shareholder's approval right is qualified only by the limitation that it not act "ultra vires, illegally, or in bad faith." *Id.*   What happened here—consenting to a transaction whereby A-1 Unitholders were offered the *same* cash consideration offered to the Archstone REIT's public shareholders—does not remotely run afoul of such limitation.   That is especially true where, as here, the Declaration of Trust provides expressly that the Archstone REIT is under no obligation to consider the separate interests of the other Unitholders, "including, without limitation, the tax consequences to the other Unitholders."   Declaration of Trust (Reif Aff., Tab 1), Annex A, § 5.8B; *see also id.* at § 5.1E (Archstone REIT "may, but shall be under no obligation to, take into account the tax consequences to any Unitholder . . . of any action taken (or not taken) by any of them.").   The Complaint here alleges no facts from which culpability may plausibly be inferred.   Where a complaint, "[s]tripped of all argument, . . . simply states the fact that the majority stockholders and the directors exercised their voting power," no claim lies under Maryland law for breach of fiduciary duty by the majority.   *See Patterson* v. *Patterson*, No. 03-C-05-005429, 2006 WL 990998, at *5-*6 (Md. Cir. Ct. Jan. 31, 2006) (attached hereto as

18

Exhibit I) ("statement of fact as to what the ulterior motives [were or] facts that would show that the ulterior purpose [was] *adverse to the Corporation's interests*" is required; "[i]t is not sufficient to plead simply that an ulterior purpose exists and that the ulterior purpose is adverse to the *individual stockholder*") (emphasis added); *see also Tomran, Inc.* v. *Passano*, 862 A.2d 453, 470 (Md. Ct. Spec. App. 2004) ("bald allegations . . . without some factual indication" of "personal benefit" accruing to majority inadequate to plead claim of fraud on the minority), *aff'd*, 891 A.2d 336 (Md. 2006).

For these reasons, Counts II and III fail to state a claim and should be dismissed.[9]

### III.  IF ANY COUNT OR PORTION OF THE COMPLAINT IS NOT STAYED OR DISMISSED, THE COURT SHOULD STAY THE ENTIRE ACTION IN LIGHT OF THE ARBITRABLE ISSUES.

Section 3 of the Federal Arbitration Act mandates that where suit is brought "upon any *issue* referable to arbitration . . . the court . . . *shall* . . . stay the trial of the *action* until such arbitration has been had in accordance with the terms of the [arbitration] agreement." 9 U.S.C. § 3 (emphasis added). Thus, "so long as (1) there is an agreement to arbitrate and (2) at least one of the issues involved in the suit is within the scope of the arbitration agreement, a stay is to be granted *as a matter of course*, except in rare cases." *China Union Lines* v. *Am. Marine Underwriters, Inc.*, 458 F. Supp. 132, 135 (S.D.N.Y. 1978) (emphasis added); *accord Air*

---

[9]      The aiding and abetting claims in Counts II and III fail for the same reasons as the primary claims. *See Alleco Inc.* v. *Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1050 (Md. 1995) ("[C]ivil aider and abettor liability . . . requires that there exist underlying tortious activity."). Moreover, plaintiffs do not even attempt to plead facts in the Complaint that would plausibly support an inference of knowing participation or "substantial assistance or encouragement" by any defendant in a fiduciary breach. *See id.* at 1043.

*Freight Servs., Inc.* v. *Air Cargo Transp., Inc.*, 919 F. Supp. 321, 325 (N.D. Ill. 1996) ("The fact that some of the issues involved in the case are arbitrable is enough to require the entire case to be stayed pending arbitration of the arbitrable issues.").

"[C]onsiderations of judicial economy and avoidance of confusion and possible inconsistent results . . . militate in favor of staying the entire action." *Am. Home Assurance Co.* v. *Vecco Concrete Constr. Corp.*, 629 F.2d 961, 964 (4th Cir. 1980). The decision to stay the entire action is particularly appropriate where, as here, arbitrable issues "predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco, Inc.* v. *T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987).

Because the entire Complaint is "permeated with arbitrable issues," *J.D. Marshall Int'l, Inc.* v. *Redstart, Inc.*, 656 F. Supp. 830, 834 (N.D. Ill. 1987)—namely, whether there has been a breach of the tax-related covenants as a result of the Archstone merger (*see, e.g.*, Compl. ¶¶ 2-5, 7-8, 45-46, 55-57, 59-64, 67-69, 74, 77, 79-82, 87, 97-98, 105, 107-09, 116, 118)—the Court should stay all proceedings until the arbitrable issues have been resolved. *See Universal Marine Ins. Co.* v. *Beacon Ins. Co.*, 588 F. Supp. 735, 739 (W.D.N.C. 1984) (staying non-arbitrable claims that "spr[u]ng from the same set of operative facts and assumptions" where "[r]esolution of the [arbitrable] contractual issues . . . [would] clarify, simplify, and streamline the ultimate resolution of the litigation").

## Conclusion

Defendants respectfully submit that the motion to stay or to dismiss should be granted.

Dated: January 29, 2008

Respectfully submitted,

ROTHGERBER JOHNSON & LYONS LLP

*/s/ Frederick J. Baumann*
Frederick J. Baumann
Cindy Coles Oliver
One Tabor Center, Suite 3000
1200 17th Street
Denver, Colorado  80202-5839
(303) 623-9000
Fax: (303) 623-9222
E-mail:  fbaumann@rothgerber.com
E-mail:  coliver@rothgerber.com

-and-

WACHTELL, LIPTON, ROSEN & KATZ
David Gruenstein
George T. Conway III
David C. Bryan
51 West 52nd Street
New York, New York  10019
(212) 403-1000
Fax: (212) 403-2000
E-mail:  drguenstein@wlrk.com
E-mail:  gtconway@wlrk.com
E-mail:  dcbryan@wlrk.com

-and-

21

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes
Ralph I. Miller
Ashish D. Gandhi
767 Fifth Avenue
New York, New York  10153
(212) 310-8000
Fax: (212) 310-8007
E-mail:  ralph.miller@weil.com
E-mail:  jonathan.polkes@weil.com
E-mail:  ashish.gandhi@weil.com

*Attorneys for Archstone (formerly known as*
*Archstone-Smith Operating Trust) and Tishman*
*Speyer Archstone-Smith Multifamily Series I Trust*
*(successor by merger to Archstone-Smith Trust)*

HOLME ROBERTS & OWEN LLP

*/s/ Bobbee Musgrave*
B. Lawrence Theis
Bobbee Musgrave
1700 Lincoln Street, Suite 4100
Denver, Colorado  80203-4541
(303) 861-7000
Fax:  (303) 866-0200
E-mail:  larry.theis@hro.com
E-mail:  bobbee.musgrave@hro.com

*Attorneys for Individual Defendants*

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP

*/s/ Roger P. Thomasch*
Roger P. Thomasch
K. Allison White
1225 17th Street, Suite 2300
Denver, Colorado  80202-5596
(303) 292-2400
Fax: (303) 296-3956
E-mail:  thomasch@ballardspahr.com
E-mail:  whiteka@ballardspahr.com

22

*Attorneys for Lehman Brothers Holdings Inc.*
*and Tishman Speyer Development Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of January, 2008, I electronically filed the foregoing **DEFENDANTS' MOTION TO STAY OR TO DISMISS IN FAVOR OF ARBITRATION AND TO DISMISS FOR FAILURE TO STATE A CLAIM** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel listed below who have consented to service through the CM/ECF system. To the extent that any of the counsel listed below have not consented to service through the CM/ECF system, a true and correct copy of the foregoing will be served upon them by electronic mail.

Gerald L. Bader, Jr.
BADER & ASSOCIATES, LLC
14426 East Evans Avenue, Suite 200
Denver, Colorado 80014
gbader@bader-associates.com

Lee Squitieri
SQUITIERI & FEARON, LLP
32 East 57th Street, Second Floor
New York, New York 10022
lee@sfclasslaw.com

Kenneth A. Wexler
Edward A. Wallace
Christopher J. Stuart
Andrae P. Reneau
WEXLER TORISEVA WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
kaw@wtwlaw.com
eaw@wtwlaw.com
cjs@wtwlaw.com
apr@wtwlaw.com

B. Lawrence Theis
Bobbee Musgrave
HOLME ROBERTS & OWEN LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203-4541
Larry.Theis@hro.com
Bobbee.Musgrave@hro.com

David Gruenstein
George T. Conway III
David C. Bryan
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
dgruenstein@wlrk.com
gtconway@wlrk.com
dcbryan@wlrk.com

Jonathan D. Polkes
Ralph I. Miller
Ashish D. Gandhi
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
jonathan.polkes@weil.com
ralph.miller@weil.com
ashish.gandhi@weil.com

Roger P. Thomasch
K. Allison White
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
1225 17th Street, Suite 2300
Denver, Colorado  80202-5596
thomasch@ballardspahr.com
whiteka@ballardspahr.com


*/s/ Frederick J. Baumann*
Frederick J. Baumann
One Tabor Center, Suite 3000
1200 17th Street
Denver, Colorado  80202-5839
(303) 623-9000
Fax: (303) 623-9222
E-mail:  fbaumann@rothgerber.com

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-02503 EWN-MJW

STEVEN A. STENDER and INFINITY CLARK
STREET OPERATING, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

v.

JAMES A. CARDWELL, ERNEST A. GERARDI, JR.,
RUTH ANN M. GILLIS, NED S. HOLMES, ROBERT P.
KOGOD, JAMES H. POLK III, JOHN M. RICHMAN,
JOHN C. SCHWEITZER, R. SCOT SELLERS, ROBERT
H. SMITH, STEPHEN R. DEMERITT, CHARLES MUELLER,
JR., CAROLINE BROWER, MARK SCHUMACHER, ALFRED
G. NEELY, ARCHSTONE-SMITH OPERATING TRUST,
ARCHSTONE-SMITH TRUST, LEHMAN BROTHERS
HOLDINGS INC., and TISHMAN SPEYER DEVELOPMENT
CORPORATION,

      Defendants.

---

## DEFENDANTS' MOTION TO STAY DISCOVERY AND FURTHER PRETRIAL PROCEEDINGS PENDING RESOLUTION OF THRESHOLD ISSUES

---

Defendants, by their undersigned counsel, hereby move to stay discovery and further pretrial proceedings in this action pending resolution of the case-dispositive threshold issues of law raised by defendants' concurrently filed separate motion ("*Defendants' Motion to Stay or to Dismiss in Favor of Arbitration and to Dismiss for Failure to State a Claim*") (attached hereto as Exhibit A) to stay or dismiss this action.

As set forth in the motion to stay or dismiss, the Complaint asserts two theories, each of which is subject to fundamental flaws that should be resolved at the threshold. First, plaintiffs' breach of contract claim (Count I) should be stayed or dismissed in favor of mandatory arbitration. Second, plaintiffs' breach of fiduciary duty claims (Counts II and III) are barred for lack of derivative standing under Maryland law, and in any event are precluded by contractual and statutory exculpation provisions, by Maryland's business judgment rule, and by the governing Declaration of Trust.

The decision to issue a stay of pretrial proceedings rests within the sound discretion of the trial court. *Landis* v. *N. American Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). A stay is warranted, upon a showing of good cause, to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). This protection includes the timing of discovery and other pretrial proceedings. *See Namoko* v. *Milgard Mfg., Inc.*, No. 06-cv-02031, 2007 WL 1063564, at *1 (D. Colo. Apr. 6, 2007) (attached hereto as Exhibit B) ("[A] stay may be appropriate if resolution of a preliminary motion may dispose of the entire action . . . [and if] a stay does not unduly prejudice the opposing party.") (internal quotation marks and citations omitted); *see also* 3 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 16.12(3)(b) (3d ed. 2007) ("It makes little sense to try to fix schedules for future events in a case if a real prospect exists that an early motion would result in dismissal or in dramatic changes in the content or scope of the case.").

For the following reasons, there is good cause here to issue a stay:

First, the very purpose of an arbitration clause is to resolve matters privately, outside the courts, thus avoiding the expense and burden of litigation on the parties and on the courts.[1] In light of that salutary purpose, the Federal Arbitration Act requires courts to respect valid arbitration agreements and to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Indeed, as this Court has recognized, "'a valid and unwaived arbitration clause deprives the court of subject matter jurisdiction until the dispute has been submitted to arbitration.'" *Crawford* v. *United Servs. Auto. Ass'n Ins.*, No. 06-cv-00380, 2006 U.S. Dist. LEXIS 46433, at *47 (D. Colo. July 7, 2006) (Nottingham, J.) (attached hereto as Exhibit C) (quoting *Encore Prods., Inc.* v. *Promise Keepers*, 53 F. Supp. 2d 1101, 1111 (D. Colo. 1999) (dismissing arbitrable claims for lack of jurisdiction)). "The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (internal quotation marks and citation omitted).

Granting a pretrial stay pending resolution of a motion in favor of arbitration accords with the limits on the Court's jurisdiction, the policies of the Federal Arbitration Act, and common sense: the parties should only undergo the expense and burden of dispute resolution

---

[1] *See Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105, 122-23 (2001) (recognizing the "real benefits to the enforcement of arbitration provisions" of "allow[ing] parties to avoid the costs of litigation" and reducing the "accompanying burden to the courts"); *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) ("[B]y agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.") (internal quotation marks and citation omitted); *Foster* v. *Turley*, 808 F.2d 38, 42 (10th Cir. 1986) ("[A] primary purpose behind arbitration agreements is to avoid the expense and delay of court proceedings.").

once—*after* the court has determined whether the case should be adjudicated in court or, rather, must be arbitrated. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Coors*, 357 F. Supp. 2d 1277, 1280 (D. Colo. 2004) (staying discovery pending resolution of motion to dismiss on threshold issue of arbitrability); *Stiener* v. *Apple Computer, Inc.*, No. C 07-4486, 2007 WL 4219388, at *1 (N.D. Cal. Nov. 29, 2007) (attached hereto as Exhibit D) ("In the interests of conserving the resources of the parties, a short stay of the initial scheduling obligations and discovery pending the determination of the motion to compel arbitration is therefore prudent.").

Conversely, denying such a stay would undermine the parties' agreement, waste judicial resources, and run contrary to the Federal Arbitration Act. *See Foster* v. *Turley*, 808 F.2d 38, 42 (10th Cir. 1986) ("Contracts to arbitrate are not to be undermined by allowing one party to ignore the contract and resort to the courts.") (citing *Southland Corp.* v. *Keating*, 465 U.S. 1, 7 (1984)); *Hardin* v. *First Cash Fin. Servs., Inc.*, 465 F.3d 470, 474 n.2 (10th Cir. 2006) ("Arbitration is an attempt to avoid unnecessary court costs; by keeping non-dispositive matters within the purview of the district court, the parties continue to face costs for which they did not bargain.").[2]

Accordingly, absent undue prejudice, discovery and other pretrial proceedings should await the resolution of a motion to stay or dismiss based upon the arbitrability of the subject dispute. *See LaFleur* v. *Teen Help*, 342 F.3d 1145, 1152-53 (10th Cir. 2003) (affirming stay of discovery pending resolution of motion to dismiss); *Coors*, 357 F. Supp. 2d at 1280 ("interests of

---

[2]     *See also Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U.S. 265, 278 (1995); *Dean Witter Reynolds, Inc.* v. *Byrd*, 470 U.S. 213, 225 (1985) (White, J., concurring); *McCauley* v. *Halliburton Energy Servs., Inc.*, 413 F.3d 1158, 1162 (10th Cir. 2005); *Bowen* v. *Amoco Pipeline Co.*, 254 F.3d 925, 934 (10th Cir. 2001).

judicial economy would be advanced by staying discovery in this action pending a decision on

Defendant's . . . motion" to dismiss or compel arbitration).[3]

Plainly there is no such "undue prejudice" here. Plaintiffs did not file their complaint

until months *after* the closing of the challenged transaction. They could have sued before the

merger transaction closed, and indeed could have sought a preliminary injunction. But they did

not. Plaintiffs today have no pressing need to proceed with discovery or other pretrial matters

prior to this Court's adjudication of defendants' dispositive motion to stay or dismiss this case.

Second, a stay is also warranted in view of the pending motion to dismiss plaintiffs'

fiduciary duty claims for lack of standing. Corporations (and here, REITs) and their directors

(here, trustees) should not have to undergo burdensome discovery and other litigation unless and

until a court determines that the case is properly maintainable, either as a direct or derivative

action. *See Orloff* v. *Shulman*, C.A. No. 852-N, 2005 WL 333240, at *2 (Del. Ch. Feb. 2, 2005)

(attached hereto as Exhibit H) (staying discovery pending resolution of dismissal motion

asserting lack of derivative standing; "the interests of justice will be promoted by deferring

discovery until the motion to dismiss is resolved and the scope and nature of the claims properly

asserted in this case is determined").

---

[3]    *See also, e.g., Babb* v. *Northrop Grumman Corp.*, No. 06-cv-00581, 2007 WL 2705530,
at *1 (D. Colo. Sept. 13, 2007) (Watanabe, Mag. J.) (attached hereto as Exhibit E) ("A stay may
be appropriate pending the resolution of a dispositive motion if the motion would resolve the
entire case and the stay will not unduly prejudice the opposing party.") (granting stay); *Maugein*
v. *Newmont Mining Corp.*, No. 02-M-204, slip op. at 1 (D. Colo. June 19, 2002) (attached hereto
as Exhibit F) ("Because the defendants have challenged subject matter jurisdiction and the
sufficiency of the complaint to state a claim for relief within the jurisdiction of this court,
discovery should not proceed until those questions have been resolved."); *Grynberg* v. *Royal
Dutch Petroleum Co.*, No. 03-B-1212, slip op. at 5 (D. Colo. Feb. 12, 2004) (attached hereto as
Exhibit G) ("Discovery in this matter shall be STAYED until Defendants' motion to dismiss is
resolved.").

Granting such stays is critical to protecting the autonomy and authority of corporate (and here, REIT) boards to govern internal corporate affairs, including the decision whether or not to commence litigation.[4]  Allowing discovery to proceed before a plaintiff demonstrates standing would eviscerate the safeguards embodied in the demand requirement and effectively eliminate the protections of the business judgment rule.  *See Levine* v. *Smith*, 591 A.2d 194, 208-10 (Del. 1991) (allowing discovery before deciding standing would reflect a "complete abrogation" of the basic corporate governance principle that it is "the board's duty to manage the business and affairs of the corporation"), *overruled on other grounds* (standard of appellate review), *Brehm* v. *Eisner*, 746 A.2d 244, 253-54 (Del. 2000); *see also Beam* v. *Stewart*, 845 A.2d 1040, 1056 n.49 (Del. 2004) (applying *Levine*).

## Conclusion

Defendants respectfully submit that discovery and other pretrial proceedings herein should be stayed pending resolution of defendants' motion to stay or dismiss.

---

[4]      *See* MD. CODE, CORPS. & ASS'NS § 2-401(b) ("All powers of the corporation may be exercised by or under authority of the board of directors except as conferred on or reserved to the stockholders by law or by the charter or bylaws of the corporation."); 8 *Del. C.* § 141(a) (same); *Werbowsky* v. *Collomb*, 766 A.2d 123, 134 (Md. 2001) ("The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.") (internal quotation marks and citations omitted); *Zapata Corp.* v. *Maldonado*, 430 A.2d 779, 784-86 (Del. 1981) (demand requirement properly places control of derivative litigation in the hands of the board of directors, which "remains empowered under [8 *Del. C.*] § 141(a) to make decisions regarding corporate litigation").

## D.C.COLO.LCivR 7.1(A) Certification

Undersigned counsel for defendants Archstone-Smith Trust and Archstone-Smith Operating Trust certify that they conferred by telephone with counsel for plaintiffs in an effort to resolve the dispute raised by this motion, and that counsel for plaintiffs advised that they would not consent to the relief requested herein.

Dated: January 29, 2008

Respectfully submitted,

ROTHGERBER JOHNSON & LYONS LLP

*/s/ Frederick J. Baumann*
Frederick J. Baumann
Cindy Coles Oliver
One Tabor Center, Suite 3000
1200 17th Street
Denver, Colorado  80202-5839
(303) 623-9000
Fax: (303) 623-9222
E-mail:  fbaumann@rothgerber.com
E-mail:  coliver@rothgerber.com

-and-

WACHTELL, LIPTON, ROSEN & KATZ
David Gruenstein
George T. Conway III
David C. Bryan
51 West 52nd Street
New York, New York  10019
(212) 403-1000
Fax: (212) 403-2000
E-mail:  dgruenstein@wlrk.com
E-mail:  gtconway@wlrk.com
E-mail:  dcbryan@wlrk.com

-and-

7

WEIL, GOTSHAL & MANGES LLP
Jonathan D. Polkes
Ralph I. Miller
Ashish D. Gandhi
767 Fifth Avenue
New York, New York  10153
(212) 310-8000
Fax: (212) 310-8007
E-mail:  jonathan.polkes@weil.com
E-mail:  ralph.miller@weil.com
E-mail:  ashish.gandhi@weil.com

*Attorneys for Archstone (formerly known as Archstone-Smith Operating Trust) and Tishman Speyer Archstone-Smith Multifamily Series I Trust (successor by merger to Archstone-Smith Trust)*

HOLME ROBERTS & OWEN LLP

*/s/ Bobbee Musgrave*
B. Lawrence Theis
Bobbee Musgrave
1700 Lincoln Street, Suite 4100
Denver, Colorado  80203-4541
(303) 861-7000
Fax:  (303) 866-0200
E-mail:  larry.theis@hro.com
E-mail:  bobbee.musgrave@hro.com

*Attorneys for Individual Defendants*

BALLARD SPAHR ANDREWS & INGERSOLL, LLP

*/s/ Roger P. Thomasch*
Roger P. Thomasch
K. Allison White
1225 17th Street, Suite 2300
Denver, Colorado  80202-5596
(303) 292-2400
Fax: (303) 296-3956
E-mail:  thomasch@ballardspahr.com
E-mail:  whiteka@ballardspahr.com

8

*Attorneys for Lehman Brothers Holdings Inc.*
*and Tishman Speyer Development Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of January, 2008, I electronically filed the foregoing **DEFENDANTS' MOTION TO STAY DISCOVERY AND FURTHER PRETRIAL PROCEEDINGS PENDING RESOLUTION OF THRESHOLD ISSUES** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel listed below who have consented to service through the CM/ECF system. To the extent that any of the counsel listed below have not consented to service through the CM/ECF system, a true and correct copy of the foregoing will be served upon them by electronic mail.

Gerald L. Bader, Jr.
BADER & ASSOCIATES, LLC
14426 East Evans Avenue, Suite 200
Denver, Colorado 80014
gbader@bader-associates.com

Lee Squitieri
SQUITIERI & FEARON, LLP
32 East 57th Street, Second Floor
New York, New York 10022
lee@sfclasslaw.com

Kenneth A. Wexler
Edward A. Wallace
Christopher J. Stuart
Andrae P. Reneau
WEXLER TORISEVA WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
kaw@wtwlaw.com
eaw@wtwlaw.com
cjs@wtwlaw.com
apr@wtwlaw.com

B. Lawrence Theis
Bobbee Musgrave
HOLME ROBERTS & OWEN LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203-4541
Larry.Theis@hro.com
Bobbee.Musgrave@hro.com

David Gruenstein
George T. Conway III
David C. Bryan
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
dgruenstein@wlrk.com
gtconway@wlrk.com
dcbryan@wlrk.com

Jonathan D. Polkes
Ralph I. Miller
Ashish D. Gandhi
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
jonathan.polkes@weil.com
ralph.miller@weil.com
ashish.gandhi@weil.com

Roger P. Thomasch
K. Allison White
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
1225 17th Street, Suite 2300
Denver, Colorado  80202-5596
thomasch@ballardspahr.com
whiteka@ballardspahr.com

*/s/ Frederick J. Baumann*
Frederick J. Baumann
One Tabor Center, Suite 3000
1200 17th Street
Denver, Colorado  80202-5839
(303) 623-9000
Fax: (303) 623-9222
E-mail:  fbaumann@rothgerber.com

11

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACK P. KATZ, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 08 CV 4035 Judge Darrah |
| ERNEST A. GERARDI, JR., et al., | ) ) ) | |
| Defendants. | ) | |

### DECLARATION IN SUPPORT OF CERTAIN DEFENDANTS' 28 U.S.C. § 1404(a) MOTION TO TRANSFER

I, THOMAS S. REIF, declare under penalty of perjury as follows:

1.     I am Associate General Counsel and Group Vice President of the defendant real estate investment trust organized under Maryland law formerly known as Archstone-Smith Operating Trust and currently named Archstone (the "Archstone UPREIT"). I work full time at Archstone's corporate headquarters located at 9200 E. Panorama Circle, Englewood, Colorado.

2.     I am submitting this declaration in support of the Defendants' motion to transfer venue from the Northern District of Illinois to the District of Colorado. I am over age 21 and have personal knowledge of the facts stated in this Declaration.

### Archstone – A Colorado Based Company

3.     Archstone UPREIT (and its predecessor Archstone Communities Trust) and its sole trustee, Tishman Speyer Archstone-Smith Multifamily Series I Trust (successor by merger to Archstone-Smith Trust) (the "Archstone REIT," and collectively with Archstone UPREIT, "Archstone"), have been based in Englewood, Colorado since July 1997. Archstone currently employs 266 people in Colorado.

4.      Substantially all of Archstone's current and former senior management is located in Colorado. Of the named defendants, only one, Ruth Ann M. Gillis, resides in Illinois. Five of the named defendants reside or have their principal executive offices in Colorado. Three of these named defendants are also likely to be witnesses in this action. Their names and areas of likely testimony are:

- **Caroline Brower (former General Counsel and Secretary of Archstone) and Charles E. Mueller, Jr. (Archstone Chief Financial Officer and Chief Operating Officer)** are knowledgeable regarding:  the business, management, operations, structure, and corporate governance of the Archstone REIT and Archstone UPREIT during their tenure as officers of the Archstone REIT and Archstone UPREIT; the 2007 mergers which are the subject of the *Katz* Complaint; and the allegations concerning their conduct and actions as described in the *Katz* Complaint.

- **R. Scot Sellers (Archstone CEO and former Board Chairman of Archstone REIT)** is knowledgeable regarding: the business, management, operations, structure, and corporate governance of the Archstone REIT and Archstone UPREIT during his tenure on the board and as CEO; the 2007 mergers which are the subject of the *Katz* Complaint; and the allegations concerning his conduct and actions as described in the *Katz* Complaint.

5.      At least two other potential non-defendant witnesses are located in Colorado, including:

- **Robert C. Lund (Archstone's VP of Tax)** and **David M. Flory (Former Archstone VP of Tax)** are knowledgeable regarding: the magnitude and scope of the Archstone UPREIT's tax protection arrangements with Class A-1 Unitholders (such as the Plaintiff Katz); and matters relating to the number of Class A-1 Unitholders in existence prior to the 2007 mergers which are the subject of the *Katz* Complaint.

## Location of Operative Facts and Books and Records

6.      In 2001, the Archstone UPREIT merged with another UPREIT, Charles E. Smith Residential Realty, L.P. (the "Smith UPREIT"). Plaintiff Katz alleges that he held stakes in the Smith UPREIT, and thusly became a Class A-1 Unitholder of the Archstone UPREIT. This transaction led to, among other things, the Archstone UPREIT changing its "Declaration of

Trust." Documents related to this transaction, as well as all other documents relating to and maintained by Archstone, are located and maintained at Archstone's Englewood, Colorado headquarters.

7.    Moreover, documents related to the October 2007 mergers involving Archstone, which form the basis of Katz's complaint, are located and stored in Colorado.

8.    The primary negotiations of the October 2007 mergers occurred, among other places, in and around the Denver area, including at Archstone's headquarters, and in New York. No negotiations of the mergers occurred in Illinois.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This Declaration was executed by me on _23_ July, 2008 at Englewood, Colorado.

Thomas S. Reif

# Exhibit F

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| ILLINOIS NORTHERN | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 8,422 | 8,093 | 9,056 | 10,584 | 11,126 | 11,135 | | |
| | Terminations | | 7,929 | 8,255 | 8,805 | 11,461 | 10,888 | 10,709 | | |
| | Pending | | 8,091 | 7,711 | 7,914 | 7,706 | 8,699 | 8,587 | | |
| | % Change in Total Filings | Over Last Year | 4.1 | | | | | | 27 | 2 |
| | | Over Earlier Years | | -7.0 | -20.4 | -24.3 | -24.4 | | 81 | 6 |
| | Number of Judgeships | | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | Vacant Judgeship Months** | | 15.8 | 5.7 | 12.0 | 9.6 | 22.1 | 17.8 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 382 | 367 | 412 | 481 | 505 | 506 | 62 | 4 |
| | | Civil | 346 | 330 | 369 | 437 | 461 | 459 | 36 | 3 |
| | | Criminal Felony | 24 | 26 | 34 | 32 | 38 | 39 | 93 | 7 |
| | | Supervised Release Hearings** | 12 | 11 | 9 | 12 | 6 | 8 | 77 | 6 |
| | Pending Cases | | 368 | 351 | 360 | 350 | 395 | 390 | 48 | 3 |
| | Weighted Filings** | | 462 | 443 | 485 | 512 | 526 | 525 | 39 | 3 |
| | Terminations | | 360 | 375 | 400 | 521 | 495 | 487 | 66 | 5 |
| | Trials Completed | | 11 | 11 | 13 | 12 | 12 | 14 | 86 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 14.7 | 13.9 | 12.9 | 10.3 | 9.9 | 10.3 | 90 | 7 |
| | | Civil** | 6.2 | 6.5 | 6.9 | 5.9 | 5.5 | 5.5 | 7 | 2 |
| | From Filing to Trial** (Civil Only) | | 29.7 | 26.4 | 27.0 | 28.4 | 26.0 | 26.0 | 65 | 5 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 456 | 500 | 388 | 337 | 442 | 461 | | |
| | | Percentage | 6.5 | 7.4 | 5.6 | 5.0 | 5.6 | 6.0 | 65 | 6 |
| | Average Number of Felony Defendants Filed Per Case | | 1.7 | 1.8 | 1.9 | 1.9 | 1.7 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 45.20 | 45.07 | 51.46 | 39.36 | 45.57 | 43.63 | | |
| | | Percent Not Selected or Challenged | 31.8 | 30.9 | 36.9 | 31.0 | 37.3 | 34.8 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7620 | 118 | 150 | 701 | 53 | 55 | 1504 | 902 | 563 | 428 | 1614 | 23 | 1509 |
| Criminal* | 527 | 1 | 152 | 59 | 43 | 107 | 80 | 13 | 6 | 17 | 11 | 11 | 27 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| COLORADO | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **12-MONTH PERIOD ENDING SEPTEMBER 30** | | | | | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 3,377 | 3,399 | 3,305 | 3,520 | 3,418 | 3,233 | | |
| | Terminations | | 3,332 | 3,587 | 3,441 | 3,545 | 3,201 | 3,294 | | |
| | Pending | | 2,633 | 2,592 | 2,764 | 2,910 | 2,966 | 2,950 | | |
| | % Change in Total Filings | Over Last Year | -.7 | | | | | | 43 | 4 |
| | | Over Earlier Years | | 2.2 | -4.1 | -1.2 | 4.5 | | 26 | 3 |
| | Number of Judgeships | | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | .0 | 3.0 | 10.1 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 482 | 486 | 472 | 504 | 488 | 461 | 32 | 2 |
| | | Civil | 399 | 401 | 380 | 407 | 383 | 372 | 19 | 1 |
| | | Criminal Felony | 62 | 62 | 71 | 75 | 87 | 79 | 56 | 5 |
| | | Supervised Release Hearings** | 21 | 23 | 21 | 22 | 18 | 10 | 52 | 5 |
| | Pending Cases | | 376 | 370 | 395 | 416 | 424 | 421 | 44 | 2 |
| | Weighted Filings** | | 527 | 522 | 544 | 579 | 557 | 550 | 20 | 1 |
| | Terminations | | 476 | 512 | 492 | 506 | 457 | 471 | 34 | 3 |
| | Trials Completed | | 20 | 23 | 26 | 26 | 23 | 27 | 47 | 5 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 8.7 | 8.4 | 8.1 | 8.5 | 7.4 | 9.4 | 47 | 8 |
| | | Civil** | 6.9 | 8.8 | 8.3 | 8.7 | 9.3 | 9.9 | 15 | 1 |
| | From Filing to Trial** (Civil Only) | | 29.0 | 32.0 | 28.4 | 26.4 | 26.0 | 28.0 | 61 | 7 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 90 | 138 | 157 | 151 | 160 | 181 | | |
| | | Percentage | 4.3 | 6.6 | 6.9 | 6.2 | 6.3 | 7.4 | 45 | 5 |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.3 | 1.5 | 1.5 | 1.4 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 51.58 | 40.94 | 33.26 | 36.91 | 38.89 | 31.14 | | |
| | | Percent Not Selected or Challenged | 48.8 | 43.5 | 27.4 | 37.8 | 45.6 | 35.8 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2796 | 130 | 71 | 782 | 88 | 58 | 102 | 363 | 186 | 130 | 411 | 4 | 471 |
| Criminal* | 422 | - | 43 | 137 | 63 | 65 | 37 | 23 | 5 | 17 | 1 | 13 | 18 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."