**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JACK P. KATZ, on behalf of himself and all
others similarly situated,

        Plaintiff,

        v.

ERNEST A. GERARDI, JR., RUTH ANN M.
GILLIS, NED S. HOLMES, ROBERT P.
KOGOD, JAMES H. POLK III, JOHN C.
SCHWEITZER, R. SCOT SELLERS,
ROBERT H. SMITH, STEPHEN R.
DEMERITT, CHARLES MUELLER, JR.,
CAROLINE BROWER, MARK
SCHUMACHER, ALFRED G. NEELY,
ARCHSTONE-SMITH OPERATING
TRUST, ARCHSTONE-SMITH TRUST,
LEHMAN BROTHERS HOLDINGS, INC.,
and TISHMAN SPEYER DEVELOPMENT
CORPORATION,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 08-CV-04035
Judge John W. Darrah

**CERTAIN DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND**

SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois 60606
(312) 876-8000

*Attorneys for Defendants; This Filing Made on
Behalf of Defendants Archstone-Smith
Operating Trust, Archstone-Smith Trust,
Tishman Speyer Development Corporation, and
Lehman Brothers Holdings Inc.,*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................................ii

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND .............................................................................................. 3

    A.    Katz's Allegations ........................................................... 3

    B.    Procedural Background ................................................... 5

ARGUMENT .................................................................................................... 6

I.    THE ANTI-REMOVAL PROVISION OF THE '33 ACT DOES NOT BAR REMOVAL OF THIS ACTION. ................................................. 6

    A.    Katz's Claims Do Not Arise Under the '33 Act; Hence, Section 22(a) Does Not Bar Removal of This Action ............................................ 6

    B.    Section 22(a)'s Bar to Removal Does Not Trump CAFA's Express Jurisdictional and Removal Provisions ........................................ 10

            1.    Defendants Respectfully Submit That *Luther* Was Wrongly Decided................................................................ 14

II.    KATZ'S CONTENTION THAT CAFA'S AMOUNT-IN-CONTROVERSY REQUIREMENT HAS NOT BEEN SATISFIED HERE IS WITHOUT MERIT................................................................................................ 17

CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bennett v. Bally Manufacturing Corp.*
    785 F. Supp. 559 (D.S.C. 1992) ................................................................. 8, 9

*Brill v. Countrywide Home Loans, Inc.*
    427 F.3d 446 (7th Cir. 2005) ................................................................. 17, 18

*Burda v. M. Ecker Co.*
    954 F.2d 434 (7th Cir. 1992) ................................................................. 7

*California Public Employees' Retirement System v. WorldCom, Inc.*
    368 F.3d 86 (2d Cir. 2004) ................................................................. passim

*Cathedral Trading, LLC v. Chicago Board Options Exch.*
    199 F. Supp. 2d 851 (N.D. Ill. 2002) (Bucklo, J.) ................................................................. 8

*Chevron U.S.A., Inc. v. Hammond*
    726 F.2d 483 (9th Cir. 1984) ................................................................. 14

*Detweiler v. Pena*
    38 F.3d 591 (D.C. Cir. 1994) ................................................................. 11, 14

*Franczyk v. Cingular Wireless, L.L.C.*
    2004 U.S. Dist. LEXIS 643  (N.D. Ill. Jan. 20, 2004) (Darrah, J.) ................................................................. 7

*Hart v. FedEx Ground Package System Inc.*
    457 F.3d 675 (7th Cir. 2006) ................................................................. 16

*Lott v. Pfizer, Inc.*
    492 F.3d 789 (7th Cir. 2007) ................................................................. 20

*Luther v. Countrywide Home Loans Servicing, LP.*
    2008 U.S. App. LEXIS 15115 (9th Cir. July 16, 2008) ................................................................. passim

*Estate of Pew v. Cardarelli*
    527 F.3d 25 (2d Cir. 2008) ................................................................. 13

*Pinter v. Dahl*
    486 U.S. 622 (1988) ................................................................. 15

*Pisciotta v. Old National Bancorp*
    499 F.3d 629 (7th Cir. 2007) ................................................................. 17

**TABLE OF AUTHORITIES**
(continued)

*Radzanower v. Touche Ross & Co.*
    426 U.S. 148 (1976) ................................................................................... 14,15

*Regional Rail Reorganization Act Cases*
    419 U.S. 102 (1974) .................................................................................... 14

*In re Transcon Lines*
    58 F.3d 1432 (9th Cir. 1995) ....................................................................... 15

*U.S. v. Johnson*
    529 U.S. 53 (2000) ...................................................................................... 11

*Watt v. Alaska*
    451 U.S. 259 (1981) ................................................................................ 14, 15

*Winstead v. Midwest Renal Care, Inc.*
    2007 U.S. Dist. LEXIS 79808 (N.D. Ill. Oct. 26, 2007) (Guzman, J.) ................ 8

**DOCKETED CASES**

*Stender, et al. v. Cardwell, et al.*
    No. 07-cv-2503 (D. Colo. 2007) ....................................................................... 1

**FEDERAL STATUTES**

15 U.S.C. § 77k ................................................................................................... 8

15 U.S.C. § 77l ................................................................................................... 8

15 U.S.C. § 77v ............................................................................................. 6, 15

28 U.S.C. § 1332 ......................................................................................... 10, 15

28 U.S.C. § 1441 ......................................................................................... 11, 12

2005 U.S.C.C.A.N. 3 .................................................................................... 12, 16

Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2 .................................. 12

S. Rep. No. 109-14 (2005).................................................................................. 16

Defendants Archstone-Smith Operating Trust (the "Archstone UPREIT"),

Archstone-Smith Trust (the "Archstone REIT"), Tishman Speyer Development Corporation,

and Lehman Brothers Holdings Inc. (collectively, "Defendants") respectfully submit this

memorandum of law in opposition to plaintiff Jack B. Katz's ("Plaintiff") motion to remand,

dated July 23, 2008 (the "Remand Motion" or "Remand Mot.").

## PRELIMINARY STATEMENT

In an obvious attempt to circumvent this Court's jurisdiction, and prevent this

putative class action from being heard in federal court, Plaintiff purports to plead claims

arising under the Securities Act of 1933 (the "'33 Act").  By so pleading, Katz hopes that the

'33 Act's anti-removal provision -- Section 22(a) -- will enable this action to remain in Illinois

state court, from which it cannot then be transferred to the federal district court in Colorado,

where a related action on behalf of the same putative class is pending.  For the following

independent reasons, however, Katz's Remand Motion should be denied, and this case should

remain in federal court where, for the reasons set forth in Defendants' previously-filed

Section 1404(a) Motion to Transfer Venue (the "Motion to Transfer Venue"), it should be

transferred to the federal district court in Colorado to be consolidated with that related action,

*Stender, et al. v. Cardwell, et al.* (No. 07-cv-2503) (D. Colo. 2007) (the "Stender Action").[1]

To begin, Katz's motion is based primarily on the assertion that Section 22(a)

supersedes the Class Action Fairness Act of 2005 ("CAFA"), which is the statute Defendants

properly invoked to remove this case to this Court.  But that assertion is without merit

because, simply put, Section 22(a) is inapplicable.  Under the doctrine prohibiting "artful

---

[1] Alternatively, as set forth in Defendants' Motion to Transfer Venue, *before* addressing Plaintiff's Remand Motion, this Court has the option of transferring the instant proceeding to the United States District Court for the District of Colorado.

pleading," Katz's claims do not arise under the '33 Act, and hence Section 22(a) does not apply here.  In short, as he himself alleges, Katz was a seller, not a purchaser, of A-1 Units, and, given that the '33 Act provides a remedy to securities purchasers only, Katz lacks standing to sue under that Act.  That Plaintiff attaches a "'33 Act" label to his claims does not determine whether federal court jurisdiction exists in this case.  Instead, it is black letter law that the existence of federal court jurisdiction turns on the legal and factual substance of Plaintiff's claims, and here, regardless of how Plaintiff labels them, Katz's claims do not arise under the '33 Act.  *See*, *infra*, Point I.A.

But even if Katz's claims truly arose under the '33 Act -- which they clearly do not -- and Section 22(a) actually applied here -- which it does not -- Section 22(a) still would not "trump" CAFA, as Katz contends.  By its terms, CAFA's removal provision applies to "*any* civil action" meeting its requirements.  Significantly, although CAFA's removal provision contains several exceptions, including for class actions that involve "covered" securities, it contains no exception for large interstate securities class actions relating to *noncovered* securities, such as the A-1 Units here.  Holding that Section 22(a) supersedes CAFA would, therefore, be tantamount to holding that CAFA contains an additional, unwritten exception that Congress never intended to, and in fact did not, create.  Moreover, creating, as Katz seeks to do, an exception for large interstate securities class actions relating to noncovered securities would contravene Congress's express intent in enacting CAFA that large interstate class actions, including securities class actions, be litigated in federal court.  Hence, Defendants respectfully submit that *Luther* -- the Ninth Circuit decision upon which Katz heavily relies to support his position that Section 22(a) supersedes CAFA -- was wrongly decided.  *See*, *infra*, Point I.B.1.

Finally, almost as an afterthought, the only other basis on which Katz moves for remand is his half-hearted assertion that CAFA's $5,000,000 jurisdictional amount-in-controversy requirement has not been satisfied here. Katz does not (and cannot) dispute that all of CAFA's other requirements for removal have been satisfied. Although Katz meticulously avoids pleading damages here, the value of what he seeks for himself and the putative class is, according to his own allegations in his complaint, "enormous" and totaling in the "millions of dollars." Moreover, Defendants have already been sued in two separate, but related actions, including the Stender Action, in which members of the same putative class as alleged here seek damages based on similar factual allegations as alleged here, and plaintiffs in those actions plead damages well in excess of $5,000,000. In fact, in the Stender Action, class counsel here alleged that the claims of the same class exceeded CAFA's amount-in-controversy requirement, and relied upon CAFA to establish federal jurisdiction for the Stender plaintiffs' state law claims. Plaintiff's argument here on amount-in-controversy irreconcilably conflicts with the position his class counsel took in the Stender Action to create federal jurisdiction there. It simply strains credulity to argue, as Katz does, that the amount-in-controversy does not exceed $5,000,000. *See*, *infra*, Point II.

## BACKGROUND

### A.     Katz's Allegations[2]

Katz and the other putative class members are former holders of Class A-1 Units (the "A-1 Units") of the Archstone UPREIT, a real estate investment trust. Compl. ¶¶ 2, 12, 32. Several years ago, they contributed certain properties to either defendant

---

[2] For purposes of this opposition only, Katz's factual allegations are assumed to be true. Defendants' Notice of Removal, which is incorporated by reference herein, contains further discussion of Katz's factual allegations, and additional background on this case.

Archstone UPREIT or to its predecessor, Charles E. Smith Residential Realty L.P. ("Smith UPREIT") (Archstone UPREIT and Smith UPREIT are collectively referred to as the "UPREITs"). *Id.* ¶ 2. In exchange for their property contributions to the UPREITs, Katz and other putative class members held A-1 Units of defendant Archstone UPREIT.[3] *Id.* As A-1 Unitholders, they were parties to tax (and other) agreements with or assumed by the Archstone UPREIT and the Archstone REIT (collectively, the "Archstone Entities"). Under those agreements, the A-1 Unitholders were entitled to tax and other benefits. *Id.* ¶¶ 3, 48-49.

In 2007, the Archstone Entities participated in a $22.2 billion merger transaction (the "October 2007 Mergers"). *Id.* ¶¶ 65-70. In the October 2007 Mergers, for their A-1 Units, A-1 Unitholders received their choice of (a) premium cash consideration ($60.75 per A-1 Unit), (b) new securities designated as Series O Preferred Units, or (c) a combination of cash and new securities. *Id.* ¶¶ 5, 7-8, 12. Notably, Katz elected to *sell* his A-1 Units for *cash only*; he received no new securities. *Id.* ¶ 12.

In his Complaint, Plaintiff alleges that the October 2007 Mergers stripped A-1 Unitholders of tax and other benefits. *Id.* ¶ 9. Specifically, Katz claims that the Archstone Entities disclosed in a purportedly false and misleading Prospectus and Registration Statement that, following the October 2007 Mergers, they will no longer indemnify A-1 Unitholders for any tax liabilities. *Id.* ¶¶ 74-75. Katz purports to allege claims under Sections 11, 12(a)(2) and 15 of the '33 Act. *Id.* ¶ 1. The gravaman of his complaint is that he and the other putative class members were injured because "Defendants failed to include information in the Prospectus and Registration Statement, information without which Plaintiff and members of

---

[3] All parties agree that the A-1 Units are not "covered securities," as defined by the '33 Act. 15 U.S.C. § 77r(b)(1)(2); Remand Mot. at p. 7, n. 3.

the Class were unable to make a reasonable and informed decision as to their [above-mentioned] 'election,' thereby rendering both the Prospectus and Registration Statement false and misleading." *Id.* ¶ 9.

### B.    Procedural Background

This purported class action is not the first of its kind.  On November 30, 2007, two members of the same putative class as alleged here filed suit in the U.S. District Court for the District of Colorado.  Those plaintiffs are represented by the same lawyers who represent Katz here.  Like this action, that action, the Stender Action, challenges the fairness of the October 2007 Mergers and alleges the same facts, purports to represent the same putative class, and names the same defendants as Plaintiff's complaint.  The plaintiffs in the Stender Action assert only state law claims; no federal law claims are pled.  In the Stender Action, Defendants moved to dismiss the plaintiffs' complaint or, in the alternative, to stay the Stender Action pending arbitration of the plaintiffs' claims.  There is currently a stay of all discovery and other pretrial proceedings pending resolution of the motion to dismiss and/or stay.  Importantly, in the Stender Action, the basis on which the plaintiffs alleged that federal court jurisdiction was proper was CAFA.  *See*, *e.g.*, Stender Compl. ¶¶ 35, 41-42 (attached hereto as Ex. A).

Long before Katz filed this case, the plaintiffs in the Stender Action told the Stender court that they were contemplating bringing "federal securities claim[s]" in that action.  Transcript of Feb. 12, 2008 hearing in the Stender Action, at 7 (attached hereto as Ex. B).  Despite this statement to that court, those plaintiffs and their counsel ultimately decided not to bring such claims.  Instead, in a transparent attempt to avoid the stay in the Stender Action, the Stender plaintiffs' counsel decided to bring this case on behalf of a different

plaintiff representing the same class in another, state forum and assert only federal securities law claims under a statute -- the '33 Act -- that contains a section -- Section 22(a) -- that they hope will interfere with removal of this case.

## ARGUMENT

On May 9, 2008, Plaintiff filed the instant action in Illinois state court. On July 16, 2008, within thirty days of service, Defendants removed this case from Illinois state court to this Court under CAFA. A week later, Plaintiff filed the instant Remand Motion, asserting that removal was barred by Section 22(a), which, he claims, trumps CAFA. Remand Mot. at 5-8. In addition, Katz asserts that, in any event, CAFA is inapplicable here because Defendants have not established that the amount-in-controversy in this case exceeds the $5,000,000 threshold requirement set forth in CAFA. *Id.* at 8-11. Notably, this is the *only* requirement Plaintiff claims is not met. Plaintiff concludes that, for these two reasons, this action may not be removed. *Id.* at 12. As set out below, Katz's arguments lack any basis in law or fact.

## I.    THE ANTI-REMOVAL PROVISION OF THE '33 ACT DOES NOT BAR REMOVAL OF THIS ACTION.

### A.    Katz's Claims Do Not Arise Under the '33 Act; Hence, Section 22(a) Does Not Bar Removal of This Action.

In a transparent attempt to circumvent CAFA, and its broad grant of federal diversity jurisdiction, and prevent his case from being heard in this Court (or transferred to the U.S. District Court for the District of Colorado), Katz asserts claims purporting to arise under the '33 Act. In so doing, Katz attempts to invoke Section 22(a) of the '33 Act, which bars removal of certain types of actions that arise under that Act, and specifically, individual and class actions arising under the '33 Act involving a noncovered security. 15 U.S.C. § 77v(a)

("Except as provided in section 77p(c) of this title [providing for removal of certain class actions involving covered securities], no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."). The legal and factual substance of Katz's claims establish, however, that they do not arise under the '33 Act. Pursuant to the "artful pleading" doctrine, the '33 Act's anti-removal provision does not apply here.

It is well-established that, although a plaintiff is the "master of his complaint," the court is to determine the existence of federal question jurisdiction based upon the substance of a plaintiff's claims, not the labels that a plaintiff attaches to them. *Burda v. M. Ecker Co.*, 954 F.2d 434, 438 (7th Cir. 1992) ("Although the plaintiff is generally considered the 'master of his complaint,' this principle is not without limitation. An independent corollary to the 'well-pleaded complaint rule' is the 'artful pleading doctrine.' A plaintiff may not frame his action under state law and omit federal questions that are essential to recovery.") (citation omitted). "Therefore, a federal court may, in some situations, look beyond the face of the complaint to determine whether a plaintiff has *artfully pleaded* his suit so as to couch a federal claim in terms of state law. In these cases, we will conclude that a plaintiff's claim actually arose under federal law and is therefore removable." *Id.* (emphasis added). Indeed, in the context of denying a plaintiff's motion to remand, this Court has held that "*when a complaint can be fairly read to state a federal question, the defendant may remove the case to federal court.*" *Franczyk v. Cingular Wireless, L.L.C.*, 2004 U.S. Dist. LEXIS 643, at *3-4 (N.D. Ill. Jan. 20, 2004) (Darrah, J.) (emphasis added) (citation omitted).[4]

---

[4] Although the "artful pleading" doctrine is usually invoked in cases in which the issue is whether a given claim arises under a particular federal statute, and hence whether federal

Here, Katz alleges claims purporting to arise under Sections 11, 12(a)(2), and 15 of the '33 Act.  Critically, to have standing under Section 11, Katz must have "acquir[ed]" a security.  15 U.S.C. § 77k ("[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person *acquiring* such security" may sue select categories of defendants) (emphasis added).[5]  Similarly, to have standing under Section 12(a)(2), Katz must have "purchased" a security.  15 U.S.C. § 77l(a)(2) ("[a]ny person who . . . offers or sells a security . . . by means of a [false or misleading] prospectus or oral communication . . . shall be liable . . . to the person *purchasing* such security from him.") (emphasis added).[6]

Katz's own allegations establish, however, that he neither acquired nor purchased any security; instead, he elected to receive *cash* for his A-1 Units, not new securities.  Compl. ¶¶ 5, 7-8, 12.  At best, therefore, Katz sold, not acquired or purchased, securities.  Remand Mot. at n. 1 ("As a result of the Merger Agreement, A-1 Unit Holders, all of whom were solicited by Defendants, *sold* their A-1 Units. . . .") (emphasis added).  Because Katz did not acquire or purchase any security, he has no standing to assert Section 11

---

question jurisdiction exists, its reasoning is no less applicable here, where the issue is whether Katz's claims arise under the '33 Act, and hence whether removal was proper under CAFA. *Bennett v. Bally Mfg. Corp.*, 785 F. Supp. 559, 560 (D.S.C. 1992).

[5] *See Winstead v. Midwest Renal Care, Inc.*, 2007 U.S. Dist. LEXIS 79808, at *6 (N.D. Ill. Oct. 26, 2007) (Guzman, J.) (stating that "the 1933 Act authorizes plaintiff to sue only if she *purchased* the stock from defendants") (emphasis added).

[6] *See Cathedral Trading, LLC v. Chicago Bd. Options Exch.*, 199 F. Supp. 2d 851, 858 (N.D. Ill. 2002) (Bucklo, J.) (stating that "section 12 . . . only grants standing to the person *purchasing* . . . security") (emphasis added).

or 12(a)(2) claims, and, as such, Section 22(a) cannot bar removal of this action.[7]  Under the

"artful pleading doctrine," that Katz mislabels his claims as "Section 11," "Section 12(a)(2),"

and "Section 15" claims is of no moment.  Compl. ¶ 1.

*Bennett* is squarely on point.  785 F. Supp. at 560.  There, as here, the plaintiff

alleged violations of Section 12(2) of the '33 Act.  *Id.*  After the case was removed to federal

court, the plaintiff moved to remand.  *Id.*  As here, the plaintiff argued that "the 1933 Act

expressly provides that claims brought pursuant to the Act may not be removed."  *Id.*

Although the court did not disagree that "the 1933 Act expressly provides that claims brought

pursuant to the Act may not be removed," it noted that "merely alleging a claim under a

statute that forbids removal will not necessarily protect a complaint from being removed."  *Id.*

Indeed, the court held that "defendants may defeat the motion for remand if they can show

that the § 12(2) claim is unsupported by the clear weight of legal authority."  *Id.*  Denying

remand, the court concluded that "§ 12(2) does not apply to [the type of] secondary market

transactions" alleged, and thus the plaintiff's claim was "unsupported by the clear weight of

legal authority."  *Id.* at 561.

Given that Katz's claims do not arise under the '33 Act, this Court need not

reach the issue of whether Section 22(a) conflicts with CAFA, and, if so, which statute

prevails.  As explained below, however, even if Plaintiff's claims arose under the '33 Act and

Plaintiff did have a proper basis to invoke Section 22(a) -- which he did not -- CAFA would

still allow removal of this case.

---

[7] Defendants raise the issue of Katz's standing to assert '33 Act claims only to illustrate, for jurisdictional purposes, the glaring degree to which Plaintiff has attempted to package his claims as claims subject to an anti-removal provision.  To the extent necessary, in their motion to dismiss Katz's complaint, Defendants intend to brief the numerous additional reasons Katz's complaint fails to state a claim for violations of the '33 Act.

**B.      Section 22(a)'s Bar to Removal Does Not Trump CAFA's Express Jurisdictional and Removal Provisions.**

Contrary to Plaintiff's assertions, even if Katz's claims truly arose under the '33 Act -- which they do not -- and Section 22(a) applied here, Section 22(a) still does not "trump" CAFA, as Katz contends.  By its terms, CAFA's removal provision applies to "*any* civil action" meeting its requirements.  28 U.S.C. § 1332(d)(1)(B) (emphasis added). Significantly, although CAFA contains several exceptions, it contains no exception for large interstate securities class actions relating to noncovered securities, such as the A-1 Units at issue here.  Holding that Section 22(a) supersedes CAFA would, therefore, be tantamount to holding that Section 22(a) constitutes an implied additional exception to CAFA that Congress never created, and would contravene Congress's express intent that large interstate class actions, including securities class actions, be litigated in federal court.  Hence, Defendants respectfully submit that *Luther v. Countrywide Home Loans Servicing, LP*, 2008 US. App. LEXIS 15115 (9th Cir. July 16, 2008) -- the Ninth Circuit decision upon which Katz heavily relies to support his position that Section 22(a) supersedes CAFA -- was wrongly decided.

To begin, by its terms, CAFA applies to "*any* civil action" meeting its requirements.  *Id.* (emphasis added).  Significantly, CAFA contains several express exceptions to its coverage.  For example, CAFA does not apply to class actions that "solely" involve claims that "concern[] a covered security as defined under . . . the Securities Act of 1933."  28 U.S.C. § 1332(d)(9)(A).  CAFA includes, however, no exception for large interstate securities class actions arising under the '33 Act relating to *noncovered* securities. It follows, therefore, that the absence of an exception for claims arising under the '33 Act relating to noncovered securities was not unintentional, but, rather, as noted below, reflective of Congress's intent that large interstate securities class actions be litigated in federal court.

Indeed, as the U.S. Supreme Court has stated, "[w]hen Congress provides exceptions in a statute, [] it does not follow that courts have authority to create others.  The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."  *U.S. v. Johnson*, 529 U.S. 53, 58 (2000); *Detweiler v. Pena*, 38 F.3d 591, 594 (D.C. Cir. 1994) ("Where a statute contains explicit exceptions, the courts are reluctant to find other implicit exceptions.").

Moreover, when it enacted CAFA, Congress also knew how to create blanket exceptions to a statute for prior Acts of Congress.  For example, in 28 U.S.C. Section 1441(a), the general removal statute, Congress provided that "*[e]xcept as otherwise expressly provided by Act of Congress*, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a) (emphasis added).  Tellingly, Congress included no such blanket exception in CAFA.  That Congress knew how to create such a blanket exception, yet included none in CAFA, establishes that Congress intended that CAFA not be subject to all prior Acts of Congress.

*California Public Employees' Retirement System v. WorldCom, Inc.* is squarely on point.  368 F.3d 86, 90 (2d Cir. 2004).  There, the issue was whether Section 22(a) -- the same provision of the '33 Act relied on by Plaintiff here -- trumps the bankruptcy removal statute -- a statute that allows removal of actions related to a bankruptcy case.  *Id.* at 90.  The Second Circuit held that Section 22(a) does not preclude removal of such actions.  *Id.*  The court noted that, "unlike the general removal statute, 28 U.S.C. § 1441(a), the [bankruptcy removal statute], contains no exception for federal claims that are expressly nonremovable

11

under an Act of Congress." *Id*. at 105. The court reasoned that this "crucial distinction *within* the federal jurisdiction scheme of Title 28," suggested that "Congress did not intend for Section 22(a) and its analogues to bar removal of . . . claims" related to a bankruptcy case. *Id.* at 105-06 (emphasis in original). The same "crucial distinction within the federal jurisdiction scheme" is present here. As noted, CAFA contains no exception for prior Acts of Congress. The absence of such an exception demonstrates that Congress did not intend for Section 22(a) to bar removal of large interstate securities class actions, as here. Notably, Katz does not even mention *WorldCom*.

Holding that Section 22(a) supersedes CAFA would be tantamount to holding that CAFA contains an additional, unwritten exception that Congress did not draft. As noted, however, it is black letter law that courts are not permitted to write into a statute an exception that Congress did not intend to include in it.

Indeed, creating an exception for large interstate securities class actions would contravene Congress's express intent that large interstate class actions, including securities class actions, be litigated in federal court. As CAFA itself states, Congress's intent was to "restore the intent of the framers of the United States Constitution by providing for *Federal* court consideration of interstate cases of national importance under diversity jurisdiction." CAFA, Pub. L. No. 109-2, § 2(b)(2) (codified as note to 28 U.S.C. § 1711) (emphasis added). Echoing this intent, in its report accompanying the passage of CAFA, the Senate Judiciary Committee stated that "[b]ecause interstate class actions typically involve more people, more money, and more interstate commerce ramifications than any other type of lawsuit," Congress "firmly believe[d] that such cases properly belong in *federal* court." S. Rpt. 109-14, *reprinted in* 2005 U.S.C.C.A.N. 3, at 5 (emphasis added). The Senate Judiciary Committee also stated

that "[o]verall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions," and hence that "[i]ts provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Id.*

These statements demonstrate that Congress intended for large interstate class actions to be litigated in federal court, and, as a result, that CAFA should be applied expansively. Consistent with this "strong preference that interstate class actions should be heard in federal court," courts have held that Congress intended for CAFA to apply to large interstate securities class actions. *Estate of Pew v. Cardarelli*, 527 F.3d 25, 26 (2d Cir. 2008) (noting that "[o]ne purpose of CAFA is to provide a federal forum for *securities* cases that have national impact, without impairing the ability of state courts to decide cases of chiefly local import or cases that concern traditional state regulation of the states' corporate creatures. CAFA does that by expanding federal diversity jurisdiction, by allowing removal of securities cases of national impact from the state courts, and by conferring appellate jurisdiction to review orders granting or denying motions to remand such removed cases.") (emphasis added). Hence, Katz's argument that, notwithstanding CAFA, Congress intended for large interstate securities class actions relating to noncovered securities to be subject to Section 22(a) flies in the face of CAFA and its legislative history.

1.    **Defendants Respectfully Submit That *Luther* Was Wrongly Decided.**

In light of the foregoing, Defendants respectfully assert that the Ninth Circuit's *Luther* decision was wrongly decided.[8]  *Luther* impermissibly creates an additional exception to CAFA that Congress decided not to include in that statute -- and, indeed, does not even mention *WorldCom*'s holding on the issue of the significance of the absence of a general exception for prior Acts of Congress; and undercuts Congress's express intent that large interstate securities class actions be litigated in federal court.

Defendants respectfully submit that *Luther* was incorrectly decided for several additional reasons.  *First*, *Luther* overlooks the rule that "[p]rinciples of construction requiring the more recent and specific statute to prevail over the earlier and more general only apply when there is an *irreconcilable conflict* between statutes."  *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 490 n.8 (9th Cir. 1984) (citation omitted).[9]  Here, no such

---

[8] In *Luther*, the issue was whether Section 22(a) bars the removal of a class action arising under the '33 Act, relating to a noncovered security, and meeting the requirements for removal under CAFA.  2008 U.S. App. LEXIS, at *15115.  Citing U.S. Supreme Court precedent, *Luther* noted that "'[i]t is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.'"  *Id.* at *7 (citing *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153 (1976)).  *Luther* found that "the Securities Act of 1933 is the more specific statute; it applies to the narrow subject of securities cases and § 22(a) more precisely applies only to claims arising under the Securities Act of 1933" *id.*, and that "CAFA, on the other hand, applies to a 'generalized spectrum' of class actions."  *Id.* (citing *Radzanower*, 426 U.S. at 153).  *Luther* held that, as a result, Section 22(a) takes precedent over CAFA.  *Id.* at *1.  *Luther* did not involve any issue of "artful pleading"; hence, that decision does not affect the analysis in Section I.A., *supra*.

[9] *See Watt v. Alaska*, 451 U.S. 259, 266 (1981) (declining to apply the recent statute canon when statutes did not "*irreconcilably*" *conflict*) (emphasis added); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133-34 (1974) (rejecting the claim that a more specific statute should be read to modify a general statute on the ground that no "*positive repugnancy*" existed between them) (emphasis added); *Detweiler*, 38 F.3d at 594 ("The Secretary next offers two canons of statutory construction to counteract the 'plain meaning'

14

"irreconcilable conflict" exists.  By recognizing an extremely limited exception to Section

22(a) for the small number of large interstate securities class actions arising under the '33 Act,

relating to noncovered securities, and meeting the requirements for removal under CAFA,

CAFA and Section 22(a) can easily be harmonized.  That harmonization does no violence to

the 33 Act's primary purpose ("to protect investors by requiring publication of material

information . . . concerning public offerings of securities in interstate commerce," *Pinter v.*

*Dahl*, 486 U.S. 622, 637-38 (1988) (citations omitted)), yet protects CAFA's primary

purpose, and is consistent with the principle of statutory construction that "whenever possible,

[courts must] attempt to reconcile potential conflicts in statutory provisions."  *In re Transcon*

*Lines*, 58 F.3d 1432, 1440 (9th Cir. 1995); *Watt*, 451 U.S. at 267 ("We must read the statutes

to give effect to each if we can do so while preserving their sense and purpose.").

   *Second*, even if the above-mentioned principle of statutory construction

applied here, it still would not bar removal of this action.  CAFA is undisputedly the more

recent expression of Congress's intent and, despite what *Luther* holds, Section 22(a) is not

more specific than CAFA.  Although Section 22(a) applies to fewer types of *claims* than

CAFA, CAFA applies to fewer types of *actions* than Section 22(a).  Whereas Section 22(a)

applies to both individual and class actions, 15 U.S.C. § 77v(a), CAFA applies to only one

type of action -- class actions.  28 U.S.C. § 1332(d)(1)(B).

   Finally, *Luther* fails to consider that application of Section 22(a) here would

"unduly interfere" with the operation of CAFA.  As the Second Circuit explained, "[t]he

---

interpretation of § 205:  recent enactments should be favored over older ones; and specific
statutory provisions should prevail over general ones.   These canons, whatever their
combative power against a statute's plain meaning, are not appropriately invoked in this case;
they apply only in the face of '*irreconcilably conflicting* statutes.'") (emphasis added) (citing
*Watt*, 451 U.S. at 266).

Supreme Court in *Radzanower*" -- the very cases upon which *Luther* relies -- indicated that "[w]here the application of a specific statute would '*unduly interfere*' with the operation of a general statute that was enacted subsequent to the specific statute, the more general statute controls." *WorldCom*, 386 F.3d at 103 (citing *Radzanower*, 426 U.S. at 156) (emphasis added). *Luther* does not even address whether application of Section 22(a) would "unduly interfere" with CAFA.

Indeed, application of Section 22(a) would "unduly interfere" with the "operation" of CAFA. To the extent that CAFA and Section 22(a) conflict, that conflict manifests itself in only a small number of cases -- large interstate class actions arising under the '33 Act and relating to noncovered securities. Holding that, in those limited circumstances, CAFA supersedes Section 22(a) would not interfere with the '33 Act's primary purpose. To the contrary, CAFA impacts no substantive provisions of the '33 Act. Indeed, regardless of the application of CAFA, plaintiffs can still assert '33 Act claims -- just in federal, not state, court. Plaintiffs can also assert their '33 Act claims individually or on behalf of smaller classes, and yet not risk removal; only when they seek to expand their role to represent a class of more than 100 members with over $5,000,000 in controversy and the requisite minimal diversity would CAFA apply. The converse holding (that Section 22(a) supersedes CAFA, and constitutes, therefore, an implied exception to CAFA) would "unduly interfere" with CAFA's primary purpose: "to expand substantially federal court jurisdiction over class actions." *Hart v. FedEx Ground Package System Inc.*, 457 F.3d 675, 681 (7th Cir. 2006) (citing S. Rep. No. 109-14, at 43 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 41).

## II.     KATZ'S CONTENTION THAT CAFA'S AMOUNT-IN-CONTROVERSY REQUIREMENT HAS NOT BEEN SATISFIED HERE IS WITHOUT MERIT.

Plaintiff's Remand Motion is based on a final contention:  that Defendants failed to establish that the amount-in-controversy here exceeds the $5,000,000 minimum jurisdictional threshold.  Katz does not -- because he cannot -- dispute that all of CAFA's other requirements have been met here.  But, as set forth below and as Defendants established in their Notice of Removal, based on the allegations in the Complaint, the amount in controversy here exceeds $5,000,000, exclusive of interest and costs.  (Notice of Removal ¶ 26.)

"In calculating the requisite amount in controversy, CAFA requires that the claims of all the plaintiffs be aggregated."  *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633-34 (7th Cir. 2007).  "To meet the amount-in-controversy requirement, the removing litigant must show a *reasonable probability* that the stakes exceed the minimum."  *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005) (emphasis added) (citation omitted).  "The question is not what damages the plaintiff will recover, but what amount is 'in controversy' between the parties."  *Id.* at 448 (citation omitted).  Thus, "the removing party's burden is to show not only what the stakes of the litigation *could* be, but also what they are given the plaintiff's actual demands. . . .  The demonstration concerns what the plaintiff is claiming (and thus the amount in controversy between the parties), not whether plaintiff is likely to win or be awarded everything he seeks."  *Id.* at 449 (emphasis in original).  "Once the proponent of jurisdiction has set out the amount in controversy, only a '*legal certainty*' that the judgment will be less forecloses federal jurisdiction."  *Id.* (citation omitted) (emphasis added).

Katz's own allegations make clear that the amount-in-controversy exceeds
$5,000,000.  Katz "brings this action on behalf of himself and a nationwide class of . . . all
holders of Class A-1, Series O Preferred Units or similar Common Units of Archstone-Smith
Operating Trust at the time of the [$22.2 billion] Merger."  Compl. ¶ 87.  Katz alleges that
this putative class includes "hundreds, if not thousands of similarly situated A-1 Unit holders
of record scattered throughout the United States."  *Id.* ¶ 89.  Katz claims that as a result of the
purportedly false and misleading statements in the Registration Statement and Prospectus,
Defendants are liable for, *inter alia*:  (i) with respect to members of the class who elected to
receive Series O Preferred Units (*which does not include Plaintiff*), rescission and rescissory
damages "in the amount of the full value of the A-1 Units at the time of the merger," and
damages for "the value of the tax protections and other provisions that were provided to [A-1
Unitholders] as A-1 Unit holders but that they did not receive as Series O Unit holders" (*id.*
¶ 103), and (ii) with respect to class members who elected to receive cash, rescissory damages
for their exchange and/or damages in the "amount of their *tax liability* that [A-1 Unitholders]
were required to pay when they cashed out of their A-1 Units."  *Id.* ¶ 113 (emphasis added).
According to Plaintiff's own allegations, the aggregate value of these tax liabilities is
"enormous," *id.* ¶ 4, and approximates "millions of dollars."  *Id.* ¶¶ 5, 75.  As is self-evident
from the allegations on the face of Plaintiff's Complaint, it is "reasonably probable" that the
amount-in-controversy -- as pled in the Complaint -- exceeds $5,000,000.  *Brill*, 427 F.3d at
449.

Plaintiff's claim that discovery or expert analysis is needed to determine the
damages for the "hundreds, if not thousands" of "nationwide" class members is nonsensical.
Indeed, plaintiffs in the Stender Action, represented by the same class counsel, have invoked

18

CAFA and asserted "that the matter in controversy, upon information and belief, exceeds the sum of $5,000,000, exclusive of interest and costs."  Stender Compl. ¶ 35.  As mentioned above, the Stender Action is brought on behalf of the same putative class as here for claims arising out of the same October 2007 Mergers as are challenged in this action.  Plaintiff makes no effort to explain why the class representatives in the Stender Action alleged that the class met the jurisdictional minimum but he alleges the opposite here even though it is the same class (represented by the same class counsel) in both cases.  And, as set forth above, Plaintiff's counsel stated to the federal district court in Colorado that the putative class in the Stender Action possessed federal securities claims, and they may choose to assert the very claims brought here in that action, where they concede the amount in controversy exceeds $5,000,000.[10]

Finally, as noted above, Plaintiff seeks, among other things, rescissory damages.  Although Defendants dispute that this is a valid way to compute damages here, rescissory damages for the A-1 Unitholders that elected to receive only cash would, if Plaintiffs were successful, far exceed the $5,000,000 minimum requirement.  By way of example only, in connection with the October 2007 Mergers, of the approximately 27 million A-1 Units outstanding at the time of the October 2007 Mergers, "holders of approximately 21.6 million Class A-1 Common Units elected to exchange their Class A−1 Common Units for cash consideration of $60.75 [per Unit]. . ."  Archstone-Smith Operating Trust Form 10-Q, for period ended Sept. 30, 2007, at 7 (attached hereto as Ex. D).  The aggregate value of those

---

[10] In addition, certain other putative class members have filed an action in California state court, styled *Ruby* v. *Tishman Speyer Properties, L.P.* (Case No. BC393671), alleging breach of contract and breach of fiduciary duty claims arising out of the same October 2007 Mergers as are challenged here and in the Stender Action.  Plaintiffs in that case seek "damages in excess of $100 million."  Ruby Complaint ¶ 87 (attached hereto as Ex. C).

21.6 million units -- at $60.75 per Unit -- is in excess of $1.2 billion.  Although Defendants

again emphasize that rescissory damages are not an appropriate measure of damages here, or

even that the above example is the proper way of calculating such damages, it is, in any event,

"reasonably probable" that the minimum amount-in-controversy, as pled in the Complaint,

exceeds $5,000,000.   Simply put, to argue -- as Plaintiff does in the Remand Motion -- that

the amount in controversy as pled in the Complaint does not exceed the $5,000,000 threshold

lacks credibility.

## CONCLUSION

For all the foregoing reasons, and those set forth in Defendants' Notice of

Removal, the Remand Motion should be denied in its entirety.[11]

Dated: Chicago, Illinois
        August 25, 2008

SONNENSCHEIN NATH & ROSENTHAL LLP


   /s/ Jeffery S. Davis
Christopher Q. King (ARDC #6189835)
Steve Merouse (ARDC # 6243488)
Jeffery S. Davis (ARDC #6277345)
Melissa A. Economy (ARDC #6282802)
7800 Sears Tower
Chicago, Illinois  60606
(312) 876-8000
(312) 876-7934 (fax)
*Attorneys for Defendants*

---

[11] Katz also seeks an award of costs and expenses, including attorneys' fees.  (Pls. Remand
Mot. at p. 11.)  This claim lacks merit, as it is well established that "if clearly established law
did not foreclose a defendant's basis for removal, then a district court should not award
attorneys' fees."  *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007).  Here, even if this
Court remands this case, costs and expenses should not be awarded because Defendants had a
good faith basis for removing this action under CAFA's removal provision.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2008, I electronically filed the preceding, and notice of same, with the Clerk of the Court using the CM/ECF system which will send notification of such filings to the following and, in addition, served the following by U.S. Mail and email on August 25, 2008:

Kenneth A. Wexler
Edward A. Wallace
Christopher J. Stuart
Melisa Twomey
Wexler Toriseva Wallace LLP
55 W. Monroe Street
Suite 3300
Chicago, IL  60603

Lee Squitieri
Squitieri & Fearon, LLP
32 E. 57th Street
2nd Floor
New York, NY  10022


      /s/ Jeffery S. Davis

# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

STEVEN A. STENDER and INFINITY )
CLARK STREET OPERATING, on behalf of )
themselves and all others similarly situated, )
                                              )
                    Plaintiffs, )
                                              )    Case No.
            v.                                )
                                              )
JAMES A. CARDWELL, )
ERNEST A. GERARDI, JR., )    Jury Trial Demanded
RUTH ANN M. GILLIS, )
NED S. HOLMES, )
ROBERT P. KOGOD, )
JAMES H. POLK III, )
JOHN M. RICHMAN, )
JOHN C. SCHWEITZER, )
R. SCOT SELLERS, )
ROBERT H. SMITH, )
STEPHEN R. DEMERITT, )
CHARLES MUELLER, JR., )
CAROLINE BROWER, )
MARK SCHUMACHER, )
ALFRED G. NEELY, )
ARCHSTONE-SMITH OPERATING TRUST, )
ARCHSTONE-SMITH TRUST, )
LEHMAN BROTHERS HOLDINGS, INC., )
and )
 TISHMAN SPEYER DEVELOPMENT )
CORPORATION, )
                                              )
                    Defendants. )

## CLASS ACTION COMPLAINT

Plaintiffs Steven A. Stender ("Stender") and Infinity Clark Street Operating ("Infinity")

(hereinafter sometimes collectively referred to as "Plaintiffs"), by their attorneys, for their class

action complaint against Archstone-Smith Operating Trust, Archstone-Smith Trust, James A.

Cardwell, Ernest A. Gerardi, Jr., Ruth Ann M. Gillis, Ned S. Holmes, Robert P. Kogod, James H.

Polk III, John M. Richman, John C. Schweitzer, R. Scot Sellers, Robert H. Smith, Stephen R.

Demeritt, Charles Mueller, Jr., Caroline Brower, Mark Schumacher, Alfred G. Neely Lehman

Brothers Holding, Inc. ("Lehman Brothers") and Tishman Speyer Development Corporation

("Tishman Speyer"), (hereinafter sometimes collectively referred to as "Defendants"), allege

upon knowledge as to their own acts, and upon information and belief as to all other matters,

based upon the investigation conducted by and through their attorneys, which investigation

included, *inter alia*, reviewing Securities Exchange Commission ("SEC") filings, press releases,

analyst reports, news articles, communications from the corporate Defendants and other

materials, as follows:

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action individually and as a class action on behalf of all

persons who owned Class A-1 Common Units of Archstone-Smith Operating Trust ("A-1 Unit

holders") as of the Merger (as defined hereinafter), for compensatory damages, contractual

damages and declaratory relief arising from the merger agreement among Archstone-Smith

Operating Trust (the "Archstone UPREIT"), Archstone-Smith Trust (the "Archstone REIT"),

Tishman Speyer and Lehman Brothers (Tishman Speyer and Lehman Brothers are referred to

collectively as the "Tishman-Lehman Partnership") to take the publically held Archstone REIT

private (the "Merger").

2.    The A-1 Unit holders of the Archstone UPREIT are former property owners, or

investors of former property owners, which contributed their properties (and/or equity in their

property holding companies) to the Archstone UPREIT, or its predecessor, Charles E. Smith

Residential Realty L.P. (the "Smith UPREIT), in exchange for limited partnership interests in the

Archstone UPREIT (or the Smith UPREIT) in the form of common units. The objective of A-1

Unit holders in making such contributions was to obtain from the Archstone UPREIT (or the

Smith UPREIT) tax advantages, dividends and liquidity as specified in contribution agreements entered into at the time of their respective contributions. Upon information and belief, none of the contribution agreements pursuant to which the A-1 Unit holders received their A-1 Units allow the Archstone REIT, Archstone UPREIT or any subsequent buyers or merger partners to eliminate or avoid the contractual tax benefits, liquidity rights and dividends bargained for by the A-1 Unit holders at the time they contributed their properties to the Archstone UPREIT.

3.    Given the magnitude of the tax liability A-1 Unit holders faced upon occurrence of a taxable event, the contractual tax liability protection afforded to the A-1 Unit holders by the Archstone UPREIT constituted an enormous potential liability to third parties interested in merging with or acquiring the Archstone UPREIT and the Archstone REIT. In this case, as explained in greater detail below, that liability was factored into the $60.75 buyout price offered per A-1 Unit by the Tishman-Lehman Partnership to A-1 Unit holders, which had been lowered from $64.00 to $62.50 to $60.75 to account for the Archstone UPREIT's obligations to A-1 Unit holders. However, even after lowering the offer price, the Defendants structured the Merger to disregard altogether the contractual tax, dividend and liquidity benefits owed to A-1 Unit holders. The Tishman-Lehman Partnership has not compensated the A-1 Unit holders for the loss of these benefits and A-1 Unit holders have sustained and will continue to accrue significant damages as a result.

4.    More specifically, pursuant to the Merger Agreement, Plaintiffs and members of the Class (as defined hereinafter) have been coerced into: (1) cashing-out their A-1 Units, which will result in millions of dollars of unprotected tax liabilities; or (2) converting their A-1 Units into new Series O Preferred units ("Series O Units") which are economically inferior to the A-1 Units. While the Merger Agreement couches the cashing in of A-1 Units or conversion into

3

Series O Units as an "election," neither action as described in this Complaint was voluntary, but was coerced by Defendants. Insofar as the terms "elect" or "election" are used in this Complaint, it is for convenience only and in reference to the terminology in the Merger Agreement and is not intended to concede that it was a voluntary act of any kind.

5.      As a result of the Merger Agreement, A-1 Unit holders who took the Tishman-Lehman Partnership's cash offer will have to recognize capital gain in an amount based on the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT.

6.      Alternatively, A-1 Unit holders whose A-1 Units were converted to Series O Units have lost the liquidity and dividends they enjoyed before the Merger. Indeed, the Merger Agreement provides that Series O Unit holders will have to wait until the fifth anniversary of the Merger before they can redeem any or all of their Series O Units at a cash redemption price of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date. Moreover, the dividends previously regularly distributed to A-1 Unit holders have essentially been eliminated.

7.      Hence, many of the contractual tax protections, liquidity and long-term investment strategy benefits that hundreds, if not thousands of A-1 Unit holders enjoyed have been eliminated through the Merger by the unilateral breach of contract and breach of fiduciary duties by the Defendants.

8.      By entering into the Merger Agreement, the Individual Defendants, the Archstone REIT and Archstone UPREIT breached their fiduciary duties owed to A-1 Unit holders by failing to take all necessary steps to ensure that the unit holders will receive the maximum value realizable for their ownership interests and/or retain certain liquidity and dividend benefits and

tax protections they were guaranteed. The Tishman-Lehman Partnership aided and abetted the other Defendants' breach of fiduciary duties and procured the breaches of contract detailed herein.

9.    Because Defendants failed to protect the best interests of the Class and breached with Class members, this lawsuit seeks compensatory damages, contractual damages and injunctive relief for all A-1 Unit holders who were or will be injured by Defendants' wrongful conduct.

## II.    PARTIES

10.    Plaintiff Stender is a resident of Cook County, Illinois and has been an owner of A-1 Units at all relevant times described herein. Because of the coercive nature of the Merger Agreement, Stender was forced to "elect" to cash-out his A-1 Units and receive $60.75 per A-1 Unit.

11.    Plaintiff Infinity is an Illinois general partnership with its principal place of business in Chicago, Illinois. Infinity is the successor in interest to Infinity Clark Street Operating, L.L.C., an Illinois limited liability company. Infinity has been an owner of A-1 Units at all relevant times described herein. Because of the coercive nature of the Merger Agreement, Infinity was forced to convert each Class A-1 Common Unit it owns to a newly issued Series O Preferred Unit on a one for one basis.

12.    Defendant James A. Cardwell was a director/trustee of both the Archstone REIT and the Archstone UPREIT at all relevant times.

13.    Defendant Ernest A. Gerardi, Jr. was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

14.    Defendant Ruth Ann M. Gillis was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

15.    Defendant Ned S. Holmes was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

16.    Defendant Robert P. Kogod was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

17.    Defendant James H. Polk III was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

18.    Defendant John M. Richman was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

19.    Defendant John C. Schweitzer was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

20.    Defendant R. Scot Sellers was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times, as well as the Chairman and Chief Executive Officer of the Archstone REIT and the Archstone UPREIT.  As an officer of the Archstone REIT and the Archstone UPREIT he will receive monetary benefits from the Merger in addition to the Merger consideration.

21.    Defendant Robert H. Smith was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

22.    Defendant Stephen R. Demeritt was a director/trustee of the Archstone REIT and the Archstone UPREIT at all relevant times.

23.    Defendant Charles Mueller, Jr. was the Chief Financial Officer of the Archstone REIT and the Archstone UPREIT at all relevant time.

24.     Defendant Caroline Brower was an Executive Vice President and General Counsel of the Archstone REIT and the Archstone UPREIT at all relevant times.

25.     Defendant Mark Schumacher was the Senior Vice President and Chief Accounting Officer of the Archstone REIT and the Archstone UPREIT at all relevant times.

26.     Defendant Alfred G. Neely was the Chief Development Officer and President of the Charles E. Smith Division of the Archstone REIT and the Archstone UPREIT at all relevant times.

27.     The individual directors and officer Defendants are sometimes collectively referred to as the "Individual Defendants."

28.     The Individual Defendants, as officers, directors and trustees of the Archstone REIT and the Archstone UPREIT, owed fiduciary duties of care, candor, loyalty and good faith toward the A-1 Unit holders and were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of Archstone UPREIT, including, among other things, acting in good faith and with loyalty, due care, and candor towards A-1 Unit holders.

29.     Defendant Lehman Brothers is a corporation existing under the laws of the State of Delaware which, through affiliates: (1) owned and controlled River Holding LP, the party with which the Archstone REIT has merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT has merged.

30.     Defendant Tishman Speyer is a corporation existing under the laws of the state of Delaware which, through affiliates: (1) owned and controlled River Holding LP, an entity with which the Archstone REIT merged; and (2) owned and controlled River Trust Acquisition (MD) LLC, an entity with which the Archstone UPREIT merged.

31.　Defendant Archstone REIT was engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States. The Archstone REIT was organized under Maryland law and maintained its headquarters at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112. The Archstone REIT owned approximately 89% of the Archstone UPREIT. The Archstone REIT was the sole trustee of the Archstone UPREIT and its relation with the Archstone UPREIT was governed by the Declaration of Trust of the Archstone UPREIT.

32.　Defendant Archstone UPREIT was a limited partnership with its principal office at 9200 E. Panorama Circle, Suite 400, Englewood, Colorado 80112. The Archstone UPREIT was organized under Maryland law. Plaintiffs and members of the Class owned limited partnership interests known as A-1 Units in the Archstone UPREIT.

33.　By the acts, transactions, and courses of conduct alleged herein, Defendants, individually and as part of a common plan and scheme and/or aiding and abetting one another in total disregard of their fiduciary duties, are depriving Plaintiff and the Class of the true value of their investment in the Archstone UPREIT and/or the entity formed as a result of the Merger (the "Company").

34.　Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in his or her capacity as an officer and/or director of the Archstone REIT and the Archstone UPREIT, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## III.　JURISDICTION AND VENUE

35.　The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) in that the matter in controversy, upon information and belief, exceeds the sum of $5,000,000.00

exclusive of interest and costs, and is a class action in which members of the Class are citizens of states other than Colorado.

36.    Upon information and belief, at least one Class Member is a citizen of a state different than the Defendants.  Plaintiffs are seeking relief on behalf of a nationwide class and believe that Class Members reside in states throughout the country.

37.    Upon information and belief, more than two-thirds of the Class Members are not citizens of the state in which this action was filed.

38.    The principal injuries to the Class were incurred throughout the United States and were not principally incurred in the state where the action was originally filed.

39.    Upon information and belief, Colorado citizens do not comprise greater than one-third of the Plaintiff Class.

40.    Upon information and belief, Defendants are, for jurisdictional purposes, citizens of Colorado.  Defendants are not charitable organizations.

41.    This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. §§ 1332(d)(4)(A) and (B).

42.    This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(3).

43.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.  Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **Real Estate Investment Trusts**

44.     A Real Estate Investment Trust ("REIT") is an entity that owns and manages

income-producing real estate such as apartments, offices and industrial space.  Along with

meeting additional criteria, to qualify as a REIT the entity must:

- pay at least 90% of its taxable income to its shareholders every year;

- have at least 100 shareholders;

- invest at least 75% of its total assets in real estate; and

- derive at least 75% of its income from rent or mortgage interest from properties in its portfolio.

45.     One of the most beneficial aspects of a REIT is the method in which taxes are

handled.  A REIT may deduct the dividends paid to the shareholders from its corporate tax bill.

Therefore, a REIT generally does not pay federal corporate income tax and taxes are only paid

by the individual investor for the dividends received and any capital gains.

46.     REIT investors also enjoy the advantages of limited liability and transferability of

shares (*i.e.*, liquidity) that a corporate structure offers, without incurring the costs of double

taxation.  Thus, a REIT is essentially a combination of a corporation and a partnership in that it

combines the benefits of a corporation with the tax pass-through nature of a partnership.

47.     An UPREIT is a partnership (Umbrella Partnership Real Estate Investment Trust).

A typical UPREIT is created by a group of sponsors who form a limited partnership and

contribute their property to the UPREIT in return for limited partnership interests in the

UPREIT.  Simultaneously, a corporation, typically the REIT, contributes cash that it raised in a

public offering in return for a general partnership interest in the UPREIT. The resulting partnership is called an UPREIT.

48.    The managing general partner of an UPREIT is usually a REIT. Because the REIT is the managing general partner of the UPREIT, it is responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT.

49.    By contributing real estate to an UPREIT, sponsors can mitigate the level of risk associated with the property they contributed by becoming equity holders in a much larger entity that owns a diverse portfolio of real estate assets. Sponsors also avail themselves of the opportunity to eliminate the personal liabilities that encumber their contributed property by having the UPREIT assume these liabilities.

50.    In most UPREITs, the sponsors receive limited partnership interests that are easily convertible into common stock of the managing partner REIT. As a result, the limited partnership interests are easily sellable on the open market.

**B.**    **Archstone-Smith Trust's and Archstone-Smith Operating Trust's Structure as an UPREIT**

51.    Archstone-Smith Operating Trust was structured as an UPREIT.

52.    Archstone-Smith Trust was a REIT with its common shares publicly traded on the New York Stock Exchange. The Archstone REIT was the managing general partner of the Archstone UPREIT. Because the Archstone REIT was the managing general partner of the Archstone UPREIT, it was responsible for the strategic direction of the UPREIT, as well as the management and administration of the properties held by the UPREIT. Moreover, the Archstone REIT was the sole trustee and owned 88.2% of the Archstone UPREIT at December 31, 2006.

53.    As of December 31, 2006, the Archstone REIT and Archstone UPREIT (sometimes collectively referred to as the "Archstone Entities") owned or had an ownership position in 348 communities, representing 88,011 units, including units under construction. The Archstone Entities were engaged primarily in the acquisition, development, redevelopment, operation and long-term ownership of apartment communities in the United States.

54.    In the Archstone UPREIT, like most UPREITs, the limited partners (here the A-1 Unit holders) received limited partnership interests that were convertible into common stock of the Archstone REIT. The primary purpose of this feature was to give A-1 Unit holders liquidity in their investment. Rather than being restricted to holding an illiquid limited partnership interest in the Archstone UPREIT, the A-1 Unit holders could redeem their interests for cash or convert their interests to common stock in the publicly traded Archstone REIT and then sell the stock in the open market.

55.    The Archstone UPREIT also offered valuable tax advantages to the A-1 Unit holders. For example, generally transfers of appreciated property to a REIT are taxable events. Thus, under the basic REIT form, a sponsor who contributes appreciated property to the REIT must recognize gain in an amount equal to the excess of the value of the stock received over the basis of the property contributed. This tax ramification, however, applies only to corporations, not to partnerships. By utilizing the Archstone UPREIT, A-1 Unit holders were able to contribute their property to the Archstone UPREIT, rather than to the Archstone REIT, with the result being tax deferred treatment of the transactions.

**C.    Plaintiffs and Members of the Class Were Afforded Significant Tax Protections and Liquidity Rights Upon Contributing Their Properties to the Archstone UPREIT**

56.    In the late 1990's, realizing the tax benefits and liquidity advantages of an UPREIT, many real estate investors, including partnerships Plaintiffs were investors in, agreed to

contribute their properties to various UPREITS in exchange for limited partnership interests ("Sponsors").

57.    Oftentimes, the Sponsors' real estate contribution agreements and partnership agreements with the UPREITS provided them with certain tax benefits, dividends and liquidity. For example, the Plaintiffs' contribution agreements with Charles E. Smith Residential Realty L.P. ("Smith UPREIT") provided that for a period of time following the closings of their real estate contributions, the Smith UPREIT could not dispose of any interest in the property contributed by Plaintiffs that resulted in them realizing a taxable gain. If such a gain was triggered, the Plaintiffs were to be indemnified by the Smith UPREIT for any resulting tax liability.

58.    The Plaintiffs' contribution agreements also provided that they could redeem their UPREIT units for cash or tradable common stock of the Charles E. Smith, Inc. REIT.

59.    On October 31, 2001, the Smith UPREIT merged with and into the Archstone UPREIT. The foregoing tax protections and liquidity provisions were all contained in binding contribution agreements assumed by the Archstone UPREIT and Archstone REIT as well the declaration of trust governing the Archstone UPREIT and Archstone REIT.

60.    Upon information and belief, Plaintiffs' tax protections and liquidity provisions were common in most real estate contribution and partnership agreements with UPREITS, including those with the Archstone UPREIT.

61.    Indeed, the Archstone UPREIT agreed in its Declaration of Trust, for the benefit of the hundreds, if not thousands of A-1 unit holders with tax and liquidity provisions virtually identical to those of the Plaintiffs, not to sell, exchange or otherwise dispose of, except in tax-free or tax-deferred transactions, any of the specifically enumerated properties that were held by

a wholly owned subsidiary of the Archstone UPREIT. According to the Declaration of Trust, these restrictions were to be effective until January 1, 2022.

62.    Moreover, each A-1 Unit issued pursuant to contribution agreements with tax protections and liquidity provisions virtually identical to those contained in Plaintiffs' contribution agreements was subject to a unit redemption right at the option of the A-1 Unit holder. This redemption right required the Archstone UPREIT to acquire the unit holder's A-1 Unit for the market price of Archstone REIT common shares. The Archstone REIT, in its discretion, could elect to assume and directly satisfy the Archstone UPREIT's redemption obligation, in which case the Archstone REIT would pay the redeeming unit holder in Archstone REIT common shares, or their cash equivalent.

63.    In addition, the Archstone UPREIT was contractually obligated to maintain specified levels of borrowings outstanding with respect to the properties contributed by Plaintiffs and members of the Class, and A-1 Unit holders were to receive quarterly dividend distributions from the Archstone UPREIT.

64.    These provisions were intended to ensure that Plaintiffs and members of the Class would be able to continue to defer the gain that would otherwise be recognized by them for tax purposes: (i) upon a sale by the Archstone UPREIT of any of the properties contributed by Plaintiffs or the members of the Class; (ii) upon the sale by the Archstone UPREIT of any of its interest in a subsidiary owning the properties contributed by Plaintiffs or the members of the Class; or (iii) upon the repayment of borrowings relating to the properties contributed by Plaintiffs or the members of the Class. If the Archstone UPREIT sold any of the properties contributed by Plaintiffs or members of Class, or any interest therein, without satisfaction of certain conditions, or repaid borrowings relating to the contributed properties, the Archstone

UPREIT was liable for the loss of tax benefits and could be liable for monetary damages for engaging in these undertakings.

1.   **The Archstone Entities' Merger Agreement With the Tishman-Lehman Partnership Circumvents the Benefits Provided to the Plaintiffs and Other A-1 Unit Holders**

1.   *The Merger's Background*

65.   On April 30, 2007, an unidentified company submitted a non-binding written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

66.   On May 2, 2007, the Tishman-Lehman Partnership submitted a written indication of interest to acquire the Archstone Entities for a cash purchase price of $64 per Archstone REIT common share and $64 per Archstone UPREIT common unit.

67.   On May 15 and 16, 2007, the Archstone REIT's board of trustees became aware of concerns on the part of both bidders with respect to the "significant magnitude of the built-in gain associated with certain of [Archstone's] properties that are subject to tax protection agreements with operating trust unitholders and the magnitude of the increase in property taxes as a result of the transaction." Archstone Smith Operating Trust Form 424B3, filed Aug. 9, 2007, at 56.

68.   On May 19 and 20, 2007, the Tishman-Lehman Partnership indicated to Morgan Stanley, the Archstone Entities' financial advisor, that "due to increased expected transaction costs resulting from their better understanding of the magnitude of the company's tax protection obligations and due to adverse changes in the debt markets, they were uncertain whether any offer that they were to submit would be at a price equal to their initial indication of $64.00 per common share and unit." *Id.* at 58.

15

69.    On May 23, 2007, the Tishman-Lehman Partnership contacted Morgan Stanley and offered to acquire the Archstone Entities at a price of $60 per Archstone REIT common share and $60 per Archstone UPREIT common unit. This offer represented a 6.25% decrease over a period of only three weeks, which Tishman-Lehman Partnership indicated "was primarily a result of information obtained in their confirmatory due diligence regarding, among other things, the magnitude and scope of our tax protection arrangements, the compression in returns that they could expect to realize from our development pipeline, and the deterioration of the debt capital markets." *Id.* at 59. In addition, the Tishman-Lehman Partnership "indicated that they had determined that there were significant transaction costs exclusive of the impact on value associated with the Company's tax protection obligations." *Id.* In response, the Archstone REIT's board of trustees instructed Morgan Stanley to present a counterproposal of $62 per common share and common unit.

70.    On May 24, the Tishman-Lehman Partnership increased its offer to $61 per common share and common unit. Later that day, the Tishman-Lehman Partnership indicated that it was unwilling to pay $61 per common share and common unit unless the second quarter dividend was not paid. In response, Archstone REIT's board of trustees instructed Morgan Stanley to inform the Tishman-Lehman Partnership that the board would accept a price of $60.75 per common share and common unit and pay the second quarter dividend of $0.4525 per common share and common unit.

71.    By the close of business on May 29, 2007, the Archstone REIT's shares traded at $61.45, a material premium to the Merger Agreement's consideration of $60.75 per share. Furthermore, the Archstone REIT's common stock price traded well above the Merger Agreement's consideration as recently as January 30, 2007. In fact, the Archstone REIT's

common shares have lost a considerable amount of their value between late January 2007,

and the day prior to the announcement concerning the Merger Agreement were and are

poised to enjoy significant gains as slumping house prices cause individuals to rent, rather

than buy, properties in large commercial markets.

    2.    *The Merger Agreement*

    72.    On May 29, 2007, the Archstone REIT publicly announced that it signed a

definitive merger agreement to be acquired by the Tishman-Lehman Partnership in a transaction

valued at approximately $22.2 billion, including the assumption and refinancing of the Archstone

REIT's outstanding debt and excluding transaction costs.

    73.    Pursuant to the Merger Agreement, the Tishman-Lehman Partnership agreed to

acquire all outstanding common shares of the Archstone REIT in exchange for $60.75 per share

in cash. The Archstone REIT reported that the purchase price per share represented a 22.7%

premium over the share price on May 24, 2007, immediately before published reports regarding

a potential acquisition.

    74.    The Merger Agreement also provided that holders of A-1 Units were entitled to

one newly issued Series O Unit for each existing A-1 Unit. Alternatively, A-1 Unit holders

could "elect" to receive: (a) $60.75 per A-1 Unit in cash, without interest and less applicable

withholding taxes; or (b) a combination of the cash consideration and Series O Units.

    75.    Moreover, pursuant to the Merger Agreement no additional quarterly dividend

distributions would be paid to A-1 Unit holders prior to the completion of Merger.

    76.    A-1 Unit holders were allowed until 11:59 P.M., EST, on September 10, 2007, to

make an "election" for their common units, which deadline was later extended until September

18, 2007.

77.    Had the A-1 Unit holders been told that the Archstone REIT and Archstone UPREIT were engaged in negotiating a transaction that would eliminate their dividend, liquidity and tax benefits, the A-1 holders could have redeemed their A-1 Units before they were informed of the Merger, and at prices substantially higher than the $60.75 per unit Merger price.

**3.    The A-1 Unit Holders' Tax Benefits Are Recognized as an Integral Part of the Archstone Entities' Economic Structure**

78.    As indicated above, prior to the Merger Agreement being consummated, at least one additional unidentified company was involved in bidding on the acquisition of the Archstone UPREIT and the Archstone REIT.

79.    Interestingly, both the unidentified company and the Tishman-Lehman Partnership explained on numerous occasions that their offer prices to acquire the Archstone entities were based upon, among other things, the magnitude and scope of the Archstone UPREIT's tax protection arrangements with A-1 Unit holders. All potential acquirers came to the same conclusion -- that the UPREIT's tax protection and other obligations were contractual obligations that would survive the Merger and therefore the potential acquirers felt that they needed to factor that liability into the acquisition price. Accordingly the potential liability to the acquirers of the tax protection obligations caused the acquirers to lower the price to be offered which lowered the price at which A-1 unit holders could "elect" to cash out at the time of the Merger. In fact, this factor ultimately led to the unidentified company's decision not to submit an offer to acquire the Archstone Entities. Yet, despite the prospective buyers' lack of willingness to acquire the Archstone Entities at an adequate price, Defendants persisted on reaching a deal with the Tishman-Lehman Partnership, even if it meant that the A-1 Unit holders would suffer severe tax consequences or have the liquidity of their investments severely impaired.

80.    Moreover, even though Plaintiffs' and A-1 Unit holders' tax protection agreements were among one of the most significant factors in determining the lower final acquisition price of the Archstone UPREIT and the Archstone REIT, the Individual Defendants, the Archstone REIT, the Archstone UPREIT and the Tishman-Lehman Partnership refused to provide A-1 Unit holders with compensation for elimination of the tax protection agreements and refused to preserve a host of other contractual benefits contained in the contribution agreements for A-1 Unit holders.

### 4.    *The Negative Effects of the Merger on A-1 Unit Holders*

81.    The Merger has had negative financial consequences for both A-1 Unit holders that "elected" to receive the Tishman-Lehman Partnership's cash offer and A-1 Unit holders that "elected" to convert or otherwise had their A-1 Units converted to Series O Units.

82.    The A-1 Unit holders that were forced to accept the Tishman-Lehman Partnership's cash offer have had to recognize capital gain in an amount equal to the amount of gain they originally deferred when their properties were contributed to the Archstone UPREIT. Upon information and belief, such gains have resulted in millions of dollars of tax liability for many A-1 Unit holders.

83.    Alternatively, the A-1 Unit holders that were forced convert their units to Series O Units have been forced to forfeit the liquidity they enjoyed before the Merger and are now saddled with owning an investment in a private company that will likely be highly leveraged with debt.

84.    For example, the Merger Agreement provides that after five years Series O Unit holders can redeem any or all their units at a cash redemption of $60.75 per unit plus all accumulated and unpaid distributions, if any, through the redemption date. Hence, the Series O

Units will be completely illiquid for a minimum of five years and the Series O Unit holders will be deprived of any increase in the value of the underlying properties.

85.     Yet, even after the expiration of the five-year redemption waiting period described above, Series O Unit holders may only gradually liquidate their investment because the Company will not be required to redeem more than one-third of the Series O Units outstanding in any twelve month period. If the Company receives redemption notices for a number of Series O Units in excess of the limit, it will redeem the units in the order that it received the redemption notices rather than pro rata.

86.     Thus, Series O Unit holders will be forced to hold an almost completely illiquid asset for a minimum of five years since these units are not publicly traded in the market, and even after this five year period, the liquidity of these units will be severely limited and possibly eliminated altogether. The Company, however, has the right to redeem all of the Series O units for cash at $60.75 per unit any time after the fifth anniversary of the Merger.

87.     Plaintiffs and members of the Class are also damaged by the Archstone UPREIT's failure to pay third quarter dividends to A-1 Unit holders, as well as the Company's failure to plan for the regular payment of dividends to Series O Unit holders. Previously, Plaintiffs and members of the Class had available the distributions that they regularly received from the Archstone UPREIT to defray taxes on gains. As a result of A-1 Unit holders not receiving their third quarter dividends, however, they will not be able to defray a significant portion of their tax liability. Moreover, following the Merger, A-1 Unit holders will likely no longer be able to defray their taxes because the payment of the six percent dividend on Series O Units is discretionary and, according to a source at the Archstone REIT, the Company has no current plan to pay dividends and does not know when it will begin, if ever, paying them. Thus, Plaintiffs

and members of Class will likely now be forced to pay taxes on "phantom income" allocated to them, but for which there are no cash distributions with which to pay the taxes.

88.    Yet, there are additional adverse consequences that the Merger has upon Plaintiffs and members of the Class, which include, but are not limited to the following:

a.    Before the Merger, A-1 Units were protected by anti-dilution measures in the Archstone UPREIT's governing documents. After the Merger, these anti-dilution measures were eliminated.

b.    Before the Merger, A-1 Unit holders were entitled to their pro rata share of the proceeds of dissolution, liquidation, or winding up remaining after payment of the Archstone UPREIT's debts and satisfaction of the preferences of any class or series of units entitled to a preference in dissolution, liquidation, or winding up over the Archstone UPREIT's common units. After the Merger, Series O Unit holders are only entitled to $60.75 per share plus any unpaid distributions.

c.    Before the Merger, the Archstone UPREIT was managed by the Archstone REIT, and the Archstone REIT could not take any action that was contrary to an express limitation or prohibition in the declaration of trust without an amendment to that provision adopted under the Archstone UPREIT Declaration of Trust. After the Merger, the protection of allowing limited or prohibited action only after amendment of the Archstone UPREIT Declaration of Trust was eliminated.

d.    Before the Merger, the Archstone REIT was generally prohibited from, directly or indirectly, entering into or conducting any business other than in connection with the ownership, acquisition and disposition of its and the management of its business activities. After the Merger the Company can engage in business activities in addition to those relating to the newly formed UPREIT, including business interests and activities that are in direct competition with newly formed UPREIT.

e.    Before the Merger, A-1 Unit holders received quarterly and annual financial reports. After the Merger, Series O Unit holders will receive only annual financial reports.

89.    Hence, Plaintiffs and members of the Class have sustained and will continue to accrue significant damages as a result of the Merger.

## IV.    CLASS ACTION ALLEGATIONS

95.    Plaintiffs bring this action on their own behalf and as a class action pursuant to

Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all

Class A-1 Common Unit holders of Archstone-Smith Operating Trust at the time of the Merger

(the "Class").

96.    Subject to additional information obtained through further investigation and

discovery, the Class definition may be expanded or narrowed by amendment or amended

complaint.  Specifically excluded from the Class are Defendants, their officers, directors, agents,

trustees, parents, children, corporations, trusts, representatives, employees, principals, servants,

partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns,

or other persons or entities related to or affiliated with Defendants and/or their officers and/or

directors, or any of them; the Judge assigned to this action, and any member of the Judge's

immediate family.

97.    **Numerosity**.  Plaintiffs are informed and believe, and on that basis allege, that the

proposed Class contains hundreds, if not thousands of similarly situated A-1 Unit holders of

record scattered throughout the United States.  Upon information and belief, hundreds, if not

thousands of other A-1 Unit holders enjoyed similar, if not identical liquidity and tax benefits

through their agreements with the Archstone UPREIT.  The precise number of Class Members is

unknown to Plaintiffs.  The true number of Class Members is known by Defendants, however,

and thus, may be notified of the pendency of this action by first class mail, electronic mail, and

by published notice.

98.    **Existence and Predominance of Common Questions of Law and Fact**.

Common questions of law and fact exist as to all members of the Class and predominate over

any questions affecting only individual Class Members. These common legal and factual

questions include, but are not limited to, the following:

    i.    Whether the Defendants have breached their fiduciary duties owed by them to Plaintiffs and the Class, and/or have aided and abetted in such breach, by virtue of their participation and/or acquiescence and by their other conduct complained of herein;

    ii.    Whether Defendants breached their contracts with Plaintiffs and members of the Class;

    iii    Whether Tishman Speyer and Lehman Brothers have tortiously interfered with the A-1 Unit holders contracts; and

    iv.    Whether Plaintiffs and members of the Class have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages.

99.    **Typicality**. Plaintiffs' claims are typical of the claims of the Class Members in

that Plaintiffs and each member of the Class are all A-1 Unit holders of the Archstone UPREIT

who have and will continue to suffer financial hardship and other damages as a result of

Defendants' conduct.

100.    **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the

interests of the members of the Class. Plaintiffs have retained counsel experienced in complex

class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no

adverse or antagonistic interests to those of the Class.

101.    **Superiority**. A class action is superior to all other available means for the fair

and efficient adjudication of this controversy. The damages or other financial detriment suffered

by individual members of the Class is relatively small compared to the burden and expense that

would be entailed by individual litigation of their claims against the Defendants. It would thus

be virtually impossible for the members of the Class, on an individual basis, to obtain effective

redress for the wrongs done to them. Furthermore, even if members of the Class could afford

such individualized litigation, the court system could not. Individualized claims brought by

members of the Class would create the danger of inconsistent or contradictory judgments arising

from the same set of facts. Individualized litigation would also increase the delay and expense to

all parties and the court system from the issues raised by this action. By contrast, the class action

device provides the benefits of adjudication of these issues in a single proceeding, economies of

scale, and comprehensive supervision by a single court, and presents no unusual management

difficulties under the circumstances here.

102.    The requirements for maintaining this action as a class action under Rules

23(b)(1) and (b)(2) are also satisfied:

a.    Prosecution of separate actions by members of the Class would create a risk of

inconsistent adjudications with respect to individual members of the Class which

would establish incompatible standards of conduct for Defendants. Alternatively,

adjudications with respect to individual members of the Class would, as a

practical matter, be dispositive of the interests of the other members not parties to

the adjudications, or substantially impair or impede their ability to protect their

interests, particularly in light of the fact that Plaintiffs seek to obtain relief on

behalf of all A-1 Unit holders; and

b.    Defendants have acted and/or failed to act, on grounds generally applicable to the

Class, thereby making appropriate monetary relief, final injunctive and other

equitable relief with respect to the Classes as a whole.

## COUNT I

## BREACH OF CONTRACT
### (Against the Archstone UPREIT and the Archstone REIT)

103.   Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

104.   Plaintiffs and members of the Class executed enforceable property contribution agreements and partnership agreements with the Archstone UPREIT.

105.   Under the contribution agreements and partnership agreements, the Archstone UPREIT and the Archstone REIT agreed not to enter into any transactions or dispose of any interest in the property contributed by the A-1 Unit holders that resulted in them realizing a taxable gain and to provide A-1 Unit holders with the ability to liquidate their units by receiving cash or converting them to common shares in the publicly traded Archstone REIT.

106.   The Archstone UPREIT and the Archstone REIT, as the general managing partner of the Archstone UPREIT, failed to perform their duties under the contribution and partnership agreements and statutory and common law partnership principles, and thereby breached their contractual obligations by failing to honor certain liquidity provisions in the contribution and partnership agreements and by failing to act independently so that the interests of A-1 Unit holders would be protected.

107.   Instead, the Archstone REIT and the Individual Defendants have accepted the Merger Agreement, which subjects Plaintiffs and members of the Class either to adverse tax consequences or completely strips them of their liquidity rights, in violation of the contribution and partnership agreements.

108.   The Archstone Entities' failure to perform their duties under the contribution and partnership agreements have and will continue to cause financial and other damage to Class A-1 Common Unit holders.

109.   The Archstone Entities' failure to perform their duties under the contribution and partnership agreements is material in nature thereby discharging any and all obligations Plaintiffs and the members of the Class owe to the Archstone Entities under the contribution and partnership agreements.

110.   Plaintiffs and the members of the Class have performed all conditions precedent to enable them to recover the relief sought herein, or such conditions have been excused or waived.

## COUNT II

### BREACH OF FIDUCIARY DUTIES - MAJORITY OPPRESSION OF THE MINORITY A-1 UNIT HOLDERS
### (Against the Archstone REIT and against the Individual Defendants and Tishman-Lehman Partnership for the aiding and abetting thereof)

111.   Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

112.   At all relevant times, the Archstone REIT was the majority owner of the Archstone UPREIT, owning of over 89% of the equity of the Archstone UPREIT.

113.   As majority owner, the Archstone REIT owed a fiduciary duty to the minority A-1 Unit holders to avoid using its majority ownership in bad faith or in reckless disregard of its duties as trustee to oppress the minority owners.

114.   The actions of the Archstone REIT in negotiating, formulating and voting in favor of the Merger of Archstone Entities with the Tishman-Lehman Partnership, however, were committed in bad faith and with reckless disregard of its duties as trustee and constitute oppression of the minority by the majority and have resulted in damage and loss to Plaintiffs and members of the Class.

115. More specifically, the Merger proceeded without a vote of Plaintiffs and members of the Class, thereby disenfranchising the A-1 Unit holders. The Archstone REIT approved the Merger pursuant to a written consent dated and effective as of August 31, 2007.

116. As a result of the Merger, Plaintiffs and the members of the Class were entitled to receive one newly issued Series O Unit per each existing A-1 Unit. Alternatively Plaintiffs and the members of the Class were offered an "election" to receive in exchange for their A-1 Units either $60.75 per unit in cash, without interest and less applicable withholding taxes or a combination of the cash consideration and Series O Units.

117. Plaintiffs and the members of the Class were also forced to forgo any dividends owed to them by the Archstone UPREIT for the third quarter of fiscal year 2007.

118. The Archstone REIT used its majority power in bad faith and with reckless disregard to its duties as trustee to: (1) disenfranchise the minority; (2) coerce the minority into converting their A-1 Units for cash with less than the fair value of the allocable share of the equity, assets and earnings of the Archstone UPREIT; (3) deprive the minority A-1 Unit holders of the financial benefits of the dividends and tax agreements; and (4) destroy the liquidity of the A-1 Units.

119. The Individual Defendants and the Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transaction on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Archstone UPREIT owed fiduciary duties to the A-1 Unit holders and with knowledge that the Archstone REIT was breaching its fiduciary duties to Archstone UPREIT and the A-1 Unit holders.

## COUNT III

### BREACH OF FIDUCIARY DUTIES – SELF DEALING
#### (Against the Archstone REIT and the Individual Defendants
#### and against the Tishman-Lehman Partnership for the aiding and abetting thereof)

120.    Plaintiffs repeat and reallege the previous paragraphs as if fully set forth herein.

121.    At all relevant times, the Individual Defendants and the Archstone REIT, as the sole trustee and majority owner of Archstone UPREIT, had: (1) a fiduciary duty to the minority A-1 Unit holders to, in good faith, act in the best interests of all A-1 Unit holders; (2) a fiduciary duty not to act in reckless disregard of its duties as trustee; (3) a duty not to self-deal with the Archstone UPREIT on terms that were more beneficial to the Archstone REIT, its directors and officers, or any of its affiliates than to the minority holders; (4) a fiduciary duty to deal at arms length with the Archstone UPREIT and in such dealings to eliminate all conflicts of interests; and (5) a fiduciary duty to ensure that in all dealings with the Archstone UPREIT were maintained an "entire fairness" standard, meaning that any transactions between the Archstone REIT and Archstone UPREIT must be achieved, if at all, through a fair process at a fair price.

122.    The Archstone REIT breached its fiduciary duties by, *inter alia*: (1) refusing to allow A-1 Unit holders to vote on the Merger; (2) refusing to appoint an independent committee to act on behalf of the Archstone UPREIT; (3) refusing to require that any transaction between Archstone REIT (and any affiliates thereof) and Archstone UPREIT be approved by a majority vote of the A-1 and A-2 Unit holders voting separately as a class; and (4) refusing to allow the Archstone UPREIT to engage investment and legal advisers to advise on the fairness of any transactions, from a procedural and financial view to the minority holders.

123.    As a result of the Archstone REIT's and the Individual Defendants' self-dealing and reckless disregard of their duties as trustees and officers of the trust, and the aiding and

abetting thereof by the Tishman-Lehman Partnership, Plaintiffs and the Class have sustained loss and damage to the value of their A-1 Units.

124. The Tishman-Lehman Partnership separately and jointly acted to intentionally force an entirely unfair transactions on the minority A-1 Unit holders with knowledge that the Archstone REIT and the Individual Defendants owed fiduciary duties to Archstone UPREIT and the Class A-1 Unit holders and with knowledge that the Archstone REIT and Archstone UPREIT were breaching their fiduciary duties to A-1 Unit holders.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: November 30, 2007

STEVEN A. STENDER and INFINITY CLARK
STREET OPERATING, on behalf themselves
and all others similarly situated,

s/Gerald L. Bader, Jr.
Gerald L. Bader, Jr.
Renée B. Taylor
**BADER & ASSOCIATES, LLC**
14426 East Evans Avenue
Suite 200
Denver, Colorado 80014
Telephone: 303-534-1700

Kenneth A. Wexler
Edward A. Wallace
Christopher J. Stuart
Andrae P. Reneau
**WEXLER TORISEVA WALLACE LLP**
55 West Monroe Street
Suite 3300
Chicago, Illinois 60603
Telephone: 312-346-2222

Lee Squitieri
**SQUITIERI & FEARON, LLP**
32 East 57th Street
2nd Floor
New York, New York  10022
Telephone:  212-421-6492

Plaintiffs' addresses:

Steven A. Stender
900 Elm Place
Glencoe, Illinois 60022

Infinity Clark Street Operating
20 North Wacker Drive
Suite 1725
Chicago, Illinois 60606

%JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

STEVEN A. STENDER, ET AL

## DEFENDANTS

ARCHSTONE-SMITH TRUST, ET AL.

(b) County of Residence of First Listed Plaintiff   COOK COUNTY, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Bader &Associates, LLC, 14426 E. Evans Ave #200, Aurora, CO 80014

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury – | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | PERSONAL PROPERTY | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | LABOR | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | FEDERAL TAX SUITS | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | 26 USC 7609 | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities – | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities – | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332
Brief description of cause:
breach of contract and breach of fiduciary duties

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

DATE

November 30, 2007

SIGNATURE OF ATTORNEY OF RECORD

Gerald L. Bader, Jr.                    Gerald L Bader

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

```
Court Name: U.S. District Court, Colorad
o
Division: 1
Receipt Number: COX005971
Cashier ID: sg
Transaction Date: 11/30/2007
Payer Name: COLETTE POEPPEL
--------------------------------------
CIVIL FILING FEE
 For: COLETTE POEPPEL
 Amount:        $350.00
--------------------------------------
CREDIT CARD
 Amt Tendered: $350.00
--------------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:     $0.00

07-CV-2503


A fee of $45.00 will be assessed on
any returned check.
```

Appendix H

## INFORMATION REGARDING
## SPECIAL ASSIGNMENTS
### See  D.C.COLO.LCivR 40.1

Case number of action being filed: _____

Case number of claimed related pending case in this court:  1:07-cv-01135 _____

Judge assigned to claimed related case:  Robert E. Blackburn _____

Type of action of claimed related case:  stockholder suit _____

Status of claimed related pending case: _____ complaint filed; stayed pending finalization of

settlement _____

_____

State reasons the new case is claimed to be related to a pending case(s):  Related parties and

similar claim _____

_____        Steven A. Stender, et al, Plaintiffs_____
Attorney                                 Party


November 30, 2007
Date


(Rev. 11/04)

# Exhibit B

1

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF COLORADO

3     Case No. 07-cv-02503-EWN-MJW

4     ════════════════════════════════════════════

5     STEVEN A. STENDER, et al.,

6          Plaintiffs,

7     vs.

8     JAMES A. CARDWELL, et al.,

9          Defendants.

10    ════════════════════════════════════════════

11         Proceedings before CRAIG B. SHAFFER, United States

12    Magistrate Judge, United States District Court for the

13    District of Colorado, commencing at 8:34 a.m., February 12,

14    2008, in the United States Courthouse, Denver, Colorado.

15    ════════════════════════════════════════════

16         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18    ════════════════════════════════════════════

19                        APPEARANCES

20         GERALD L. BADER, JR., RENEE B. TAYLOR, MR. SQUITIERI:
21    SQUITIERI and KENNETH WEXLER, Attorneys at Law, appearing
22    for plaintiffs.
23         FREDERICK J. BAUMANN, DAVID GRUENSTEIN, K. ALLISON
24    WHITE, BOBBEE J. MUSGRAVE, JONATHAN D. POLKES and CINDY
25    OLIVER, Attorneys at Law, appearing for defendants.
26
27    ════════════════════════════════════════════
28
29                     STATUS CONFERENCE
30

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO   80203
303-825-6119        FAX 303-893-8305

2

```
 1                P R O C E E D I N G S
 2            (Whereupon, the within electronically recorded
 3      proceedings are herein transcribed, pursuant to order of
 4      counsel.)
 5            THE CLERK: All rise.  Court is in session.
 6            THE COURT: You may be seated.  The Court calls
 7      2007-cv-02503-EWN-MJW, Steven A. Stender, et al.,
 8      plaintiffs, versus James A. Cardwell, et al., defendants.
 9      I'll start first with counsel on behalf of the plaintiff.
10      If you'd enter your appearance, please.
11      *TRANSCRIBER'S NOTE: Speakers not speaking directly into a
12      microphone cannot be heard.
13            MR. BADER: Good morning, Your Honor.  Gerald L.
14      Bader, Jr., and Renee Taylor from Denver.  And I'd like to
15      introduce Mr. Squitieri from New York and Mr. Ken Wexler
16      from Illinois.
17            THE COURT: Thank you.
18            MR. SQUITIERI: Good morning, Your Honor.
19            MR. WEXLER: Good morning, Your Honor.
20            THE COURT: Good morning.  Counsel on behalf of the
21      defendants, please.  We'll start at this end.
22            MR. BAUMANN:  Good morning, Your Honor.  Fred
23      Baumann of Rothgerber Johnson & Lyons on behalf of the
24      defendants Archstone Smith Trust, which is now known as
25      Tishman Speyer Archstone Smith Multi Family One Trust and
```

3

1      the defendant Archstone Smith Operating Trust which is now

2      known as Archstone.  If the Court would indulge me, I would

3      simply refer to them both as Archstone.  With me today is

4      my partner, Cindy Oliver, who is sitting in the back.

5                THE COURT: All right.

6                MR. BAUMANN: The next men I'd like to introduce to

7      the Court, Andy Gruenstein of Wachtell Lipton Rosen & Katz

8      in New York. And in the front row, as well, Jonathan D.

9      Polkes from Weil Gotshal & Manges.

10               MR. POLKES: Good morning, Your Honor.

11               THE COURT: Good morning.

12               MR. BAUMANN: Messrs. Gruenstein and Polkes are

13      admitted to practice and we're all counsel for Archstone.

14               THE COURT: All right.  Thank you.

15               MS. WHITE: Good morning, Your Honor.  K. Allison

16      White of Ballard Spahr Andrews & Ingersoll, and I represent

17      defendants Tishman Speyer Development Corp and Lehman

18      Brothers Holding Corp.

19               THE COURT: Thank you.

20               MS. MUSGRAVE: Good morning, Your Honor, I'm Bobbee

21      Musgrave from Holme Roberts & Owen and I represent the

22      individual defendants.

23               THE COURT: All right.  Thank you.  This case is

24      before the Court this morning for a Rule 16 scheduling

25      conference.  The Court has reviewed the scheduling order as

4

1    tendered, and we'll go over that scheduling order at this

2    point.  First on the scheduling order, pages 1 through and

3    including page 14, inclusive, each of those pages are

4    approved within the scheduling order.

5             MR. BAUMANN: Your Honor, excuse me for a moment.

6             THE COURT: Yes, sir.

7             MR. BAUMANN:  Before you address this scheduling

8    order, on behalf of defendants, as you know, we have filed

9    a motion to stay discovery pending the -- Judge Nottingham's

10   determination of our separate motion to stay pending

11   arbitration or to dismiss.

12            THE COURT: Right.

13            MR. BAUMANN: And from our point of view, it would

14   make sense, Your Honor, since that motion to stay is in

15   front of you, to stay discovery, that we defer

16   considerations of the scheduling until Your Honor has a

17   chance to decide whether any discovery is appropriate, given

18   that we have a motion to dismiss in favor of arbitration

19   pending in front of Judge Nottingham.

20            THE COURT: Denied.

21            MR. BAUMANN: That motion will be fully briefed

22   within the next --

23            THE COURT: Well, it's not ripe so we're going to

24   go forward with the case until it gets ripe.  You just filed

25   it on January 29, unless I'm mistaken.

5

1          MR. BAUMANN: That's correct, Your Honor, but it
2     will be briefed within the next two weeks.

3          THE COURT: And I'll address it then.

4          MR. BAUMANN: Okay.

5          THE COURT: I don't believe in delaying any of
6     these cases, so we're just going to go forward with it.
7     I'll set the discovery out far enough that you don't have to
8     start if you don't want to, but we'll go forward with it.

9          MR. BAUMANN: Okay, Your Honor.

10         THE COURT: Did something prevent you from filing
11    this motion earlier?

12         MR. BAUMANN: Your Honor, we had just joined in the
13    case a couple weeks before that, and we filed it as soon as
14    possible.

15         THE COURT: Okay.

16         MR.  BAUMANN:  It  was filed along with the
17    dispositive motion.

18         THE COURT: I'll take it up as soon as it becomes
19    ripe, like I always do.  All right.

20         Paragraph 6 on the Rule 26(f) meeting and 26(a)(1)
21    disclosures, the parties have met pursuant to Rule 26(f) on
22    January 22nd, year 2008, at 3 o'clock p.m.  Moreover, it
23    does  appear  the  parties  have  agreed to make the Rule
24    26(a)(1) as of February 5, 2008.  That's why I double-check
25    with parties. Has the plaintiff done that, Mr. Bader?

6

1            MR. SQUITIERI: Yes.

2            THE COURT: All right.  Mr. Baumann, on behalf of

3     your clients?

4            MR. BAUMANN: Yes, Your Honor, we have.

5            THE COURT: All right.  Ms. White?

6            MS. WHITE: Yes, Your Honor.

7            THE COURT: And, Ms. Musgrave?

8            MS. MUSGRAVE: Yes, Your Honor.

9            THE COURT: The Court will find the parties have

10    then complied with both Rules 26(f) and 26(a)(1) of the

11    Federal Rules of Civil Procedures.  Accordingly, paragraph

12    number 6 is approved.

13            Page 17, paragraph 7 on consent, that's approved.

14    There is no consent in this case.

15            Paragraph 8, which deals with the case plan and

16    schedule and subparagraphs thereunder, we'll go over those

17    at this point in time.  Noting the motion itself, we're

18    going to simplify this a little bit to move the case along

19    here.

20            What other parties does the plaintiff anticipate

21    adding in this case?

22            MR. SQUITIERI: Your Honor, at this time we only

23    anticipate adding any parties that we know about but this is

24    a very complex series of transactions.  We want to provide

25    for the event that we do learn of new potential parties.

7

1          THE COURT: What other claims are you suggesting
2     you're going to have?
3          MR. SQUITIERI: At this time, Your Honor, I don't
4     know other than perhaps a federal securities claim based on
5     the  federal  securities statutes arising out of the
6     prospectus.
7          THE COURT: Okay.
8          MR. SQUITIERI: And other materials that we use in
9     connection with the issuance of a new unit of securities.
10          THE  COURT:  Against  which  defendant  are  you
11     referring to?
12          MR. SQUITIERI: Excuse me, Your Honor?
13          THE  COURT:  Against  which  defendant  are  you
14     referring to that you may be adding?
15          MR. SQUITIERI: Against the original corporate
16     defendant, Archstone --
17          THE COURT: Okay.
18          MR. SQUITIERI: -- and the individual defendants
19     who signed and/or were responsible for the directing and
20     issuance of the offering materials.
21          THE COURT: Okay.
22          MR. SQUITIERI: But they're already in the case.
23          THE COURT: I understand that.  I just want to see
24     what we really need to -- time we need to amend the
25     pleadings or join the parties.

8

1              Mr. Baumann, what other parties are you intending
2       to trying to join in this case?
3              MR. BAUMANN: I don't believe at this time our
4       clients intend to join any parties.
5              THE COURT: What are any other claims to be added?
6              MR. BAUMANN: We have no --
7              THE COURT: Counterclaims, cross-claims, third-
8       party complaints?
9              MR. BAUMANN: We still have not responded -- or
10      answered the complaint so we --
11             THE COURT: Okay.
12             MR. BAUMANN: -- are not in a position to assert
13      any other claims.  We have filed a motion to (inaudible-both
14      speaking).
15             THE COURT: All right.  Ms. White?
16             MS. WHITE: I take the same position as Mr.
17      Baumann.
18             THE COURT: All right.  Ms. Musgrave?
19             MS. MUSGRAVE: Same position, Your Honor.
20             THE COURT: All right.  Noting the pending motions
21      that have been outlined by the parties and the Court's aware
22      of those and when they'll become ripe.
23             (Pause) All right.  The deadline to join parties
24      or amend pleadings will be March 31, 2008.  I'll correct
25      paragraph 8-A to reflect the same.

9

1          Turning to discovery cutoff, I'll simplify this.
2     We'll have one date for all discovery including all experts.
3     That date will be -- noting the motions that are pending,
4     that will be July 31, 2008, for discovery to be complete.
5          Dispositive motion deadline will be moved back
6     slightly till August 29, 2008.
7          We'll address the experts at this point.  You're
8     looking at how many experts for the plaintiff?  It looks
9     like two or three.  Is that it?
10          MR. SQUITIERI: It could be as many as four, Your
11     Honor.
12          THE COURT: Okay.  How about -- well, we'll start
13     at this end for the defendants.  Mr. Baumann.
14          MR. BAUMANN: Your Honor, we've identified five
15     areas.  We would anticipate no more than five experts for
16     them.
17          THE COURT: Okay.  Ms. White?
18          MS. WHITE: I think (inaudible-no microphone)
19          MS. MUSGRAVE: (Inaudible-no microphone).
20          THE COURT: All right. Give me just a moment here.
21          (Pause) All right.  There'll be five experts per
22     each party group because a number of you represent multiple
23     parties, so each of your groups that you represent as
24     counsel get five experts without leave of court.
25          Turning now to the disclosure of the experts.

10

1    Plaintiff will disclose their experts in this case by May
2    1st, 2008.  The depositions of those experts need to be done
3    by the discovery cutoff date, so I'll delete that other
4    sentence there.

5         Defendants shall disclose their experts by June
6    2nd, 2008.  And then I'll give you a date for the rebuttal
7    experts -- let me write that in.  And the rebuttal experts
8    need to be disclosed by June 30th, 2008.  The experts need
9    to be disclosed by the discovery cutoff date, which I've set
10   on July 31, 2008.

11        We'll move on now to the deposition schedule.
12   Looks like you made your Rule 26(a)(1) disclosures already,
13   so I'll give you a date certain to file with the Court your
14   deposition schedule.

15        (Pause) Deposition schedule needs to be filed by
16   February 25, 2008.  That's two weeks from today. That's more
17   than enough time to get that done.

18        Regarding the interrogatory schedule and requests
19   for production of documents and requests for admissions
20   schedule, I'm going to simplify this, too.

21        (Pause)  All right.  Your interrogatories,
22   requests   for   production   of   documents,   requests   for
23   admissions, those need to be served no later than June 27th,
24   2008.  That's 33 days before the discovery cutoff, which is
25   consistent with the time of response plus Rule 6 on timing.

11

1          All   right.  Let's deal with the class
2     certification issue at this point.  We need to discuss that
3     briefly with the plaintiff.  What have you done on that
4     issue and how many other people are you talking about here?
5          MR. SQUITIERI: Your  Honor,  we  think  there's
6     thousands of people in the class.
7          THE COURT: Based upon what?
8          MR.  SQUITIERI:  Based  upon  some  (inaudible)
9     information we have about the (inaudible) of the -- let's
10     say the various stuff, partnerships and (inaudible) rolled
11     up into what was -- has become the operat' -- we had some
12     information about certain partners in the partnership but --
13          THE COURT: Okay.
14          MR. SQUITIERI: -- it looks like it will certainly
15     be a class to try and meet any numerosity requirements.
16          THE COURT: All right.  As a potential putative
17     class, Mr. Baumann, are  you  in  agreement  with  those
18     statements or not?
19          MR. BAUMANN: We  acknowledge  that  there  are
20     multiple people in the class.  We don't know exactly how
21     they intend to define their class.
22          THE COURT: Wait a minute.  He's talking in the
23     thousands, I think, by his statement.
24          MR. BAUMANN: There are over a thousand (inaudible)
25     holders --

12

1           THE COURT: Okay.

2           MR. BAUMANN: -- or were in the Archstone Trust.

3      But the issue for us is this that this issue -- class

4      certification should be done sooner rather than later.  The

5      issue is not whether they're going to (inaudible-someone

6      coughing) the requirements of Rule 23, but under Rule 23 and

7      the Tenth Circuit's law.

8           THE COURT: Right.

9           MR. BAUMANN: This should be done as soon as

10     practicable.  Their schedule, put it at the end.  Our

11     proposed schedule, put it at the front.

12          THE COURT: Right.

13          MR. BAUMANN: We think that is the first thing that

14     the parties should focus on.

15          THE COURT: Ms. White, are you in agreement with

16     the potential putative class in the case?  As far as the

17     number.

18          MS. WHITE: I agree with Mr. Baumann's statements

19     regarding the class.

20          THE COURT: Okay.  And, Ms. Musgrave?

21          MS. MUSGRAVE: Yes, Your Honor, we agree.

22          THE COURT: All right.  Give me just a moment then.

23          (Pause) All right.  On the issue of class

24     certification, which is on page 19, carries over to page 20

25     and 21 and a small portion of page 22, there have been

13

1  various versions submitted here by both plaintiff and

2  defendant.  The Court rejects the plaintiff's version.

3  Class certification issues need to be addressed first.

4          Accordingly, under paragraph 8-H, the plaintiffs'

5  proposed class certification schedule is rejected and

6  deleted at this point.  The Court will adopt the defendants'

7  version, and accordingly the plaintiff's brief concerning

8  class certification will be due on February 15th, 2008.

9  Defendants will be due on March 13th, 2008, and the reply

10  papers by the plaintiff March 27, 2008.

11          Concerning the class certification and discovery

12  on the class, the Court approves that stated by defendants

13  in this case, which is defendants' deadline to serve

14  requests for production of documents and interrogatories

15  regarding class certification will be February 11th.

16          MR. BAUMANN: Your Honor, that is yesterday and we

17  did serve them yesterday.

18          THE COURT: That's fine.  And plaintiff shall

19  respond to those by February 25, 2008.  We're going to move

20  this along.

21          The depositions as outlined there are approved.

22  They need to be set. Have the parties discussed a location

23  for these two depositions that are listed here, Mr. Stender

24  and the 30(b)(6) designation from the Infinity Clark Street

25  Operating?

14

1              UNIDENTIFIED ON LOG: Have not.

2              THE COURT: Okay.  I want you to do that after this

3      morning.  You can use the conference room and get those set

4      so we can take care of those.

5              MR. WEXLER: Any objection to Chicago?

6              THE COURT: Well, let me find out.

7              MR. GRUENSTEIN:  We don't think we'll object, Your

8      Honor.

9              THE COURT: All right.  Well, I want counsel to

10     agree upon that today so we can move that along.  I don't

11     want that to be a delay in the case.

12             All right. Regarding Roman numeral small iii on

13     page 21, which is towards the bottom concerning the experts.

14     That's fine and approved as well, and Roman numeral iv is

15     also approved on page 22.

16             That leads us now to paragraph 8-I on page 22

17     towards the middle, which deals with the rest of the

18     discovery on the merits of the case.

19             MR. WEXLER: Your Honor?

20             THE COURT: Yeah.

21             MR. WEXLER: With regard to the February 15th date

22     for filing our class papers --

23             THE COURT: Yes, sir.

24             MR. WEXLER: -- could we possibly one extra week?

25             THE COURT: Well, that's going to throw off the

15

1   schedule, though, isn't it?

2            MR. WEXLER: It will.  By a week.

3            THE COURT: That's denied.

4            MR. WEXLER: Okay.

5            THE    COURT:   Turning   now   to   the   discovery

6   limitations, we'll address that at this point.  Regarding

7   the depositions, I guess I want to find out from counsel how

8   do you get to this number 60 at this stage?

9            MR. WEXLER: Well, Your Honor, we had -- we support

10   different parties here --

11            THE COURT: Sure.

12            MR.  WEXLER:  --  by four  different  counsel.   The

13   individual defendants alone number, I think, 12 to 15.  We

14   have  investment  bankers  on  various  sides  of  the  deal  who

15   have  to  be  deposed.   We  have  sometimes  more  than  one

16   plaintiff or adviser for each of these entities.  We have

17   two levels of corporate entities, the (inaudible) brief and

18   the parent brief.  The defendants themselves have identified

19   over --

20            UNIDENTIFIED:  Over 72.

21            MR. WEXLER: Excuse me?

22            UNIDENTIFIED:  Over 72.

23            MR. WEXLER: -- over 72 witnesses on their Rule 26

24   disclosures.

25            THE COURT: Okay.

16

1          MR.  WEXLER:  And  I  think  we've  identified

2      approximately 40.

3          THE COURT: Okay.

4          MR.  WEXLER:  Obviously,  there  is  some  overlap.

5      We'd  like  not  to  have  to  take  60  depositions,  but  we  think

6      we may need right near that number.

7          THE COURT: All right.  Let me hear from the

8      defendants.

9          MR. BAUMANN: Your Honor, we identified 60 largely

10     because  the  plaintiffs  asked  for  60.   Our  concern  is  that

11     there  are  a  large  number  of  individual  agreements.   Each  of

12     these  folks  in  the  putative  class  had  --

13         THE COURT: Right.

14         MR.  BAUMANN:  --  a  separate  agreement,  and  we

15     believe  they're  different.   We  believe  that's  of  course  why

16     there  will  never  be  a  class  certified  here.   But  as  part  of

17     our  discovery,  we  believe  we  may  need  to  take  a  lot  of

18     depositions  of  non-named  class  members  in  addition  to  the

19     folks  that  are  on  the  26(a)(1)  list.   That's  why  we  have  a

20     large  number  of  individuals.

21         THE COURT: Well, some of those people should be

22     pretty short, I would think.

23         MR. BAUMANN: That's true.

24         THE COURT: This is just limited to that one issue,

25     isn't it?

17

1          MR. BAUMANN: Each of these people would have

2     entered under a separate --

3          THE COURT: Right.

4          MR. BAUMANN: -- agreement. And so, Your Honor, I

5     do not anticipate that those will be lengthy depositions,

6     that's true. But we have identified the number, not the

7     duration.

8          THE COURT: All right.

9          MR. BAUMANN: We said we can complete them all in

10    a (inaudible).

11         THE COURT: All right. Mr. -- I'm sorry, Ms.

12    White.

13         MS. WHITE: We agree with that position, Your

14    Honor.

15         THE COURT: All right. Ms. Musgrave?

16         MS. MUSGRAVE: As do we, Your Honor.

17         THE COURT: All right. I'll permit the 60

18    depositions per side, so 60 got the plaintiffs, 60 for

19    defendants collectively, that means all defendants. I'm

20    going to indicate all defendants and all plaintiffs so we

21    don't run into some dispute there.

22         This case-by-case basis on the deposition length,

23    the rule calls for seven hours. Which ones of these people

24    are you going to need more than seven hours on?

25         MR. SQUITIERI: Well, Your Honor, we anticipate

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305

18

1    that we will be identifying people who were very, very

2    involved with all aspects of the deal and, therefore, need

3    to be deposed on all of the issues in the case, and we

4    anticipate that some of those witnesses will take two,

5    possibly three days.  We don't know who they are yet.  We

6    can guess at some them, but we don't know how many there

7    will be until rather than set some hard and fast rules about

8    the categories of people, we raised the issue with

9    defendants and said let's see how it goes as we identify

10   people and get documents.

11        THE COURT: Well, the way you've phrased this, you

12   put: To be determined on a case-by-case basis. The length of

13   each deposition will be up to the maximum allowed under the

14   federal rules.  Well, the maximum allowed is seven hours.

15        MR. SQUITIERI: Yes.

16        THE COURT: So is that what you're saying, seven

17   hours?

18        MR. SQUITIERI: Well, I -- I think what we tried to

19   put in here is that unless we work out something

20   specifically for a witness, then it's going to be seven

21   hours.

22        THE COURT: Is that the intention is of the

23   defendants?

24        MR. BAUMANN: That is our understanding.  We did

25   agree with the plaintiffs and we would anticipate discussing

19

1   with them before we agree on a schedule, which is now due on

2   February 25th --

3            THE COURT: Right.

4            MR. BAUMANN: -- that if there are any witnesses

5   that the parties agree could be longer than seven hours --

6            THE COURT: Otherwise, you're falling back to the

7   default which is seven hours maximum, right?

8            MR. BAUMANN: Yes.  Correct.

9            THE COURT: All right.  Under that understanding

10  I'll approve paragraph 8-I, parens, 2, close parens.

11            Turning now to the number of interrogatories and

12  requests for production of documents and/or requests for

13  admissions, I'm a little -- I want to make sure I'm clear on

14  this wording here.  Is it  -- is the parties saying that

15  each plaintiff is going to have separate 50 interrogatories

16  and each defendant the same?

17            MR. SQUITIERI: For the plaintiffs, we envision 50

18  in the aggregate, Your Honor.

19            THE COURT: Okay.  How about from the def' -- I

20  know counsel represent more than one defendant so what are

21  we talking about there?

22            MR. BAUMANN: We agree, I believe, per side --

23            THE COURT: Okay.

24            MR. BAUMANN: -- that the defendants as a side --

25            THE COURT: All right.

20

1    MR. BAUMANN: -- would agree.  We think --

2    THE COURT: That's what I want to make sure.

3    MR. BAUMANN: -- it should be 35, not 50, but --

4    it's per side.

5    THE COURT:  All  right.  There'll be 50

6    interrogatories per side.  I'm going to try to clarify this

7    so  it's clear.  Each side may serve no more than 50

8    interrogatories, so I'll correct that.  And the request for

9    production of parties in request -- excuse me, excuse me

10   requests for production of documents and the requests for

11   admissions, is that to be per party or per side?

12   MR. BAUMANN: Per party, Your Honor.

13   THE COURT: Well, I got a problem with that,

14   because, for example, Ms. Musgrave represents a bunch of

15   individuals.  Are you going to ask 25 for each?

16   MS. MUSGRAVE: I don't know.

17   THE COURT: Then it's -- I'll allow it per party

18   group.  So each party group will get 25 requests for

19   production of documents and 25 requests for admissions.

20   Now, I want to caution everybody here.  I don't

21   believe in costing people's time and expense.  So I want the

22   defendants to meet, because I don't want you serving the

23   same stuff on the plaintiff that can be served once and

24   shared.  That's not going to happen.  And the same with

25   plaintiffs to the defendants because that's just a total

1    waste of people's expense and people's time.  So I want you

2    to meet and confer on that to see if you can come up with a

3    collective request and then you can just share the

4    information.  It's much easier.

5         I also want to remind counsel that under 26(a)(1),

6    you have mandatory disclosures.  There are a lot of

7    documents and it seems to me already in this case you've

8    identified a lot of documents that should be just turned

9    over.  So I want counsel to meet and confer on that as well.

10        All right.  Now, before we move on to paragraph 9,

11   what discussions have been made regarding any protective

12   orders in this case?

13        MR. BAUMANN: Your Honor, we identified as part of

14   the discussions in the 26(f) conference the need for a

15   protective order.  I believe that we have agreed that we

16   will meet by next Monday and confer with defendants --

17        THE COURT: Okay.

18        MR. BAUMANN: -- I'm sorry, the plaintiffs, to try

19   and come up with an agreement on the form.

20        THE COURT: Okay.  Is that right?

21        MR. SQUITIERI: That is, Your Honor.  The 18th is

22   the date we agreed to (inaudible) with them.

23        THE COURT: All right.  Well, I want it filed no

24   later than February 25, 2008.  Either it's going to be

25   unopposed or jointly filed or whoever's requesting it --

22

1    sounds like the defendants maybe filed, and so we can

2    address that.

3         I want to remind counsel that that will not

4    prevent discovery from going forward, because it's -- you

5    have time to respond in discovery. So that's why I want it

6    filed as soon as possible so that we can address that. So

7    the parties need to file any requests for protective orders

8    in this case either jointly or unopposed -- or if it is

9    opposed, let me know that -- by February 25, 2008.

10        All right. Let's address paragraph 9 on

11   settlement. That's fine as tendered at this point. And the

12   Court did receive the parties' initial confidential

13   settlement statements and reviewed those. We'll discuss

14   settlement a little bit further in a moment.

15        Regarding paragraph 11, I'm aware of the motions

16   that are outstanding. I've already addressed those and how

17   we're going to handle those. So that's fine.

18        Under paragraph 10-B, dealing with the length of

19   trial, that's a little difficult to determine at this point

20   only because we're not sure what's going to happen with the

21   class issue. So I"m going to leave this as is as stated

22   where you put: Assuming a class, maximum time would be 25

23   days to 35 days. We'll leave that as is, but I think we'll

24   relook at it the preliminary pretrial conference, because

25   we'll know better if this case is going forward in that

23

 1    capacity or not.  So I'll leave that as is at this point.

 2                Paragraph 11, we'll skip over for a moment, but

 3    I'll return to it on further conferences.

 4                Paragraph 12, other matters on page 25 is approved

 5    as tendered.

 6                Paragraph 13, amendments to the scheduling order,

 7    that's also approved as tendered.  Give me just a moment

 8    here.

 9                (Pause) All right.  I need counsel to go back to

10    paragraph 11 at this point.  And if you would go to

11    paragraph 11-C, which is currently on page 25 of the

12    scheduling order.  Give me just one moment to make one

13    modification to that.

14                (Pause) All right.  Judge Nottingham will conduct

15    his own final pretrial conference.  I will conduct a

16    preliminary pretrial conference which will be set prior to

17    the close of discovery, so we're looking at the first part

18    of June.  I need counsel to take their calendars out at this

19    point.  We'll set that at this juncture.

20                Friday, June 6th at 8:30 a.m. for final pr' --

21    forgive me, preliminary pretrial conference.  Can the

22    plaintiff accept that date and time?

23                MR. SQUITIERI: Yes, Your Honor.

24                THE COURT: All right.  I'll start here.  Mr.

25    Baumann for the defendants, please?

24

1           MR. BAUMANN: One second, Your Honor.

2           THE COURT: All right.

3           MR. BAUMANN: Friday, the 6th?

4           THE COURT: Friday, the 6th at 8:30.  That's this

5      year.

6           MR. SQUITIERI: That'd be fine.

7           THE COURT: Okay.

8           MR. BAUMANN: That's fine, Your Honor.

9           THE COURT: Fine, Ms. Musgrave?  Ms. White?

10          MS. WHITE: If I could have one moment.  I'm sorry.

11          THE COURT: All right. That's all right.

12          MR. BAUMANN: Your Honor, we do have a large number

13     of counsel.  Not all of them will be able to make it on the

14     6th.

15          THE COURT: That's fine.

16          MR. BAUMANN: As long as we --

17          THE COURT: As long as I have one.

18          MR. BAUMANN: -- have representatives from

19     everyone.

20          THE COURT: Right.

21          MR. BAUMANN: True.

22          MS. WHITE: Yes, Your Honor, that works fine.

23     Thank you.

24          THE COURT: All right.  The matter is set for

25     preliminary pretrial conference June 6th, 2008, beginning at

25

1    8:30 a.m.  Each party has now accepted that date and time

2    through their counsel.

3          I will need your proposed preliminary pretrial

4    order submitted to the Court by Monday, June 2nd, 2008.  The

5    format to prepare the preliminary pretrial order may be

6    found on the Court's Web site.  Also each counsel are

7    ordered to the Court's Web site under Judge Nottingham's

8    name to make sure you're familiar with pretrial and trial

9    practices and procedures since you will be required to

10   follow those in this case.  Give me a moment to write that

11   in on our calendar.

12         (Pause)  All right.  Noting where the case is

13   postured, meaning the following: The current outstanding

14   motions that are pending including the motions to stay the

15   case pending resolution of the other motions that have been

16   filed in the case, I'm going to -- in reviewing the

17   settlement conference documents, I'm going to set a further

18   status conference, and I think we'll know where we stand

19   with this case in around 60 days.  So let me see if I can

20   clear a date in roughly the week of April 7th.  See what's

21   available during that time frame.

22         What's counsels' availability on April 8th, 2008,

23   at 8:30 a.m. for status conference?

24         MR. BAUMANN: Your Honor, I will be out of town

25   that day.

26

```
 1              THE COURT: You will, all right.  Are you out of
 2     town that week, rest of the week, or not?
 3              MR. BAUMANN: I am not out on Monday.  I am out of
 4     town the rest of the week of the 7th.
 5              THE COURT: Okay.  April 14th at 8:30?  That's this
 6     year.  Plaintiff's fine?
 7              MR. SQUITIERI: Yes, Your Honor.
 8              THE COURT: Defendants?
 9              MR. BAUMANN: Yes, Your Honor.
10              THE COURT: Everybody's shaking their heads so
11     that's good.  That's the date set.  Give me a moment to
12     write that in.
13              (Pause)
14              MR. BAUMANN: Your Honor, what time on the 14th?
15              THE COURT: 8:30 a.m.
16              MR. BAUMANN: Thank you.  Give me a moment to put
17     that in our scheduling order here.  That's on the 14th.
18     Everybody make sure they have that, April 14th at 8:30.
19     Okay.
20              MS. MUSGRAVE: Your Honor, I'm showing on that date
21     a preliminary pretrial conference.
22              THE COURT: Well, it shows it's been vacated on
23     this.
24              MS. MUSGRAVE: You know what.  It was.
25              THE COURT: All right.
```

27

1           MS. MUSGRAVE: I'm (inaudible).

2           THE COURT: All right.  Thank you.

3           (Pause) All right.  The status conference is set

4      for April 14th, year 2008, beginning at 8:30 a.m.  At that

5      time, I will need the parties to give me an update on

6      discovery, status on the outstanding motions at that point

7      will be addressed, and I'll look at the need to set a

8      settlement conference at that point.  We'll see where we are

9      with the case at that juncture.  At this point, I'm not

10     going to set any settlement conference.  I'll address that

11     at the status.

12          All right.  Ms. Moore, do you have all those

13     dates?

14          THE CLERK: Yes.

15          THE COURT: All right.  The Court will approve the

16     scheduling order as amended this morning on the record.

17          MR. BAUMANN: Excuse me, Your Honor.

18          THE COURT: Yes, sir.

19          MR. BAUMANN: I do have a question.  You went over

20     it too quickly for me to catch it before.  On item 5 in the

21     scheduling order on page 14 --

22          THE COURT: Let me go to it.

23          MR. BAUMANN: -- with respect to damages.  We had

24     raised an objection in our -- I guess in our section there

25     that that is a inadequate description of the plaintiff's

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119       FAX 303-893-8305

28

1    damages and contrary to the instructions for the scheduling

2    order.  The plaintiffs have made a similar nondisclosure in

3    their  26(a)(1)s  with  respect  to  damages.  These are

4    (inaudible-both speaking) --

5              THE COURT: I understand that.

6              MR. BAUMANN: -- Your Honor, so our request would

7    be that we not approve the scheduling order except that we

8    direct the plaintiffs to supplement, to describe as required

9    by the rules --

10             THE COURT: Right.

11             MR. BAUMANN: -- the damages that they believe

12   they've incurred.

13             THE COURT: Let me hear from the plaintiff.  Why

14   aren't you more specific on these damages?

15             MR.  SQUITIERI: Your  Honor,  we  can't  really

16   quantify the damages as yet.  We can categorize them and

17   we'll  supplement  to  categorize  the  damages.  But the

18   quantification of the damages are going to depend on things

19   like valuations of the new securities that were issued in

20   exchange for the old securities.  And certain estimates as

21   to when properties otherwise may or not have been sold,

22   estimating gains that would be subject (inaudible).  But we

23   can categorize at this time.  We think it's going to need an

24   expert to make the estimates that we need to make.

25             MR. BAUMANN: Your Honor, at least we --

29

1            THE COURT: Well --

2            MR. BAUMANN: -- we'd request that -- that

3       plaintiffs would split the cash.  This case is fundamentally

4       about their claiming tax liability and they should be able

5       to calculate and compute that --

6            THE COURT: Mr. Stender, I can understand you may

7       have some problem with potentially other putative class

8       members, but not with the named plaintiff.

9            MR. SQUITIERI: We'll supplement that, Your Honor.

10           THE COURT: All right.  Well, I'll have you -- I'm

11      just going to indicate on the scheduling order here the

12      plaintiff will supplement, and then I'll have you just

13      insert that when you resubmit it.  All right.

14           (Pause) All right.  I'll have plaintiff supplement

15      their damage calculation on paragraph 5 when this gets

16      resubmitted after the corrections get made that I made of

17      record.  So with that addition, the Court approves the --

18           MR. BAUMANN: Your Honor, if I -- just for the

19      record.  We ask that you enter the scheduling order without

20      prejudice to our position that this case should be

21      arbitrated and not litigated.  We're not waiving any of the

22      claims.

23           THE COURT: Oh, then -- there's no waiver.

24           MR. BAUMANN: I didn't think so, but I do want to

25      make sure the record is clear.

30

1          THE COURT: No, I just said the way the case is
2     postured.  There's outstanding motions but that's not
3     unusual for cases to have outstanding dispositive motions
4     and we still go forward with the case.
5          MR. BAUMANN: I understand.
6          THE COURT: Until they're ripe for ruling.  No,
7     you're -- there's no waiver by the defendants of their other
8     requests.
9          All right.  The Court approves the scheduling
10    order now as further amended on the record.  It is made an
11    order of the Court and a copy of the same will be provided
12    to you counsel who get that through e-notice.
13         May I ask whose, this scheduling order, word
14    processor it's on, plaintiffs or defendants or who?
15         MR. SQUITIERI:  I think it's on both of ours.
16         THE COURT: All right.
17         MR. BAUMANN: It's on either one of ours.
18         MR. TAYLOR: (Inaudible) our office.
19         MR. BAUMANN: Colorado counsel's saying they --
20         THE COURT: Plaintiff are to make the corrections
21    in blue that I"m handing you my copy.  Approved as to form
22    by all defendants, resubmit it to the Court.  I'll give you
23    two weeks, which will be until February 25, 2008.  It should
24    be nunc pro tunc back to today's date, as well, which is the
25    12th of February 2008.  And I put that on the signature

31

1     block, so you just need to follow that.  Okay.

2            Ms. Moore, do we have any problem with any of the

3     attorneys' e-notice addresses?

4            THE CLERK: (Inaudible-no microphone)

5            THE COURT: All right.  I'll order that take place

6     forthwith.  If you're going to participate in the case, you

7     need to enter your appearance electronically.  And remember

8     each   attorney   must   have   their   entry  of   appearance

9     electronically separately to be placed on the e-notice list.

10           Also if any of the parties wish to have their

11    secretaries, paralegals, or both, added to the notice list,

12    let Ms. Moore know and we'll add those people for you.  I

13    suggest you do that, because I don't want people missing

14    hearings and so forth, so I suggest you do that.

15           Secondly, I want to advise counsel of a couple of

16    things that have arisen recently.  Make sure you speak with

17    your IT people in your offices to make sure that the Court's

18    domain name is placed on their white lists and your spam

19    blockers.  And that's so that the e-mails from the Court,

20    make sure they get they get delivered to you.

21           I did have an unfortunate case where the law firm

22    increased their spam levels, never checked to see what was

23    now being caught up in the spam file.  Turned out all of our

24    orders from the Court were being culled -- caught in it.

25    And then the argument by counsel was that: We didn't get it.

32

1    And the argument was denied because you got it and you
2    characterized it as spam.
3            If you look at the local rules, if it's received
4    by you folks and it's not a kickback -- in other words
5    nondeliverable by the Court -- it's being delivered to you.
6    So make sure you speak to your IT people, because I'm sure
7    all of you have spam filters on your computer systems, and
8    make sure that we're on the white list.
9            I would also recommend that any of the courts you
10   work in that have electronic filing they're also on the
11   white list as far as their domain names.  So you don't run
12   into that problem.  And that's an issue that has been
13   brought up in the court here because I don't like delay and
14   wasting people's time and people not showing up, and that's
15   what happened in that case.  And unfortunately, someone had
16   to get sanctioned with attorneys' fees and costs because one
17   side came in from out of state with all their parties and
18   the other side never showed up.  So let's not let that
19   happen.
20           Okay.  On the motions, I'm aware of those that
21   were outlined earlier by the parties.  Those aren't yet ripe
22   for ruling at this point noting they were recently filed
23   right at the end of January of this year.  We'll address
24   those as soon as they become ripe for ruling.
25           All right.  Anything further now on behalf of the

33

1    plaintiff at this point?

2                MR. SQUITIERI: Your Honor, just one thing for the

3    record if I may.

4                THE COURT: Yes, sir.

5                MR. SQUITIERI: Defendants' counsel spoke about

6    taking absent class members discovery.  I didn't jump up to

7    object, I didn't want to interrupt.  I do not agree to

8    waiving any of our rights to object to absent class members

9    that -- which is only very, very rarely ever raised.

10               THE COURT: Very well.  Anything else on behalf of

11   plaintiff?

12               MR. SQUITIERI: No, Your Honor.

13               THE COURT: On behalf -- Mr. Baumann, on behalf of

14   your clients -- defendants?

15               MR. BAUMANN: No, Your Honor.

16               THE COURT: All right.  Ms. White, on behalf of

17   your clients?

18               MS. WHITE: No, Your Honor.

19               THE COURT: Okay.  And finally, Ms. Musgrave, on

20   behalf of your clients?

21               MS. MUSGRAVE: None, Your Honor.

22               THE COURT: We're in recess.  Thank you.

23               MR. BAUMANN: Thank you.

24               THE CLERK: All rise.

25               (Whereupon, the within proceedings were then in

34

1     conclusion at 9:16 a.m. on February 12, 2008.)

2

3          I certify the foregoing is a correct transcript, to the

4     best of my knowledge and belief, from the record of

5     proceedings in the above-entitled matter.

6

7     _____     _____

8     Signature of Transcriber           Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit C

1   KINSELLA, WEITZMAN, ISER, KUMP & ALDISERT LLP
    Dale F. Kinsella, State Bar No. 135046

2   Jonathan P. Steinsapir, State Bar No. 226281

3   808 Wilshire Blvd.
    3rd Floor

4   Santa Monica, CA 90401

5   Telephone: 310.566.9800
    Facsimile: 310.566.9850

6

7   WILLIAMS & CONNOLLY LLP (Of Counsel)
    Philip A. Sechler

8   John E. Joiner

9   Vidya A. Mirmira
    725 Twelfth Street, N.W.

10   Washington, D.C. 20005
    Telephone: (202) 434-5000

11

**FILED**
LOS ANGELES SUPERIOR COURT

JUL 02 2008

JOHN A. CLARKE, CLERK

BY D.M. SWAIN, DEPUTY

12            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                **COUNTY OF LOS ANGELES**

14

15   HOWARD F. RUBY, HOWARD F. RUBY      CASE NO.   BC393671
    TRUST, MARINA DEL REY COUNTRY

16   CLUB APARTMENTS, OAKWOOD        **COMPLAINT FOR:**
    GARDEN APARTMENTS-SAN JOSE

17   NORTH, OAKWOOD LASALLE, LP,       1. **Breach of Trustee's Fiduciary**
    SBCA-MID WILSHIRE GP, LLC, KEN and       **Duties;**

18   WENDY RUBY LIVING TRUST, KEN      2. **Breach of Fiduciary Duties Owed by**

19   RUBY, and WENDY RUBY,          **Controlling Interest Holder;**

20           Plaintiffs,          3. **Aiding and Abetting Breach of**
                    **Fiduciary Duties;**

21     vs.                   4. **Breach of Contract – Declaration of**
                    **Trust;**

22   TISHMAN SPEYER PROPERTIES, LP,     5. **Breach of Contract – Tax Related**

23   TISHMAN SPEYER REAL ESTATE        **Agreement (Consent); and**
    VENTURE VII, LP, LEHMAN BROTHERS    6. **Tortious Interference with Contract**

24   HOLDINGS, INC., TISHMAN SPEYER

25   ARCHSTONE-SMITH MULTIFAMILY
    SERIES I TRUST, RIVER HOLDING, LP,

26   and MORGAN STANLEY & CO., INC.,

27          Defendants.

28

1         Plaintiffs Howard F. Ruby, Howard F. Ruby Trust, Marina del Rey Country

2 Club Apartments, Oakwood Garden Apartments-San Jose North, Oakwood LaSalle, LP,

3 SBCA-Mid Wilshire GP, LLC, Ken and Wendy Ruby Living Trust, Ken Ruby, and Wendy

4 Ruby, for their Complaint in this matter, allege as follows:

5                             **INTRODUCTION**

6         1.    In 2005, Plaintiffs, their partners, and affiliated entities—referred to

7 collectively as "the Oakwood Contributors"—transferred $1.7 billion of real estate to the

8 Archstone-Smith Operating Trust ("ASOT" or "the Trust"), then an affiliate of Archstone-

9 Smith Trust ("Archstone-Smith"), a publicly traded real estate investment trust ("REIT")

10 engaged in the development, operation, and ownership of apartment communities. The

11 property that the Oakwood Contributors conveyed to the Trust consisted of 34 first-class

12 apartment communities managed by R&B Realty Group, a partnership affiliated with

13 certain Plaintiffs doing business under the well-known "Oakwood Worldwide" brand.

14 Archstone-Smith's acquisition of the Oakwood properties significantly enhanced the real-

15 estate portfolio it controlled and increased its presence in many core markets. After this

16 landmark deal, the Oakwood Contributors transferred another $120 million in apartment

17 communities to the Trust.

18         2.    The consideration that Plaintiffs received for their interests in the

19 Oakwood properties consisted mostly of beneficial interests in the Trust, which itself was a

20 REIT. These beneficial interests, known as "A-1 common units," afforded the Oakwood

21 Contributors an ownership interest in all assets held in the Trust, including a continuing

22 interest in the properties they had contributed. The A-1 common units entitled the

23 Oakwood Contributors to participate fully in the economic performance of the portfolio of

24 properties controlled by Archstone-Smith and provided each Oakwood Contributor with the

25 right, at any time following an initial one-year restriction, to cause the Trust to buy back its

26 A-1 common units for cash. Because federal tax law requires entities like Archstone-Smith

27 that are taxable as REITs to distribute most of their annual earnings in the form of

28

1   dividends, the A-1 common units also provided the Oakwood Contributors with the

2   expectation of periodic, substantial cash distributions.

3       3.    Tax protection was critical to the deal. The Oakwood Contributors, for

4   the most part, had owned the properties for a substantial period of time, in some cases since

5   the 1960s. As a result, many of the properties had an extremely low tax basis relative to

6   their fair market values, so a taxable sale of the properties would generate a large tax

7   liability. Because the Oakwood Contributors transferred their interests to ASOT in

8   exchange for A-1 common units, however, the transfer did not constitute a sale for tax

9   purposes and did not trigger recognition of capital gains or recapture of depreciation.

10  Critically, although the transfer of properties to the Trust was tax-deferred, the Oakwood

11  Contributors' deferred tax liability potentially could be triggered in the future as the result

12  of transactions undertaken by Archstone-Smith or ASOT. Accordingly, the Oakwood

13  Contributors required that Archstone-Smith and ASOT promise not to "cause or permit"

14  such transactions for the longer of the remainder of Howard Ruby's life or ten years (the

15  "Lockout Period") and further agree to indemnify the Oakwood Contributors from any

16  resulting tax liability in the event either of them broke that promise. These commitments

17  were embodied in Tax-Related Agreements between Archstone-Smith, ASOT, and the

18  Oakwood Contributors. Without this assurance of protection from future tax liability

19  arising from events beyond their control, Plaintiffs would not have agreed to transfer the

20  Oakwood properties to the Trust.

21      4.    In October 2007, just months after the Oakwood Contributors

22  transferred the last of their properties to the Trust, much of what Plaintiffs had bargained

23  for, including the beneficial interests in the portfolio of properties held in the Trust, was

24  taken by Defendants in an oppressive, deceptive, and self-interested scheme to facilitate the

25  $22 billion acquisition of Archstone-Smith by Defendants Tishman Speyer Properties, LP

26  and Tishman Speyer Real Estate Venture VII, LP (collectively, "Tishman") and Defendant

27  Lehman Brothers Holdings, Inc. ("Lehman"). The acquisition was effected by the merger

28

- 3 -
COMPLAINT

1   of Archstone-Smith into Defendant Tishman Speyer Archstone-Smith Multifamily Series I

2   Trust ("Tishman Speyer Trust"), a privately held entity owned by Tishman and Lehman.

3   This transaction (the "Tishman-Lehman Acquisition") was one of the biggest real-estate

4   deals ever, and the largest public-to-private acquisition of an apartment REIT.

5            5.    In order to get this record-breaking deal done, Archstone-Smith and its

6   trustees acted with total disregard for Plaintiffs' rights and interests.  Archstone-Smith and

7   its trustees knowingly and willfully breached the contractual and fiduciary obligations they

8   owed Plaintiffs, acted maliciously and oppressively toward them, and undertook to enhance

9   their own return at Plaintiffs' expense.  (The liabilities arising from this conduct are now

10   liabilities of Tishman Speyer Trust, Archstone-Smith's successor entity).  Archstone-

11   Smith's entire course of conduct was aided and abetted and otherwise induced by the

12   buyers, Tishman and Lehman, as well as by Archstone-Smith's financial advisor, Defendant

13   Morgan Stanley & Co., Inc.  Defendants' acts of wrongdoing included the following:

14            *First,* Defendants proceeded with the transaction in direct abrogation of

15   approval and consent rights that Plaintiffs held.  As Defendants were well aware, numerous

16   aspects of the deal required the A-1 Unitholders' consent, including the merger of

17   Archstone-Smith into the Tishman Speyer Trust, the forced termination and/or conversion

18   of the A-1 units, and the necessary amendments of the Declaration of Trust.  Yet, rather

19   than undertake to obtain the consent of Plaintiffs and the other A-1 Unitholders, Defendants

20   falsely stated in public filings that the A-1 Unitholders' consent was not required and

21   attempted to structure the transaction to avoid the consent rights of the A-1 Unitholders.

22            *Second,* Defendants forcibly squeezed the A-1 Unitholders, including

23   Plaintiffs, out of their rights and interest in the Trust and the portfolio of properties held in

24   the Trust to their detriment.  In so doing, Defendants treated the A-1 Unitholders in a

25   manner different from the way the other common unitholder, namely Archstone-Smith

26   itself, was treated.  And Defendants squeezed the A-1 Unitholders out of their rights and

27

28

COMPLAINT

1   interest in the Trust in furtherance of their own self-interested scheme to enrich themselves

2   (and Archstone-Smith's trustees).

3          *Third,* Tishman and Lehman, during negotiations leading up to the deal, noted

4   the existence of Archstone-Smith's and ASOT's tax-protection obligations to Plaintiffs and

5   certain other A-1 Unitholders. In response to those obligations, Tishman and Lehman

6   publicly stated that they had reduced their offer for Archstone-Smith by more than $900

7   million. Moreover, Archstone-Smith publicly acknowledged that the cash consideration to

8   be paid to the A-1 Unitholders (who would not be given an opportunity to retain their A-1

9   units) "would be taxable to them for U.S. federal income tax purposes." Yet, instead of

10  paying Plaintiffs and other A-1 Unitholders those hundreds of millions of dollars,

11  Defendants created a scheme to vitiate their payment obligations and then took the

12  egregious position—at the urging of the buyer parties—that the A-1 Unitholders would not

13  receive any payments under the Tax-Related Agreements with respect to any gain

14  recognized by them as a result of the forced taking of their interests. Indeed, Defendants

15  took the inexplicable position that the Tishman Speyer Trust—the direct successor-in-

16  interest to Archstone-Smith—would have no obligation whatsoever to make any further

17  payments under the Tax-Related Agreements once the Tishman-Lehman Acquisition

18  closed.

19         *Fourth,* in an attempt to rationalize their repudiation of the Tax-Related

20  Agreements and their obligations thereunder, Defendants developed a scheme to claim that

21  Plaintiffs' receipt of cash for their A-1 units was not caused by Archstone-Smith or ASOT,

22  but was the product of Plaintiffs' "choice." That scheme involved Defendants' creation of a

23  new, inferior ASOT security—which they called "Series O"—into which all A-1 units

24  would automatically convert unless A-1 Unitholders accepted cash consideration for their

25  A-1 units. Of course, for Plaintiffs, accepting cash meant recognizing the taxable gain that

26  Archstone-Smith had promised Plaintiffs they would not recognize for at least ten years

27  under the now repudiated Tax-Related Agreements. But even Archstone-Smith had to

28

1  recognize, in its public filings, that the Series O units were far inferior, in a number of

2  respects, to the A-1 common units—they had limited distribution and redemption rights,

3  limited rights to share in profits and property appreciation, and in short were "materially

4  different from, and may be less favorable than, the rights [Plaintiffs] have as holders of the

5  Class A-1 common units . . . ." The supposed "choice" between cash and Series O,

6  therefore, was no choice at all, but rather an artifice designed by Defendants to allow the

7  buyer parties to hold onto hundreds of millions of dollars that Archstone-Smith would

8  plainly owe Plaintiffs and other A-1 Unitholders.

9     *Fifth*, Defendants' wrongful actions in effecting this deal have left ASOT in a

10 severe state of financial distress and, potentially, insolvent. The buyer parties financed their

11 $22 billion acquisition of Archstone-Smith by highly leveraging the assets held in the Trust

12 and then transferring billions from ASOT as soon as Plaintiffs were forced out of their A-1

13 units. Had Plaintiffs retained their A-1 units, and had the Declaration of Trust not been

14 wrongfully amended, no such distribution could have occurred. At the time the Tishman-

15 Lehman Acquisition closed in 2007, the amount of ASOT's annual interest payments alone

16 exceeded the amount of earnings available to make those payments, and the real-estate

17 market since has substantially declined. ASOT's current financial condition underscores

18 the outrageousness of Defendants' actions, including their position that the Tishman Speyer

19 Trust now has no obligation to Plaintiffs under the Tax-Related Agreements.

20                              **PLAINTIFFS**

21    6.   <u>Howard F. Ruby</u>.  Plaintiff Howard F. Ruby is a resident of the State of

22 California and a founder of Oakwood. He also is trustee, and a beneficiary, of the Howard

23 F. Ruby Trust. As a result of the Tishman-Lehman Acquisition, Ruby suffered significant

24 damages.

25    7.   <u>The Howard F. Ruby Trust</u>.  Plaintiff Howard F. Ruby Trust (the

26 "Ruby Trust") was established under the laws of California. The Ruby Trust is the

27 successor to ASOT units received by fifteen partnerships and limited liability companies

28

1   ("the Ruby Trust Partnerships") that contributed properties to ASOT in exchange for A-1

2   common units in ASOT.  The Ruby Trust served directly or indirectly as general partner or

3   managing member of the Ruby Trust Partnerships, and serves as general partner of

4   Plaintiffs Marina del Rey Country Club Apartments and Oakwood Garden Apartments-San

5   Jose North.  At the time of the Tishman-Lehman Acquisition, the Ruby Trust held

6   1,146,518 A-1 common units in ASOT.  Unable because of Defendants' wrongful and

7   egregious conduct to retain its A-1 common units, the Ruby Trust received cash

8   consideration in exchange for those units in connection with the Tishman-Lehman

9   Acquisition.  As a result of the Tishman-Lehman Acquisition, the Ruby Trust and its

10  beneficiaries suffered significant damages.

11          8.    Marina del Rey Country Club Apartments.  Plaintiff Marina del Rey

12  Country Club Apartments ("Marina") is a California general partnership, with partners

13  residing in Arizona, California, Colorado, Florida, Kentucky, Maryland, Massachusetts,

14  Montana, Nevada, Ohio, Pennsylvania, Texas, and British Columbia.  Marina contributed

15  property to ASOT in exchange for A-1 common units in ASOT.  At the time of the

16  Tishman-Lehman Acquisition, Marina held 268,633 A-1 common units.  Unable because of

17  Defendants' wrongful and egregious conduct to retain its A-1 common units, Marina

18  received cash consideration in exchange for those units in connection with the Tishman-

19  Lehman Acquisition.  As a result of the Tishman-Lehman Acquisition, Marina suffered

20  significant damages.

21          9.    Oakwood Garden Apartments-San Jose North.  Plaintiff Oakwood

22  Garden Apartments-San Jose North ("San Jose North") is a California limited partnership,

23  with partners residing in Arizona, California, Colorado, Florida, Georgia, Hawaii,

24  Kentucky, Maryland, Missouri, Nevada, Oregon, Pennsylvania, Texas, Virginia, and British

25  Columbia.  San Jose North contributed property to ASOT in exchange for A-1 common

26  units in ASOT.  At the time of the Tishman-Lehman Acquisition, San Jose North held

27  399,585 A-1 common units.  Unable because of Defendants' wrongful and egregious

28

1   conduct to retain its A-1 common units, San Jose North received cash consideration in

2   exchange for those units in connection with the Tishman-Lehman Acquisition. As a result

3   of the Tishman-Lehman Acquisition, San Jose North suffered significant damages.

4          10.   **Oakwood LaSalle, LP.** Plaintiff Oakwood LaSalle, LP ("LaSalle") is a

5   Minnesota limited partnership, the partners of which are Plaintiff San Jose North and

6   LaSalle GP Holdings, Inc., a Minnesota corporation. LaSalle contributed property to ASOT

7   in exchange for A-1 common units in ASOT. At the time of the Tishman-Lehman

8   Acquisition, LaSalle held 8,783 A-1 common units. Unable because of Defendants'

9   wrongful and egregious conduct to retain its A-1 common units, LaSalle received cash

10  consideration in exchange for those units in connection with the Tishman-Lehman

11  Acquisition. As a result of the Tishman-Lehman Acquisition, LaSalle suffered significant

12  damages.

13         11.   **SBCA-Mid Wilshire GP, LLC.** Plaintiff SBCA-Mid Wilshire GP,

14  LLC ("Mid Wilshire") is a Delaware limited liability company wholly owned by the Ruby

15  Trust. Mid Wilshire is the successor to ASOT units received by an Oakwood Contributor

16  that contributed property to ASOT in exchange for A-1 common units in ASOT. At the

17  time of the Tishman-Lehman Acquisition, Mid Wilshire held 11,830 A-1 common units.

18  Unable because of Defendants' wrongful and egregious conduct to retain its A-1 common

19  units, Mid Wilshire received cash consideration in exchange for those units in connection

20  with the Tishman-Lehman Acquisition. As a result of the Tishman-Lehman Acquisition,

21  Mid Wilshire and its sole member suffered significant damages.

22         12.   **Ken and Wendy Ruby Living Trust.** Plaintiff Ken and Wendy Ruby

23  Living Trust ("Ken & Wendy Trust") is a California marital trust. The Ken & Wendy Trust

24  is the successor to ASOT units received by partnerships and limited liability companies that

25  contributed properties to ASOT in exchange for A-1 common units in ASOT. At the time

26  of the Tishman-Lehman Acquisition, the Ken & Wendy Trust held 518,279 A-1 common

27  units in ASOT. Unable because of Defendants' wrongful and egregious conduct to retain

28

1   its A-1 common units, the Ken & Wendy Trust received cash consideration in exchange for

2   those units in connection with the Tishman-Lehman Acquisition. As a result of the

3   Tishman-Lehman Acquisition, the Ken & Wendy Trust and its beneficiaries suffered

4   significant damages.

5        13.    <u>Ken Ruby and Wendy Ruby.</u> Plaintiffs Ken Ruby and Wendy Ruby

6   are residents of the State of California. As a result of the Tishman-Lehman Acquisition,

7   Ken Ruby and Wendy Ruby suffered significant damages.

8                                **DEFENDANTS**

9        14.    <u>Tishman Speyer Properties, LP.</u> Tishman Speyer Properties, LP

10  ("Tishman Speyer Properties") is a New York limited partnership with its principal place of

11  business in New York. Tishman Speyer Properties is registered as a foreign limited

12  partnership in California, and has designated Los Angeles as the location of its principal

13  office in California. Tishman Speyer Properties is an affiliate of Tishman Speyer Real

14  Estate Venture VII, LP (and they are collectively referred to herein as "Tishman"). Along

15  with Lehman, Tishman owns or controls the entities that were involved in the Tishman-

16  Lehman Acquisition and that acquired Archstone-Smith, ASOT, and the portfolio of

17  properties held in ASOT by forcing out the A-1 Unitholders. These entities include

18  Tishman Speyer Archstone Smith Multifamily Series I Trust, River Holding, LP, River

19  Acquisition (MD), LP, and River Trust Acquisition (MD), LLC.

20       15.    <u>Tishman Speyer Real Estate Venture VII, LP.</u> Tishman Speyer Real

21  Estate Venture VII, LP ("Tishman Speyer Real Estate Venture") is a Delaware limited

22  partnership with its principal place of business in New York. Tishman Speyer Real Estate

23  Venture is an affiliate of Tishman Speyer Properties. Along with Lehman, Tishman owns

24  or controls the entities that were involved in the Tishman-Lehman Acquisition and that

25  acquired Archstone-Smith, ASOT, and the portfolio of properties held in ASOT by forcing

26  out the A-1 Unitholders. These entities include Tishman Speyer Archstone Smith

27

28

1 | Multifamily Series I Trust, River Holding, LP, River Acquisition (MD), LP, and River Trust

2 | Acquisition (MD), LLC.

3 |         16.    Lehman Brothers Holdings, Inc. Lehman Brothers Holdings, Inc.

4 | ("Lehman") is a Delaware corporation with its principal place of business in New York.

5 | Lehman has a registered agent in California, and Lehman and/or its affiliates have several

6 | offices in California. Along with Tishman, Lehman owns or controls the entities that were

7 | involved in the Tishman-Lehman Acquisition and that acquired Archstone-Smith, its assets,

8 | and the portfolio of properties held in ASOT by forcing out the A-1 Unitholders. These

9 | entities include Tishman Speyer Archstone Smith Multifamily Series I Trust, River

10 | Holding, LP, River Acquisition (MD), LP, and River Trust Acquisition (MD), LLC.

11 |         17.    River Holding, LP. River Holding, LP ("River Holding") is a

12 | Delaware limited partnership with its principal place of business in New York. River

13 | Holding was formed by Tishman Speyer Real Estate Venture in connection with the

14 | Tishman-Lehman Acquisition. It is jointly controlled by Tishman and Lehman and their

15 | affiliates. River Holding, in turn, wholly owns River Acquisition (MD), LP ("River

16 | Acquisition"), which, in turn, wholly owns River Trust Acquisition (MD), LLC, both of

17 | which were formed in connection with the Tishman-Lehman Acquisition. River

18 | Acquisition assigned it rights under the merger agreement to Tishman Speyer Archstone-

19 | Smith Multifamily Series I Trust.

20 |         18.    Tishman Speyer Archstone-Smith Multifamily Series I Trust. Prior to

21 | its 2007 acquisition, Archstone-Smith was one of the largest publicly held REITs in the

22 | United States. It focused on apartment investments and operations. Archstone-Smith was

23 | organized in Maryland, and its principal place of business was in Colorado. Substantially

24 | all assets in which Archstone-Smith owned an interest were held in a real estate investment

25 | trust, Archstone-Smith Operating Trust ("ASOT"), through which Archstone-Smith

26 | conducted substantially all its business. Archstone-Smith was the sole trustee of ASOT and

27 | owned nearly 90 percent of the beneficial interests in ASOT. The beneficial interests held

28 |

1    by Archstone-Smith were referred to as A-2 common units and, pursuant to its Declaration

2    of Trust, the only asset Archstone-Smith could own were A-2 common units. As part of the

3    2007 Tishman-Lehman Acquisition, Archstone-Smith was merged into Tishman Speyer

4    Archstone-Smith Multifamily Series I Trust ("Tishman Speyer Trust"), with the Tishman

5    Speyer Trust surviving the merger. The Tishman Speyer Trust is a Maryland REIT with its

6    principal place of business in Colorado. Defendants Tishman and Lehman jointly control

7    the Tishman Speyer Trust, which, after the merger, became the sole trustee of ASOT and is

8    legally obligated to assume the rights and obligations of Archstone-Smith Trust.

9            19.    Morgan Stanley & Co., Inc. Morgan Stanley & Co., Inc. ("Morgan

10   Stanley") is a Delaware corporation with its principal place of business in New York and

11   several offices in California. Morgan Stanley served as Archstone-Smith's financial advisor

12   during the Tishman-Lehman Acquisition, and in that capacity assisted Tishman, Lehman,

13   and Archstone-Smith in structuring the transaction so as to deprive Plaintiffs and other A-1

14   Unitholders of their rights. Morgan Stanley also provided a "fairness opinion" with respect

15   to certain aspects of the Tishman-Lehman Acquisition. Morgan Stanley or its affiliates

16   owned millions of shares of Archstone-Smith at the time of the Acquisition.

17                        **JURISDICTION AND VENUE**

18            20.    The Court has subject-matter jurisdiction over this matter, as the

19   amount in controversy in Plaintiffs' claims exceeds $25,000.

20            21.    The Court has personal jurisdiction over Defendants pursuant to

21   Section 410.10 of the California Code of Civil Procedure.

22            22.    Venue is proper in this Court pursuant to Sections 395, 395.2, and

23   395.5 of the California Code of Civil Procedure.

24

25

26

27

28

- 11 -
COMPLAINT

**FACTUAL ALLEGATIONS**

I.   **ARCHSTONE-SMITH ACQUIRES OAKWOOD PROPERTIES.**

    A.   **Oakwood Worldwide and the Oakwood Brand.**

       23.   In the 1960s, Howard Ruby, Ken Ruby, and certain of their partners, through R&B Realty Group ("R&B"), a California limited partnership, began developing apartment buildings and communities in Southern California. These developments were innovative and offered amenities rarely seen in apartment communities at the time.

       24.   As its business matured, R&B developed the "Oakwood" brand. Under Oakwood, R&B expanded its activities beyond property development to include management of entire apartment properties owned by others (including partnerships affiliated with R&B). In the 1990s, R&B created Oakwood Corporate Housing, through which R&B began to furnish and sublet individual apartments to extended-stay travelers.

       25.   These innovations, coupled with the business sophistication and discipline of Howard Ruby and his partners, transformed the Oakwood brand from a small Southern California business into one of the leading and most-respected developers and managers of apartments.

    B.   **The Oakwood Contributors Consider a REIT Transaction.**

       26.   By 2004, the "Oakwood Worldwide" brand portfolio of apartments was particularly prized. The portfolio consisted of highly coveted properties that were concentrated in strong-performing markets, such as the Southern California, San Francisco Bay, and Washington, D.C. metropolitan areas. The Oakwood properties were owned by the Oakwood Contributors and managed by R&B.

       27.   Although the Oakwood Contributors had rebuffed numerous advances by persons seeking to purchase the apartment properties, they began in 2004 to consider an "UPREIT" transaction with a publicly held REIT. Such a transaction would involve an exchange whereby the Oakwood Contributors would contribute their properties to a trust or partnership, for which a publicly held REIT would serve as trustee or general partner, and

1    elect to receive in return either cash or beneficial ownership interests, called units, in the
2    trust or partnership.

3            28.    An UPREIT transaction was appealing to the Oakwood Contributors
4    for a number of reasons, not the least of which was that by offering a cash election it would
5    provide immediate liquidity to those partners interested in cashing out their interests. But
6    for the majority of partners interested in receiving interests in the trust or partnership, the
7    benefits were even more profound. Those partners could (i) acquire interests in hundreds of
8    additional properties, (ii) expect larger, more frequent cash distributions than they had
9    received previously, and (iii) monetize their interests at any time following the one-year
10   anniversary of their contribution. In addition, these interests could be acquired in a tax-
11   deferred transaction that could be structured to permit each partner to maintain or acquire
12   control, independent of all other investors, over the timing of the recognition of the taxes
13   deferred in the transaction. In other words, those partners contributing property and
14   receiving interests would be able to defer the significant tax liabilities they otherwise would
15   have incurred on any taxable sale of the properties until such time as they chose to permit or
16   engage in a taxable transaction with respect to their interests.

17           29.    For the Oakwood Contributors, tax-deferral and control over the timing
18   of any tax recognition was a necessary prerequisite to any deal involving their property
19   interests. Because many of the contributed properties had an extremely low tax basis
20   relative to their value, a taxable sale would leave a significant number of partners with large
21   tax liabilities; for some partners, in fact, the proceeds from a sale would be insufficient even
22   to cover the tax liability generated by the sale. Moreover, since the tax-deferred treatment
23   afforded by an UPREIT transaction could then be vitiated by actions of the trustee and Trust
24   (placing the Oakwood Contributors in essentially the same position from a tax perspective
25   as they would have been in had they sold the properties), it was essential that the Oakwood
26   Contributors also obtain a promise of tax protection.

27
28

1        30.   In 2004, the Oakwood Contributors discussed a potential transaction

2    with several REITs, all of which were of sufficient size to be able to accommodate the

3    consideration the partners desired and were competitive buyers of apartment buildings

4    actively looking for properties like those held by the Oakwood Contributors. Three REITs

5    submitted offers for the properties, two of which were deemed credible: an offer from

6    Archstone-Smith and an offer from "REIT Z," the actual name of which is confidential by

7    agreement. Although the two offers were similar, the Oakwood Contributors ultimately

8    entered into a non-binding letter of intent with Archstone-Smith on February 4, 2005. The

9    letter of intent provided for a 24-day disclosure period during which the parties would

10   determine whether they could perform their obligations under the terms of the letter of

11   intent and were prepared to proceed with the transaction.

12       **C.**    **The Archstone-Smith/Oakwood Transactions.**

13       31.   On February 28, 2005, following the disclosure period, Archstone-

14   Smith and ASOT signed a Master Agreement with the Oakwood Contributors to acquire the

15   apartment properties. Archstone-Smith announced the deal in a March 1, 2005 press

16   release. R. Scott Sellers, Chairman and Chief Executive Officer of Archstone, described the

17   properties to be contributed by the Oakwood Contributors as an "exceptionally well-located

18   portfolio," noted "the long term benefits of building a dominant position" in Archstone-

19   Smith's markets, and acknowledged "Oakwood [a]s a recognized global leader in the

20   corporate and furnished apartment business" with which Archstone-Smith "look[ed]

21   forward to pursuing mutually beneficial opportunities."

22       32.   The bulk of acquisitions closed in July 2005, after Archstone-Smith

23   completed its due diligence; additional acquisitions closed later in 2005, in 2006, and in

24   2007. The Oakwood Contributors ultimately contributed their interests in 37 properties to

25   the Trust, to be held in the Trust as part of its portfolio of properties. Those properties were

26   valued at approximately $1.8 billion.

27

28

33.   In exchange for contributing their properties, the Oakwood Contributors received cash and common beneficial interests, referred to as A-1 common units, in ASOT. The Oakwood Contributors' beneficial interests in ASOT represented an interest in all of the real estate assets held in the Trust, including a continuing interest in the properties they had contributed. The A-1 common units received by the Oakwood Contributors constituted roughly 5% of all common units in ASOT. Other individuals and entities, who had engaged in similar UPREIT transactions with Archstone and ASOT, likewise held A-1 common units in ASOT. The remainder of the common units in ASOT—almost 90%—were A-2 common units, all of which were held by Archstone-Smith. The Oakwood Contributors (along with the other A-1 Unitholders) thus were in a minority position vis-à-vis the vastly greater number of common units owned and controlled by Archstone-Smith.

34.   All common unitholders, including the Oakwood Contributors and other A-1 Unitholders, and Archstone-Smith, as the sole A-2 Unitholder, were beneficiaries of ASOT and parties to the ASOT Declaration of Trust ("Declaration of Trust"). The Declaration of Trust dictated that A-1 and A-2 common units were to be equally treated, and were to "have the same designations, preferences, rights, powers and duties."

35.   In addition to being the majority beneficiary of ASOT, Archstone-Smith was (and its successor, the Tishman Speyer Trust, is) the sole trustee of ASOT, and as set forth in the Declaration of Trust, "holds the duties of Trustee hereunder and holds all assets of the Trust presently existing and hereafter to be received, and all rents, income, profits and gains therefrom, from whatever source derived, in trust for the Unitholders." As trustee, Archstone-Smith was in a fiduciary relationship with, and owed the duties of a fiduciary to, the Oakwood Contributors and the other A-1 Unitholders.

36.   The deal with Archstone-Smith provided the flexibility sought by the Oakwood Contributors. It provided those partners interested in liquidating their investment an opportunity to make a cash election and do so. It provided those partners interested in

- 15 -
COMPLAINT

1  making a unit election with, among other things, a tax-deferred transaction, the ability to

2  control when they would recognize their deferred taxable gain, and the diversification of

3  assets and bundle of rights associated with the A-1 common units. As provided in the

4  Declaration of Trust, this bundle of rights included the rights of A-1 Unitholders to receive

5  quarterly distributions (subject to the availability of sufficient distributable cash), to share in

6  the appreciation of all properties held in the Trust, and to redeem, at any time after a one-

7  year hold, and solely at their election, their A-1 common units for cash or, at Archstone-

8  Smith's election, a publicly traded share of Archstone-Smith.

9          37.    In part to protect these and other rights of the A-1 Unitholders, and to

10  protect the A-1 Unitholders generally, the Declaration of Trust contained express limitations

11  on Archstone-Smith's authority as trustee, and prohibited Archstone-Smith from taking any

12  action contrary to an express prohibition or limitation of the Declaration of Trust without

13  adhering to the Declaration of Trust's amendment provisions. Those amendment provisions

14  in turn required Archstone-Smith, before taking certain actions, to obtain the approval either

15  of a majority of the A-1 Unitholders or of all adversely affected A-1 Unitholders. For

16  example, the Declaration of Trust required approval of a majority of A-1 Unitholders to

17  amend provisions restricting Archstone-Smith's power to conduct business beyond owning

18  common units in, and managing the business of, ASOT. The Declaration of Trust required

19  approval of *every* adversely affected A-1 Unitholder to amend any provision altering the

20  Unitholder's interest in profits or losses, or the Unitholder's distribution, redemption, or

21  transfer rights, among others. As stated in the Archstone-Smith Information Statement

22  distributed to the Oakwood Contributors: "The ASOT Declaration of Trust may not be

23  amended with respect to any unitholder adversely affected by the amendment without the

24  consent of that unitholder if the amendment would, among other things . . . alter the interest

25  of a unitholder in profits or losses, or the right to receive any distributions . . . [or] alter the

26  redemption right of the unitholders of ASOT . . . ."

27

28

38.    The UPREIT transaction permitted the Oakwood Contributors to defer the tax liabilities they otherwise would have incurred in connection with a taxable sale of their properties.  Without further protection, however, Archstone-Smith and ASOT (at Archstone-Smith's direction) could take a number of actions after the contribution that would cause the Oakwood Contributors to incur unplanned, substantial tax liabilities related to the gain the Oakwood Contributors deferred by contributing (rather than selling) their properties to ASOT.  To protect against that risk, the Oakwood Contributors required that the parties enter into Tax-Related Agreements in connection with the contribution of each property.

39.    The Tax-Related Agreements limited, for the longer of the remainder of Howard Ruby's life or ten years (i.e., the "Lockout Period"), Archstone-Smith's and ASOT's ability to engage in or allow certain transactions without the permission of the Oakwood Contributors that would cause the Oakwood Contributors to incur their deferred tax liability.  Specifically, the Tax-Related Agreements provided that, except on certain conditions (including expiration of the Lockout Period) not applicable here, "neither the Operating Trust [ASOT] nor the Trustee [Archstone-Smith] will cause or permit a sale, transfer, exchange, distribution, or any other transaction that, for federal income tax purposes, is treated as a sale, transfer, exchange, distribution, or disposition (collectively, a 'Transfer'), of all or any portion of the Contributed Property or any interest therein . . . ."

40.    In addition to prohibiting Archstone-Smith and ASOT from causing or permitting any of these prohibited transactions, the Tax-Related Agreements required, again for the duration of the Lockout Period, that Archstone and ASOT allocate a stated amount of "qualified nonrecourse liability," i.e., debt, to the Oakwood Contributors.  This allocation of nonrecourse liability was designed to ensure that the Oakwood Contributors remained tax neutral in connection with their transfer to the Trust of any property that was encumbered by an amount of debt in excess of the contributed property's tax basis.  Any failure by Archstone-Smith and ASOT to abide by their obligations in this regard would have

1    profound consequences for the Oakwood Contributors, who, in essence, would be deemed

2    the recipients of taxable cash and, consequently, be subject to substantial tax liabilities.

3            41.    The Tax-Related Agreements required Archstone-Smith and ASOT,

4    should they engage in or allow such a prohibited transaction, or fail to allocate the requisite

5    amount of qualified nonrecourse liability, to pay to the Oakwood Contributors an amount

6    equal to all or a portion of any tax liability incurred as a result of the transaction or as a

7    result of the failure to allocate. In this respect, the Tax-Related Agreements provided that

8    "[i]n the event that the Operating Trust [ASOT] and/or the Trustee [Archstone-Smith]

9    violates or breaches its [tax-related] obligations … the Operating Trust [ASOT] and/or the

10   Trustee [Archstone-Smith] shall pay to the [Oakwood Contributors] as damages an amount

11   equal to the Tax Liability of the [Oakwood Contributors]." To keep the Oakwood

12   Contributors completely tax neutral until such a time as they elected to permit or engage in

13   a taxable transaction, the Tax-Related Agreements contained a "gross-up" provision, under

14   which Archstone-Smith and ASOT agreed to pay all taxes associated with any payments

15   made to the Oakwood Contributors under the Tax-Related Agreements.

16           42.    These provisions in the Tax-Related Agreements were intended to

17   ensure what was understood by all parties to the transactions: that, during the Lockout

18   Period, the Oakwood Contributors retained control over whether and when they would

19   recognize the taxable gain deferred in connection with their contributions to ASOT. As

20   stated in the Information Statement distributed to the Oakwood Contributors, which

21   Archstone-Smith demanded to, and did, review and approve: "During the Lockout Period,

22   ASOT, Archstone-Smith, and any and all successors to ASOT and Archstone-Smith will be

23   precluded from entering into any transaction that would result in a Partner (or any and all

24   indirect partners of the applicable Property Partnerships) receiving an allocation (or the

25   recognition) of income and/or gain that is attributable to a Property's (and any and all

26   replacement properties received in a permitted nonrecognition exchange for the Property)

27   'Built-In Gain.'" Archstone-Smith knew that it could cause or permit such a taxable event

28

1  only if it was prepared to pay the Oakwood Contributors the amount of any resulting tax

2  liability.

3         43.    To preclude Archstone-Smith and ASOT from circumventing these

4  indemnification obligations, the Tax-Related Agreements expressly applied to subsidiaries

5  and successors of Archstone-Smith and ASOT and generally required all parties' prior

6  written consent before any party could assign its rights or obligations under the Agreements.

7  Although the terms of the Agreements did permit ASOT to assign its rights and obligations

8  under the Tax-Related Agreements "in connection with a merger, consolidation, sale or

9  contribution of all or substantially all of its assets," the Tax-Related Agreements contained

10  no such provision permitting Archstone-Smith to make such an assignment.  Moreover, the

11  Agreements expressly provided that no such assignment would release Archstone-Smith

12  and ASOT from their liabilities and obligations under the Tax-Related Agreements, and

13  further provided that if any affiliate or successor caused or permitted a breach or violation

14  of the tax covenants that Archstone-Smith, ASOT, and the affiliate or successor would be

15  required to make the tax liability payments contemplated by the Tax-Related Agreements.

16         44.    The ability of the Oakwood Contributors to maintain control over the

17  timing of any tax recognition incurred in connection with the acquisition of their beneficial

18  interests was a driving force behind the Oakwood Contributors' willingness to consider an

19  UPREIT transaction generally and the transaction with Archstone-Smith specifically.  The

20  Oakwood Contributors would not have conveyed their properties to Archstone-Smith and

21  the Trust absent the protections afforded by the Tax-Related Agreements.

22  II.    **TISHMAN AND LEHMAN ACQUIRE ARCHSTONE-SMITH.**

23         A.    **The Bidding for Archstone-Smith.**

24         45.    Between July 2005 and May 2007, Archstone-Smith and ASOT never

25  contested their obligation to (i) refrain from engaging in a transaction that would cause the

26  Oakwood Contributors to recognize the deferred tax gain; and (ii) allocate the proper

27  amount of qualified nonrecourse liabilities to the Oakwood Contributors.  On May 28, 2007,

28

1  however, without any prior notice to the Oakwood Contributors, the parties to the Tishman-

2  Lehman Acquisition announced that they had agreed to a $22 billion deal to acquire

3  Archstone-Smith and take it private.

4       46.   Unbeknownst to the Oakwood Contributors, Archstone-Smith for

5  months had been negotiating, and in fact actively pursuing, potential deals with Tishman,

6  Lehman, and others. The May 2007 merger announcement was the culmination of talks that

7  began as early as March 2006, when Lehman representatives first expressed interest in

8  acquiring Archstone-Smith. Although Lehman tendered no formal proposal in March 2006,

9  it re-initiated contact with Archstone-Smith in April 2007, when a Lehman representative

10  advised Archstone-Smith that Tishman and Lehman were interested in pursuing an

11  acquisition of the REIT. At that time, Archstone-Smith for weeks had been discussing—at

12  the direction of its Board of Trustees—a transaction with a large real-estate private equity

13  fund, denominated "Company A" in Archstone-Smith's Information Statement, pursuant to

14  which Company A also would acquire Archstone-Smith and take it private. Still another

15  suitor, denominated "Company B" in Archstone-Smith's Information Statement, likewise

16  had expressed, before Lehman's April 2007 call, similar interest in merging with

17  Archstone-Smith.

18       47.   Negotiations between Archstone-Smith on the one hand, and Tishman-

19  Lehman and Company A on the other hand (Company B had dropped out of the bidding),

20  intensified throughout April and May 2007, with Tishman-Lehman and Company A

21  submitting initial bids for Archstone-Smith of $64.00 per common share and $62.50 per

22  common share, respectively. Both bidders significantly reduced their initial offers,

23  however, after learning of Archstone-Smith's obligations to the Oakwood Contributors (and

24  other similarly situated A-1 Unitholders) under the Tax-Related Agreements.

25       48.   As stated in Archstone-Smith's Information Statement, the potential

26  purchasers "expressed concern regarding the significant magnitude of the built-in gain

27  associated with certain of the company's properties that are subject to tax protection

28

1    agreements and the magnitude of the increase in property taxes as a result of the

2    transaction." Company A thereafter informed Archstone-Smith's financial advisor, Morgan

3    Stanley, that the "significant impact of [Archstone-Smith's] existing tax protection

4    agreements with common units" in ASOT would increase its transaction costs to acquire

5    Archstone-Smith. Company A subsequently withdrew from bidding "due primarily to the

6    costs associated with the tax protection" agreements. Tishman and Lehman expressed

7    similar concerns, and accordingly conveyed to Morgan Stanley that their subsequent offer

8    would be reduced "due [in part] to increased expected transaction costs resulting from their

9    better understanding of the magnitude of [Archstone-Smith's] tax protection obligations."

10   In response to the "magnitude and scope of the company's tax protection arrangements,"

11   among other things, Tishman and Lehman reduced their bid to $60.00 per share.

12         49.    Tishman and Lehman ultimately settled with Archstone-Smith on a

13   purchase price of $60.75 per share, a total reduction of $900 million from their original

14   $64.00 bid. Archstone-Smith publicly stated that the acquisition price "was decreased to

15   take into account potential transaction costs, such as tax protection obligations . . . ."

16   **B.    Defendants Trample on the Rights of the A-1 Unitholders.**

17         50.    The Merger Agreement and Archstone-Smith's Information Statement

18   make clear that the Tishman-Lehman Acquisition eviscerated the rights of the A-1

19   Unitholders and breached Archstone-Smith's obligations (and those of its successor,

20   Tishman Speyer Trust) to the Oakwood Contributors. Indeed, Tishman, Lehman, and

21   Archstone-Smith, aided by Archstone-Smith's financial advisor, Morgan Stanley, structured

22   the transaction to accomplish exactly that end when it became apparent that the rights of the

23   A-1 Unitholders were an impediment to consummation of the deal on the desired terms.

24   Defendants thus set out to force the A-1 Unitholders from ASOT by stripping the A-1

25   Unitholders of their A-1 common units and the rights associated therewith, then looting the

26   assets held in ASOT and leaving it in financial distress, and finally repudiating their

27   obligations to make payments under the Tax-Related Agreements.

28

51.　Defendants first created a new type of interest in ASOT, called a Series O preferred unit. These newly created Series O units, as compared to the A-1 units, would not fully share in the appreciation of the assets held in ASOT and would not themselves have the opportunity to appreciate. They would have a severely limited right to a capped distribution, and they would also have a lockout period of generally five years before permitting even a limited redemption. Despite the stark disparity between the rights, and therefore value, of Series O and A-1 units, the A-1 common units were to be forcibly converted into Series O units unless the A-1 Unitholders accepted cash, and the resulting tax liability. The A-1 Unitholders were not given the opportunity to, and did not, consent to the taking of their A-1 units and the evisceration of the rights associated therewith, despite the provisions of the Declaration of Trust requiring consent of each such "adversely affected" A-1 Unitholder. Notwithstanding provisions in the Declaration of Trust and the Tax-Related Agreements requiring the consent of the Oakwood Contributors and other A-1 Unitholders, Archstone-Smith, Tishman, and Lehman asserted that the consent of the A-1 Unitholders was not required to perfect the transaction. Archstone-Smith claimed in public filings that its "approval [was] the only approval of the holders of [its] common units that [was] necessary . . . ."

52.　Although an initial draft of the merger agreement proposed that the A-1 Unitholders be offered the option of keeping their A-1 common units, Tishman and Lehman redrafted the merger agreement to strip the A-1 Unitholders of that option and to force the A-1 Unitholders entirely out of the beneficial interests they held in the Trust.

53.　The Oakwood Contributors and other A-1 Unitholders who were required to accept cash or Series O units were presented with a lose-lose proposition. An acceptance of cash would cause such A-1 Unitholders to recognize the substantial taxable gain that was deferred in their contributions of properties to the Trust, but, according to Archstone-Smith, would *not* result in payments to the A-1 Unitholders under the Tax-Related Agreements. Prior to closing of the Tishman-Lehman Acquisition, Archstone-

- 22 -
COMPLAINT

1  Smith recognized in its Information Statement that those A-1 Unitholders who accepted

2  cash, like the Oakwood Contributors, would face "tax risks" and "significant" tax liabilities

3  that could wipe out the cash consideration; that "it is possible that the amount of gain

4  [recognized] . . . upon the receipt of cash, or even [the] resulting tax liability, could exceed

5  the amount of cash . . . actually receive[d] by a significant amount"; and that one of the

6  reasons *not* to go forward with the transaction was "the fact that . . . all such cash

7  consideration would be taxable to [the A-1 Unitholders] for U.S. federal income tax

8  purposes." Yet, in the same Information Statement in which it acknowledged these tax risks

9  and their accompanying significant liabilities, Archstone-Smith and the buyer parties

10  unambiguously renounced their obligations under the Tax-Related Agreements, stating that

11  the protections guaranteed by those Agreements "shall not apply" and that "if you [the

12  Oakwood Contributor] elect to receive cash consideration, in whole or in part, the buyer

13  parties intend to take the position that you are not entitled, and the buyer parties and we do

14  not intend to pay you, any additional consideration with respect to any federal, state, local

15  or other taxes payable by you in connection with your election to receive cash."

16      54.    On the other hand, any A-1 Unitholder who accepted the Series O

17  units, into which the A-1 units were automatically converted in the absence of a cash

18  "election," would suffer a fundamental change in such holder's rights and interests in ASOT

19  and the assets held in ASOT following the Tishman-Lehman Acquisition. As described

20  above, the Series O units, unlike the A-1 units, limited the extent to which Series O holders

21  could participate in the growth in value of the assets held in ASOT, and contained

22  limitations on rights to distributions and redemptions. Archstone-Smith was prohibited by

23  the Declaration of Trust from imposing such a fundamental change on an A-1 Unitholder

24  without the consent of each and every adversely affected A-1 Unitholder. Prior to the

25  closing of the transaction, Archstone-Smith conceded, again in its Information Statement,

26  that Series O units "will have materially different rights than" A-1 units; that it may not

27  even "be able to satisfy [its] obligations to redeem the Series O preferred units"; that its

28

1  "ability to pay current distributions" to Series O unitholders "are expected to [be]

2  restrict[ed]"; that it did "not expect to be able to pay regular quarterly distributions on the

3  Series O preferred units and that it is possible that *no* cash distributions [would] be made";

4  that Tishman and Lehman "have outside activities that will conflict with . . . [the interests]

5  of the Series O preferred unitholders"; and that a reason *not* to proceed with the transaction

6  was "the fact that the Series O preferred unitholders . . . will not experience any

7  appreciation in the value of their Series O preferred units even if our profitability, operating

8  performance and gains on asset sales may result in significant distributions and value

9  appreciation for our common unitholders."

10      55.    Thus, Defendants recognized the lose-lose proposition between cash

11  consideration and Series O units, but proceeded to create this Hobson's Choice to permit

12  them later to assert that any tax liability arising from the acceptance of cash for A-1

13  common units was a voluntary choice made by the Oakwood Contributors, and thus not an

14  event that triggered a payment obligation under the Tax-Related Agreements.

15      56.    Defendants initially even took the position that, in order to be allowed

16  to "choose" cash, A-1 Unitholders would be required to release any claim for

17  reimbursement of tax liabilities incurred as a result of the election Defendants were forcing

18  the A-1 Unitholders to make.  Archstone-Smith's indefensible attempt to force minority A-1

19  Unitholders to relinquish their rights as a precondition to receiving cash consideration was a

20  clear violation of its fiduciary duties, and a position from which it retreated when certain A-

21  1 Unitholders objected.  It also reflected Defendants' understanding that the forced

22  cancellation or conversion of the A-1 Unitholders' interests in the Trust would give rise to

23  liabilities of ASOT and Archstone-Smith (and Archstone-Smith's successor) under the Tax-

24  Related Agreements.

25      57.    To effectuate the Tishman-Lehman Acquisition, including amendment

26  of the Declaration of Trust and the resulting squeeze-out of A-1 Unitholders in ASOT,

27

28

1   Tishman and Lehman, with the advice and assistance of Morgan Stanley, caused the

2   creation of three entities: River Holdings, LP, which was controlled by affiliates of Tishman

3   and Lehman, and which wholly owned River Acquisition, LP, which in turn wholly owned

4   River Trust Acquisition, LLC.

5           58.     River Trust Acquisition, LLC's sole purpose was to merge into ASOT

6   and provide cover for the resulting amendment—done without the requisite consent of the

7   A-1 Unitholders—of the Declaration of Trust. At the closing date, River Trust Acquisition,

8   LLC merged into ASOT with ASOT surviving the merger. After River Trust Acquisition,

9   LLC merged into ASOT, River Trust Acquisition was subsumed. There was no business

10  purpose for this merger other than to provide a mechanism to amend the Declaration of

11  Trust and to squeeze out the A-1 Unitholders without first obtaining their consent.

12          59.     Immediately after the forced elimination of the A-1 common units,

13  Archstone-Smith, in conjunction with and at the direction of Tishman and Lehman, caused

14  billions of dollars in assets held by ASOT to be distributed to Archstone-Smith as part of

15  the merger consideration. This distribution could not have been effected had the A-1

16  Unitholders been permitted to retain their A-1 interests in ASOT.

17          60.     After further leveraging and looting the assets of ASOT and

18  relinquishing them for the benefit of the buyer parties, Archstone-Smith merged into the

19  Tishman Speyer Trust, which became the sole trustee of ASOT. The sole purpose of

20  leveraging the assets was to permit an impermissible distribution to the A-2 unitholders to

21  fund the acquisition of trustee Archstone-Smith.

22          61.     The buyers made clear that the deal could not have been effected if the

23  A-1 Unitholders had been treated like the A-2 unitholder and allowed to retain their

24  interests. Thus, Archstone-Smith and its trustees forced the A-1 Unitholders out of their

25  interests and rights in ASOT and ASOT's assets so that it could itself take full advantage of

26  those assets (and the leveraging opportunities they provided), to the exclusion of the A-1

27  Unitholders, in order to fund its own blockbuster acquisition and enrich the trustees.

28

62.    Tishman and Lehman accomplished their acquisition of Archstone-Smith, which cost over $22 billion, with contributions of only $250 million each. The remainder of the purchase price came from a bridge-equity loan of approximately $4.6 billion, and new debt, for which the assets held in ASOT would serve as security, of approximately $15.2 billion obtained as a result of Tishman and Lehman's decision to substantially leverage the properties held in ASOT. This new debt included a purchase by Fannie Mae of a $7.1 billion credit facility secured by 105 properties that were part of the transaction, and a $1.8 billion structured transaction executed by Freddie Mac. Archstone-Smith acknowledged that this "high degree of leverage could adversely affect [its] ability to obtain additional financing" and that it "may not have sufficient cash flow from operations or capital transactions to service [its] indebtedness."

**C.    Morgan Stanley is Deeply Involved in the Tishman-Lehman Acquisition.**

63.    Archstone-Smith retained Morgan Stanley in early 2007 to serve as its financial advisor concerning potential bids for the company. Morgan Stanley was familiar with Archstone-Smith from its prior substantial investment banking work for the company, and previously had provided investment banking services to Tishman and Lehman as well. As of May 31, 2007, Morgan Stanley or its affiliates owned 5.3% of Archstone-Smith's common shares.

64.    As part of its work, Morgan Stanley issued a "fairness opinion" concluding that the financial consideration offered to public shareholders of Archstone-Smith was fair. For providing its "fairness opinion" and advising Archstone's Board of Trustees in connection with the Tishman-Lehman Acquisition, Morgan Stanley was paid $25 million dollars, a staggering $24 million of which was contingent upon the closing of the transaction. Had the transaction not closed, Morgan Stanley would have foregone over 96% of its financial windfall.

65.    The Morgan Stanley opinion expressly did not address the question of whether the transaction was fair to the A-1 Unitholders.  Moreover, the fairness opinion was provided to Archstone-Smith's Board solely in its capacity as Board for the publicly traded company; it was expressly not provided in Archstone-Smith's role as trustee to ASOT or as majority interest holder of ASOT.  In other words, Morgan Stanley opined that Archstone-Smith's actions were in compliance with the duties Archstone-Smith owed to its public shareholders, but expressly did not opine whether Archstone-Smith's actions were consistent with the fiduciary duties it owed to A-1 Unitholders.  Morgan Stanley recognized at the time that the proposed transaction was unfair to A-1 Unitholders and that Archstone-Smith was breaching its fiduciary duties to the A-1 Unitholders.

66.    Morgan Stanley was involved in virtually all aspects of the Tishman-Lehman Acquisition, providing debt bridge financing services to Archstone-Smith and advising Archstone-Smith both on the financial aspects of the deal and the appropriate structure it should take in light of the obligations owed the A-1 Unitholders.  Upon information and belief, Morgan Stanley was a principal architect of the strategy to structure the transaction so that A-1 Unitholders would be forced to relinquish their A-1 common units and at the same time be wrongfully deprived of the benefits they were owed under the Tax-Related Agreements.  Morgan Stanley previously had served as a financial advisor to an affiliate of the Blackstone Group ("Blackstone") when Blackstone acquired Equity Office Properties Trust ("EOP").  EOP, like Archstone-Smith, had tax-indemnification agreements with those who had contributed their property or property interest to EOP.  Like the Tishman-Lehman Acquisition, the EOP acquisition was structured so that unitholders in EOP would be required to accept a preferred unit or cash, and thereafter permit Blackstone to claim that the unitholders had lost the benefit of their tax protection agreements.

67.    During the bidding process, Morgan Stanley, Archstone-Smith's senior management, and attorneys for Archstone-Smith had numerous meetings and phone calls with Tishman and Lehman, and Company A, to discuss, among other things, "the

1  significant tax protection obligations owed by the company to unitholders of our operating

2  trust and the related economic consequences of potential asset dispositions." Morgan

3  Stanley provided Archstone-Smith's Board with its analysis of the "potential financial

4  impact of the existing tax protection" agreements. Morgan Stanley and Archstone-Smith's

5  Board and management also discussed: (i) options that would or could be afforded to

6  common unitholders as part of the Tishman-Lehman Acquisition; (ii) how other recent

7  REIT transactions, upon information and belief including the EOP transaction, were

8  structured; (iii) whether a higher purchase price could be obtained if more A-1 Unitholders

9  accepted cash consideration instead of the Series O units (a discussion that necessarily

10  acknowledged the benefit to Defendants of forcing out the A-1 Unitholders and repudiating

11  the Tax-Related Agreements); and (iv) the "financial terms of the proposed transaction and

12  . . . certain financial analyses regarding the proposed transaction, including the dividend rate

13  and other terms of the preferred units."

14      68.    Morgan Stanley thus did far more than provide a fairness opinion; it

15  was an active participant in the wrongdoing. Morgan Stanley was willfully blind to the

16  clear wrongs and substantial injuries being inflicted on the A-1 Unitholders, and acted

17  affirmatively and for its own self interest by knowingly and willingly assisting Archstone-

18  Smith in breaching its fiduciary duties to the A-1 Unitholders.

19  **D.    Archstone-Smith's Self-Dealing and Conflicts of Interest.**

20      69.    The executive officers and individual trustees of Archstone-Smith

21  stood to, and did, reap enormous financial benefits from the Tishman-Lehman Acquisition

22  and accordingly acted in their personal self-interest to the degradation of the interests of the

23  A-1 Unitholders, including the Oakwood Contributors. The individual trustees owned

24  considerable positions in Archstone-Smith and therefore stood to profit individually from

25  the increase in value to Archstone-Smith created by abandoning the interests of the A-1

26  Unitholders and closing the Tishman-Lehman Acquisition. They also stood to profit, and

27  did profit, in their own right as well.

28

- 28 -
COMPLAINT

70.    Prior to the merger, Archstone-Smith recognized that its "executive officers and the company and its board of trustees may be deemed to have interests in the [transaction] that are in addition to or different from the interests of [its] unitholders generally . . . ." More specifically, Archstone-Smith acknowledged that one of the reasons *not* to go forward with the transaction was "the fact that some of the company's trustees and [its] executive officers may have interests . . . that are different from, or in addition to, those of [its] Class A-1 common unitholders." Notwithstanding the conflict, no disinterested group was designated to review the Tishman-Lehman Acquisition on behalf of the A-1 Unitholders.

71.    In order to ensure that the personal interests of their executive officers were protected following the Tishman-Lehman Acquisition, Archstone-Smith entered into a change of control agreement with each officer. These agreements provided lucrative severance payments and other benefits to the officers upon completion of the Acquisition. While Archstone-Smith adopted specific measures to protect the interests of its officers, it simultaneously took affirmative steps to injure the interests of the A-1 Unitholders.

72.    Sellers, Archstone-Smith's CEO, stood to receive more than $26.5 million in aggregate consideration in the merger stemming from options and restricted shares he owned that would vest with the merger. He received an additional $17.7 million in deferred compensation that would come due upon the merger. Moreover, Sellers was guaranteed that he would serve as the CEO of the surviving entity and would be guaranteed at least $4.75 million in salary and bonus for 2008. In comparison, Sellers earned $750,000 in salary and no bonus in 2007 and $750,000 in salary and $1.75 million in bonus in 2006. Sellers' total yearly compensation thus increased dramatically as a result of the merger, even excluding the substantial one-time payments he received as a result of the merger. With a financial windfall hanging in the balance, Sellers had a keen personal interest in ensuring the closing of the Tishman-Lehman Acquisition (even if it meant the vitiation of the rights of the Oakwood Contributors and other A-1 Unitholders). Prior to the closing of

- 29 -
COMPLAINT

1  the transaction, Archstone-Smith acknowledged that one of the reasons *not* to go forward

2  with the transaction was "the fact that the buyer parties were willing to pursue [the

3  transaction] . . . *only* if they and Mr. Sellers negotiated and entered into a binding

4  arrangement regarding his future employment . . . ."

5          73.    The trustees who voted to approve the Tishman-Lehman Acquisition

6  on Archstone-Smith's behalf stood to receive more than $4.7 million in aggregate

7  consideration in the merger stemming from options and restricted shares they owned and

8  that would vest with the merger. These trustees therefore also had a direct financial interest

9  in ensuring that the Tishman-Lehman Acquisition closed, even if it did so at the expense of

10  the A-1 Unitholders and in violation of the fiduciary duties and contractual obligations

11  owed the A-1 Unitholders.

12      **E.    Defendants Reaped Substantial Benefits By Squeezing Out A-1**

13          **Unitholders.**

14          74.    In this scheme, Defendants profited handsomely at the expense of the

15  A-1 Unitholders. By squeezing out the A-1 Unitholders—and knowingly and intentionally

16  disregarding their rights under the Declaration of Trust and Tax-Related Agreements—

17  Defendants were able to fully leverage the assets held in ASOT and fund the $22 billion

18  deal. In addition, Defendants maximized their payout from the transaction. Tishman and

19  Lehman used Archstone-Smith's obligations under the Tax-Related Agreements as both

20  sword and shield. Not only were they able to obtain a savings of $900 million on the

21  purchase price, but also they refused to pay the hundreds of millions of dollars to the

22  Oakwood Contributors, and other A-1 Unitholders, as agreed under the Tax-Related

23  Agreements. Morgan Stanley received substantial advisory fees and also profited as a large

24  shareholder in Archstone-Smith.

25          75.    While the Oakwood Contributors' A-1 interests were taken from them,

26  Archstone-Smith's interests in ASOT (the A-2 common units) continued in full force after

27

28

- 30 -
COMPLAINT

1  the Tishman-Lehman Acquisition. The A-2 unitholder was allowed to maintain its full

2  beneficial interest in the Trust and the properties held in the Trust, was permitted a

3  distribution of billions of dollars of cash and assets from the Trust to hold and dispose of

4  without regard for the interests of the A-1 Unitholders, did not have to "choose" between a

5  reduced-value cash payment or a substantially devalued alternate security, and was able to

6  leverage the assets of the Trust to fund its own acquisition. Despite the equality of interests

7  guaranteed by the Declaration of Trust, A-1 and A-2 units in ASOT were treated drastically

8  differently during the Tishman-Lehman Acquisition. Thus Archstone-Smith, the fiduciary,

9  protected its own interests by preserving the value of its A-2 units, while stripping the value

10  of the interests of the Oakwood Contributors, and other A-1 Unitholders, to whom

11  Archstone-Smith owed a fiduciary duty. In fact, Archstone-Smith recognized, again in its

12  Information Statement, that one of the reasons *not* to go forward with the transaction was

13  "the fact that [it was] not offering to the Class A-1 common unitholders an opportunity to

14  remain as common unitholders . . . thereby precluding [them] from having the opportunity

15  to fully participate in the future performance of [its] assets, any future earnings growth, or

16  any future appreciation in the value of [its] properties."

17      76.    Defendants' conduct shows not only their bad faith, but also

18  Archstone-Smith's willful disregard for its obligations as a fiduciary and majority interest

19  holder, for its obligations under the Declaration of Trust and the Tax-Related Agreements,

20  and for the A-1 Unitholders generally. Defendants induced the Oakwood Contributors to

21  contribute their properties to the Trust with the express promises that the Oakwood

22  Contributors would control the timing of any tax recognition associated with any deferred

23  taxable gain, that the Oakwood Contributors' interests would be treated the same as

24  Archstone-Smith's interests, and that the Oakwood Contributors would have specified rights

25  to redeem their interests, to receive distributions, to share in the profits and growth of the

26  Trust's assets, to receive debt allocations, and to provide or withhold their consent to

27

28

- 31 -
COMPLAINT

1  actions adversely affecting their interests or to other certain amendments to the Declaration

2  of Trust.

3       77.    Yet Archstone-Smith—in concert with the other Defendants—actively

4  sought to, and ultimately did, repudiate its obligations to the Oakwood Contributors, in utter

5  disregard of its fiduciary obligations, by engaging in the Tishman-Lehman Acquisition.

6  Acting for their own self-interest, Defendants forced the Tishman-Lehman Acquisition on

7  the Oakwood Contributors, stripped the Oakwood Contributors of their A-1 units without

8  seeking the A-1 Unitholders' consent, and schemed to maximize their take from the deal by

9  requiring the Oakwood Contributors to accept the newly created, inferior Series O units or

10  the cash consideration and its attendant tax liabilities.  Although Defendants were fully

11  aware of their obligations under the Declaration of Trust and Tax-Related Agreements, and

12  the buyer parties cited those obligations in justifying the reduced purchase price for

13  Archstone-Smith, Defendants repudiated those obligations altogether, and subsequently

14  issued an amended and restated Declaration of Trust that wrote out of existence the A-1

15  units and their associated rights.

16       78.    As a result of Defendants' wrongful conduct, Plaintiffs have suffered

17  substantial damage, including the economic loss arising from the forced taking of their A-1

18  units, the economic loss arising from the forced tax liabilities that Defendants' improper

19  actions necessarily triggered, and the economic loss arising from Defendants' complete

20  abrogation of Plaintiffs' rights as A-1 Unitholders, and under the Declaration of Trust and

21  Tax-Related Agreements.  Defendants have incurred damages in excess of $100 million.

22           **FIRST CAUSE OF ACTION**

23           **For Breach of Trustee's Fiduciary Duties**

24           **(Against Tishman Speyer Trust)**

25       79.    Plaintiffs incorporate by reference, as if fully set forth herein, each of

26  the preceding paragraphs of the Complaint.

27

28

1       80.     At all relevant times, Archstone-Smith, as the sole trustee of ASOT,

2   owed fiduciary duties to Plaintiffs, as A-1 Unitholders, (1) to act in good faith; (2) to act in

3   the best interest of the beneficiaries of ASOT; (3) to act with the care that a reasonably

4   prudent person in a like position would use under similar circumstances; (4) to not act in

5   reckless disregard of its duties as trustee or with gross negligence; and (5) to not profit from

6   self-dealing at the expense of ASOT's beneficiaries.

7       81.     Archstone-Smith breached its fiduciary duties owed to Plaintiffs by

8   (1) forcing the A-1 Unitholders out of their common beneficiary position; (2) treating the A-

9   1 Unitholders in a discriminatory fashion as compared to itself, as the holder of the A-2

10  common units; (3) scheming to deprive the A-1 Unitholders of their bargained-for benefits

11  under the Declaration of Trust and Tax-Related Agreements; (4) removing the A-1

12  Unitholders from their position so that it could have exclusive access to (and the benefits of)

13  the assets held in ASOT; and (5) approving a transaction that has deepened the insolvency

14  concerns regarding ASOT.

15      82.     As the result of these actions, Archstone-Smith improperly benefited

16  from its multiple breaches of fiduciary duty and acts of self-dealing.  Archstone-Smith, the

17  fiduciary, retained and enhanced the value of its interests in the properties held in ASOT

18  before the Tishman-Lehman Acquisition while stripping Plaintiffs, to whom a fiduciary

19  duty was owed, of their A-1 common units, i.e., their pre-acquisition interests in the

20  properties.

21      83.     In taking these actions, Archstone-Smith acted at all times in bad faith,

22  with gross negligence, and/or in reckless disregard of its duties as trustee of ASOT.

23      84.     In taking these actions, Archstone-Smith acted with malice and

24  oppression toward Plaintiffs, as it intentionally and willfully trampled their rights, and

25  knowingly ignored its own fiduciary duties, in order to unjustly enrich itself.

26      85.     As the direct and proximate result of these bad faith and gross breaches

27  of fiduciary duty, Plaintiffs were damaged.

28

1    86.    The damages were suffered by Plaintiffs as beneficiaries of ASOT, and

2  not by ASOT.

3    87.    The proper remedy for the breach of these fiduciary duties is the

4  money damages caused by the breach, which are in excess of $100 million.

5    88.    As a result of the Tishman-Lehman Acquisition, the Tishman Speyer

6  Trust has assumed the assets and liabilities of Archstone-Smith, thereby rendering it jointly

7  and severally liable for Archstone-Smith's breaches of fiduciary duty.

8    **SECOND CAUSE OF ACTION**

9    **For Breach of Fiduciary Duties Owed by Controlling Interest Holder**

10    **(Against Tishman Speyer Trust)**

11    89.    Plaintiffs incorporate by reference, as if fully set forth herein, each of

12  the preceding paragraphs of the Complaint.

13    90.    At all relevant times, Archstone-Smith, as the controlling interest

14  holder of almost 90% of the common units of ASOT, owed fiduciary duties to Plaintiffs, as

15  holders of a minority of common units, including duties not to exercise its control for its

16  own benefit and adverse to the interests of the minority unitholders.  These duties are

17  separate from the duties Archstone-Smith owed to ASOT and all unitholders of ASOT as

18  trustee.

19    91.    Archstone-Smith breached these duties through its participation in, and

20  its orchestration of, the squeezing of Plaintiffs from their interest in the assets held by

21  ASOT, to the detriment of Plaintiffs and simply to serve the interests of Archstone-Smith

22  and the other Defendants.

23    92.    As the result of these actions, Archstone-Smith improperly benefited

24  from its multiple breaches of fiduciary duty and acts of self-dealing.

25    93.    In taking these actions, Archstone-Smith acted at all times in bad faith,

26  with gross negligence, and in reckless disregard of its duties as trustee of ASOT.

27

28

1    94.    In taking these actions, Archstone-Smith acted with malice and

2  oppression toward Plaintiffs, as it intentionally and willfully trampled Plaintiffs' rights, and

3  knowingly ignored its own fiduciary duties, in order to unjustly enrich itself.

4    95.    As the direct and proximate result of these bad faith and gross breaches

5  of fiduciary duty, Plaintiffs were damaged.

6    96.    The damages were suffered by Plaintiffs as beneficiaries of ASOT, and

7  not by ASOT.

8    97.    The proper remedy for the breach of these fiduciary duties is the

9  money damages caused by the breach, which are in excess of $100 million.

10    98.    As a result of the Tishman-Lehman Acquisition, the Tishman Speyer

11  Trust has assumed the assets and liabilities of Archstone-Smith, thereby rendering it jointly

12  and severally liable for Archstone-Smith's breaches of fiduciary duty.

13                              **THIRD CAUSE OF ACTION**

14                **For Aiding and Abetting Breach of Fiduciary Duties**

15                    **(Against Defendants Lehman, Tishman-Speyer**

16                    **Real Estate Venture, Tishman, and Morgan Stanley)**

17    99.    Plaintiffs incorporate by reference, as if fully set forth herein, each of

18  the preceding paragraphs of the Complaint.

19    100.    Archstone-Smith owed Plaintiffs fiduciary duties both as the sole

20  trustee of ASOT and as the controlling unitholder of ASOT.

21    101.    Tishman, Lehman, and Morgan Stanley were aware of the duties owed

22  by Archstone-Smith to Plaintiffs.

23    102.    Tishman, Lehman, and Morgan Stanley substantially assisted,

24  encouraged, and aided and abetted Archstone-Smith's multiple breaches of fiduciary duty.

25    103.    Tishman, Lehman, and Morgan Stanley acted with the knowledge that

26  their actions would contribute to Archstone-Smith's breaches of fiduciary duty.

27

28

                                    - 35 -
                                  COMPLAINT

1    104.   Tishman, Lehman, and Morgan Stanley acted with the intent to have
2  Archstone-Smith breach its fiduciary duties for their own profit and at the expense of
3  Plaintiffs and in violation of the duties owed them by their fiduciary and granted them by
4  the Declaration of Trust and Tax-Related Agreements.

5    105.   As such, Tishman, Lehman, and Morgan Stanley acted with malice and
6  oppression toward Plaintiffs in aiding and abetting Archstone-Smith's willful and deliberate
7  trampling of Plaintiffs' rights in order to unjustly profit at Plaintiffs' expense.

8    106.   Without the advice and guidance of Tishman, Lehman, and Morgan
9  Stanley, as well as their active participation in the transaction, Archstone-Smith could not
10  have breached its duties owed to Plaintiffs.

11    107.   As a direct and proximate result of these breaches of fiduciary duty,
12  Plaintiffs were damaged.

13    108.   The proper remedy for the breach of these fiduciary duties is the
14  money damages caused by the breach, which are in excess of $100 million.

15                    **FOURTH CAUSE OF ACTION**
16             **For Breach of Contract—Declaration of Trust**
17                  **(Against Tishman Speyer Trust)**

18    109.   Plaintiffs incorporate by reference, as if fully set forth herein, each of
19  the preceding paragraphs of the Complaint.

20    110.   The Declaration of Trust is a binding contract between Archstone-
21  Smith and Plaintiffs.

22    111.   Article II, Section 2 of the Declaration of Trust, and Sections 5.3A, 9.2,
23  12.3, and 12.4 of the Annex to the Declaration of Trust, were breached when, as part of the
24  Tishman-Lehman Acquisition, the Declaration of Trust was amended, without Plaintiffs'
25  consent, in a manner that adversely affected Plaintiffs, including by altering their interests
26  in profits, their distribution rights set forth in Articles 3 and 4 of the Declaration of Trust,
27  and their redemption rights set forth in Section 6.6 of the Declaration of Trust.

28

1    112.    As the result of these actions, Archstone-Smith improperly benefited

2  from its breaches of contract.

3    113.    Archstone-Smith acted at all times in bad faith, with willful

4  misfeasance, and with gross negligence.

5    114.    As the direct and proximate result of these breaches, Plaintiffs suffered

6  damages in excess of $100 million.

7    115.    As a result of the Tishman-Lehman Acquisition, the Tishman Speyer

8  Trust assumed the assets and liabilities of Archstone-Smith, thereby rendering it jointly and

9  severally liable for Archstone-Smith's breaches of fiduciary duty.

10                    **FIFTH CAUSE OF ACTION**

11          **For Breach of Contract – Tax-Related Agreements (Consent)**

12                    **(Against Tishman Speyer Trust)**

13    116.    Plaintiffs incorporate by reference, as if fully set forth herein, each of

14  the preceding paragraphs of the Complaint.

15    117.    The Tax-Related Agreements are binding contracts between

16  Archstone-Smith and Plaintiffs and/or Plaintiffs are third-party beneficiaries of the Tax-

17  Related Agreements.

18    118.    The Tax-Related Agreements were breached when, as part of the

19  Tishman-Lehman Acquisition, Archstone-Smith assigned its obligations under the Tax-

20  Related Agreements without Plaintiffs' consent.

21    119.    As the result of these actions, Archstone-Smith improperly benefited

22  from its breaches of contract.

23    120.    Archstone-Smith acted at all times in bad faith, with willful

24  misfeasance, and with gross negligence.

25    121.    As a direct and proximate result of this breach, Plaintiffs suffered

26  damages in excess of $100 million.

27

28

1    122.   As a result of the Tishman-Lehman Acquisition, the Tishman Speyer

2  Trust assumed the assets and liabilities of Archstone-Smith, thereby rendering it jointly and

3  severally liable for Archstone-Smith's breaches of contract.

4  ### SIXTH CAUSE OF ACTION

5  ### For Tortious Interference with Contract

6  ### (Against Defendants Lehman, Tishman-Speyer

7  ### Real Estate Venture, Tishman, and Morgan Stanley)

8    123.   Plaintiffs incorporate by reference, as if fully set forth herein, each of

9  the preceding paragraphs of the Complaint.

10    124.   The Tax-Related Agreements and Declaration of Trust were binding

11  contracts between Archstone-Smith and Plaintiffs and/or Plaintiffs are third-party

12  beneficiaries of the Tax-Related Agreements.

13    125.   Tishman, Lehman, and Morgan Stanley were aware of the existence of

14  these contracts between Archstone-Smith and Plaintiffs.

15    126.   Archstone-Smith, with the assistance of Tishman, Lehman, and

16  Morgan Stanley, breached its obligations under the Tax-Related Agreements by (a) failing

17  to pay Plaintiffs the amounts owed under the Tax-Related Agreements as a result of the

18  Tishman-Lehman Acquisition, (b) assigning Archstone-Smith's obligations under the Tax-

19  Related Agreements without first obtaining Plaintiffs' consent, and (c) repudiating any

20  further obligation under the Tax-Related Agreements to make payments to the A-1

21  Unitholders.

22    127.   Archstone-Smith, with the assistance of Tishman, Lehman, and

23  Morgan Stanley, breached the Declaration of Trust when it amended the Declaration of

24  Trust, without Plaintiffs' consent, in a manner that adversely affected Plaintiffs, including

25  Plaintiffs' rights to profits, distributions, and redemption.

26    128.   Tishman, Lehman, and Morgan Stanley intentionally interfered with

27  these contracts, providing direct assistance and encouragement to Archstone-Smith in its

28

1  breaches of these contracts.  This intentional interference was both wrongful and without

2  justification.

3         129.    As such, Tishman, Lehman, and Morgan Stanley acted with malice and

4  oppression toward Plaintiffs.

5         130.    As a direct and proximate result, Plaintiffs suffered damages in excess

6  of $100 million.

7                              **DEMAND FOR JURY TRIAL**

8         131.    Demand is hereby made for a trial by jury as to all issues so triable.

9                                **PRAYER FOR RELIEF**

10         WHEREFORE, based upon the above facts and allegations, Plaintiffs seek

11  judgments against Defendants as follows:

12         (a)     For compensatory damages of $100 million plus such additional

13  damages as proved at trial.

14         (b)     For punitive and exemplary damages in amounts to be determined at

15  trial, pursuant to Section 3294(a) of the California Code of Civil Procedure.

16         (c)     For an award of attorneys' fees, including pursuant to Section 13.14 of

17  the Master Agreement.

18         (d)     For an award of costs and interest pursuant to Sections 1032 and

19  1033.5 of the California Code of Civil Procedure and Sections 3288 and 3289 of the

20  California Civil Code.

21         (e)     For such other relief as justice and equity require.

22

23

24

25

26

27

28

1   Dated:  July 2, 2008

                                      Respectfully submitted,

2

                                        KINSELLA, WEITZMAN, ISER, KUMP

3                                         & ALDISERT LLP

4

5                                         By: _Dale F. Kinsella_ / js

                                            Dale F. Kinsella (State Bar No. 135046)

6

7                                         808 Wilshire Blvd.

                                        3rd Floor

8                                         Santa Monica, CA  90401

                                        (310) 566-9800

9

10                                         WILLIAMS & CONNOLLY LLP (Of Counsel)

                                        Philip A. Sechler

11                                         John E. Joiner

                                        Vidya A. Mirmira

12                                         725 Twelfth Street, N.W.

13                                         Washington, DC 20005

                                        (202) 434-5000

14

15                                         Attorneys for Plaintiffs

                                        Howard F. Ruby, Howard F. Ruby Trust, Marina del

16                                         Rey Country Club Apartments, Oakwood Garden

                                        Apartments-San Jose North, Oakwood LaSalle, LP,

17                                         SBCA-Mid Wilshire GP, LLC, Ken and Wendy

18                                         Ruby Living Trust, Ken Ruby, and Wendy Ruby

19

20

21

22

23

24

25

26

27

28

# Exhibit D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2007

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from        to

Commission File Number 1-10272

# Archstone-Smith Operating Trust
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Maryland** | **90-0042860** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |

**9200 E. Panorama Circle, Suite 400
Englewood, Colorado 80112**
(Address of principal executive offices and zip code)

**(303) 708-5959**
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing for the past 90 days.

Yes ☒        No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large Accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐        No ☒

At November 1, 2007, none of the Common Units were held by non-affiliates.

**Table of Contents**

Item | Description

**PART I – Financial Information**

1. Financial Statements
   Condensed Consolidated Balance Sheets – September 30, 2007 (Unaudited) and December 31, 2006
   Condensed Consolidated Statements of Earnings – Three and Nine Months Ended September 30, 2007 and 2006 (Unaudited)
   Condensed Consolidated Statement of Unitholders' Equity, Other Common Unitholders' Interest and Comprehensive Income – Nine Months Ended September 30, 2007 (Unaudited)
   Condensed Consolidated Statements of Cash Flows – Nine Months Ended September 30, 2007 and 2006 (Unaudited)
   Notes to Condensed Consolidated Financial Statements (Unaudited)
   Report of Independent Registered Public Accounting Firm
2. Management's Discussion and Analysis of Financial Condition and Results of Operations
3. Quantitative and Qualitative Disclosures about Market Risk
4. Controls and Procedures

**PART II – Other Information**

1. Legal Proceedings
1A. Risk Factors
2. Unregistered Sales of Equity Securities and Use of Proceeds
3. Defaults Upon Senior Securities
4. Submission of Matters to a Vote of Security Holders
5. Other Information
6. Exhibits

**PART I—FINANCIAL INFORMATION**
Item 1. Financial Statements

Archstone−Smith Operating Trust

Condensed Consolidated Balance Sheets

(In thousands, except unit data)

| | | September 30, 2007 | | December 31, 2006 |
|---|---|---|---|---|
| | | (Unaudited) | | |
| **ASSETS** | | | | |
| Real estate | $ | 12,706,277 | $ | 12,945,862 |
| Real estate — held−for−sale | | 259,711 | | 241,778 |
| Accumulated depreciation | | (1,004,186) | | (957,146) |
| | | 11,961,802 | | 12,230,494 |
| Investments in and advances to unconsolidated entities | | 562,476 | | 235,323 |
| Net investments | | 12,524,278 | | 12,465,817 |
| Cash and cash equivalents | | 14,781 | | 48,655 |
| Restricted cash in tax−deferred exchange and bond escrow | | 317,222 | | 319,312 |
| Other assets | | 389,505 | | 425,343 |
| Total assets | $ | 13,245,786 | $ | 13,259,127 |
| **LIABILITIES AND UNITHOLDERS' EQUITY** | | | | |
| Liabilities: | | | | |
| Unsecured credit facilities | $ | 900,437 | $ | 84,723 |
| Unsecured loans — International | | — | | 235,771 |
| Long−Term Unsecured Debt | | 2,990,015 | | 3,355,699 |
| Mortgages payable | | 2,045,178 | | 2,758,275 |
| Mortgages payable — held−for−sale | | 17,813 | | 17,959 |
| Accounts payable | | 71,346 | | 71,967 |
| Accrued interest | | 49,383 | | 67,135 |
| Accrued expenses and other liabilities | | 308,401 | | 365,260 |
| Total liabilities | | 6,382,573 | | 6,956,789 |
| Other common unitholders' interest, at redemption value (A−1 Common Units: 26,229,731 in 2007 and 29,514,128 in 2006) | | 1,577,456 | | 1,718,017 |
| Unitholders' equity: | | | | |
| Perpetual Preferred Units | | 50,000 | | 50,000 |
| Common unitholders' equity (A−2 Common Units: 223,603,858 units in 2007 and 220,147,167 units in 2006) | | 5,224,552 | | 4,530,801 |
| Accumulated other comprehensive income | | 11,205 | | 3,520 |
| Total unitholders' equity | | 5,285,757 | | 4,584,321 |
| Total liabilities and unitholders' equity | $ | 13,245,786 | $ | 13,259,127 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

3

**Archstone−Smith Operating Trust**

**Condensed Consolidated Statements of Earnings**

**(In thousands, except per unit amounts)**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Revenues: | | | | |
| Rental revenues | $ 282,158 | $ 244,704 | $ 827,305 | $ 667,213 |
| Other income | 15,243 | 27,299 | 44,406 | 57,100 |
| | 297,401 | 272,003 | 871,711 | 724,313 |
| Expenses: | | | | |
| Rental expenses | 68,122 | 61,032 | 198,879 | 152,535 |
| Real estate taxes | 25,115 | 19,824 | 77,343 | 57,565 |
| Depreciation on real estate investments | 68,416 | 57,000 | 205,710 | 166,760 |
| Interest expense | 70,744 | 60,163 | 210,360 | 150,402 |
| General and administrative expenses | 21,601 | 18,497 | 60,732 | 49,794 |
| Other expenses | 5,578 | 4,734 | 12,571 | 15,923 |
| | 259,576 | 221,250 | 765,595 | 592,979 |
| Earnings from operations | 37,825 | 50,753 | 106,116 | 131,334 |
| Income/(loss) from unconsolidated entities | (4,542) | 2,088 | (3,540) | 31,484 |
| Other non−operating income | 26,488 | 1,718 | 28,430 | 2,137 |
| Earnings before discontinued operations | 59,771 | 54,559 | 131,006 | 164,955 |
| Earnings from discontinued operations | 339,268 | 95,552 | 661,982 | 321,802 |
| Net earnings | 399,039 | 150,111 | 792,988 | 486,757 |
| Preferred Unit distributions | (958) | (957) | (2,874) | (2,872) |
| Net earnings attributable to Common Units — Basic | $ 398,081 | $ 149,154 | $ 790,114 | $ 483,885 |
| Interest on Convertible Debt | 6,345 | — | 19,935 | — |
| Net earnings attributable to Common Units — Diluted | $ 404,426 | $ 149,154 | $ 810,049 | $ 483,885 |
| Weighted average Common Units outstanding: | | | | |
| Basic | 250,216 | 248,695 | 250,230 | 247,950 |
| Diluted | 260,033 | 249,643 | 260,032 | 248,810 |
| Earnings per Common Unit — Basic: | | | | |
| Earnings before discontinued operations | $ 0.23 | $ 0.22 | $ 0.51 | $ 0.65 |
| Discontinued operations, net | 1.36 | 0.38 | 2.65 | 1.30 |
| Net earnings | $ 1.59 | $ 0.60 | $ 3.16 | $ 1.95 |
| Earnings per Common Unit — Diluted: | | | | |
| Earnings before discontinued operations | $ 0.23 | $ 0.22 | $ 0.51 | $ 0.65 |
| Discontinued operations, net | 1.33 | 0.38 | 2.61 | 1.29 |
| Net earnings | $ 1.56 | $ 0.60 | $ 3.12 | $ 1.94 |
| Distributions paid per Common Unit | — | $ 0.4350 | $ 0.9050 | $ 1.3050 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

4

**Archstone−Smith Operating Trust**

**Condensed Consolidated Statement of Unitholders' Equity,
Other Common Unitholders' Interest and Comprehensive Income**

**Nine Months Ended September 30, 2007**

**(In thousands)
(Unaudited)**

| | Perpetual Preferred Units at Aggregate Liquidation Preference | Common Unitholders' Equity | Accumulated Other Comprehensive Income /(Loss) | Total Unitholders' Equity | Other Common Unitholders' Interest | Total |
|---|---|---|---|---|---|---|
| Balances at December 31, 2006 | $ 50,000 | $ 4,530,801 | $ 3,520 | $ 4,584,321 | $ 1,718,017 | $ 6,302,338 |
| Comprehensive income: | | | | | | |
| Net earnings | — | 706,120 | — | 706,120 | 86,868 | 792,988 |
| Change in fair value of hedges, net | — | — | (570) | (570) | — | (570) |
| Reclassification adjustment for realized net gains on marketable securities | — | — | (1,794) | (1,794) | — | (1,794) |
| Change in fair value of marketable securities | — | — | (14) | (14) | — | (14) |
| Foreign currency exchange translation, net | — | — | 10,063 | 10,063 | — | 10,063 |
| Comprehensive income attributable to Common Units | — | — | — | — | | 800,673 |
| Preferred Unit dividends | — | (2,874) | — | (2,874) | — | (2,874) |
| Common Unit dividends | — | (202,471) | — | (202,471) | (25,397) | (227,868) |
| A−1 Common Units converted into A−2 Common Units | — | 55,378 | — | 55,378 | (55,378) | — |
| Issuance of Common Units under Dividend Reinvestment Plan | — | 20,493 | — | 20,493 | — | 20,493 |
| Exercise of options | — | 11,489 | — | 11,489 | — | 11,489 |
| Equity−classified awards under Compensation Plans | — | 7,882 | — | 7,882 | — | 7,882 |
| Adjustment to redemption value | — | 88,641 | — | 88,641 | (88,641) | — |
| Common Unit redemptions | — | — | — | — | (59,080) | (59,080) |
| Issuance of A−1 Common Units in exchange for real estate | — | — | — | — | 1,067 | 1,067 |
| Other, net | — | 9,093 | — | 9,093 | — | 9,093 |
| Balances at September 30, 2007 | $ 50,000 | $ 5,224,552 | $ 11,205 | $ 5,285,757 | $ 1,577,456 | $ 6,863,213 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

5

**Archstone−Smith Operating Trust**
**Condensed Consolidated Statements of Cash Flows**

**(In thousands)**
**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| Operating activities: | | |
| Net earnings | $ 792,988 | $ 486,757 |
| Adjustments to reconcile net earnings to net cash flow provided by operating activities: | | |
| Depreciation and amortization | 220,614 | 222,360 |
| Gains on dispositions of depreciated real estate | (647,213) | (314,246) |
| Gains on sale of marketable equity securities | (1,867) | — |
| Change in swap value — DeWAG derivatives | — | 1,407 |
| Provision for possible loss on investments | — | 4,328 |
| Gains on sale of International Fund shares | (14,044) | — |
| Foreign currency gains on International investments | (12,387) | — |
| Equity in earnings from unconsolidated entities | 8,889 | 3,610 |
| Interest accrued on Mezzanine loans | (2,425) | (7,814) |
| Change in other assets | (41,159) | 14,757 |
| Change in accounts payable, accrued expenses and other liabilities | (16,447) | 22,854 |
| Other, net | 5,720 | (6,733) |
| Net cash flow provided by operating activities | 292,669 | 427,280 |
| | | |
| Investing activities: | | |
| Real estate investments | (2,034,088) | (1,826,663) |
| Purchase of DeWAG net of cash acquired of $20,364 | — | (252,428) |
| Change in investments in unconsolidated entities, net | (43,981) | (67,523) |
| Proceeds from disposal of International Fund shares | 98,857 | — |
| Investment in International Fund | (104,924) | — |
| Proceeds from dispositions | 1,766,241 | 1,190,054 |
| Change in restricted cash | 2,090 | 440,695 |
| Change in notes receivable, net | 38,288 | (83,592) |
| Other, net | (29,858) | 7,679 |
| Net cash flow used by investing activities | (307,375) | (591,778) |
| | | |
| Financing activities: | | |
| Proceeds from Long−Term Unsecured Debt, net | — | 859,385 |
| Payments on Long−Term Unsecured Debt | (367,397) | (31,250) |
| Proceeds from (payments on) unsecured credit facilities, net | 921,351 | (368,864) |
| Principal repayment of mortgages payable, including prepayment penalties | (76,338) | (220,410) |
| Regularly scheduled principal payments on mortgages payable | (9,989) | (11,723) |
| Proceeds from term loan to fund DeWAG investment | — | 272,792 |
| Proceeds from Unsecured loans — International | 142,657 | — |
| Principal repayments on Unsecured loans — International | (378,428) | — |
| Proceeds from Common Units issued under DRIP and employee stock options | 29,933 | 46,913 |
| Cash dividends paid on Common Units | (227,868) | (324,044) |
| Cash dividends paid on Preferred Units | (2,874) | (2,872) |
| Redemption of A−1 Units | (59,080) | — |
| Other, net | 8,865 | (16,987) |
| Net cash flow provided (used) by financing activities | (19,168) | 202,940 |
| Net change in cash and cash equivalents | (33,874) | 38,442 |
| Cash and cash equivalents at beginning of period | 48,655 | 13,638 |
| Cash and cash equivalents at end of period | $ 14,781 | $ 52,080 |
| Significant non−cash investing and financing activities: | | |
| Common Units issued in exchange for real estate | $ 1,067 | $ 81,412 |
| A−1 Common Units converted to A−2 Common Units | 55,378 | 107,758 |
| Assumption of mortgages payable upon purchase of apartment communities | 15,000 | 728,484 |

In connection with the formation of the International Fund, we contributed assets and liabilities at book value. The assets consisted of real estate of approximately $1.0 billion and accounts receivable and other assets of $0.1 billion. The liabilities consisted of mortgages and unsecured credit facilities of $0.7 billion and other accounts payable and accrued expenses of $0.1 billion.

These Condensed Consolidated Statements of Cash Flows combine cash flows from discontinued operations with cash flows from continuing operations.

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

6

Archstone−Smith Operating Trust

Notes to Condensed Consolidated Financial Statements

September 30, 2007 and 2006
(Unaudited)

(1)          Description of the Business and Summary of Significant Accounting Policies

*Business*

Archstone−Smith is structured as an UPREIT under which all property ownership and business operations are conducted through Archstone−Smith Operating Trust, which we refer to herein as the "Operating Trust." Archstone−Smith was our sole trustee and owned approximately 89.5% of the Operating Trust's outstanding Common Units at September 30, 2007; the remaining 10.5% of the Common Units were owned by minority interest holders. As used herein, "we," "our" and the "company" refers to the Operating Trust and Archstone−Smith, collectively, except where the context otherwise requires. Archstone−Smith is an equity REIT organized under the laws of the State of Maryland. We focus on creating value for our unitholders by acquiring, developing, redeveloping and operating apartments in markets characterized by protected locations with limited land for new housing construction, expensive single−family home prices, and a strong, diversified economic base with significant employment growth potential.

*Consummation of Agreement to be Acquired*

On May 29, 2007, Archstone−Smith announced it had signed a definitive Merger Agreement, dated as of May 28, 2007 (as amended by Amendment No. 1 thereto, the "Merger Agreement"), whereby both Archstone−Smith and the Operating Trust would be acquired by subsidiaries of an entity jointly controlled by affiliates of Tishman Speyer Real Estate Venture VII, L.P., and Lehman Brothers Holdings, Inc. (the "Buyer Parties"). The transactions contemplated by the Merger Agreement were consummated on October 4 and 5, 2007. As a result of the transactions contemplated by the Merger Agreement, the sole trustee of the Operating Trust, effective as of October 5, 2007, is Tishman Speyer Archstone−Smith Multifamily Series I Trust ("Series I Trust"), which along with Tishman Speyer Archstone−Smith Multifamily Series II, L.L.C ("Series II Trust") and Tishman Speyer Archstone−Smith Multifamily Series III, L.L.C ("Series III Trust") owns 100% of the Operating Trust's outstanding Common Units.

Under the terms of the Merger Agreement, all outstanding Common Shares of Archstone−Smith were acquired by the Series I Trust, the Series II Trust and the Series III Trust for $60.75 in cash, without interest and less applicable withholding taxes, for each Common Share issued and outstanding immediately prior to the effective time of the merger. With respect to the outstanding Series I Preferred Shares, the Buyer Parties elected to replace them with substantially identical Series I Preferred Shares of the Series I Trust.

As part of the transaction, the Operating Trust merged on October 4, 2007 with River Trust Acquisition (MD), LLC, a subsidiary of the Buyer Parties ("MergerSub"). Although the Operating Trust is the surviving entity, MergerSub is viewed as the acquiror for accounting purposes. Each Class A−2 Common Unit remains outstanding. Approximately 4.5 million Class A−1 Common Units, held by more than 300 holders, were converted into the right to receive an equivalent number of newly issued Series O Preferred Units, whereas holders of approximately 21.6 million Class A−1 Common Units elected to exchange their Class A−1 Common Units for cash consideration of $60.75 without interest and less applicable withholding taxes. Each Series O Preferred Unit has a redemption price of $60.75 and bears cumulative preferential distributions payable quarterly at an annual rate of 6%. The distribution rate will increase to 8% per annum under certain circumstances, including during any period when the ratio of total debt to total assets exceeds 0.85 to 1.00. The Series O Preferred Units, which have only limited voting rights, are redeemable by the holder or the Operating Trust under certain circumstances. The Series I Preferred Units remain outstanding and unchanged. Each Series M Preferred Unit and each Series N−1 and N−2 Convertible Preferred Unit was converted into the right to receive one newly issued Series P Preferred Unit, Series Q−1 Preferred Unit and Series Q−2 Preferred Unit, respectively, of the Operating Trust.

Further, immediately after the effective time of the Operating Trust merger, the Buyer Parties caused the Operating Trust to make certain material asset distributions to Archstone−Smith. In connection with the transaction, the Operating Trust distributed approximately $2.9 billion of real estate, based on cost, to affiliated entities.

7

*Interim Financial Reporting*

The accompanying Condensed Consolidated Financial Statements of the Operating Trust are unaudited and certain information and footnote disclosures normally included in financial statements have been omitted. While management believes that the disclosures presented are adequate for interim reporting, these interim financial statements should be read in conjunction with the financial statements and notes included in the Operating Trust's Annual Report on Form 10–K, for the year ended December 31, 2006 ("2006 Form 10–K"). See the glossary in our 2006 Form 10–K for definitions of all initially–capitalized terms not defined herein.

In the opinion of management, the accompanying unaudited financial statements contain all adjustments necessary for a fair presentation of the Operating Trust's financial statements for the interim periods presented. The results of operations for the three and nine months ended September 30, 2007 are not necessarily indicative of the results to be expected for the entire year.

*Principles of Consolidation*

The accounts of the Operating Trust and its controlled subsidiaries are consolidated in the accompanying financial statements. All significant inter–company accounts and transactions have been eliminated. We use the equity method to account for investments that do not qualify as variable interest entities, variable interest entities where we are not the primary beneficiary and entities that we do not control, or where we do not own a majority of the economic interest, but have the ability to exercise significant influence over the operating and financial policies of the investee. We also use the equity method when we function as the managing member and our partner does not have substantive participating rights or we can be replaced by a partner if we are the managing member. For an investee accounted for under the equity method, our share of net earnings or losses of the investee is reflected in income as earned and dividends are credited against the investment as received.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect amounts reported in the financial statements and the related notes. Actual results could differ from management's estimates. Estimates and assumptions are reviewed periodically and the effects of revisions are reflected in the period they are determined to be necessary.

*Real Estate and Depreciation*

We allocate the cost of newly acquired properties between net tangible and identifiable intangible assets. When allocating cost to an acquired property, we first allocate costs to the estimated intangible value of the existing lease agreements and then to the estimated value of the land, building and fixtures assuming the property is vacant. We estimate the intangible value of the lease agreements by determining the lost revenue associated with a hypothetical lease–up. We depreciate the building and fixtures based on the expected useful life of the asset and amortize the intangible value of the lease agreements over the average remaining life of the existing leases. This amortization expense is included in depreciation on real estate investments in our Condensed Consolidated Statements of Earnings.

*Intangibles*

Intangible assets consist of lease–related intangibles and certain intangibles associated with the DeWAG acquisition. See Note 3. The market value of above and below market leases are based on our estimate of current market rents as compared to the rent that we are receiving and is recorded in either other assets or other liabilities. These assets are charged and liabilities are credited to rental income over the estimated term of the lease. We also recognize the value of our in–place lease agreements and amortize these assets into depreciation on real estate investments over the estimated term of the lease.

We will perform an impairment test annually, or more frequently, if events or changes in circumstances indicate impairment of our intangible assets, which are included in other assets.

8

### Revenue and Gain Recognition

We generally lease our apartment units under operating leases with terms of one year or less. Communities subject to the Oakwood Master Leases entered into in 2005 have a seven-year term, expiring between July 2012 and March 2013, subject to Oakwood's right to terminate individual leases under certain circumstances. As of September 30, 2007, none of the Oakwood Master Lease Communities has been returned to the company. The aggregate annual contractual base rent due under these leases is $74.1 million and is subject to annual adjustments on January 1st of each year equal to the percentage change in the average Same-Store NOI growth for certain other specified properties. Rental income related to leases is recognized in the period earned over the lease term in accordance with Statement of Financial Accounting Standards SFAS No.13, "*Accounting for Leases.*" Rent concessions are recognized as an offset to revenues collected over the term of the underlying lease. We use the full accrual method of profit recognition in accordance with SFAS No. 66 to record gains on sales of real estate. If we sell improvements and retain a lease on the underlying land that covers substantially all of the economic life of the improvements, then we defer the profit associated with the land and record the profit ratably over the life of the lease. Accordingly, we evaluate the related GAAP requirements in determining the profit to be recognized at the date of each sale transaction (i.e., the profit is determinable and the earnings process is complete). We recognize deferred gains when a property is sold to a third party. Further, during periods when our ownership interests in an investee decrease, we will recognize gains related to previously deferred proceeds to coincide with our new ownership interest in the investee.

### Rental Expenses

Rental expenses shown on the accompanying Condensed Consolidated Statements of Earnings include costs associated with on-site and property management personnel, utilities, repairs and maintenance, property insurance, marketing, landscaping and other on-site and related administrative costs. Utility reimbursements from residents, which are recorded as offsets to utility expenses, aggregated $5.3 million and $5.4 million for the three months ended September 30, 2007 and 2006, respectively, and $18.1 million and $17.4 million for the nine months ended September 30, 2007 and 2006, respectively, including amounts reclassified to discontinued operations for the respective periods.

### Insurance Recoveries

We recognize insurance recovery proceeds as other income if the recovery is related to items that were originally expensed, such as legal settlements, legal expenses and repairs that did not meet capitalization guidelines. For recoveries of property damages that were eligible for capitalization, we reduce the basis of the property or if the property has subsequently been sold, we recognize the proceeds as an additional gain on sale. We recognize insurance recoveries at such time that we believe the recovery is probable and we have sufficient information to make a reasonable estimate of proceeds, except in cases where we have to pursue recovery via litigation. In this circumstance, we recognize the recovery when we have a signed, legally binding agreement with the insurance carrier.

### Legal Fees

We generally recognize legal expenses as incurred; however, if such fees are related to the accrual for an estimated legal settlement, we accrue for the related incurred and anticipated legal fees at the same time we accrue the estimated cost of settlement.

### Foreign Operations

Assets and liabilities of the company's foreign operations are translated into U.S. dollars at the exchange rate in effect at the balance sheet date. Revenue and expenses are translated at average rates in effect during the period. The resulting translation adjustment on our permanent investment is reflected as accumulated other comprehensive income, a separate component of unitholders' equity on the Condensed Consolidated Balance Sheets, while the change in the exchange rate on our temporary investment is included in our other non-operating income on the Condensed Consolidated Statements of Earnings. The functional currency utilized for these entities is the Euro. Upon the sale of our foreign operations, the gain or loss on the sale will include the foreign currency amounts previously recorded in accumulated other comprehensive income.

9

*Derivative Financial Instruments*

We utilize derivative financial instruments to manage our interest rate risk, foreign currency exchange risk, exposure to changes in the fair value of certain investments in equity securities and exposure to volatile energy prices. The resulting assets and liabilities associated with derivative financial instruments are carried on our financial statements at estimated fair value at the end of each reporting period. The changes in fair value of a fair value hedge and the fair value of the items hedged are generally recorded in earnings for each reporting period. The change in the fair value of effective cash flow hedges and foreign currency hedges are carried on our financial statements as a component of accumulated other comprehensive income. If effective, our hedges have little or no impact on our current earnings.

*Income Taxes*

We have made an election to be taxed as a partnership under the Internal Revenue Code of 1986, as amended, and we believe we qualify as a partnership and have made all required distributions of our taxable income.

Income taxes for our taxable REIT subsidiaries are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in earnings in the period that includes the enactment date. A valuation allowance for deferred income tax expense is provided if we believe that we will not realize the tax benefit.

*Comprehensive Income*

Comprehensive income, which is defined as net earnings and all other non−owner changes in equity, is displayed in the accompanying Condensed Consolidated Statement of Unitholders' Equity, Other Common Unitholders' Interest and Comprehensive Income. Other comprehensive income reflects unrealized holding gains and losses on the available−for−sale investments, changes in the fair value of effective cash flow hedges and gains and losses on long−term foreign currency transactions.

Our accumulated other comprehensive income for the nine months ended September 30, 2007 was as follows (in thousands):

| | Net Unrealized Gains on Marketable Securities | Cash Flow Hedges | Foreign Currency Translation | Accumulated Other Comprehensive Income |
|---|---|---|---|---|
| Balance at December 31, 2006 | $ 1,822 | $ (554) | $ 2,252 | $ 3,520 |
| Change in fair value of hedges, net | — | (738) | — | (738) |
| Change in fair value of long−term debt hedges | — | 168 | — | 168 |
| Foreign currency exchange translation, net | — | — | 10,063 | 10,063 |
| Change in fair value of marketable securities | (14) | — | — | (14) |
| Reclassification adjustment for realized net gains on marketable securities | (1,794) | — | — | (1,794) |
| Balance at September 30, 2007 | $ 14 | $ (1,124) | $ 12,315 | $ 11,205 |

10

*Per Unit Data*

Following is a reconciliation of basic net earnings per Common Unit to diluted net earnings per Common Unit for the periods indicated (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| **Reconciliation of numerator between basic and diluted net earnings per Common Unit(1):** | | | | |
| Net earnings attributable to Common Units — Basic | $  398,081 | $  149,154 | $  790,114 | $  483,885 |
| Interest on Convertible Debt | 6,345 | — | 19,935 | — |
| Net earnings attributable to Common Units — Diluted | $  404,426 | $  149,154 | $  810,049 | $  483,885 |
| **Reconciliation of denominator between basic and diluted net earnings per Common Unit(1):** | | | | |
| Weighted average number of Common Units outstanding — Basic | 250,216 | 248,695 | 250,230 | 247,950 |
| Assumed conversion of Convertible Debt into Common Units | 9,039 | — | 9,039 | — |
| Incremental options | 778 | 948 | 763 | 860 |
| Weighted average number of Common Units outstanding — Diluted | 260,033 | 249,643 | 260,032 | 248,810 |

---

(1)     Excludes the impact of potentially dilutive equity securities during periods in which they are anti–dilutive.

To calculate net earnings per Common Unit, we allocate the interest on the Convertible Debt on a pro–rata basis between continuing and discontinued operations.

*New Accounting Pronouncements*

In July 2006, the FASB issued Interpretation No. 48 (FIN 48), *"Accounting for Uncertainty in Income Taxes — An Interpretation of FASB Statement No. 109."* FIN 48 defines a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. The provisions of FIN 48 are effective for fiscal years beginning after December 15, 2006. The adoption of FIN 48 as of January 1, 2007 by us did not have a material effect on our financial position, net earnings or cash flows.

We recognize these tax positions and evaluate them using a two–step process. First, we determine whether a tax position is more likely than not (greater than 50 percent probability) to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. Then, we measure to determine the amount of benefit to recognize and record the amount of the benefit that is more likely than not to be realized upon ultimate settlement.

We or one of our subsidiaries files income tax returns in the U.S. federal jurisdiction, and various states and foreign jurisdictions. With few exceptions, we are not subject to U.S. federal, state and local, or non–U.S. income tax examinations by tax authorities for years before 2001. As of September 30, 2007, no taxing authority had proposed any significant adjustments to our tax positions. We have no significant current tax examinations in process.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in thousands):

| | | |
|---|---|---|
| Unrecognized Tax Benefits: | | |
| Balance at January 1, 2007 | $ | 2,021 |
| Current Period Interest | | 111 |
| Balance at September 30, 2007 | $ | 2,132 |

We are required to recognize interest and penalties accrued related to unrecognized tax benefits in tax expense. As of the date of adoption, the company has accrued interest of approximately $228,000 and we have not recorded any penalties.

11

In September 2006, the FASB issued SFAS No. 157, *"Fair Value Measurements."* SFAS No. 157 defines fair value, establishes a framework for measuring fair value in GAAP and expands disclosures about fair value measurements. The statement does not require new fair value measurements, but is applied to the extent other accounting pronouncements require or permit fair value measurements. The statement emphasizes fair value as a market-based measurement which should be determined based on assumptions market participants would use in pricing an asset or liability. We will be required to disclose the extent to which fair value is used to measure assets and liabilities, the inputs used to develop the measurements, and the effect of certain of the measurements on earnings (or changes in net assets) for the period. SFAS No. 157 is effective for fiscal years beginning after November 15, 2007.

In February 2007, the FASB issued SFAS No. 159, *"The Fair Value Option for Financial Assets and Financial Liabilities,"* which gives entities the option to measure eligible financial assets, financial liabilities and firm commitments at fair value on an instrument-by-instrument basis (i.e., the fair value option), which are otherwise not permitted to be accounted for at fair value under other accounting standards. The election to use the fair value option is available when an entity first recognizes a financial asset or financial liability or upon entering into a firm commitment. Subsequent changes in fair value must be recorded in earnings. Additionally, SFAS No. 159 allows for a one-time election for existing positions upon adoption, with the transition adjustment recorded to beginning retained earnings. This statement is effective for fiscal years beginning after November 15, 2007. We do not anticipate the adoption of this statement will have a material impact on our financial position, results of operations or cash flows.

**(2)     Real Estate**

*Investments in Real Estate*

Investments in real estate, at cost, were as follows (dollar amounts in thousands):

| | September 30, 2007 Investment | December 31, 2006 Investment |
|---|---|---|
| Operating Trust Apartment Communities: | | |
| Operating communities | $     11,658,490 | $     11,208,052 |
| Communities under construction | 297,316 | 406,881 |
| Development communities In Planning(1) | 141,799 | 75,538 |
| Total Operating Trust apartment communities | 12,097,605 | 11,690,471 |
| Ameriton(1) | 688,367 | 585,524 |
| International | 53,892 | 851,593 |
| Other real estate assets(2) | 126,124 | 60,052 |
| Total real estate | $     12,965,988 | $     13,187,640 |

(1)         Includes development communities In Planning – Owned but excludes In Planning – Under Control. Our investment as of September 30, 2007 and December 31, 2006 for development communities In Planning – Under Control was $13.3 million and $7.6 million, respectively, and is reflected in the "Other assets" caption of our Condensed Consolidated Balance Sheets.

(2)         Includes land that is not In Planning and other non-multifamily real estate assets.

12

The change in investments in real estate, at cost, consisted of the following (in thousands):

| | | |
|---|---|---:|
| Balance at December 31, 2006 | $ | 13,187,640 |
| Acquisition–related expenditures | | 1,420,132 |
| Redevelopment expenditures | | 37,328 |
| Recurring capital expenditures | | 30,340 |
| Development expenditures, including initial acquisition costs | | 348,793 |
| Acquisition of land for development | | 213,261 |
| Dispositions | | (1,195,068) |
| International Fund formation (See Note 3) | | (1,034,524) |
| Other | | 820 |
| Net apartment community activity | | (178,918) |
| Change in other real estate assets | | (42,734) |
| Balance at September 30, 2007 | $ | 12,965,988 |

At September 30, 2007, we had unfunded contractual commitments of $625.5 million related primarily to communities under construction and under redevelopment. The purchase prices of certain recent acquisitions in California and Washington were allocated to land, buildings and other assets based on preliminary estimates and are subject to change as we obtain more complete information regarding land, building and lease intangibles values.

### (3)    DeWAG Acquisition and International Fund Formation

On July 27, 2006, we acquired 94% of the shares and 94% of an outstanding shareholder loan of DeWAG Deutsche WohnAnlage GmbH ("DeWAG"), a company that specializes in the acquisition, ownership, operation and re–sale of quality residential properties in the major metropolitan areas of Southern and Western Germany, as well as West Berlin. Our purchase price consisted of approximately $271 million plus the assumption of approximately $509 million in DeWAG liabilities, based on the exchange rate on the transaction date. We finalized our purchase price allocation related to the acquisition and there were no significant adjustments to the original allocation.

Effective June 29, 2007, we contributed our ownership in certain German real estate entities, including those in DeWAG, into a German real estate fund. In this report we refer to the combined group of entities in which we have ownership interests as the "International Fund." The combined total assets and third–party liabilities associated with the contribution were $1.1 billion and $0.8 billion, respectively. We recognized a gain of $14.0 million on the shares that were sold, which is included in other non–operating income and we have deferred a gain of $11.2 million related to the common equity that we own at September 30, 2007. As of September 30, 2007, approximately 55% of the International Fund's common equity was owned by third–party investors with the remainder owned by the Operating Trust. Although our economic interest is significant, we do not control the International Fund. We will recognize our proportionate share of the earnings or losses using the equity method of accounting. The accompanying Condensed Consolidated Balance Sheet as of September 30, 2007 reflects the International Fund on the equity method as a result of deconsolidation, whereas the Condensed Consolidated Balance Sheet as of December 31, 2006 reflects our German real estate entities contributed to the International Fund on a consolidated basis. The accompanying Condensed Consolidated Statements of Earnings reflect operations associated with entities contributed to the International Fund on a consolidated basis through June 30, 2007 and on an equity method basis for the quarter ended September 30, 2007. Please refer to Note 5 for further information.

As part of our DeWAG acquisition in 2006, we acquired a management company which is now known as Archstone Management Germany ("AMG"). The assets of AMG consist principally of the goodwill created in the DeWAG transaction and non–compete agreements entered into with certain key officers of DeWAG. We concluded that the goodwill was primarily attributable to the people and processes which comprise the investing and the operating platform we acquired in the DeWAG transaction, none of which were contributed to the International Fund. AMG will earn fees for acting as the manager of the International Fund, and is expected to earn additional fees and incentives by providing other services including, but not limited to asset management, acquisition, disposition, financing, accounting and administrative activities. We may also earn incentive performance fees if certain investor returns are achieved over a specified period.

As of September 30, 2007, the non–compete agreements had a gross carrying amount of $21.3 million and accumulated amortization of $6.7 million. We are amortizing these agreements over a three–year period.

13

The changes in the carrying amount of goodwill are as follows (in thousands):

| | | |
|---|---|---:|
| Balance at December 31, 2006 | $ | 35,450 |
| Purchase accounting and fund formation adjustments | | 6,131 |
| Change in foreign currency translation | | 3,661 |
| Balance at September 30, 2007 | $ | 45,242 |

**(4)    Discontinued Operations**

The results of operations for properties sold during the period or designated as held–for–sale at the end of the period are required to be classified as discontinued operations. The property specific components of net earnings that are classified as discontinued operations include rental revenues, rental expenses, real estate taxes, depreciation expense, minority interest, income taxes, a pro–rata allocation of interest expense and the net gain or loss on the disposition of properties.

We had six operating apartment communities, representing 2,031 units (unaudited), classified as held–for–sale under the provisions of SFAS No. 144, at September 30, 2007. Accordingly, we have reclassified the operating earnings from these properties to discontinued operations for the three and nine months ended September 30, 2007 and 2006. During the nine months ended September 30, 2007, we sold 21 REIT and five Ameriton operating properties. The operating results of these communities and the related gain on sale are also included in discontinued operations for 2007 and 2006.

The following is a summary of net earnings from discontinued operations (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---:|---:|---:|---:|
| | 2007 | 2006 | 2007 | 2006 |
| Rental revenues | $ 14,894 | $ 61,831 | $ 77,470 | $ 214,693 |
| Rental expenses | (4,655) | (17,984) | (20,224) | (59,694) |
| Real estate taxes | (1,193) | (6,360) | (8,119) | (25,684) |
| Depreciation on real estate investments | (375) | (12,659) | (8,154) | (45,752) |
| Interest expense(1) | (3,301) | (13,877) | (16,973) | (49,475) |
| Income taxes from taxable REIT subsidiaries | (1,244) | 1,492 | (4,354) | (9,979) |
| Provision for possible loss on real estate investment | — | — | — | (4,328) |
| Debt extinguishment costs related to dispositions | (1,543) | (825) | (2,537) | (7,588) |
| Gains from the disposition of REIT real estate investments, net | 332,536 | 79,984 | 629,444 | 258,960 |
| Internal disposition costs — REIT transactions(2) | (387) | (267) | (1,462) | (1,094) |
| Gains from the disposition of taxable REIT subsidiary real estate investments, net | 4,869 | 4,631 | 17,769 | 55,286 |
| Internal disposition costs — taxable REIT subsidiary transactions(2) | (333) | (414) | (878) | (3,543) |
| Earnings from discontinued apartment communities | $ 339,268 | $ 95,552 | $ 661,982 | $ 321,802 |

(1)    Interest expense included in discontinued operations is allocated to properties based on each asset's cost in relation to the company's leverage ratio and the average effective interest rate for each respective period.

(2)    Represents the direct and incremental compensation and related costs associated with the employees dedicated to our significant disposition activity.

The real estate and mortgage payable balances associated with operating communities classified as held–for–sale are reflected as "Real estate – held–for–sale" and "Mortgages payable – held–for–sale" in the accompanying Condensed Consolidated Balance Sheets.

The disposition proceeds associated with the sales of individual rental units by our foreign subsidiaries are included in continuing operations as such sales do not meet the requirements under SFAS 144, *"Accounting for the Impairment or Disposal of Long–Lived Assets,"* to be reflected as discontinued operations.

14

**(5)    Investments in and Advances to Unconsolidated Entities**

We have investments in real estate entities that we account for using the equity method. A summary of our investments in and advances to unconsolidated entities follows (dollar amounts in thousands):

| | September 30, 2007 | | December 31, 2006 | |
| | Investment | Number of Ventures | Investment | Number of Ventures |
|---|---|---|---|---|
| Operating Trust | $ 210,974 | 12 | $ 199,705 | 13 |
| Ameriton | 62,752 | 7 | 35,618 | 5 |
| Domestic | 273,726 | 19 | 235,323 | 18 |
| International Fund | 288,750 | 1 | — | — |
| Total | $ 562,476 | 20 | $ 235,323 | 18 |

Our combined weighted average percentage of ownership in unconsolidated entities based on total assets at September 30, 2007 was 41.22%.

Combined summary balance sheet data for our investments in unconsolidated entities presented on a stand-alone basis follows (in thousands):

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| Assets: | | |
| Real estate | $ 2,790,648 | $ 1,530,659 |
| Other assets | 307,969 | 213,569 |
| Total assets | $ 3,098,617 | $ 1,744,228 |
| Liabilities and owners' equity: | | |
| Inter-company debt payable to Operating Trust | $ 113 | $ 1,519 |
| Mortgages payable(1) | 1,931,023 | 1,063,451 |
| Other liabilities | 321,199 | 126,048 |
| Total liabilities | 2,252,335 | 1,191,018 |
| Owners' equity | 846,282 | 553,210 |
| Total liabilities and owners' equity | $ 3,098,617 | $ 1,744,228 |

(1)    The Operating Trust guarantees $292.0 million of the outstanding debt balance of certain of our Archstone-Smith development ventures as of September 30, 2007 and is committed to guarantee another $39.9 million upon funding of additional debt.

Selected combined summary results of operations for our unconsolidated investees presented on a stand-alone basis follows (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Operating Trust Joint Venture revenues | $ 41,847 | $ 35,662 | $ 119,117 | $ 99,634 |
| Net earnings(1) | 5,003 | 8,225 | 1,771 | 40,261 |
| Ameriton Joint Venture revenues | $ 156 | $ 53 | $ 584 | $ 276 |
| Net earnings/(loss)(2) | (217) | (136) | 3,626 | 18,185 |
| International Fund revenues | $ 19,688 | $ — | $ 19,688 | $ — |
| Net loss(3) | (9,804) | — | (9,804) | — |
| Total revenues | $ 61,691 | $ 35,715 | $ 139,389 | $ 99,910 |
| Total net earnings | $ (5,018) | $ 8,089 | $ (4,407) | $ 58,446 |

15

(1)         Includes gains associated with the disposition of Operating Trust Joint Venture assets of $4.2 million and $9.3 million for the three months ended September 30, 2007 and 2006, and $4.2 million and $37.1 million for the nine months ended September 30, 2006, respectively.

(2)         Includes Ameriton's share of pre–tax gains associated with the disposition of real estate joint venture assets of $4.0 million and $19.7 million for the nine months ended September 30, 2007 and 2006, respectively.

(3)         The International Fund was formed at the end of June 2007 and the related earnings/(loss) for periods prior to formation are therefore incorporated into our consolidated results.

(6)       **Mortgage and Other Notes Receivable**

The change in mortgage and other notes receivable, which are included in other assets, during the nine months ended September 30, 2007 consisted of the following (in thousands):

| | | |
|---|---|---:|
| Balance at December 31, 2006 | $ | 123,261 |
| Funding of additional notes | | 13,097 |
| Accrued interest | | 5,074 |
| Prepayments | | (52,128) |
| Balance at September 30, 2007 | $ | 89,304 |

We have a commitment to fund an additional $49.9 million under existing agreements. Our rights to the underlying collateral on these notes in the event of default are generally subordinate to the primary mortgage lender. We evaluate the collectibility of our mezzanine and other notes receivable on a quarterly basis. We recognized interest income associated with notes receivable of $2.9 million and $5.5 million for the three months ended September 30, 2007 and 2006, respectively, and $9.1 million and $13.4 million for the nine months ended September 30, 2007 and 2006, respectively. The weighted average contracted interest rate on these notes as of September 30, 2007 was approximately 12.2%.

(7)       **Borrowings**

*Unsecured Credit Facilities*

Our $600 million unsecured credit facility, which is led by JPMorgan Chase Bank, N.A., bears interest at the greater of the prime rate or the federal funds rate plus 0.50% or, at our option, LIBOR plus 0.40%. The spread over LIBOR can vary from LIBOR plus 0.325% to LIBOR plus 1.00%, based upon the rating of our long–term unsecured senior notes. The facility contains an accordion feature that allows us to increase the size of the commitment to $1.0 billion at any time during the life of the facility, subject to lenders providing additional commitments, and enables us to borrow up to $150 million in foreign currencies.

On May 29, 2007, we entered into an agreement with Morgan Stanley Senior Funding, Inc., that provides for a $500 million unsecured revolving line of credit. This facility bears interest at the greater of the prime rate or the federal funds rate plus 0.50% or, at our option, LIBOR plus 0.40%. The spread over LIBOR can vary from LIBOR plus 0.325% to LIBOR plus 1.00%, based upon the rating of our long–term unsecured senior notes. The credit facility was scheduled to mature in December 2007 and was paid off in connection with the merger.

16

The following table summarizes our revolving credit facility borrowings under our lines of credit (in thousands, except for percentages):

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| Total unsecured revolving credit facilities | $ 1,100,000 | $ 600,000 |
| Borrowings outstanding at end of period | 871,000 | 80,000 |
| Outstanding letters of credit under the JPMorgan Chase Bank facility | 13,977 | 14,880 |
| Weighted average daily borrowings | 485,095 | 100,474 |
| Maximum borrowings outstanding during the period | 965,427 | 360,000 |
| Weighted average daily nominal interest rate | 5.5% | 5.0% |
| Weighted average daily effective interest rate | 5.8% | 6.3% |

We also have a short-term unsecured borrowing agreement with JPMorgan Chase Bank, N.A., which provides for maximum borrowings of $100 million. The borrowings under the agreement bear interest at an overnight rate agreed to at the time of borrowing and ranged from 5.6% to 6.2% during the nine-month period ended September 30, 2007. There were $29.4 million of borrowings outstanding under the agreement at September 30, 2007, and $4.7 million of borrowings outstanding at December 31, 2006. The credit facility was paid off in connection with the merger.

*Long-Term Unsecured Debt*

A summary of our Long-Term Unsecured Debt outstanding at September 30, 2007 and December 31, 2006 follows (dollar amounts in thousands):

| Type of Debt | Coupon Rate(1) | Effective Interest Rate(1)(2) | Balance at September 30, 2007 | Balance at December 31, 2006 | Average Remaining Life (Years) |
|---|---|---|---|---|---|
| Long-term unsecured senior notes | 5.4% | 5.7% | $ 2,930,366 | $ 3,279,404 | 5.3 |
| Unsecured tax-exempt bonds | 4.0% | 4.9% | 59,649 | 76,295 | 14.3 |
| Total/Weighted average | 5.4% | 5.6% | $ 2,990,015 | $ 3,355,699 | 5.5 |

(1)     Represents a fixed rate for the long-term unsecured notes and a variable rate for the unsecured tax-exempt bonds.

(2)     Includes the effect of fair value hedges, loan cost amortization and other ongoing fees and expenses, where applicable.

*Mortgages Payable*

Our mortgages payable generally feature either monthly interest and principal payments or monthly interest-only payments with balloon payments due at maturity. Early repayment of mortgages is generally subject to prepayment penalties.

17

A summary of mortgages payable follows (dollar amounts in thousands):

| | Outstanding Balance at(1) | | Effective Interest Rate(2) |
| | September 30, 2007 | December 31, 2006 | |
|---|---|---|---|
| Secured floating rate debt: | | | |
| Tax–exempt debt | $ 837,238 | $ 935,536 | 5.5% |
| Conventional mortgages | 47,925 | 167,020 | 5.9% |
| Total Floating | 885,163 | 1,102,556 | 5.5% |
| Secured fixed rate debt: | | | |
| Tax–exempt debt | 84 | 3,086 | 6.4% |
| Conventional mortgages | 1,159,643 | 1,651,650 | 6.1% |
| Other secured debt | 18,101 | 18,942 | 4.6% |
| Total Fixed | 1,177,828 | 1,673,678 | 6.0% |
| Total mortgages payable | $ 2,062,991 | $ 2,776,234 | 5.8% |

(1)     Includes the unamortized fair market value adjustment associated with assumption of fixed rate mortgages in connection with real estate acquisitions. The unamortized balance aggregated $33.3 million and $43.9 million at September 30, 2007 and December 31, 2006, respectively, and is being amortized as a credit to interest expense over the life of the underlying debt.

(2)     Includes the effect of fair value hedges, credit enhancement fees, the amortization of fair market value purchase adjustment, and other related costs, where applicable.

The change in mortgages payable during the nine months ended September 30, 2007 consisted of the following (in thousands):

| | | |
|---|---|---|
| Balance at December 31, 2006 | $ | 2,776,234 |
| Regularly scheduled principal amortization | | (9,989) |
| Borrowings, prepayments, final maturities and other, net | | (78,924) |
| International Fund formation (See Note 3) | | (624,330) |
| Balance at September 30, 2007 | $ | 2,062,991 |

*Other*

The majority of our debt was paid off in connection with the merger and replaced with new debt to finance a significant portion of the transaction.

The book value of total assets pledged as collateral for mortgage loans and other obligations at September 30, 2007 and December 31, 2006 was $4.3 billion and $5.6 billion, respectively. Our debt instruments generally contain covenants common to the type of facility or borrowing, including financial covenants establishing minimum debt service coverage ratios and maximum leverage ratios. We were in compliance with all financial covenants pertaining to our debt instruments at September 30, 2007.

The total interest paid on all outstanding debt was $120.0 million and $96.5 million for the three months ended September 30, 2007 and 2006, respectively, and $283.6 million and $244.8 million for the nine months ended September 30, 2007 and 2006, respectively. We capitalize interest incurred during the construction period as part of the cost of apartment communities under development. Capitalized interest was $12.2 million and $13.3 million for the three months ended September 30, 2007 and 2006, respectively, and $37.6 million and $39.6 million for the nine months ended September 30, 2007 and 2006, respectively.

18

**(8)    Distributions to Unitholders**

The following table summarizes the quarterly cash distributions paid per unit on Common and Preferred Units during the three and nine months ended September 30, 2007. We will not pay any additional distributions on Common Units and will continue to pay $7,660 per year related to the Series I Perpetual Preferred Units in accordance with the terms of the Merger Agreement. Please see Note I for a discussion of the merger of Archstone–Smith.

| | Quarterly Cash Distribution Per Unit | | Cash Distribution Per Unit for the Nine Months Ended September 30, 2007 | |
|---|---|---|---|---|
| Common Units | $ | — | $ | 0.905 |
| Series I Perpetual Preferred Units(1) | $ | 1,915 | $ | 5,745 |

(1)    Series I Preferred Units have a par value of $100,000 per unit.

**(9)    Benefit Plans and Implementation of SFAS 123R**

Our long–term incentive plan was approved in 1997 and was modified in connection with the Smith merger. There have been seven types of awards under the plan: (i) options with a DEU feature (only awarded prior to 2000); (ii) options without the DEU feature (generally awarded after 1999); (iii) RSU awards with a DEU feature (awarded prior to 2006); (iv) RSU awards with a cash dividend payment feature (awarded after 2005); (v) employee share purchase program with matching options without the DEU feature, granted only in 1997 and 1998; (vi) performance units, which are convertible into Common Shares upon vesting, issued to certain named executives under a Special Long–Term Incentive Program; and (vii) stock appreciation rights.

No more than 20.0 million share or option awards in the aggregate may be granted under the plan, and no individual may be awarded more than 1.0 million share or option awards in any one–year period. As of September 30, 2007, Archstone–Smith had approximately 9.6 million shares available for future issuance. Non–qualified options constitute an important component of compensation for officers below the level of senior vice president and for selected employees.

A summary of share option activity for the options and RSUs is presented below:

| | Option Awards | | RSU Awards | |
|---|---|---|---|---|
| | Options | Weighted Average Exercise Price | Units | Weighted Average Grant Price |
| Balance, December 31, 2006 | 1,831,355 | $ 30.14 | 946,615 | $ 31.82 |
| Granted | 388,017 | $ 58.62 | 175,176 | $ 58.62 |
| Exercised/Settled | (165,369) | $ 33.70 | (99,532) | $ 28.86 |
| Forfeited | (22,306) | $ 42.63 | — | — |
| Expired | — | — | — | — |
| Balance, March 31, 2007 | 2,031,697 | $ 35.16 | 1,022,259 | $ 36.72 |
| Granted | 4,102 | $ 53.05 | 12,000 | $ 53.05 |
| Exercised/Settled | (135,537) | $ 27.09 | (39,248) | $ 27.77 |
| Forfeited | (26,935) | $ 49.61 | (23,633) | $ 48.61 |
| Expired | — | — | — | — |
| Balance, June 30, 2007 | 1,873,327 | $ 35.57 | 971,378 | $ 36.99 |
| Granted | — | — | — | — |
| Exercised/Settled | (28,316) | $ 22.78 | — | — |
| Forfeited | (1,570) | $ 56.19 | — | — |
| Expired | — | — | — | — |
| Balance, September 30, 2007 | 1,843,441 | $ 34.92 | 971,378 | 36.99 |

Certain of the options and RSUs, included in the table above, have a DEU feature. The aggregate number of vested DEUs outstanding as of September 30, 2007 was approximately 240,000. During the nine months ended September 30, 2007, we recorded $185,000 as a charge to operating expense related to unvested DEUs and $1,620,000 of Common Share dividends related to vested DEUs.

19

*Options*

During the nine months ended September 30, 2007 and 2006, the share options granted to associates had a calculated fair value of $8.44 and $5.52 per option, respectively. The historical exercise patterns of the associate groups receiving option awards are similar, and therefore we used only one set of assumptions in calculating fair value for each period. For the three and nine months ended September 30, 2007, the calculated fair value was determined using the Black–Scholes–Merton valuation model, using a weighted average risk–free interest rate of 4.44%, a weighted average dividend yield of 3.39%, a volatility factor of 18.62% and a weighted average expected life of four years. For the three and nine months ended September 30, 2006, the calculated fair value was determined using the Black–Scholes–Merton valuation model, using a weighted average risk–free interest rate of 4.66%, a weighted average dividend yield of 4.57%, a volatility factor of 18.30% and a weighted average expected life of four years. The options vest over a three–year period and have a contractual term of 10 years. We used an estimated forfeiture rate of 10% in recording option compensation expense for the three and nine months ended September 30, 2007, based primarily on historical experience. The unamortized compensation cost is $2.9 million, which includes all options previously granted but not yet vested. This amount will be recorded as compensation cost on the merger date.

The total intrinsic value of the share options exercised during the nine–month periods ended September 30, 2007 and 2006 were $9.9 million and $26.0 million, respectively. The intrinsic value is defined as the difference between the realized fair value of the share or the quoted fair value at the end of the period, less the exercise price of the option. We had 1.1 million fully vested options outstanding at September 30, 2007 with a weighted average exercise price of $26.86. The weighted–average contractual life of the fully vested options is 5.18 years, and they have an intrinsic value of $37.6 million. In addition, we have 657,100 options outstanding that we expect to vest with a weighted average exercise price of $51.80. The weighted–average contractual life of the unvested options is 9.23 years, and they have an intrinsic value of $5.5 million.

*Restricted Share Units*

Also during the nine months ended September 30, 2007 and 2006, we issued RSUs to senior officers and trustees of the company with an average grant date fair value of $58.26 and $45.77, respectively per share. The units vest over a three–year period and the related unamortized compensation cost is $13.4 million, which includes all units previously granted but not yet vested. This amount will be recorded as compensation cost on the merger date.

We had 576,318 fully vested RSUs outstanding at September 30, 2007 with a weighted average grant date fair value of $28.53. The weighted–average contractual life for the fully vested shares is 5.12 years and the intrinsic value is $34.7 million. In addition, we have 390,685 RSUs outstanding that we expect to vest with a weighted average grant date fair value of $49.40. The weighted–average contractual life for the unvested shares is 9.04 years and the intrinsic value is $19.3 million. The total intrinsic value of the RSUs settled during the nine–month periods ended September 30, 2007 and 2006 were $8.3 million and $3.5 million, respectively.

*Special Long–Term Incentive Program*

Effective January 1, 2006, a special long–term incentive program related to the achievement of total shareholder return performance targets was established for certain of our executive officers. We would issue approximately 300,000 performance units if all performance targets are ultimately met as of December 31, 2008. The calculated grant date fair value of approximately $4.8 million is being charged to compensation expense ratably over the three–year term of the plan. The calculated fair value was determined by an independent third party using a Monte Carlo simulation approach which yielded an estimated payout percentage of 41%. The related unamortized compensation cost at September 30, 2007 is $1.3 million and will be recorded as compensation cost on the merger date.

*Summary*

The compensation cost associated with all awards for the nine months ended September 30, 2007 was approximately $10.0 million, of which approximately $7.9 million was charged to operating expenses, and approximately $2.1 million related to dedicated investment personnel was capitalized with respect to development and other qualifying investment activities. The compensation cost associated with all awards for the nine months ended September 30, 2006 was approximately $8.9 million, of which approximately $6.7 million was charged to operating expenses, and approximately $2.2 million

20

related to dedicated investment personnel was capitalized with respect to development and other qualifying investment activities. The unamortized compensation cost of $16.4 million will be recorded as compensation cost on the merger date.

**(10)    Segment Data**

We have determined that our garden communities and our High−Rise communities have similar economic characteristics and meet the other GAAP criteria, which permit the garden communities and High−Rise communities to be aggregated into two reportable segments. Additionally, we have defined the activity from Ameriton as an individual operating segment, as its primary focus is the opportunistic acquisition, development and eventual disposition of real estate with a short−term investment horizon. NOI is defined as rental revenues less rental expenses and real estate taxes. We rely on NOI for purposes of making decisions about resource allocations and assessing segment performance. We also believe NOI is a valuable means of comparing year−to−year operating performance.

Following are reconciliations, which exclude the amounts classified as discontinued operations, of each reportable segment's (i) revenues to consolidated revenues; (ii) NOI to consolidated earnings from operations; and (iii) assets to consolidated assets, for the periods indicated (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Reportable apartment communities segment revenues: | | | | |
| Same−Store: | | | | |
| Garden communities | $ 125,665 | $ 118,861 | $ 356,391 | $ 334,579 |
| High−Rise communities | 98,945 | 93,606 | 254,710 | 242,440 |
| Non Same−Store and other: | | | | |
| Garden communities | 24,489 | 4,334 | 65,495 | 16,774 |
| High−Rise communities | 25,865 | 11,155 | 97,843 | 50,312 |
| Ameriton communities(1) | 3,042 | 348 | 6,084 | (460) |
| International and other non−reportable operating segment revenues | 4,152 | 16,400 | 46,782 | 23,568 |
| Total segment and consolidated rental revenues | $ 282,158 | $ 244,704 | $ 827,305 | $ 667,213 |
| Reportable apartment communities segment NOI: | | | | |
| Same−Store: | | | | |
| Garden communities | $ 86,576 | $ 81,618 | $ 248,741 | $ 234,409 |
| High−Rise communities | 68,066 | 63,756 | 175,165 | 168,180 |
| Non Same−Store and other: | | | | |
| Garden communities | 13,491 | 2,086 | 35,637 | 9,194 |
| High−Rise communities | 16,539 | 5,310 | 62,904 | 30,976 |
| Ameriton communities(1) | 1,391 | 136 | 2,915 | (446) |
| International and other non−reportable operating segment revenues | 2,858 | 10,942 | 25,721 | 14,800 |
| Total segment NOI | 188,921 | 163,848 | 551,083 | 457,113 |
| Reconciling items: | | | | |
| Other income | 15,243 | 27,299 | 44,406 | 57,100 |
| Depreciation on real estate investments | (68,416) | (57,000) | (205,710) | (166,760) |
| Interest expense | (70,744) | (60,163) | (210,360) | (150,402) |
| General and administrative expenses | (21,601) | (18,497) | (60,732) | (49,794) |
| Other expenses | (5,578) | (4,734) | (12,571) | (15,923) |
| Consolidated earnings from operations | $ 37,825 | $ 50,753 | $ 106,116 | $ 131,334 |

21

(1)     While rental revenue and NOI are the primary measures we use to evaluate the performance of our assets, management also utilizes gains from the disposition of real estate when evaluating the performance of Ameriton, as its primary focus is the opportunistic acquisition, development and eventual disposition of real estate with a short-term investment horizon. Pre-tax net gains from the disposition of Ameriton operating communities were $4.5 million and $4.2 million for the three months ended September 30, 2007 and 2006, respectively, and $16.9 million and $51.7 million for the nine months ended September 30, 2007 and 2006, respectively. These gains are classified within discontinued operations. Additionally, Ameriton had gains from the sale of unconsolidated joint venture assets that are classified within income from unconsolidated entities and gains from land sales that are classified within other income. Ameriton assets are excluded from our Same-Store population as they are acquired or developed to achieve short-term opportunistic gains, and therefore, the average holding period is typically much shorter than the holding period of assets operated by the Operating Trust.

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| Reportable operating communities segment assets, net: | | |
| Same-Store: | | |
| Garden communities | $ 3,580,569 | $ 3,610,111 |
| High-Rise properties | 2,993,519 | 3,028,995 |
| Non Same-Store: | | |
| Garden communities | 2,116,288 | 2,760,786 |
| High-Rise properties | 2,095,779 | 1,818,834 |
| Ameriton | 600,145 | 461,276 |
| FHA/ADA settlement accrual | 16,103 | 29,185 |
| International | 51,811 | 48,438 |
| Other non-reportable operating segment assets | 283,133 | 264,246 |
| Total segment assets | 11,737,347 | 12,021,871 |
| Real estate held-for-sale, net | 224,455 | 208,623 |
| Total segment assets | 11,961,802 | 12,230,494 |
| | | |
| Reconciling items: | | |
| Investment in and advances to unconsolidated entities | 562,476 | 235,323 |
| Cash and cash equivalents | 14,781 | 48,655 |
| Restricted cash in tax-deferred exchange escrow | 317,222 | 319,312 |
| Other assets | 389,505 | 425,343 |
| Consolidated total assets | $ 13,245,786 | $ 13,259,127 |

    Total capital expenditures for garden communities included in continuing operations were $18.3 million and $15.7 million for the three months ended September 30, 2007 and 2006, respectively, and $47.0 million and $38.5 million for the nine months ended September 30, 2007 and 2006, respectively. Total capital expenditures for High-Rise properties included in continuing operations were $15.9 million and $15.7 million for the three months ended September 30, 2007 and 2006, respectively, and $33.0 million and $43.8 million for the nine months ended September 30, 2007 and 2006, respectively. Total capital expenditures for Ameriton properties included in continuing operations were $0.7 million and $0.2 million for the three months ended September 30, 2007 and 2006, respectively, and $1.3 million and $0.8 million for the nine months ended September 30, 2007 and 2006, respectively.

**(11)    Litigation and Contingencies**

    On May 30, 2007, two separate purported shareholder class-action lawsuits related to the Merger Agreement and the transactions contemplated thereby were filed naming the company and each of the company's trustees as defendants. One of these lawsuits, *Seymour Schiff v. James A. Cardwell, et al.* (Case No. 2007cv1135), was filed in the United States District Court for the District of Colorado. The other, *Mortimer J. Cohen v. Archstone-Smith Trust, et al.* (Case No. 2007cv1060), was filed in the District Court, County of Arapahoe, Colorado. On May 31, 2007, two additional purported shareholder class-action lawsuits related to the Merger Agreement and the transactions contemplated thereby were filed in the District Court, County of Arapahoe, Colorado. The first, *Howard Lasker v. R. Scot Sellers, et al.* (Case No. 2007cv1073), names the

22

company, each of the company's trustees and one of the company's senior officers as defendants. The second, *Steamship Trade Association/International Longshoremen's Association Pension Fund v. Archstone−Smith Trust, et al.* (Case No. 2007cv1070), names the company, each of the company's trustees, Tishman Speyer and Lehman Brothers as defendants. On June 11, 2007, an additional purported shareholder class–action lawsuit related to the Merger Agreement, *Doris Staehr v. Archstone−Smith Trust, et al.* (Case No. 2007cv1081), was filed in the District Court, County of Arapahoe, Colorado, naming the company and each of the company's trustees as defendants. All five lawsuits allege, among other things, that the company's trustees violated their fiduciary duties to the company's shareholders in approving the mergers.

On June 21, 2007, the District Court, County of Arapahoe, Colorado entered an order consolidating the *Lasker, Steamship Trade Association/International Longshoremen's Association Pension Fund* and *Staehr* actions into the *Cohen* action, under the caption *In re Archstone−Smith Trust Shareholder Litigation.*

On August 17, 2007, we and the other defendants entered into a memorandum of understanding with the plaintiffs regarding the settlement of both the *Schiff* and the consolidated action captioned *In re Archstone−Smith Trust Shareholder Litigation.* In connection with the settlement, we agreed to make certain additional disclosures to our shareholders. Subject to the completion of certain confirmatory discovery by counsel to the plaintiffs, the memorandum of understanding contemplates that the parties will enter into a stipulation of settlement. The stipulation of settlement will be subject to customary conditions, including court approval following notice to our shareholders and consummation of the merger. In the event that the parties enter into a stipulation of settlement, a hearing will be scheduled at which the court will consider the fairness, reasonableness and adequacy of the settlement, which, if finally approved by the court, will resolve all of the claims that were or could have been brought in the actions being settled, including all claims relating to the merger, the merger agreement and any disclosure made in connection therewith. In addition, in connection with the settlement, the parties contemplate that plaintiffs' counsel will petition the court for an award of attorneys' fees and expenses to be paid by us, up to an agreed–upon limit. There can be no assurance that the parties will ultimately enter into a stipulation of settlement or that the court will approve the settlement even if the parties were to enter into such stipulation. In such event, the proposed settlement as contemplated by the memorandum of understanding may be terminated. The settlement will not affect the amount of the merger consideration that the plaintiffs are entitled to receive in the merger. We and the other defendants vigorously deny all liability with respect to the facts and claims alleged in the lawsuits, and specifically deny that any modifications to the Merger Agreement or any further supplemental disclosure was required under any applicable rule, statute, regulation or law. However, to avoid the risk of delaying or adversely affecting the merger and the related transactions, to minimize the expense of defending the lawsuits, and to provide additional information to our shareholders at a time and in a manner that would not cause any delay of the merger, we and our trustees agreed to the settlement described above. We and the other defendants further considered it desirable that the actions be settled to avoid the substantial burden, expense, risk, inconvenience and distraction of continued litigation and to fully and finally resolve the settled claims.

During the second quarter of 2005, we entered into a full and final settlement in the United States District Court for the District of Maryland with three national disability organizations and agreed to make capital improvements in a number of our communities in order to make them fully compliant with the FHA and ADA. The litigation, settled by this agreement, alleged lack of full compliance with certain design and construction requirements under the two federal statutes at 71 of the company's wholly–owned and joint venture communities, of which we still own or have an interest in 40. As part of the settlement, the three disability organizations all recognized that the Operating Trust had no intention to build any of its communities in a manner inconsistent with the FHA or ADA.

The amount of the capital expenditures required to remediate the communities named in the settlement was estimated at $47.2 million and was accrued as an addition to real estate during the fourth quarter of 2005. The settlement agreement approved by the court allows us to remediate each of the designated communities over a three–year period, and also provides that we are not restricted from selling any of our communities during the remediation period. We agreed to pay damages totaling $1.4 million, which included legal fees and costs incurred by the plaintiffs. We had $16.1 million of the original accrual remaining on September 30, 2007.

We are subject to various claims filed in 2002 and 2003 in connection with moisture infiltration and resulting mold issues at certain High–Rise properties we once owned in Southeast Florida. These claims generally allege that water infiltration and resulting mold contamination resulted in the claimants having personal injuries and/or property damage. Although certain of these claims continue to be in various stages of litigation, with respect to the majority of these claims, we

23

have either settled the claims and/or we have been dismissed from the lawsuits that had been filed. With respect to the lawsuits that have not been resolved, we continue to defend these claims in the normal course of litigation.

We are a party to various other claims and routine litigation arising in the ordinary course of business. We do not believe that the results of any such claims or litigation, individually or in the aggregate, will have a material adverse effect on our business, financial position or results of operations.

24

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Trustee and Unitholders
Archstone–Smith Operating Trust:

    We have reviewed the accompanying condensed consolidated balance sheet of Archstone–Smith Operating Trust and subsidiaries as of September 30, 2007, and the related condensed consolidated statements of earnings for the three and nine months ended September 30, 2007 and 2006, condensed consolidated statement of unitholders' equity, other common unitholders' interest and comprehensive income for the nine months ended September 30, 2007, and condensed consolidated statements of cash flows for the nine months ended September 30, 2007 and 2006. These condensed consolidated financial statements are the responsibility of Archstone–Smith Operating Trust's management.

    We conducted our reviews in accordance with standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

    Based on our reviews, we are not aware of any material modifications that should be made to the Condensed Consolidated Financial Statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.

    We have previously audited, in accordance with standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Archstone–Smith Operating Trust as of December 31, 2006, and the related consolidated statements of earnings, unitholders' equity, other common unitholders' interest and comprehensive income (loss), and cash flows for the year then ended (not presented herein); and in our report dated March 1, 2007, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2006 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ KPMG LLP

Denver, Colorado
November 9, 2007

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following information should be read in conjunction with Archstone−Smith Operating Trust's 2006 Form 10−K as well as the financial statements and notes included in Item 1 of this report.

*Forward−Looking Statements*

*This Form 10−Q contains forward−looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements are based on current expectations, estimates and projections about the industry, markets in which Archstone−Smith operates, management's beliefs, assumptions made by management and the transactions described in this Form 10−Q. While Archstone−Smith management believes the assumptions underlying its forward−looking statements and information are reasonable, such information is necessarily subject to uncertainties and may involve certain risks, many of which are difficult to predict and are beyond management's control. These risks include, but are not limited to: (1) the ability to recognize the benefits of the merger; (2) the amount of the costs, fees, expenses and charges related to the merger and the actual terms of certain financings that will be obtained for the merger; and (3) the impact of the substantial indebtedness incurred to finance the consummation of the merger; and other risks that are set forth under "Risk Factors" in the Operating Trust's 2006 Form 10−K. All forward−looking statements speak only as of the date of this filing or, in the case of any document incorporated by reference, the date of that document. All subsequent written and oral forward−looking statements attributable to us or any person acting on our behalf are qualified by the cautionary statements in this section. We undertake no obligation to update or publicly release any revisions to forward−looking statements to reflect events, circumstances or changes in expectations after the date of this Form 10−Q.*

*Consummation of Agreement to be Acquired*

On May 29, 2007, Archstone−Smith announced it had signed the Merger Agreement, whereby both Archstone−Smith and the Operating Trust would be acquired by the Buyer Parties. The transactions contemplated by the Merger Agreement were consummated on October 4 and 5, 2007. As a result of the transactions contemplated by the Merger Agreement, the sole trustee of the Operating Trust, effective as of October 5, 2007, is the Series I Trust, which along with Series II Trust and Series III Trust owns 100% of the Operating Trust's outstanding Common Units.

Under the terms of the Merger Agreement, all outstanding Common Shares of Archstone−Smith were acquired by the Series I Trust, the Series II Trust and the Series III Trust for $60.75 in cash, without interest and less applicable withholding taxes, for each Common Share issued and outstanding immediately prior to the effective time of the merger. With respect to the outstanding Series I Preferred Shares, the Buyer Parties elected to replace them with substantially identical Series I Preferred Shares of the Series I Trust.

As part of the transaction, the Operating Trust merged on October 4, 2007 with River Trust Acquisition (MD), LLC, a subsidiary of the Buyer Parties ("MergerSub"). Although the Operating Trust is the surviving entity, MergerSub is viewed as the acquiror for accounting purposes. Each Class A−2 Common Unit remains outstanding. Approximately 4.5 million Class A−1 Common Units, held by more than 300 holders, were converted into the right to receive an equivalent number of newly issued Series O Preferred Units, whereas holders of approximately 21.6 million Class A−1 Common Units elected to exchange their Class A−1 Common Units for cash consideration of $60.75 without interest and less applicable withholding taxes. Each Series O Preferred Unit has a redemption price of $60.75 and bears cumulative preferential distributions payable quarterly at an annual rate of 6%. The distribution rate will increase to 8% per annum under certain circumstances, including during any period when the ratio of total debt to total assets exceeds 0.85 to 1.00. The Series I Preferred Units, which have only limited voting rights, are redeemable by the holder or the Operating Trust under certain circumstances. The Series I Preferred Units remain outstanding and unchanged. Each Series M Preferred Unit and each Series N−1 and N−2 Convertible Preferred Unit was converted into the right to receive one newly issued Series P Preferred Unit, Series Q−1 Preferred Unit and Series Q−2 Preferred Unit, respectively, of the Operating Trust.

Further, immediately after the effective time of the Operating Trust merger, the Buyer Parties caused the Operating Trust to make certain material asset distributions to Archstone−Smith. In connection with the transaction, the Operating Trust distributed approximately $2.9 billion of real estate and the corresponding liabilities to affiliated entities.

26

*The Company*

We are engaged primarily in the acquisition, development, redevelopment, operation and long−term ownership of apartment communities in the United States. Archstone−Smith is structured as an UPREIT, with all property ownership and business operations conducted through the Operating Trust. Archstone−Smith was the sole trustee and owned approximately 89.5% of our Common Units at September 30, 2007. Archstone−Smith Common Shares traded on the New York Stock Exchange (NYSE: ASN) through October 5, 2007. As a result of the consummation of the transactions contemplated by the Merger Agreement, the sole trustee of the Operating Trust is now the Series I Trust, which together with Series II Trust and Series III Trust owns 100% of the Operating Trust Common Units.

**Results of Operations**

*Executive Summary*

The major factors that influenced our operating results for the quarter ended September 30, 2007 as compared to the quarter ended September 30, 2006 were as follows:

- NOI decreased due primarily to net dispositions and the formation of the International Fund. These decreases were partially offset by a 6.1% increase in NOI from our Same−Store communities and an increase in lease−up activity.

- Other income decreased in 2007 due to Ameriton land sale gains recorded in 2006.

- General and administrative expenses increased principally as a result of our international expansion, higher payroll−related costs and professional expenses.

- Other expense was higher in 2007 due principally to transaction costs related to the merger that were incurred in 2007.

- Earnings from unconsolidated entities were lower in 2007 primarily due to gains on sale of joint venture assets in 2006 and initial formation costs for the International Fund.

- Other non−operating income increased due to foreign currency gains recognized on our international investments and a $14.0 million gain recognized on the sale of International Fund shares.

- The increase in gains on disposition of real estate was driven principally by higher transaction volume and significantly larger average gains per transaction in REIT dispositions in 2007.

The major factors that influenced our operating results for the nine months ended September 30, 2007 as compared to the nine months ended September 30, 2006 were as follows:

- NOI increased due primarily to a 5.1% increase in NOI for our Same−Store communities as well as the DeWAG transaction that occurred in July 2006. These increases were partially offset by net dispositions of operating communities and formation of the International Fund effective July 1, 2007.

- Other income decreased in 2007 due to gains on the sale of land in 2006 and higher recoveries from moisture infiltration and hurricane damage claims in 2006.

- Interest expense increased due to the interest charge related to our international business that began material operations in July 2006, as well as higher borrowings on our lines of credit which carry a higher effective interest rate as compared to our long−term debt and mortgages. These increases were partially offset by the impact of deconsolidation of our international operations effective July 1, 2007.

- General and administrative expenses increased principally as a result of our international expansion, higher payroll−related costs and professional expenses.

- Other expense was lower in 2007 due principally to higher income tax expenses in 2006 relating to Ameriton dispositions. These decreases were partially offset by a $10.1 million charge for transaction costs related to the proposed merger that were incurred in 2007.

27

- Earnings from unconsolidated entities were lower in 2007 primarily due to gains on the sale of a joint venture asset in 2006 and initial formation costs for the International Fund.

- Other non-operating income increased due to foreign currency gains recognized on our international investments and gains recognized on the sale of International Fund shares.

- The increase in gains on disposition of real estate was driven principally by larger average gains per transaction on REIT dispositions partially offset by lower Ameriton gains in 2007.

*Reconciliation of Quantitative Summary to Condensed Consolidated Statements of Earnings*

The following schedules are provided to reconcile our Condensed Consolidated Statements of Earnings to the information presented in the "Quantitative Summary" provided in the next section (in thousands).

| | Three Months Ended September 30, 2007 | | | Three Months Ended September 30, 2006 | | |
|---|---|---|---|---|---|---|
| | Continuing Operations | Discontinued Operations | Total | Continuing Operations | Discontinued Operations | Total |
| Rental revenue | $ 282,158 | $ 14,894 | $ 297,052 | $ 244,704 | $ 61,831 | $ 306,535 |
| Other income | 15,243 | — | 15,243 | 27,299 | — | 27,299 |
| Property operating expenses (rental expenses and real estate taxes) | (93,237) | (5,848) | (99,085) | (80,856) | (24,344) | (105,200) |
| Depreciation on real estate investments | (68,416) | (375) | (68,791) | (57,000) | (12,659) | (69,659) |
| Interest expense | (70,744) | (3,301) | (74,045) | (60,163) | (13,877) | (74,040) |
| General and administrative expenses | (21,601) | — | (21,601) | (18,497) | — | (18,497) |
| Other income/(expense) | (5,578) | (2,787) | (8,365) | (4,734) | 667 | (4,067) |
| Income/(loss) from unconsolidated entities | (4,542) | — | (4,542) | 2,088 | — | 2,088 |
| Other non-operating income | 26,488 | — | 26,488 | 1,718 | — | 1,718 |
| Gains, net of disposition costs | — | 336,685 | 336,685 | — | 83,934 | 83,934 |
| Net earnings | $ 59,771 | $ 339,268 | $ 399,039 | $ 54,559 | $ 95,552 | $ 150,111 |

| | Nine Months Ended September 30, 2007 | | | Nine Months Ended September 30, 2006 | | |
|---|---|---|---|---|---|---|
| | Continuing Operations | Discontinued Operations | Total | Continuing Operations | Discontinued Operations | Total |
| Rental revenue | $ 827,305 | $ 77,470 | $ 904,775 | $ 667,213 | $ 214,693 | $ 881,906 |
| Other income | 44,406 | — | 44,406 | 57,100 | — | 57,100 |
| Property operating expenses (rental expenses and real estate taxes) | (276,222) | (28,343) | (304,565) | (210,100) | (85,378) | (295,478) |
| Depreciation on real estate investments | (205,710) | (8,154) | (213,864) | (166,760) | (45,752) | (212,512) |
| Interest expense | (210,360) | (16,973) | (227,333) | (150,402) | (49,475) | (199,877) |
| General and administrative expenses | (60,732) | — | (60,732) | (49,794) | — | (49,794) |
| Other expense | (12,571) | (6,891) | (19,462) | (15,923) | (21,895) | (37,818) |
| Income/(loss) from unconsolidated entities | (3,540) | — | (3,540) | 31,484 | — | 31,484 |
| Other non-operating income | 28,430 | — | 28,430 | 2,137 | — | 2,137 |
| Gains, net of disposition costs | — | 644,873 | 644,873 | — | 309,609 | 309,609 |
| Net earnings | $ 131,006 | $ 661,982 | $ 792,988 | $ 164,955 | $ 321,802 | $ 486,757 |

*Quantitative Summary*

This summary is provided for reference purposes and is intended to support and be read in conjunction with the narrative discussion of our results of operations. This quantitative summary includes all operating activities, including those classified as discontinued operations for GAAP reporting purposes. This information is presented to correspond with the manner in which we analyze the business. We generally reinvest disposition proceeds into new operating communities and developments and therefore believe it is most useful to analyze continuing and discontinued operations on a combined basis. The impact of communities classified as "discontinued operations" for GAAP reporting purposes is discussed separately in a later section under the caption "Discontinued Operations Analysis" (dollar amounts in thousands).

28

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Increase/ (Decrease) | 2007 | 2006 | Increase/ (Decrease) |
| Rental revenues: | | | | | | |
| Same–Store(1) | $ 232,071 | $ 219,855 | $ 12,216 | $ 633,004 | $ 598,361 | $ 34,643 |
| Non Same–Store and other | 57,535 | 65,848 | (8,313) | 214,198 | 238,535 | (24,337) |
| Ameriton | 3,294 | 3,293 | 1 | 9,758 | 16,959 | (7,201) |
| Non–multifamily | 2,505 | 2,848 | (343) | 6,025 | 9,378 | (3,353) |
| International | 1,647 | 14,691 | (13,044) | 41,790 | 18,673 | 23,117 |
| Total rental revenues | 297,052 | 306,535 | (9,483) | 904,775 | 881,906 | 22,869 |
| Property operating expenses (rental expenses and real estate taxes): | | | | | | |
| Same–Store(1) | 72,542 | 69,511 | 3,031 | 194,401 | 181,214 | 13,187 |
| Non Same–Store and other | 23,256 | 27,951 | (4,695) | 84,166 | 95,612 | (11,446) |
| Ameriton | 1,994 | 1,641 | 353 | 4,861 | 8,672 | (3,811) |
| Non–multifamily | 257 | 1,243 | (986) | 603 | 2,845 | (2,242) |
| International | 1,036 | 4,854 | (3,818) | 20,534 | 7,135 | 13,399 |
| Total property operating expenses | 99,085 | 105,200 | (6,115) | 304,565 | 295,478 | 9,087 |
| Net income (rental revenues less property operating expenses) | 197,967 | 201,335 | (3,368) | 600,210 | 586,428 | 13,782 |
| Margin (NOI/rental revenues): | 66.6% | 65.7% | 1.0% | 66.3% | 66.5% | (0.2)% |
| Average occupancy during period:(2) | 93.0% | 95.0% | (2.0)% | 93.0% | 94.9% | (1.9)% |
| Other income | 15,243 | 27,299 | (12,056) | 44,406 | 57,100 | (12,694) |
| Depreciation of real estate investments | 68,791 | 69,659 | (868) | 213,864 | 212,512 | 1,352 |
| Interest expense | 86,248 | 87,370 | (1,122) | 264,908 | 239,515 | 25,393 |
| Capitalized interest | 12,203 | 13,330 | (1,127) | 37,575 | 39,638 | (2,063) |
| Net interest expense | 74,045 | 74,040 | 5 | 227,333 | 199,877 | 27,456 |
| General and administrative expenses | 21,601 | 18,497 | 3,104 | 60,732 | 49,794 | 10,938 |
| Other expense | 8,365 | 4,067 | 4,298 | 19,462 | 37,818 | (18,356) |
| Earnings from continuing and discontinued operations | 40,408 | 62,371 | (21,963) | 123,225 | 143,527 | (20,302) |
| Equity in earnings/(loss) from unconsolidated entities | (4,542) | 2,088 | (6,630) | (3,540) | 31,484 | (35,024) |
| Other non–operating income (expense). | 26,488 | 1,718 | 24,770 | 28,430 | 2,137 | 26,293 |
| Gains on disposition of real estate investments, net of disposition costs | | | | | | |
| Taxable subsidiaries | 4,536 | 4,217 | 319 | 16,891 | 51,743 | (34,852) |
| REIT | 332,149 | 79,717 | 252,432 | 627,982 | 257,866 | 370,116 |
| Net earnings | $ 399,039 | $ 150,111 | $ 248,928 | $ 792,988 | $ 486,757 | $ 306,231 |

(1)            Reflects revenues and operating expenses for Same–Store communities that were owned on September 30, 2007 and fully operating during both of the comparison periods.

(2)            Does not include occupancy associated with properties owned by Ameriton, located in Germany or operated under the Oakwood Master Leases.

*Property–level operating results*

      We utilize NOI as the primary measure to evaluate our operating performance and for purposes of making decisions about resource allocations and assessing segment performance. We also believe NOI is a valuable means of comparing period–to–period operating performance. In analyzing the performance of our operating portfolio, we evaluate Same–Store communities separately from Non Same–Store communities and other properties.

29

*Same−Store Analysis*

The following table reflects revenue, expense and NOI growth for Same−Store communities that were owned on September 30, 2007 and fully operating during each of the respective comparison periods.

| | Same−Store Revenue Growth | | Same−Store Expense Growth | | Same−Store NOI Growth | |
|---|---|---|---|---|---|---|
| | Q3 2007 vs. Q3 2006 | YTD 2007 vs. YTD 2006 | Q3 2007 vs. Q3 2006 | YTD 2007 vs. YTD 2006 | Q3 2007 vs. Q3 2006 | YTD 2007 vs. YTD 2006 |
| Garden | 5.5% | 6.3% | 5.0% | 7.4% | 5.7% | 5.9% |
| High−Rise | 5.7% | 5.0% | 3.6% | 7.1% | 6.7% | 4.1% |
| Average | 5.6% | 5.8% | 4.4% | 7.3% | 6.1% | 5.1% |

Same−Store revenues were up 5.6% for the quarter ended September 30, 2007 as compared to the same period in 2006 due primarily to an increase in average rental revenue per unit, partially offset by lower occupancy. Same−Store expenses were up 4.4% for the quarter ended September 30, 2007 as compared to the same period in 2006, primarily due to higher real estate taxes and increased personnel costs. These changes in revenues and expenses resulted in an increase in Same−Store NOI of 6.1%, driven principally by strong growth in Seattle, the San Francisco Bay Area and the New York City Metropolitan Area, which collectively represent 34.0% of the company's portfolio.

Same−Store revenues were up 5.8% for the nine months ended September 30, 2007 as compared to the same period in 2006 due primarily to an increase in average rental revenue per unit. Same−Store expenses were up 7.3% for the nine months ended September 30, 2007 as compared to the same period in 2006, primarily due to higher insurance costs, real estate taxes and personnel costs. These changes in revenues and expenses resulted in an increase in Same−Store NOI of 5.1% driven principally by strong growth in Seattle, the San Francisco Bay Area, Southern California and the New York City Metropolitan Area which collectively represent 61.8% of the company's portfolio.

*Non Same−Store and Other Analysis*

The $3.6 million decrease in NOI in the Non Same−Store portfolio for the quarter ended September 30, 2007 as compared to the same period in 2006 is primarily attributable to a $26.4 million decrease related to community dispositions, offset by a $15.6 million increase related to acquisitions and a $7.1 million increase related to recently stabilized development communities and communities in lease−up.

The $12.9 million decrease in NOI in the Non Same−Store portfolio for the nine months ended September 30, 2007 as compared to the same period in 2006 is primarily attributable to a $70.7 million decrease related to community dispositions, offset by a $39.9 million increase related to acquisitions and a $17.7 million increase related to recently stabilized development communities and communities in lease−up.

*Ameriton*

The decrease in NOI from Ameriton apartment communities for the nine months ended September 30, 2007 as compared to the comparable period in the prior year is primarily attributable to dispositions.

*International*

The decrease in NOI of $9.2 million for the quarter ended September 30, 2007 is attributable to the contribution of the majority of our international operations to the International Fund on June 29, 2007. The results of those operations are now included in income from unconsolidated entities.

NOI for the nine months ended September 30, 2007 increased $9.7 million as compared to the same period in the prior year due to the DeWAG acquisition that occurred in July 2006. The increase was partially offset by a decrease related to the contribution of the majority of our international operations to the International Fund on June 29, 2007. The results of those operations are included in income from unconsolidated entities in the third quarter of 2007.

30

*Other Income*

Other income was lower for the quarter ended September 30, 2007 as compared to the same period in the prior year due to a decrease of $11.8 million related to higher 2006 land sales gains and a reduction of $5.1 million in interest income that resulted from lower cash balances in 2007, offset by $5.2 million in management fee income from the German management company.

Other income was lower for the nine months ended September 30, 2007 as compared to the same period in the prior year due to an $11.9 million decrease related to higher 2006 land sales gains and a $7.9 million decrease in insurance recoveries offset by a $5.2 million management fee increase from the German management company.

*Interest Expense*

Gross interest expense for the quarter ended September 30, 2007 decreased due to the interest charge related to our international operations that is now included in our equity in earnings from unconsolidated entities, offset by higher borrowings on our line of credit which carries a higher effective interest rate, as compared to our long-term debt and mortgages.

Gross interest expense for the nine months ended September 30, 2007 increased due to the interest charge related to our international operations that began material operations in July 2006 as well as higher borrowings on our lines of credit which carry a higher effective interest rate as compared to our long-term debt and mortgages. These increases were partially offset by the impact of the deconsolidation of the majority of our international operations as of July 1, 2007.

*General and Administrative Expenses*

General and administrative expenses were higher for the three and nine months ended September 30, 2007 as compared to the same periods in 2006 due primarily to higher personnel-related costs associated with our international expansion that began material operations in July 2006 and higher payroll-related costs and professional fees.

*Other Expense*

Other expense for the quarter ended September 30, 2007 increased $4.3 million as compared to the same period in 2006 due principally to merger related costs.

Other expense for the nine months ended September 30, 2007 was lower as compared to the same period in 2006 due principally to $20.2 million in tax expense in 2006 related to Ameriton dispositions, $4.8 million in debt extinguishment costs related primarily to prior year dispositions and a $4.3 million impairment charge related to an asset that we sold in 2006. These decreases were partially offset by a $10.1 million charge for transaction costs related to the merger.

*Equity in Earnings from Unconsolidated Entities*

Earnings from unconsolidated entities were lower for the three months ended September 30, 2007 as compared to the same period in 2006 primarily due to a $1.5 million decrease in gains on the sale of joint venture assets and initial formation costs for the International Fund.

Earnings from unconsolidated entities were lower for the nine months ended September 30, 2007 as compared to the same period in 2006 primarily due to a $22.9 million decrease in gains on the sale of joint venture assets and initial formation costs for the International Fund.

*Other Non-Operating Income*

Non-operating income was higher for the quarter and nine months ended September 30, 2007 due to foreign currency gains on our international investments and gains recognized on the sale of International Fund shares.

31

*Gains on Real Estate Dispositions*

See "Discontinued Operations Analysis" below for a discussion of gains.

*Discontinued Operations Analysis*

Included in the overall results discussed above are the following amounts associated with properties which have been sold or were classified as held-for-sale as of September 30, 2007 (dollar amounts in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Rental revenues | $  14,894 | $  61,831 | $  77,470 | $  214,693 |
| Rental expenses | (4,655) | (17,984) | (20,224) | (59,694) |
| Real estate taxes | (1,193) | (6,360) | (8,119) | (25,684) |
| Depreciation on real estate investments | (375) | (12,659) | (8,154) | (45,752) |
| Interest expense(1) | (3,301) | (13,877) | (16,973) | (49,475) |
| Income taxes from taxable REIT subsidiaries | (1,244) | 1,492 | (4,354) | (9,979) |
| Provision for possible loss on real estate investment | — | | — | (4,328) |
| Debt extinguishment costs related to dispositions | (1,543) | (825) | (2,537) | (7,588) |
| Gains on disposition of real estate investments, net of disposition costs: | | | | |
| Taxable subsidiaries | 4,536 | 4,217 | 16,891 | 51,743 |
| REIT | 332,149 | 79,717 | 627,982 | 257,866 |
| Total discontinued operations | $  339,268 | $  95,552 | $  661,982 | $  321,802 |
| Number of communities sold during the period | 8 | 5 | 26 | 28 |
| Number of sold communities included in discontinued operations NOI | 8 | 43 | 26 | 67 |
| Number of communities classified as held-for-sale and included in discontinued operations NOI as of September 30, 2007 | 6 | 5 | 6 | 5 |

(1)          Interest expense included in discontinued operations is allocated to properties based on each asset's cost in relation to the company's leverage ratio and the average effective interest rate for each respective period.

As a result of the execution of our strategy of managing our invested capital through the selective sale of apartment communities and redeploying the proceeds to fund investments with higher anticipated growth prospects, we had significant disposition activity in both 2007 and 2006. The resulting gains, net of disposition costs, including those from Ameriton, were the biggest drivers of overall earnings from discontinued operations. NOI related to communities sold or classified as held-for-sale was higher in 2006 as compared to 2007 as assets we sold were owned longer in 2006 than 2007. Direct operating expenses, depreciation and allocated interest expense are generally proportional to the net operating income of communities included in discontinued operations for each period. For the quarter ended September 30, 2007, the number of REIT dispositions and the relative size of the corresponding gain were significantly higher than the same period in 2006. For the nine months ended September 30, 2007, although the number of REIT dispositions was lower, the relative size of the gains was significantly higher than the same period in 2006.

**Liquidity and Capital Resources**

We generally finance a portion of our long-term investing and operating activities with long-term debt. In connection with the recent merger, we paid off most of our debt and entered into several new credit agreements to finance a significant portion of the transaction. The leverage ratios and interest rates on the new credit facilities are generally higher. As a result of the significant cash flow generated by our operations, the available capacity under new or existing credit facilities and other new term loans, available cash balances, proceeds from the disposition of real estate or from joint venture formations and our demonstrated ability to secure financing, we believe our liquidity and financial condition are sufficient to meet all of our reasonably anticipated cash flow needs during the next 12 months. Please refer to the Condensed Consolidated Statements of Cash Flows for detailed information of our sources and uses of cash for the nine months ended September 30, 2007 and 2006.

*Scheduled Debt Maturities and Interest Payment Requirements*

On October 5, 2007 we borrowed approximately $13.7 billion under various credit facilities with third party lenders to, among other things, finance a portion of the cost of the Merger and refinance a portion of our existing indebtedness.

One of the credit facilities, with Lehman Brothers Inc., Banc of America Securities LLC, Bank of America, N.A., Barclays Capital Real Estate Inc., and Lehman Commercial Paper Inc., contains a $750 million revolving facility that can be used by us or certain of our affiliates, with a $75 million swing line and a letter of credit commitment with a maximum of $425 million for the first year, which decreases thereafter. The revolving credit facility bears interest at LIBOR plus 3.00% and has a maturity date of October 5, 2011. This facility also includes a $1.75 billion term loan maturing on October 5, 2011, bearing interest at LIBOR plus 3.00% and a $3.029 billion term loan maturing on October 5, 2012, bearing interest at LIBOR plus 3.25%. The swing line bears interest at 2.00% plus the greater of (a) the prime rate or (b) the federal funds rate plus 1/2%. The credit agreement for this facility has not been finalized and is therefore subject to change. We expect that the final agreement will contain customary terms, including customary financial and other covenant requirements, including specific leverage ratios and debt service coverage ratios as well as minimum levels of tangible net worth.

Additionally, we have a $7.1 billion facility provided by the Federal National Mortgage Association ("Fannie Mae"), which is secured by 105 of our properties. This facility is divided into 9 loan pools. Pools 1 through 3, totaling $2.5 billion, mature on November 1, 2017 and bear interest at 6.256%. Pool 4, totaling $963.5 million, matures on November 1, 2014, and bears interest at 5.883%. Pools 5 through 7, totaling $2.3 billion, matures on November 1, 2012 and bears interest at 6.193%. Pools 8 and 9, totaling $1.3 billion, matures on November 1, 2009 and bears interest at LIBOR plus 1.265%. In addition to the Fannie Mae facility, Lehman Brothers Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc. (collectively, the "Fannie Mae Mezzanine Lenders"), have provided $768.9 million of mezzanine loans subordinate to each of the nine Fannie Mae pools. The anticipated interest rates on these mezzanine loans range from 7.350% to 7.860%. The Fannie Mae Mezzanine Lenders intend to distribute these mezzanine loans post–closing to various other debt providers. We also have an $847 million facility provided by the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which is secured by 13 of our properties. This facility matures on November 1, 2012 and bears interest at LIBOR plus 1.01%. In addition to the Freddie Mac facility, Lehman Brothers Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc. (collectively, the "Freddie Mac Mezzanine Lenders"), have provided $135.4 million of mezzanine loans subordinate to the Freddie Mac facility. The anticipated interest rate on this mezzanine loan is 7.75%. The Freddie Mac Mezzanine Lenders intend to distribute this mezzanine loan post–closing to various other debt providers.

On November 1, 2007, the revolver portion of our unsecured credit facilities was undrawn, and we had $151 million outstanding under letters of credit, leaving available borrowing capacity on the revolving portion of our unsecured credit facilities of $599 million. We also had cash invested of $158 million, which combined with our revolving credit capacity provided for $757 million in available liquidity. On November 1, 2007, we had $7.1 billion borrowed under the Fannie Mae facility and $847 million borrowed under the Freddie facility.

Our debt instruments generally contain covenants common to the type of facility or borrowing, including financial covenants establishing minimum debt service coverage ratios and maximum leverage ratios. We were in compliance with all financial covenants pertaining to our debt instruments as of and for the nine–month period ended September 30, 2007.

*Unitholder Distribution Requirements*

From January 1, 2007 to September 30, 2007, we paid distributions and dividends of $230.7 million. This amount represents distributions on our Common and Preferred Units. Pursuant to the Merger Agreement, we did not declare any regular dividends or distributions on Common Units after May 16, 2007.

*Planned Investments*

Following is a summary of planned investments as of September 30, 2007, including Ameriton, but excluding joint ventures. The amounts labeled "Discretionary" represent future investments that we plan to make, although there is not a contractual commitment to do so. The amounts labeled "Committed" represent the approximate amount that we are contractually committed to fund for communities under construction in accordance with construction contracts with general contractors.

| | Planned Investments (in thousands) | |
| --- | --- | --- |
| | Discretionary | Committed |
| Communities under redevelopment | $ 1,149 | $ 2,642 |
| Communities under construction | — | 606,783 |
| Communities In Planning and owned | 1,743,240 | — |
| Communities In Planning and Under Control | 813,296 | — |
| Community acquisitions under contract | 205,500 | — |
| FHA/ADA settlement capital accrual | — | 16,103 |
| Total | $ 2,763,185 | $ 625,528 |

In addition to the planned investments noted above, we expect to make additional investments relating to planned expenditures on recently acquired communities as well as recurring expenditures to improve and maintain our established operating communities.

We anticipate completion of most of the communities that are currently under construction and the planned operating community improvements by the end of 2010. No assurances can be given that communities we do not currently own will be acquired or that planned developments will actually occur. In addition, actual costs incurred could be greater or less than our current estimates.

*Funding Sources*

We anticipate financing our planned investment and operating needs primarily with cash flow from operating activities, disposition proceeds, joint venture formations and borrowings under new or existing credit facilities and term loans. At November 1, 2007, we had $750 million in available capacity on our revolving facilities. In addition, we expect the proceeds from REIT dispositions to approximate or exceed our investment in new Operating Trust operating community acquisitions in 2007. We therefore do not believe that discontinued operations will have an adverse impact on our liquidity in the foreseeable future.

*Litigation and Contingencies*

On May 30, 2007, two separate purported shareholder class−action lawsuits related to the Merger Agreement and the transactions contemplated thereby were filed naming the company and each of the company's trustees as defendants. One of these lawsuits, *Seymour Schiff v. James A. Cardwell, et al.* (Case No. 2007cv1135), was filed in the United States District Court for the District of Colorado. The other, *Mortimer J. Cohen v. Archstone−Smith Trust, et al.* (Case No. 2007cv1060), was filed in the District Court, County of Arapahoe, Colorado. On May 31, 2007, two additional purported shareholder class−action lawsuits related to the Merger Agreement and the transactions contemplated thereby were filed in the District Court, County of Arapahoe, Colorado. The first, *Howard Lasker v. R. Scot Sellers, et al.* (Case No. 2007cv1073), names the company, each of the company's trustees and one of the company's senior officers as defendants. The second, *Steamship Trade Association/International Longshoremen's Association Pension Fund v. Archstone−Smith Trust, et al.* (Case No. 2007cv1070), names the company, each of the company's trustees, Tishman Speyer and Lehman Brothers as defendants. On June 11, 2007, an additional purported shareholder class−action lawsuit related to the Merger Agreement, *Doris Staehr v. Archstone−Smith Trust, et al.* (Case No. 2007cv1081), was filed in the District Court, County of Arapahoe, Colorado, naming the company and each of the company's trustees as defendants. All five lawsuits allege, among other things, that the company's trustees violated their fiduciary duties to the company's shareholders in approving the mergers.

On June 21, 2007, the District Court, County of Arapahoe, Colorado entered an order consolidating the *Lasker, Steamship Trade Association/International Longshoremen's Association Pension Fund* and *Staehr* actions into the *Cohen* action, under the caption *In re Archstone−Smith Trust Shareholder Litigation.*

On August 17, 2007, we and the other defendants entered into a memorandum of understanding with the plaintiffs regarding the settlement of both the *Schiff* and the consolidated action captioned *In re Archstone−Smith Trust Shareholder Litigation.* In connection with the settlement, we agreed to make certain additional disclosures to our shareholders. Subject to the completion of certain confirmatory discovery by counsel to the plaintiffs, the memorandum of understanding contemplates that the parties will enter into a stipulation of settlement. The stipulation of settlement will be subject to customary conditions, including court approval following notice to our shareholders and consummation of the merger. In the event that the parties enter into a stipulation of settlement, a hearing will be scheduled at which the court will consider the fairness, reasonableness and adequacy of the settlement, which, if finally approved by the court, will resolve all of the claims that were or could have been brought in the actions being settled, including all claims relating to the merger, the merger agreement and any disclosure made in connection therewith. In addition, in connection with the settlement, the parties contemplate that plaintiffs' counsel will petition the court for an award of attorneys' fees and expenses to be paid by us, up to an agreed−upon limit. There can be no assurance that the parties will ultimately enter into a stipulation of settlement or that the court will approve the settlement even if the parties were to enter into such stipulation. In such event, the proposed settlement as contemplated by the memorandum of understanding may be terminated. The settlement will not affect the amount of the merger consideration that the plaintiffs are entitled to receive in the merger. We and the other defendants vigorously deny all liability with respect to the facts and claims alleged in the lawsuits, and specifically deny that any modifications to the Merger Agreement or any further supplemental disclosure was required under any applicable rule, statute, regulation or law. However, to avoid the risk of delaying or adversely affecting the merger and the related transactions, to minimize the expense of defending the lawsuits, and to provide additional information to our shareholders at a time and in a manner that would not cause any delay of the merger, we and our trustees agreed to the settlement described above. We and the other defendants further considered it desirable that the actions be settled to avoid the substantial burden, expense, risk, inconvenience and distraction of continued litigation and to fully and finally resolve the settled claims.

During the second quarter of 2005, we entered into a full and final settlement in the United States District Court for the District of Maryland with three national disability organizations and agreed to make capital improvements in a number of our communities in order to make them fully compliant with the FHA and ADA. The litigation, settled by this agreement, alleged lack of full compliance with certain design and construction requirements under the two federal statutes at 71 of the company's wholly−owned and joint venture communities, of which we still own or have an interest in 40. As part of the

34

settlement, the three disability organizations all recognized that the Operating Trust had no intention to build any of its communities in a manner inconsistent with the FHA or ADA.

The amount of the capital expenditures required to remediate the communities named in the settlement was estimated at $47.2 million and was accrued as an addition to real estate during the fourth quarter of 2005. The settlement agreement approved by the court allows us to remediate each of the designated communities over a three−year period, and also provides that we are not restricted from selling any of our communities during the remediation period. We agreed to pay damages totaling $1.4 million, which included legal fees and costs incurred by the plaintiffs. We had $16.1 million of the original accrual remaining on September 30, 2007.

We are subject to various claims filed in 2002 and 2003 in connection with moisture infiltration and resulting mold issues at certain High−Rise properties we once owned in Southeast Florida. These claims generally allege that water infiltration and resulting mold contamination resulted in the claimants having personal injuries and/or property damage. Although certain of these claims continue to be in various stages of litigation, with respect to the majority of these claims, we have either settled the claims and/or we have been dismissed from the lawsuits that had been filed. With respect to the lawsuits that have not been resolved, we continue to defend these claims in the normal course of litigation.

We are a party to various other claims and routine litigation arising in the ordinary course of business. We do not believe that the results of any such claims or litigation, individually or in the aggregate, will have a material adverse effect on our business, financial position or results of operations.

**Critical Accounting Policies**

We define critical accounting policies as those accounting policies that require our management to exercise their most difficult, subjective and complex judgments. Our management has discussed the development and selection of all of these critical accounting policies with our audit committee, and the audit committee has reviewed the disclosure relating to these policies. Our critical accounting policies relate principally to the following key areas:

*Internal Cost Capitalization*

We have an investment organization that is responsible for development and redevelopment of apartment communities. Consistent with GAAP, all direct and certain indirect costs, including interest and real estate taxes, incurred during development and redevelopment activities are capitalized. Interest is capitalized on real estate assets that require a period of time to get them ready for their intended use. The amount of interest capitalized is based upon the average amount of accumulated development expenditures during the reporting period. Included in capitalized costs are management's estimates of the direct and incremental personnel costs and indirect project costs associated with our development and redevelopment activities. Indirect project costs consist primarily of personnel costs associated with construction administration and development accounting, legal fees, and various office costs that clearly relate to projects under development. Because the estimation of capitalizable internal costs requires management's judgment, we believe internal cost capitalization is a "critical accounting estimate."

If future accounting rules limit our ability to capitalize internal costs or if our development activity decreased significantly without a proportionate decrease in internal costs, there could be an increase in our operating expenses.

*Valuation of Real Estate*

Long−lived assets to be held and used are carried at cost and evaluated for impairment when events or changes in circumstances indicate such an evaluation is warranted. We also evaluate assets for potential impairment when we deem them to be held−for−sale. Valuation of real estate is considered a "critical accounting estimate" because the evaluation of impairment and the determination of fair values involve a number of management assumptions relating to future economic events that could materially affect the determination of the ultimate value, and therefore, the carrying amounts of our real estate. Furthermore, decisions regarding when a property should be classified as held−for−sale under SFAS No. 144 requires significant management judgment. There are many phases to the disposition process ranging from the initial market research to being under contract with non−refundable earnest money to closing. Deciding when management is committed to selling an asset is therefore highly subjective.

When determining if there is an indication of impairment for assets intended to be held and used, we estimate the asset's NOI over the anticipated holding period on an undiscounted cash flow basis and compare this amount to its carrying value. Estimating the expected NOI and holding period requires significant management judgment. If it is determined that

35

there is an indication of impairment for assets to be held and used, or if an asset is deemed to be held–for–sale, we then determine the fair value of the asset.

The apartment industry uses capitalization rates as the primary measure of fair value. Specifically, annual NOI for a community is divided by an estimated capitalization rate to determine the fair value of the community. Determining the appropriate capitalization rate requires significant judgment and is typically based on many factors including the prevailing rate for the market or submarket, as well as the quality and location of the properties. Further, capitalization rates can fluctuate up or down due to a variety of factors in the overall economy or within local markets. If the actual capitalization rate for a community is significantly different from our estimated rate, the impairment evaluation for an individual asset could be materially affected.

### Capital Expenditures and Depreciable Lives

We incur costs relating to redevelopment initiatives, revenue–enhancing and expense–reducing capital expenditures, and recurring capital expenditures that are capitalized as part of our real estate. These amounts are capitalized and depreciated over estimated useful lives determined by management. We allocate the cost of newly acquired properties between net tangible and identifiable intangible assets. The primary intangible asset associated with an apartment community acquisition is the value of the existing lease agreements. When allocating cost to an acquired property, we first allocate costs to the estimated intangible value of the existing lease agreements and then to the estimated value of the land, building and fixtures assuming the property is vacant. We estimate the intangible value of the lease agreements by determining the lost revenue associated with a hypothetical lease–up. We depreciate the building and fixtures based on the expected useful life of the asset and amortize the intangible value of the lease agreements over the average remaining life of the existing leases.

Determining whether expenditures meet the criteria for capitalization, the assignment of depreciable lives and determining the appropriate amounts to allocate between tangible and intangible assets for property acquisitions requires our management to exercise significant judgment and is therefore considered a "critical accounting estimate."

### Pursuit Costs

We incur costs relating to the potential acquisition of existing operating communities or land for development of new operating communities, which we refer to as pursuit costs. To the extent that these costs are identifiable with a specific property and would be capitalized if the property were already acquired, the costs are accumulated by project and capitalized in the Other Asset section of the balance sheet. If these conditions are not met, the costs are expensed as incurred. Capitalized costs include but are not limited to earnest money, option fees, environmental reports, traffic reports, surveys, photos, blueprints, direct and incremental personnel costs and legal costs. Upon acquisition, the costs are included in the basis of the acquired property. When it becomes probable that a prospective acquisition will not be acquired, the accumulated costs for the property are charged to Other Expense on the statement of earnings in the period such a determination is made.

Because of the inherent judgment involved in evaluating whether a prospective property will ultimately be acquired, we believe capitalizable pursuit costs are a "critical accounting estimate."

### Consolidation vs. Equity Method of Accounting for Ventures

From time to time, we make co–investments in real estate ventures with third parties and are required to determine whether to consolidate or use the equity method of accounting for the venture. FASB Interpretation No. 46R, "*Consolidation of Variable Interest Entities,*" (as revised) and Emerging Issues Task Force issued EITF No. 04–5, "*Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights,*" are the two primary sources of accounting guidance in this area. Appropriate application of these relatively complex rules requires substantial management judgment, which we believe, makes the choice of the appropriate accounting method for these ventures a "critical accounting estimate."

## Off Balance Sheet Arrangements

Our real estate investments in entities that do not qualify as variable interest entities, variable interest entities where we are not the primary beneficiary and entities we do not control through majority economic interest are not consolidated and are reported as investments in unconsolidated entities. Our investments in and advances to unconsolidated entities at September 30, 2007 aggregated $562.5 million. Please refer to Note 5 to the financial statements included in this report, *Investments in and Advances to Unconsolidated Entities,* for additional information.

36

**Contractual Commitments**

Please refer to "Scheduled Debt Maturities and Interest Payment Requirements" and "Planned Investments" above for further discussion of significant contractual commitments.

**Item 3.   Quantitative and Qualitative Disclosures about Market Risk**

During the quarter ended September 30, 2007, there was no material change in the qualitative or quantitative disclosures regarding our market risk. For detailed information about the qualitative and quantitative disclosures of our market risk, see Item 7A in our 2006 Form 10−K.

**Item 4.   Controls and Procedures**

*Disclosure Controls and Procedures*

An evaluation was carried out under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a−15(e) under the Securities Exchange Act of 1934). Based on their evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective, to the best of their knowledge, as of September 30, 2007.

*Changes in Internal Control over Financial Reporting*

There has been no change to our internal control over financial reporting during the quarter ended September 30, 2007 that has materially affected or is reasonably likely to materially affect our internal control over financial reporting.

37

## PART II — OTHER INFORMATION

**Item 1.   Legal Proceedings**

We are party to various claims and routine litigation arising in the ordinary course of business. We do not believe that the results of any such claims and litigation, individually or in the aggregate, will have a material adverse effect on our business, financial position or results of operations. See Note 11 to the financial statements included in this report.

**Item 1A. Risk Factors**

See the factors discussed in Part 1, "Item 1.A. Risk Factors" in our 2006 Form 10–K.

**Item 2.   Unregistered Sales of Equity Securities and Use of Proceeds**

During the nine months ended September 30, 2007, we issued 18,081 Common Units in reliance upon the exemption provided by Section 4(2) of the Securities Act of 1933.

**Item 3.   Defaults Upon Senior Securities**

None.

**Item 4.   Submission of Matters to a Vote of Security Holders**

Archstone–Smith, as sole trustee of the Operating Trust and the majority Common Unitholder, approved the consummation of the transactions contemplated by the Merger Agreement by written consent.

**Item 5.   Other Information**

No other information is required to be disclosed for the period ended September 30, 2007 that has not been disclosed in a Current Report on Form 8–K. There has been no change to the procedures by which security holders may recommend nominees to our Board of Trustees.

**Item 6.   Exhibits**

See Exhibits.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

ARCHSTONE–SMITH OPERATING TRUST

BY: _____ /s/ R. SCOT SELLERS _____

R. Scot Sellers
*Chief Executive Officer*

BY: _____ /s/ CHARLES E. MUELLER, JR. _____

Charles E. Mueller, Jr.
*Chief Financial Officer*
*(Principal Financial Officer)*

BY: _____ /s/ ASH K. ATWOOD _____

Ash K. Atwood
*Group Vice President and Controller*
*(Principal Accounting Officer)*

Date: November 9, 2007

39

**Item 6.  Exhibits**

2.1   Agreement and Plan of Merger, dated as of May 28, 2007, by and among Archstone−Smith Trust, Archstone−Smith Operating Trust, River Holding, LP, River Acquisition (MD), LP, and River Trust Acquisition (MD), LLC (incorporated by reference to Exhibit 2.1 to the Current Report on Form 8−K filed by Archstone−Smith Trust with the SEC on June 1, 2007)

2.2   Amendment No. 1, dated as of August 5, 2007, to Agreement and Plan of Merger dated as of May 28, 2007, by and among Archstone−Smith Trust, Archstone−Smith Operating Trust, River Holding, LP, River Acquisition (MD), LP, and River Trust Acquisition (MD), LLC (incorporated by reference to Exhibit 2.1 to the Current Report on Form 8−K filed by Archstone−Smith Trust with the SEC on August 6, 2007)

3.1   Amended and Restated Declaration of Trust of Archstone−Smith Operating Trust (incorporated by reference to Exhibit 3.1 to the Archstone−Smith Operating Trust's Current Report on Form 8−K filed with the SEC on October 5, 2007)

3.2   Bylaws of Archstone−Smith Operating Trust (incorporated by reference to Exhibit 4.2 to Archstone−Smith Trust's Current Report on Form 8−K filed with the SEC on June 2, 2006)

3.4   Amendment No. 1 to Bylaws of Archstone−Smith Operating Trust (incorporated by reference to Exhibit 3.1 to the Archstone−Smith Trust's Current Report on Form 8−K filed with the SEC on June 1, 2007)

4.1   Fourth Supplemental Indenture, dated as of October 5, 2007, to the Indenture, dated as of February 1, 1994, by and between the Archstone−Smith Operating Trust and the U.S. Bank National Association, as supplemented by the First Supplemental Indenture, dated as of February 2, 1994, the Second Supplemental Indenture, dated as of August 2, 2004, and the Third Supplemental Indenture, dated as of July 14, 2006 (incorporated by reference to Exhibit 4.1 to Archstone−Smith Operating Trust's Current Report on Form 8−K, dated October 5, 2007)

10.1   Amended and Restated Declaration of Trust of Archstone−Smith Trust (incorporated by reference to Exhibit 3.1 to Archstone−Smith Trust's Current Report of Form 8−K filed with the SEC on June 2, 2006)

10.2   Restated Bylaws of Archstone−Smith Trust (incorporated by reference to Exhibit 3.2 to the Archstone−Smith Trust's Current Report on Form 8−K filed with the SEC on June 2, 2006)

10.3   Master Credit Facility Agreement, dated as of October 5, 2007, by and among certain subsidiaries of Archstone−Smith Operating Trust, as borrowers, and Lehman Brothers Holdings Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc., as initial lender, and assigned to the Federal National Mortgage Association.

10.4   Multifamily Note, dated as of October 5, 2007, by Tishman Speyer Archstone−Smith Woodland Park, L.P. for the benefit of Lehman Brothers Holdings Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc., as initial lender, and assigned to the Federal Home Loan Mortgage Corporation.

10.5   Cross−Collateralization Agreement, dated as of October 5, 2007, between Tishman Speyer Archstone−Smith Woodland Park, L.P. and Lehman Brothers Holdings Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc., as initial lender, and the trustee named therein, and assigned to the Federal Home Loan Mortgage Corporation.

10.6   Schedule of Cross−Collateralized Agreements and Promissory Notes (pursuant to Instruction 2 to Item 601 of Regulation S−K).

10.7   Mezzanine Loan A Agreement (Freddie Pool), dated as of October 5, 2007, by and among certain subsidiaries of Archstone−Smith Operating Trust, as borrowers, and Lehman Brothers Holdings Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc., as lender.

10.8   Mezzanine Loan B Agreement (Freddie Pool), dated as of October 5, 2007, by and among certain subsidiaries of Archstone−Smith Operating Trust, as borrowers, and Lehman Brothers Holdings Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc., as lender.

10.9   Mezzanine Loan A Agreement (Fannie Bucket 1), dated as of October 5, 2007, by and among certain subsidiaries of Archstone−Smith Operating Trust, as borrowers, and Lehman Brothers Holdings Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc., as lender.

10.10  Mezzanine Loan B Agreement (Fannie Bucket 1), dated as of October 5, 2007, by and among certain subsidiaries of Archstone−Smith Operating Trust, as borrowers, and Lehman Brothers Holdings Inc., Bank of America, N.A., and Barclays Capital Real Estate Inc., as lender.

10.11  Schedule of Additional Mezzanine Loans for the Fannie Portfolio (pursuant to Instruction 2 to Item 601 of Regulation S−K).

12.1   Computation of Ratio of Earnings to Fixed Charges

12.2   Computation of Ratio of Earnings to Combined Fixed Charges and Preferred Unit Distributions

31.1   Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes−Oxley Act of 2002

31.2   Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes−Oxley Act of 2002

32.1   Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes−Oxley Act of 2002

32.2   Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes−Oxley Act of 2002